# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND,
200 St. Paul Place
Baltimore, MD 21202

MINNESOTA,
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131

DISTRICT OF COLUMBIA,
400 6th Street NW
Washington, DC 20001

ARIZONA,
2005 North Central Avenue
Phoenix, Arizona 85004

CALIFORNIA,
300 S. Spring Street, Suite 1702
Los Angeles, California 90013

COLORADO,
1300 Broadway
Denver, CO 80203

CONNECTICUT,
165 Capitol Avenue
Hartford, CT 06106

DELAWARE,
820 N. French Street
Wilmington, DE 19801

HAWAII,
425 Queen Street
Honolulu, HI 96813

ILLINOIS,
115 South LaSalle Street, 35th Floor
Chicago, IL  60603

Case No.: 1:25-cv-

**COMPLAINT**

MASSACHUSETTS,
1 Ashburton Pl.
Boston, MA 02108

PEOPLE OF THE STATE OF MICHIGAN,
3030 W. Grand Blvd.
Ste. 9-600
Detroit, MI 48202

NEVADA,
555 E. Washington Ave.,
Las Vegas, NV 89101

NEW JERSEY,
25 Market Street
Trenton, NJ 08625

NEW MEXICO,
P.O. Drawer 1508
Santa Fe, NM  87504-1508

NEW YORK,
28 Liberty St.
New York, NY 10005

OREGON,
100 SW Market Street
Portland, OR 97201

RHODE ISLAND,
150 South Main Street
Providence, RI 02903

VERMONT,
109 State Street
Montpelier, VT 05609

WISCONSIN,
Post Office Box 7857
Madison, Wisconsin 53707

                    Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,
1400 Independence Avenue, S.W.,
Washington, DC 20250

BROOKE ROLLINS, *in her official Capacity
as Secretary of Agriculture*,
      1400 Independence Avenue, S.W.
      Room 214W, Whitten Building
      Washington, DC 20250

UNITED STATES DEPARTMENT OF
COMMERCE,
      1401 Constitution Avenue, N.W.
      Washington, DC 20230

HOWARD LUTNICK, *in his Official
Capacity as Secretary of Commerce*,
      1401 Constitution Avenue, N.W.
      Washington, DC 20230

UNITED STATES DEPARTMENT OF
DEFENSE,
      1000 Defense Pentagon
      Washington, DC 20301-1400

PETER HEGSETH, *in his Official Capacity
as Secretary of Defense*,
      1000 Defense Pentagon
      Washington, DC 20301-1400

UNITED STATES DEPARTMENT OF
EDUCATION,
      400 Maryland Avenue, S.W.
      Washington, DC 20202

LINDA MCMAHON, *in her Official
Capacity as Secretary of Education*,
      400 Maryland Avenue, S.W.
      Washington, DC 20202

UNITED STATES DEPARTMENT OF
ENERGY,
    1000 Independence Avenue, S.W.
    Washington, DC 20024

CHRISTOPHER WRIGHT, *in his Official
Capacity as Secretary of Energy*,
    1000 Independence Avenue, S.W.
    Washington, DC 20024

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
    200 Independence Avenue, S.W.
    Washington, D.C. 20201

ROBERT F. KENNEDY, JR.*, in his Official
Capacity as Secretary of Health and Human
Services*,
    200 Independence Avenue, S.W.
    Washington, DC 20201

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
    300 7th Street, S.W.
    Washington, DC 20201

KRISTI NOEM, *in her Official Capacity as
Secretary of Homeland Security*,
    300 7th Street, S.W.
    Washington, DC 20201

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
    451 7th Street, S.W.
    Washington, DC 20410

SCOTT TURNER, *in his Official Capacity as
Secretary of Housing and Urban
Developmen*t,
    451 7th Street, S.W.
    Washington, DC 20410

UNITED STATES DEPARTMENT OF
INTERIOR,
 1849 C Street, N.W.
 Washington, DC 20240

DOUGLAS BURGUM, *in his Official
Capacity as Secretary of the Interior*,
 1849 C Street, N.W.
 Washington, DC 20240

UNITED STATES DEPARTMENT OF
LABOR,
 200 Constitution Avenue, N.W.
 Washington, DC 20210

VINCE MICONE, *in his Official Capacity as
Acting Secretary of Labor*,
 200 Constitution Avenue, N.W.
 Washington, DC 20210

UNITED STATES DEPARTMENT OF
TRANSPORTATION,
 1200 New Jersey Avenue, S.E.
 Washington, DC 20590

SEAN DUFFY, *in his Official Capacity as
Secretary of the Transportation*,
 1200 New Jersey Avenue, S.E.
 Washington, DC 20590

UNITED STATES DEPARTMENT OF
TREASURY,
 1500 Pennsylvania Avenue, N.W.
 Washington, DC 20220

SCOTT BESSENT, *in his Official Capacity
as Secretary of the Treasury*,
 1500 Pennsylvania Avenue, N.W.
 Washington, DC 20220

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,
 810 Vermont Avenue, N.W.

Washington, DC 20420

DOUGLAS A. COLLINS, *in his Official Capacity as Secretary of the Veterans Affairs*,
    810 Vermont Avenue, N.W.
    Washington, DC 20420

CONSUMER FINANCIAL PROTECTION BUREAU,
    1700 G Street, N.W.
    Washington, DC 20520

RUSSELL VOUGHT, *in his Official Capacity as Acting Director of the Consumer Financial Protection Bureau*,
    1700 G Street, N.W.
    Washington, DC 20520

ENVIRONMENTAL PROTECTION AGENCY,
    1200 Pennsylvania Avenue, N.W.
    Washington, DC 20460

LEE ZELDIN, *in his Official Capacity as Administrator of the Environmental Protection Agency*,
    1200 Pennsylvania Avenue, N.W.
    Washington, DC 20460

FEDERAL DEPOSIT INSURANCE CORPORATION,
    550 17th Street, NW
    Washington, DC 20429

TRAVIS HILL, *in his Official Capacity as Acting Chairman of the Federal Deposit Insurance Corporation*,
    550 17th Street, NW
    Washington, DC 20429

GENERAL SERVICES ADMINISTRATION,
    1800 F Street, NW

Washington, DC 20405

STEPHEN EHIKIAN, *in his Official Capacity as Acting Administrator of the General Services Administration*,
    1800 F Street, NW
    Washington, DC 20405

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION,
    700 Pennsylvania Avenue, N.W.
    Washington, DC 20001

OFFICE OF PERSONNEL MANAGEMENT
    1900 E Street, N.W.
    Washington, DC 20415

CHARLES EZELL, *in his Official Capacity as Acting Director of the Office of Personnel Management*
    1900 E Street, N.W.
    Washington, DC 20415

SMALL BUSINESS ADMINISTRATION,
    409 3rd Street, SW
    Washington, DC 20416

KELLY LOEFLER, *in her Official Capacity as Administrator of the Small Business Administration*,
    409 3rd Street, SW
    Washington, DC 20416

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT,
    1300 Pennsylvania Avenue, NW
    Washington, DC 20004

MARCO RUBIO, *in his Official Capacities as Acting Administrator of the United States Agency for International Development and Archivist for the National Archives and Records Administration*,

1300 Pennsylvania Avenue, NW
Washington, DC 20004 ,

Defendants.

**INTRODUCTION**

1.      President Trump and his Administration have made no secret of their contempt for the roughly 2 million committed professionals who form the federal civil service. Nor have they disguised their plans to terminate vast numbers of civil servants, starting with tens of thousands of probationary employees. These large-scale, indiscriminate firings are not only subjecting the Plaintiff States and communities across the country to chaos. They are also against the law.

2.      Federal statutes and regulations set forth procedures that federal agencies must follow when conducting reductions in force ("RIFs"). Critically, these procedures require that federal agencies provide 60 days of advance notice to affected employees and to states, so that they have an opportunity to mitigate the harms of layoffs. Where an agency fails to provide such notice, the employees "may not be released."

3.      Over the past month, the new Administration has run roughshod over the RIF requirements. Specifically, as part of an effort to reduce the size of the federal workforce, the Office of Personnel Management ("OPM") has unlawfully directed federal agencies to conduct mass terminations of probationary employees, suddenly and without any advance notice. Defendants have followed through on this directive, firing employees by the hundreds and, in many instances, thousands— all without following the procedures for conducting RIFs and without providing notice to the affected employees or states.

4.      This campaign has inflicted immense harms on tens of thousands of probationary employees and their families. It has rendered them jobless without providing any advance notice

that might have given them an opportunity to seek other employment or even budget to prepare for the loss of income. As a result, many affected employees and their families are struggling to make ends meet—to pay rent, buy groceries, and care for their loved ones.

5.      This campaign is harming Plaintiff States, too. In addition to the informational and procedural injuries resulting from the deprivation of notice to which they were entitled, the lack of notice has impeded the ability of many Plaintiff States to support affected employees and thereby mitigate the financial and other impacts on state services. In fact, pursuant to federal statutory requirements, Plaintiff States operate rapid response teams that provide immediate services and resources to workers subject to mass layoffs. These services include job placement and job training services as well as connections to social services like unemployment insurance and health insurance. Because of Defendants' failure to adhere to the RIF notice procedures, many Plaintiff States have had to scramble and expend additional resources to identify even which agencies have conducted layoffs and which affected employees require support.

6.      Because of the lack of notice, many Plaintiff States have also faced increased administrative demands related to adjudicating unemployment claims; decreased tax revenues; and increased demands for social services. Some Plaintiff States have also lost the benefit of services provided by federal employees embedded within state agencies, without any time to prepare.

7.      To address these harms to Plaintiff States, this action seeks declaratory and injunctive relief requiring Defendants: to cease the RIFs of probationary employees that they have conducted unlawfully and without notice; to reinstate any probationary employees who were terminated as part of mass terminations on or after January 20, 2025; to refrain from separating any employees pursuant to a RIF prior to reinstatement of the unlawfully terminated probationary employees; and

to conduct any future RIFs in accordance with applicable laws and regulations, including providing required notices to Plaintiff States.

## I.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

9.     There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706 and the Court's equitable powers.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Maryland is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in Maryland.

## II.     PARTIES

11.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

12.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison. The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State. Minn. Stat. § 8.01.

13. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

14. Plaintiff the State of Arizona, represented by and through its Attorney General, is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Kristin K. Mayes. *See* Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

15. Plaintiff the State of California, represented by and through its Attorney General, is a sovereign state of the United States of America. California is represented by and through its chief legal officer Rob Bonta who is authorized to act on behalf of the State. Cal. Const. Art. V, § 13.

16. Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

17. Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

18.     Plaintiff the State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

19.     Plaintiff the State of Hawaiʻi, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

20.     Plaintiff the State of Illinois, represented by and through its attorney general, is a sovereign state of the United States of America. Illinois is presented by and through its chief legal officer, Kwame Raoul, who is authorized to pursue this action on behalf of the State of Illinois. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

21.     Plaintiff Massachusetts is a sovereign commonwealth in the United States of America. Massachusetts is represented by Attorney General Andrea Campbell, who is the chief law enforcement officer of Massachusetts, and brings this action on behalf of itself and its residents to protect the Commonwealth's sovereign, proprietary, and quasi-sovereign interests in the conservation and protection of its natural resources and the environment. *See* Mass. Const. Am. Art. 97; Mass. Gen. Laws, ch. 12, §§ 3 and 11D.

22.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

23.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. Minnesota is represented by and through its chief

legal officer, Attorney General Keith Ellison. The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State. Minn. Stat. § 8.01.

24.     Plaintiff the State of New Jersey, represented by and through its Attorney General, is a sovereign state of the United States of America. New Jersey is represented by and through its chief legal officer, Attorney General Matthew J. Platkin. The Attorney General is authorized to act in federal court on behalf of the State on matters of public concern.

25.     Plaintiff the State of Nevada is a sovereign state of the United States of America. Nevada is represented by and through its chief legal officer, Attorney General Aaron D. Ford. The Attorney General has the authority to file this suit to protect and secure the interests of the State. NRS 228.170.

26.     The State of New Mexico is a sovereign state of the United States of America. The Attorney General of New Mexico is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

27.     Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Letitia James is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

28.     Plaintiff the State of Oregon, represented by and through its Attorney General, is a sovereign state of the United States.  Oregon is represented by and through its chief legal officer, Dan Rayfield, who is authorized to act on behalf of the State.

29.     The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement

officer of Rhode Island and authorized to pursue this action on behalf of the State of Rhode Island. R.I. Gen. Laws § 42-9-6.

30.     Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, who is the State's chief legal officer and authorized to pursue this action on behalf of the State.  Vt. Stat. Ann. tit. 3, § 159.

31.     Plaintiff the State of Wisconsin is a sovereign state of the United States of America. The Attorney General of Wisconsin is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

32.     Defendant Department of Agriculture is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

33.     Defendant Brooke Rollins is the Secretary of the Department of Agriculture. As secretary, she is responsible for all actions taken by the agency. She is sued in her official capacity.

34.     Defendant Department of Commerce is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

35.     Defendant Howard Lutnick is the Secretary of the Department of Commerce. As Secretary, Defendant Lutnick is responsible for all actions taken by the agency. He is sued in his official capacity

36.     Defendant Department of Defense is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

37.     Defendant Pete Hegseth is the Secretary of the Department of Defense. As Secretary, Defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

38.     Defendant Department of Education is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

39.     Defendant Linda McMahon is the Secretary of the Department of Education. As Secretary, Defendant McMahon is responsible for all actions taken by the agency. She is sued in her official capacity.

40.     Defendant Department of Energy is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

41.     Defendant Chris Wright is the Secretary of the Department of Energy. As Secretary, Defendant Wright is responsible for all actions taken by the agency. He is sued in his official capacity.

42.     Defendant Department of Health and Human Services is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

43.     Defendant Robert F. Kennedy, Jr. is the Secretary of the Department of Health and Human Services. As Secretary, Defendant Kennedy is responsible for all actions taken by the agency. He is sued in his official capacity.

44.     Defendant Department of Homeland Security is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

45.     Defendant Kristi Noem is the Secretary of the Department of Homeland Security. As Secretary, Defendant Noem is responsible for all actions taken by the agency. She is sued in her official capacity.

46.     Defendant Department of Housing and Urban Development is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

47.     Defendant Scott Turner is the Secretary of the Department of Housing and Urban Development. As Secretary, Defendant Turner is responsible for all actions taken by the agency. He is sued in his official capacity.

48.     Defendant Department of the Interior is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

49.     Defendant Doug Burgum is the Secretary of the Interior. As Secretary, Defendant Burgum is responsible for all actions taken by the agency. He is sued in his official capacity.

50.     Defendant Department of Labor is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

51.     Defendant Vince Micone is the Acting Secretary of the Department of Labor. As Acting Secretary, Defendant Micone is responsible for all actions taken by the agency. He is sued in his official capacity.

52.     Defendant Department of Transportation is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

53.     Defendant Sean Duffy is the Secretary of the Department of Transportation. As Secretary, Defendant Duffy is responsible for all actions taken by the agency. He is sued in his official capacity.

54.     Defendant Department of the Treasury is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

55.     Defendant Scott Bessent is the Secretary of the Department of the Treasury. As Secretary, Defendant Bessent is responsible for all actions taken by the agency. He is sued in his official capacity.

56. Defendant Department of Veterans Affairs is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

57. Defendant Doug Collins is the Secretary of the Department of Veterans Affairs. As Secretary, Defendant Collins is responsible for all actions taken by the agency. He is sued in his official capacity.

58. Defendant Consumer Financial Protection Bureau is an agency within the meaning of 5 U.S.C. § 552(f).

59. Defendant Russ Vought is the Acting Director of the Consumer Financial Protection Bureau. As Acting Director, Defendant Vought is responsible for all actions taken by the agency. He is sued in his official capacity.

60. Defendant Environmental Protection Agency is an agency within the meaning of 5 U.S.C. § 552(f).

61. Defendant Lee Zeldin is the Administrator of the Environmental Protection Agency. As Administrator, Defendant Zeldin is responsible for all actions taken by the agency. He is sued in his official capacity.

62. Defendant Federal Deposit Insurance Corporation is an agency within the meaning of 5 U.S.C. § 552(f).

63. Defendant Travis Hill is the Acting Chairman of the Federal Deposit Insurance Corporation. As Acting Chairman, Defendant Hill is responsible for all actions taken by the agency. He is sued in his official capacity.

64. Defendant General Services Administration is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

65. Defendant Stephen Ehikian is the Acting Administrator of the General Services Administration. As Acting Administrator, Defendant Ehikian is responsible for all actions taken by the agency. He is sued in his official capacity.

66. Defendant National Archives and Record Administration is an agency within the meaning of 5 U.S.C. § 552(f).

67. Defendant Marco Rubio is the Acting Archivist for the National Archives and Records Administration. As Acting Archivist, Defendant Rubio is responsible for all actions taken by the agency. He is sued in his official capacity.

68. Defendant Office of Personnel Management is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

69. Defendant Charles Ezell is the Acting Director of the Office of Personnel Management. As Acting Director, Defendant Ezell is responsible for all actions taken by the agency. He is sued in his official capacity. Defendant Department of Health and Human Services is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

70. Defendant Small Business Administration is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

71. Defendant Kelly Loeffler is the Administrator of the Small Business Administration. As Administrator, Defendant Leoffler is responsible for all actions taken by the agency. She is sued in her official capacity.

72. Defendant United States Agency for International Development is an agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

73.     Defendant Marco Rubio is the Acting Administrator of the United States Agency for International Development. As Acting Administrator, Defendant Rubio is responsible for all actions taken by the agency. He is sued in his official capacity.

74.     Federal workers reside and work in each of the Plaintiff States. The Defendants have conducted—or have announced plans to imminently conduct—illegal RIFs by firing probationary employees in Plaintiff States without adhering to the statutory and regulatory requirements for conducting RIFs.

### III.     LEGAL FRAMEWORK

**A.     Probationary Employees**

75.     OPM's directive to agencies to terminate probationary employees *en masse* has swept up two categories of federal employees whose employment is governed by statute and regulation: probationary employees in the "competitive" service, and employees within their first two years of employment in the "excepted" service. Competitive service employees are hired through an open, competitive hiring process and excepted service employees are appointed through a non-competitive hiring process. Plaintiff States refer herein to all such employees as "probationary employees."

76.     Probationary employees in the competitive service are, with some exceptions, those who have been employed for less than one year. 5 U.S.C. § 7511(a)(1)(A)(ii); 5 C.F.R. § 315.801.

77.     Employees are appointed as "career" or "career-conditional employees" subject to completing the probationary period. 5 C.F.R. § 315.201(a).

78.     The probationary period provides the opportunity for the federal agency to assess the individual performance of the employee. Under governing OPM regulations, an agency "shall utilize the probationary period as fully as possible to determine the fitness of the employee and

shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a).

79.    Most employees in the excepted service are also subject to a statutory trial period of two years, which, like the probationary period in the competitive service, is intended to permit the agency to evaluate the employee's performance and fitness for long-term employment. 5 U.S.C. § 7511(a)(1)(C)(ii).

80.    Outside of the context of a RIF, federal agencies may lawfully terminate probationary employees for one of two reasons.

81.    First, a federal agency may lawfully terminate a probationary employee for reasons based on conditions arising before the employee's probationary appointment. 5 C.F.R. § 315.805.

82.    Second, a federal agency may lawfully terminate a probationary employee based on the agency's assessment of the employee's performance during the probationary period, pursuant to 5 C.F.R. § 315.804(a), which is entitled: "Termination of probationers for unsatisfactory performance or conduct."

83.    Under that regulation, "when an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action." 5 C.F.R. § 315.804(a). "The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." *Id.* Trial-period employees in the excepted service have the same notice rights when removed from their positions for performance reasons. 5 C.F.R. § 316.304.

**B.      RIF Requirements**

84.      Apart from terminations of probationary employees for conditions arising before their appointments or for unsatisfactory performance or conduct, federal agencies may only terminate probationary employees as part of an agency RIF.

85.      A reduction-in-force "is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions. A RIF is not an adverse action against a particular employee, but is directed solely at a position within an agency." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (citation omitted); *Schall v. U.S. Postal Serv.*, 73 F.3d 341, 344 (Fed. Cir. 1996) (similar).

86.      An agency must follow specific statutory directives in conducting a RIF, including following the retention preferences in the statute, giving preference to the retention of military veterans, and considering the employee's tenure and length of service. 5 U.S.C. § 3502(a)(1), (3).

87.      Congress delegated to OPM the authority to promulgate regulations that agencies must follow in implementing RIFs. 5 U.S.C. § 3502(a).

88.      Pursuant to that statutory authorization, and through notice-and-comment rulemaking, OPM has issued detailed regulations setting forth the procedures by which agencies must conduct RIFs. *See* 5 C.F.R. Part 351.

89.      All agencies of the federal government are required to comply with the RIF regulations whenever they "determine[] that a reduction [in] force is necessary." 5 C.F.R. § 351.204.

90.      The RIF regulations apply to employees in the competitive and excepted services. 5 C.F.R. § 351.202(a), (b).

91.      Probationary employees are expressly covered by the RIF regulations. 5 C.F.R. §§ 351.501(b)(2), 351.502(b)(2). Probationary employees are included in "group II" of three groups of employees, and may only be released, in order of retention, after the release of

"group III" employees, a group that includes employees under various temporary, term, and other provisional appointments. 5 C.F.R. § 351.501(b).

92.     Under these required RIF procedures, before conducting a RIF a federal agency must: establish "competitive areas in which employees compete for retention"; designate the "competitive areas" of which employees are to compete for retention at least 90 days before the effective date of the RIF; designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption; and rank employees for retention based on factors including their tenure group, time in service (including military service), veteran preference, length of service, and performance. *See* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.402-351.404, 351.504.

## C.     RIF Notice Requirements

93.     Under the federal RIF statute and associated regulations, federal agencies are required to provide at least 60 days of prior written notice before they may release any federal civil service employee under a RIF. The agency must provide the written notice to (a) the employee, (b) the employee's collective bargaining representative, and (c) the state or District where an affected employee's duty station was located if the RIF would involve at least 50 employees within the competitive area, 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(b).

94.     The notice to the state must be provided to the state or agency designated by the state to perform rapid response activities under the Workforce Investment Act of 1998, now called the Workforce Innovation and Opportunity Act of 2014 ("WIOA Agency"), and must also be provided to "[t]he chief elected official of local government(s) within which these separations will occur." 5 C.F.R. § 351.803(b); *see* 5 U.S.C. § 3502(d)(3)(A).   The purpose of states' "rapid response" activities is to quickly make public and private resources available to workers who are laid off, to minimize the disruption to the affected workers and their communities. To help the state or locality

prepare for the disruptions associated with job losses, notices must include: (a) the number of employees to be separated from service due to the reduction in force, broken down by geographic area and organizational unit, (b) when those separations will occur; and (c) other information that may facilitate the delivery of services to the affected workers. 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(c).

95.     The notice to an affected employee must include: (a) information concerning the right to reemployment consideration and career transition assistance; (b) a release to authorize the federal government to share his or her resume and employment information with the WIOA Agency and potential public or private sector employers; and (c) information about how to apply for unemployment insurance and access other benefits. 5 C.F.R. § 351.803(a).

96.     Where circumstances "not reasonably foreseeable" preclude giving 60 days' written notice, the agency may request that OPM shorten the notice period; however, "[n]o notice period may be shortened to less than 30 days." 5 U.S.C. § 3502(e).

97.     Where an agency fails to provide any of these statutorily required notices, an employee "may not be released, due to a reduction in force." 5 U.S.C. § 3502(d).

## IV.     FACTUAL ALLEGATIONS

98.     Since President Trump took office on January 20, 2025, Defendant Agencies have, at OPM's direction, terminated tens of thousands of probationary employees.

99.     The mass terminations of probationary employees since January 20 were not driven by agency determinations related to the performance or qualifications of any particular probationary employee. Rather, these layoffs have all been part of a coordinated effort directed by the White House and OPM to reduce the size of the federal workforce.

100.    Because the mass terminations of probationary employees are part of an effort to restructure and reduce the workforces at Defendant Agencies, they constitute RIFs. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351.

101.    In terminating probationary employees *en masse*, Defendants have not abided by the statutory and regulatory requirements for RIFs, including the requirement to provide 60 days' notice to the Plaintiff States. This has inflicted and will continue to inflict serious and irreparable harms on the Plaintiff States, as they must now deal with a sudden surge in unemployment, without the advance notice required under the federal RIF statute and regulations.

A.    **Defendants Have Conducted Unlawful RIFs Throughout the Federal Government.**

102.    On January 20, 2025, the day President Trump took office, President Trump appointed Charles Ezell to serve as Acting OPM Director.

103.    The same day, Acting OPM Director Ezell distributed a memo to "Heads and Acting Heads of Departments and Agencies" regarding "Guidance on Probationary Periods, Administrative Leave and Details." In the memo, OPM directed agency heads to "identify all employees on probationary periods . . . and send a report to OPM listing all such employees" no later than January 24, 2025. OPM further directed agencies to "promptly determine whether those employees should be retained by the agency."[1]

104.    Also on January 20, 2025, President Trump signed an executive order entitled "Hiring Freeze."[2] In addition to ordering "a freeze on the hiring of federal civilian employees" throughout the executive branch, he directed the Director of the Office of Management and Budget—in consultation with OPM and the United States Department of Government Efficiency Service

---

[1] https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20Administrative%20Leave%20and%20Details%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%20FINAL.pdf
[2] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/

("DOGE")—to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition."

105. On February 11, 2025, President Trump issued Executive Order 14210, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." The Executive Order directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."[3]

106. Rather than wait for agency heads to develop RIF plans and follow applicable procedures, however, Defendants began mass unlawful terminations of their probationary employees.

107. On or around February 11, the Consumer Financial Protection Bureau terminated approximately 73 probationary employees.[4] The agency terminated 70-100 additional probationary employees on February 13.[5]

108. On or around February 12, the Department of Education terminated 60 probationary employees.[6]

109. On or around February 12, the General Services Administration notified approximately 100 probationary employees that they would be terminated.[7] Upon information and belief, these terminations will become effective on March 7.

---

[3] https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/
[4] https://www.npr.org/2025/02/12/nx-s1-5294479/cfpb-workers-fired-trump-doge
[5] https://www.npr.org/2025/02/14/nx-s1-5298144/federal-layoffs-usda-hud-defense-trump
[6] https://www.npr.org/2025/02/13/nx-s1-5296928/layoffs-trump-doge-education-energy
[7] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

110.    On February 13, OPM officials met with agency officials throughout the federal government and ordered agencies to lay off nearly all of the federal government's approximately 220,0000 probationary employees.[8]

111.    On February 14, OPM sent an email to all agency Chief Human Capital Officers (CHCOs) and their deputies to "clarif[y] immediate next steps for probationary employees."

112.    In its February 14 email, OPM explained its directive to agencies:

> We have asked that you separate probationary employees that you have not identified as mission critical no later than the end of the day Monday, 2/27. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

113.    OPM's February 14 email reiterated that OPM's directive should be followed in light of the "President's directive to dramatically reduce the size of the federal workforce."

114.    OPM's directive at the February 13 meeting and in the February 14 email coincided with a rapid uptick in terminations of probationary employees.

115.    On or around February 13, the Department of Energy terminated nearly 2,000 probationary employees.[9] Days later, the agency rescinded approximately 350 termination notices to probationary employees in the National Nuclear Security Administration, which oversees the nation's nuclear stockpile.[10]

116.    On or around February 13, the Department of Veterans Affairs terminated more than 1,000 probationary employees.[11] The Department of Veterans Affairs fired another 1,400 probationary employees on February 24.[12]

---

[8] https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/
[9] https://www.politico.com/news/2025/02/13/trump-federal-worker-layoffs-00204180
[10] https://www.cbsnews.com/news/doge-firings-us-nuclear-weapons-workers-reversing/
[11] https://thehill.com/policy/defense/5162213-va-axes-another-1400-employees/
[12] *Id.*

117.    On or around February 13, OPM fired 250 probationary employees.[13]

118.    On or around February 13, the Small Business Administration terminated around 720 probationary employees.[14]

119.    On or around February 13, the Department of Agriculture terminated approximately 3,400 probationary employees in the Forest Service.[15]

120.    On or around February 13, the Department of Energy terminated around 130 probationary employees in the Bonneville Power Administration.[16] Several days later, the Department of Energy deemed around 30 of those probationary employees as critical and rescinded the terminations.

121.    On or around February 14, the Environmental Protection Agency fired approximately 388 probationary employees.

122.    On or around February 14, the Interior Department fired approximately 2,400 probationary employees, including 800 people from the Bureau of Land Management.[17]

123.    On or around February 14, the Department of Homeland Security terminated 605 probationary employees, including approximately 240 employees from the Transportation Security Administration, 200 employees from the Federal Emergency Management Agency, 130 employees from the Cybersecurity and Infrastructure Security Agency, 50 employees from the U.S. Citizenship and Immigration Services, and 10 employees from the DHS Science and Technology Directorate.[18]

---

[13] https://www.appropriations.senate.gov/news/minority/fact-sheet-trump-and-elons-layoffs-jeopardize-essential-services-americans-rely-on-threaten-critical-agency-objectives-keeping-americans-safe_healthy#:~:text=On%20February%2013%2C%20OPM%20fired,minutes%20to%20leave%20the%20building
[14] https://www.politico.com/news/2025/02/13/trump-federal-worker-layoffs-00204180
[15] https://www.politico.com/news/2025/02/13/forest-services-fires-3400-employees-00204213
[16] https://www.opb.org/article/2025/02/19/bonneville-power-administration-reverses-30-job-cuts-continues-with-plans-to-eliminate-430-positions/
[17] https://www.aol.com/news/trump-administration-lays-off-over-183049169.html
[18] https://www.usatoday.com/story/news/politics/2025/02/20/tsa-trump-workers-fired/79307363007/; https://thehill.com/homenews/5154340-dhs-fires-probationary-employees/

124.    On or around February 14, the Department of Health and Human Services terminated around 1,300 probationary employees working for the Centers for Disease Control ("CDC") and Prevention.[19] Upon information and belief, the Department of Health and Human Services has also terminated probationary employees at the National Institutes of Health, the Food and Drug Administration, and the Centers for Medicare and Medicaid Services.

125.    Upon information and belief, on or around February 14, the Department of Housing and Urban Development terminated more than 50 probationary employees.

126.    On or around February 15, the Department of Interior fired around 1,000 probationary employees in the National Park Service.[20]

127.    On or around February 15, the Department of Agriculture fired around 2,000 probationary employees.[21] Several days later, the department rehired several employees who were involved in the government's response to the ongoing bird flu outbreak.

128.    On or around February 18, the Department of Transportation terminated around 400 probationary employees in the Federal Aviation Administration.[22]

129.    On or around February 18, the Federal Deposit Insurance Corporation terminated approximately 170 probationary employees.[23]

130.    On or around February 20, the Department of the Treasury terminated over 6,000 probationary employees, including over 6,000 probationary employees from the Internal Revenue Service and 76 probationary employees from the Office of the Comptroller of the Currency.[24]

---

[19] https://www.npr.org/2025/02/14/nx-s1-5298144/federal-layoffs-usda-hud-defense-trump.
[20] https://apnews.com/article/doge-firings-layoffs-federal-government-workers-musk-d33cdd7872d64d2bdd8fe70c28652654
[21] https://apnews.com/article/doge-firings-layoffs-federal-government-workers-musk-d33cdd7872d64d2bdd8fe70c28652654
[22] https://apnews.com/article/doge-faa-air-traffic-firings-safety-67981aec33b6ee72cbad8dcee31f3437
[23] https://news.bloomberglaw.com/banking-law/fdic-fires-probationary-employees-amid-continued-agency-cull
[24] https://www.reuters.com/world/us/us-irs-expected-fire-6700-employees-thursday-trump-downsizing-spree-2025-02-20/; https://news.bloomberglaw.com/banking-law/occ-starts-firing-probationary-staff-joining-other-regulators

Upon information and belief, the Office of the Comptroller of the Currency terminations will become effective on March 7.

131.     On or around February 20, the National Archives and Records Administration terminated over 60 probationary employees.[25]

132.     Upon information and belief, on or around February 20, the Department of Labor notified more than 50 probationary employees that they will be terminated.  Upon information and belief, the effective date of termination will be March 7.

133.     On February 21, the Department of Defense announced that it was planning to terminate 5,400 probationary workers starting the week of February 24.[26] Upon information and belief, those terminations have not begun, but they may begin at any moment.

134.     Upon information and belief, on or around February 24, the United States Agency for International Development terminated approximately 250 probationary employees.

135.     On February 27, the Department of Commerce fired around 800 probationary employees in the National Oceanic and Atmospheric Administration.[27] Upon information and belief, the agency plans to fire additional probationary employees and those terminations may begin at any moment.

136.     On or around February 28, the Department of Commerce fired 86 probationary employees in the U.S. Patent and Trademark Office.[28]

---

[25] https://www.govexec.com/workforce/2025/02/see-which-federal-agencies-are-firing-new-hires/403033/
[26] https://www.defense.gov/News/Releases/Release/Article/4074278/dod-probationary-workforce-statement/
[27] https://www.cnn.com/2025/02/27/politics/noaa-federal-workers-firings/index.html#:~:text=Probationary%20employees%20%E2%80%94%20those%20who%20have,National%20Weather%20Service%20told%20CNN
[28] https://www.govexec.com/workforce/2025/03/some-agencies-are-still-firing-probationers-while-others-have-recalled-theirs-following-court-ruling/403407/?oref=ge-skybox-post

137.     On or around March 3, the Department of Commerce fired 73 probationary employees at the National Institute for Standards and Technology.[29]

138.     Upon information and belief, Defendants have already terminated tens of thousands of probationary employees.

139.     Defendants have not published official counts and locations of the employees they have terminated, but based on publicly reported numbers and firsthand accounts from affected employees, it appears that Defendants have terminated at least 24,000 probationary employees as of the date of this Complaint. Because Plaintiff States have not received notice of these mass terminations, this accounting is necessarily incomplete and may be far higher.

140.     Thousands of additional terminations are expected any day. To continue to reduce the size of the federal workforce, agencies that have not yet terminated most of their probationary employees may do so at any moment.

**B.     Defendants Have Not Followed Required RIF Procedures for the Mass Layoffs of Probationary Employees**

141.     Although the mass terminations of probationary employees have constituted RIFs, Defendants have failed to follow the RIF procedures required by statute and regulation.

142.     For example, Defendants did not designate the "competitive areas" in which employees would compete for retention, which they must do at least 90 days before the effective date of any RIF. *See* 5 C.F.R. § 351.402.

143.     Defendants did not designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption. *See* 5 C.F.R. § 351.403.

---

[29] https://www.govexec.com/workforce/2025/03/some-agencies-are-still-firing-probationers-while-others-have-recalled-theirs-following-court-ruling/403407/?oref=ge-skybox-post

144. Defendants did not establish a retention register of employees in each competitive level of positions included in the RIFs. *See* 5 C.F.R. § 351.404.

145. Defendants did not then rank employees for retention based on their tenure group, time in service (including military service), veteran preference, length of service, and performance. *See* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.501-351.504.

146. Defendants did not provide required notices 60 days in advance of the effective date of termination to affected employees, their collective bargaining representatives, or to Plaintiff States. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803.

147. Especially relevant to Plaintiff States, Defendants did not provide affected employees with the required releases to authorize the release of their resumes and other relevant employment information to the relevant WIOA Agency, for employment referrals to potential public and private sector employers. *See* 5 C.F.R. § 351.803(a).

148. Likewise, Defendants did not provide Plaintiff States and the relevant WIOA Agencies with any prior notice, much less the 60-day notice required by law, which would have alerted Plaintiff States to the number of employees to be separated from the agencies, broken down by geographic area, and provided the effective date of the planned separations as well as other information that could have facilitated the delivery of rapid response services. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(b)-(c).

149. Rather than comply with their legal obligations, Defendants summarily terminated probationary employees *en masse*, providing termination notices to the affected employees by form letters and emails, which frequently included errors and in many instances failed to include even the employee's name or job title.

150. These form termination notices, issued near-simultaneously to thousands of federal probationary employees, failed to include any particularized agency determinations related to the performance or qualifications of each affected probationary employee to justify their termination. The notices were pretextual because Defendants were actually engaged in RIFs designed to reduce the size of the federal workforce.

151. For example, agency management at the National Science Foundation informed probationary employees that the NSF had previously chosen to retain its probationary employees but that OPM had directed NSF to terminate the employees. The managers said that terminating the probationary employees was not a decision the agency made," but was "a direction [it had] received" from OPM and that NSF leadership had "no choice" but to "follow[] orders."

152. Likewise, in response to OPM's directive to terminate probationary employees *en masse*, the Department of Treasury directed the Internal Revenue Service to terminate all probationary employees "based on performance." Without conducting any review of probationary employees' qualifications or performance, the Department of Treasury directed the IRS to terminate approximately 6,700 probationary employees. These terminations were unrelated to the probationary employees' qualifications, performance, or conduct, but were in fact a RIF aimed at reducing the size of the agency's workforce.

153. The same pattern occurred at the Center for Consumer Information and Insurance Oversight (CCIIO), a subset of the Centers for Medicare & Medicaid Services (CMS) within the Department of Health and Human Services (HHS). CCIIO had determined that none of its probationary employees should be removed from service because all were well qualified for their positions and were performing well. Nevertheless, on February 13, 2025, HHS directed CCIIO to terminate all of its probationary employees and to issue form termination letters that stated falsely

that the affected employees were being terminated "because [their] ability, knowledge, and skills do not fit the Agency's current needs, and [their] performance has not been adequate to justify further employment." The CCIIO terminated 82 probationary employees on February 15, 2025, representing approximately 15% of its workforce of approximately 600.

154.    Defendants' failure to provide required RIF notices rendered any terminations ineffective and unlawful because an employee "may not be released, due to a reduction in force" unless an agency provides all statutorily required notices. 5 U.S.C. § 3502(d).

155.    As explained in further detail below in Section IV.C, Defendants' failure to provide these required notices has harmed Plaintiff States in several ways, including by hindering the ability to provide rapid response services.

**C.    Plaintiffs Are Harmed As a Direct Result of Defendants' Failure to Follow RIF Requirements and Provide Advance Notice to the States.**

156.    Plaintiff States have suffered and will imminently suffer several types of irreparable injury due to the federal government's failure to provide notice of the RIFs.

157.    As noted above, when a federal agency plans to release 50 or more employees in a RIF, the agency must provide 60 days' notice to the affected States' WIOA Agencies as well as the chief elected officials for affected local jurisdictions.

158.    Plaintiff States have not received notice of a federal reduction in force from any federal agency.

159.    In enacting the RIF notice requirements, Congress recognized the harms inherent to sudden, unexpected mass layoffs, including that economic dislocation of workers can easily create a cascade of instability throughout a regional economy. And it sought to provide the states with some protection against those harms by requiring that agencies provide them with advance notice.

160. Defendants' failure to provide notice has inflicted other harms as well. As a result of the lack of notice, Plaintiff States are unable to proactively reach affected individuals and provide services that would mitigate the harm the employees and their communities suffer as a result of the sudden job loss.

161. Plaintiff States also suffer procedural injury resulting in additional expenditures and harms to public finances that they would not have to bear if notice had been provided.

### *Rapid Response Expenditures*

162. The Federal Workforce Innovation and Opportunity Act of 2014, 29 U.S.C. § 3174(A)(2)(i), requires that each state have a rapid response program to conduct outreach to workers affected by a mass layoff and to provide the workers with support services, including job transition services.

163. The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

164. The purpose of the rapid response system is to reduce individuals' reliance on public benefit systems, such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

165. When notified of a forthcoming mass layoff, a state's rapid response team is required to: contact the employer, representatives of the affected workers, and the local community; assess the layoff plans and schedule; and provide information and support to affected employees, including

information about filing for unemployment compensation and career services. 20 CFR §§ 682.300, 682.330.

166.     The rapid response teams also facilitate connections to partner agencies and organizations that can provide terminated workers and their families with critical services, such as home heating assistance, legal aid, and financial advice.

167.     Because Plaintiff States' rapid response teams have received no notice of federal RIFs, certain teams have been required to dedicate significantly more staff, resources, and expenditures to fulfill their statutory mission. In particular, they have had to devote significant time and resources simply to try to identify workers subject to federal mass layoffs and to otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide the legally required notice of mass layoffs.

168.     As one example of these efforts, some state agencies handling unemployment claims have created new websites, requiring significant time and expense. *See* Maryland Workers Impacted by Recent Federal Actions, https://response.maryland.gov/federalpublicservants/. These efforts were a further attempt to provide rapid response resources and services, which could normally be targeted at specific personnel *before* they are laid off, but must now be provided less efficiently and at greater expense to the entire public, because the states' personnel remain unaware of who has been laid off and whether and when the next federal mass layoff event will occur.

169.     As another example, because Maryland's Department of Labor did not receive advance notice, staff have conducted extensive affirmative outreach to dozens of federal agencies and offices to try and determine the location and extent of upcoming layoffs. Despite these efforts, staff have not received any substantive responses. The Department has also had to divert significant additional time of other agency personnel from state projects to instead respond to

federal mass firings, to try and identify recently terminated employees and provide relevant resources and services.

### *Unemployment Benefits Expenditures*

170.    As a general matter, the federal government is required to reimburse states for unemployment benefits provided to former federal employees. Specifically, Plaintiff States are party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

171.    Each Plaintiff State has its own procedures for handling Unemployment Insurance ("UI") claims. Regardless, sudden mass layoffs burden the administrative process for handling UI claims, and the lack of notice and chaotic nature of Defendants' mass layoffs of probationary employees has already exacerbated or likely will exacerbate the strain on the Plaintiff States' systems for administering UI.

172.    Maryland's experience exemplifies the problems with the unlawful way the Defendants have conducted RIFs of probationary employees.

173.    The Maryland Department of Labor manages claims for unemployment benefits by individuals formerly employed to work in Maryland.

174.    Pursuant to Md. Code Ann., Lab. & Empl. § 8-805(a), an individual in Maryland who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the Maryland Secretary of Labor. Claimants file claims online using the Department's system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for her separation, work experience, and other relevant information. COMAR 09.32.02.05.

175.    The reason for termination alleged by the claimant is then transmitted to the claimant's employer(s) for verification. The employer is then asked to furnish a report of the separation from employment containing, among other information, the reason for the employee's separation and a report of wage history. Md. Code Ann. Lab. & Empl. § 8-627; *see also* COMAR 09.32.02.05.

176.    Maryland law disqualifies some claimants from benefits depending on the circumstances of their separation from employment. *See* Md. Code Ann. Lab. & Empl. § 8-1001, et seq. Disqualifying circumstances include, among other reasons, termination for misconduct, aggravated misconduct, and gross misconduct. *Id.* In addition, a claimant is disqualified if they quit their job without good cause directly related to employment conditions or employer actions. Md. Code Ann. Lab. & Empl. § 8-1001(a).

177.    If a determination involves a resolution of a dispute of material fact, a claims examiner from the Maryland Department of Labor must conduct a predetermination fact-finding interview after notice is provided to the employee and her employer(s). Md. Code. Ann. Lab & Empl. § 8-806(a)(2). Thereafter, a written initial determination must be made stating, among other things, the weekly benefit amount, maximum benefits payable to the claimant in a benefit year, and the reasons for the determination. Md. Code Ann. Lab. & Empl. § 8-806(c).

178.    If the claims examiner's review of a claim reveals no dispute of material fact, but the information reviewed indicates that claimant may be ineligible or disqualified, the claims examiners must still schedule a call for an appointment for a fact-finding interview and render a written decision. COMAR 09.32.16(D)-(E). A claimant or an employer may file an administrative appeal within 15 days. Md. Code Ann. Lab. & Empl. § 8-806(e)(1).

179.    The Maryland Department of Labor's latest data indicates that 813 former federal employees have applied for unemployment benefits since January 21, 2025.

180.    As noted above, the number of UCFE claims received by the Maryland Department of Labor has increased significantly in just the last few weeks, starting on or around February 14, 2025, with an approximate range of 30 to 60 new such claims *every day*.

181.    In fact, the amount of UCFE claims received by the Maryland Department of Labor in February 2025 is significantly higher than past years.  From January 21 to March 3, 2024, Maryland received only 189 unemployment claims containing federal wages in the claimant's base period.

182.    While not required to apply for unemployment benefits, multiple individuals have attached in their application their letter of employment termination from the federal government. Such letters indicate that these individuals were probationary employees purportedly terminated for cause.

183.    When an employer provides the initial report of separation to the Maryland Department of Labor, the employer must indicate the reason for the separation, including whether the employee was fired for cause, such as misconduct.

184.    Accordingly, if an employer states in its report of separation that an individual was terminated because performance has not been adequate to justify further employment at the agency, the Maryland Department of Labor's procedures require that the claims examiner must investigate the reason for discharge.

185.    The Maryland Department of Labor is also required to verify both wages and reason for separation of employment from each federal agency by sending a request for wage and separation information.  20 C.F.R. §§ 609.6(e)(1), 609.21 through 609.25.  While private employers report wages each quarter for all employees into the Department's database, see COMAR  09.32.01.12, federal agencies are not required to regularly report active employee wages to the States.

186. The same Department staff who handle regular unemployment claims also process and adjudicate UCFE claims. Redirecting staff from handling regular UI claims to process and adjudicate UCFE claims threatens to strain the state's resources.

187. This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating significant backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods. By diverting resources, the state must compromise the efficiency and responsiveness of its claims processing system, ultimately undermining public trust and exacerbating economic hardship.

188. While the Maryland Department of Labor is only beginning to process these claims, its staff has already begun  contacting relevant federal agencies to request information on relevant terminations, to determine if they were in fact done for cause

189. Thus far, Maryland has received at least 193 reports of separation from federal agencies, concerning their recently terminated employees.

190. Several Defendant agencies reported that probationary employees were terminated due to a "permanent lack of work due to a change in Presidential Administration."

191. In addition, the Maryland Department of Labor received several reports from Defendant agencies explicitly stating that the employees were "laid off due to a reduction in force."

192. And, as relevant here, certain reports by Defendants asserted that the employee at issue was terminated for cause, for instance due to "unsatisfactory work performance" and similar generic performance-related bases.

193. Similarly, other reports highlighted various potentially disqualifying circumstances.  For instance, agencies indicated that claimants might not be genuinely unemployed or had voluntarily resigned from their positions.

194. Due Defendants' assertions that certain federal employees were terminated for cause or otherwise ineligible or disqualified from benefits, or where there is disputed or conflicting information, Maryland will be required to follow our intensive and mandatory investigative process.

195. The procedures impose a significant strain on the Maryland Department of Labor's financial and temporal resources. Each case demanding interviews and/or a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

196. Moreover, where federal agencies fail to provide responses to requests for separation information, the Maryland Department of Labor must gather necessary wage and separation information. 20 C.F.R. § 609.6 (e)(2). This requires claims staff to solicit evidence from the claimants in the form of pay stubs, W-2s and affidavits and to pay benefits based on that information. In fact, recent federal guidance regarding federal unemployment during recent government shutdowns encourages states to have claimants file an affidavit, using available proof, given "limited federal HR resources" to respond to requests for separation information. "Unemployment Insurance Program Letter 03-22," U.S. Department of Labor, November 2022, https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2021/UIPL_03-22.pdf.

197. In addition, termination notices issued by federal agencies were not issued in compliance with governing reduction in force procedures. It is apparent that there are affected individuals, including veterans, who should have been accorded preference under required RIF procedures but

were not. To the extent that preferences and other such requirements would have precluded termination, and federal employees successfully challenge their separations, this will cause the Department to re-adjudicate claims, pursue overpayments, and conduct appeals.

198. While the federal Government provides grants for the purpose of administrating state unemployment benefit programs, these grants are frequently less than the total administrative costs incurred by Maryland. And that is the case now; the federal grant monies allocated to Maryland are not sufficient to cover Maryland's unemployment benefit program administration.

199. In these circumstances, Maryland relies on its Special Administrative Expense Fund ("SAEF") when federal funding is insufficient. *See* Md. Code Ann., Labor & Employment §§ 8-419 to 842. This fund may be comprised of previously transferred federal funds (in limited circumstances), as well as monies collected by the state through fines, interest, and other penalties, and contributions by the state legislature. *Id*. § 8-421. Currently, SAEF is comprised entirely of state funds. Accordingly, any increase in administrative costs of Maryland's unemployment benefits program will be covered at least in part by state funds.

200. Other Plaintiff States must also undergo intensive and mandatory investigation and appeal processes for handling disputes between claimants and employers involving the claimant's eligibility. Many Plaintiff States anticipate a significant increase in these disputes given the Defendants' chaotic and conflicting messaging around the reasons for terminating probationary employees. Handling these disputes will cause those Plaintiff States to divert staff to handle the time-consuming dispute resolutions and hinder the timely processing of ordinary unemployment claims that are not disputed.

201. For example, the Illinois Department of Employment Security ("IDES") has already received almost the same number of applications for unemployment benefits from former federal

workers this year as it received in all of last year. A substantial number of these claims require resource intensive fact-finding that will cause backlogs and delays in IDES's processing of other claims, exacerbating economic hardship for countless Illinoisans.

202.    IDES is also being forced to divert resources and staff to respond to the latest layoff news, to identify affected federal agencies and ex-employees, provide information, and adjust procedures and resources to assist confused and unemployed workers in Illinois, all in a complicated and rapidly evolving environment. To take one example, IDES had to create a new webpage, at significant time and expense, in an attempt to provide resources and services. *See* https://ides.illinois.gov/unemployment/deferred-resignation-of-federal-employees.html. Such efforts could normally be targeted at specific personnel subject to impending layoff events but must instead be provided less efficiently and at greater expense to the entire public because IDES personnel remain unaware of the individuals who have already been laid off and whether and when the next federal mass layoff event will occur.

203.    In some jurisdictions, a flood of contested UI claims will cause a backlog that affects the timely adjudication of a wide range of administrative matters that are handled by the same administrative law judges ("ALJs"), ranging from building code enforcement to traffic tickets.

204.    Plaintiff States have seen or anticipate seeing an uptick in UI claims in the areas in which the probationary employee layoffs occurred. This sudden increase—without any advanced notice—has burdened and will continue to burden state agencies charged with administering UI benefits.

*Expenditures for Other Social Services*

205.     Plaintiff States bear other burdens associated with many residents suddenly losing income. These costs arise in the administration of programs aimed at providing connections to social services, like health care and food assistance.

206.     Newly unemployed individuals apply for Medicaid at high rates, and the Plaintiff States bear a direct economic cost to provide healthcare services to them and their families.

*Harms to State Programs That Depend on Federal Employees*

207.     Many federal probationary employees who were terminated by the CDC were detailed to work at Plaintiff States' public health agencies. This includes several employees who were hired by the CDC as part of its Public Health Associate Program for Recent Graduates ("PHAP"). PHAP is a two-year program that places recent college graduates with tribal, local, and territorial public health agencies, as well as non-governmental organizations, to work alongside other public health professionals in a variety of settings.

208.     For example, three recently terminated PHAP employees ("Associates") were assigned to New Jersey's Department of Health ("NJDOH"), which is responsible for preventing the spread of infectious diseases and developing emergency preparedness plans in the state.  CDC and NJDOH entered into a two-year contract, pursuant to which CDC agreed to cover all costs for the Associates, including salary and benefits. NJDOH has participated in the PHAP program for several years and often hires PHAP Associates, who gain invaluable training and institutional knowledge over the course of the program, for permanent employment at the conclusion of their two-year term.

209.     The three Associates were detailed to different NJDOH divisions that perform core public health functions: the Division of HIV, STD, and TB Services; the Epidemiology, Environmental

and Occupational Health's Communicable Disease Service; and the Global Tuberculosis Institute at Rutgers University. Each Associate was a member of a small team dedicated to reducing the spread of communicable diseases such as HIV, TB, and foodborne and waterborne illnesses. This work involved laborious investigations, contact tracing, and collaborations with numerous local, state, and federal partners to ensure anyone infected or at risk of infection has access to treatment.

210.     Between February 16 and 17, 2025, NJDOH learned that the three Associates had been terminated from their positions on February 15, 2025—before the expiration of their contractual two-year terms. CDC never notified NJDOH of these terminations. Between March 4 and 5, NJDOH learned that the Associates were being reinstated.

211.     Despite their reinstatement, the sudden loss of essential personnel, coupled with the lack of notice, caused NJDOH significant harm and disruption. NJDOH had invested significant time and resources into months-long training for the Associates, and the agency did not have the budgetary flexibility or hiring authority to replace them, particularly given the lack of any notice. The unexpected staffing shortages and imminent need to reallocate and train existing staff already caused delays and administrative chaos, which impeded NJDOH's ability to fulfill its mission of limiting the spread of infectious diseases in the state.  The timing of the terminations was especially problematic because NJDOH has been dealing with numerous communicable disease challenges, including H5N1, measles, Covid-19, influenza, norovirus, and RSV.  The loss in workforce capacity during this time hampered NJDOH's ability to fully respond to these public health threats.

212.     The lack of notice compounded the challenges created by the terminations. NJDOH was not able to plan for the terminations, resulting in administrative inefficiencies, duplicative work, and delayed notifications to persons exposed to certain communicable diseases.

*Harms to State Finances*

213.    The mass layoffs that have taken place without the legally required notice to Plaintiff States will also have substantial impacts on the Plaintiff States' finances.

214.    For instance, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program. 42 U.S.C. § 502(a). While many Plaintiff States have been and continue to expend additional resources necessary to address the uptick in federal unemployment claims, it is not yet known whether those additional costs will be fully reimbursed.

215.    Further, Plaintiff States rely in large part on income tax revenue for their budgets. Because Defendant agencies will no longer be withholding and paying income taxes to Plaintiff States on behalf of the terminated probationary employees, the layoffs will result in a decrease to Plaintiff States' revenues. Given the number of employees forced to seek reemployment—with no notice and no opportunity for Plaintiff States to provide support services—it is highly likely that many of the Plaintiff States' residents will be unemployed for prolonged periods, depriving the Plaintiff States of significant income tax receipts.

216.    For example, the District of Columbia estimates that the mass terminations of probationary employees will cause millions of dollars in lost annual income tax revenue. The District estimates that its lost income tax revenue for the first 60 days alone, the period in which it should have received advance notice of any RIFs, will cost the District at least hundreds of thousands of dollars in lost income tax revenue. Had the District received the notice required by law, these losses would likely have been mitigated, including because employees would not have been terminated during the 60-day notice period and some would have been able to obtain alternative employment prior to their termination.

217.    Likewise, the Maryland Comptroller projects that the mass terminations of probationary employees will cause significant decreases in Maryland's income tax revenues. Maryland's budget relies in large part on personal income tax revenue, which represented 55% of Maryland's general fund revenues for fiscal year 2024. Approximately 250,000 federal workers reside in Maryland. Although unemployed individuals receiving unemployment benefits generally pay income tax on their benefits, the benefits paid are less than the amount the individuals earned when they were fully employed, and therefore the taxes paid are generally less than the taxes paid during their employment.

218.    Beyond the direct loss of income tax revenue, the Maryland Comptroller anticipates that a sudden and significant increase of newly unemployed workers will have serious negative effects on Maryland's labor market, including extended periods of unemployment, downward pressure on wages, and the migration of residents out of the state.

219.    The terminations also impact state sales tax revenues.

220.    For example, for the District of Columbia, this impact comes from two primary sources: First, federal employees living outside of the District who commute to work in the District purchase meals at restaurants, pay parking fees, and purchase other goods and services before, during, and after work. Second, in addition to these workday purchases, federal employees who are District residents also contribute to our economy as full-time residents, spending on groceries, household items, restaurants, clothing, and various services.

221.    The District estimates that these mass terminations could cause anywhere from hundreds of thousands to millions of dollars in lost annual sales tax revenue. The District further estimates that for the first 60 days alone, the period in which it should have received advance notice of any RIFs, the District will lose tens to hundreds of thousands of dollars in sales tax revenues. Had the

District received the notice required by law, these losses would likely have been mitigated, including because employees would not have been terminated during the 60-day notice period and some would have been able to obtain alternative employment prior to their termination.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedures Act
### Action Not in Accordance with Law

222.     Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

223.     Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

224.     Defendants are agencies subject to the APA. 5 U.S.C. § 701.

225.     Because Defendants' mass terminations of probationary employees are part of an effort to restructure and reduce the federal workforce, they constitute RIFs, and Defendants were obligated to follow RIF procedures set forth by statute and regulation to carry out the terminations. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351.

226.     Defendants violated the law by carrying out the mass terminations of probationary employees without following the required RIF procedures, *see* 5 U.S.C. § 3502; 5 C.F.R. Part 351, including providing 60 days' notice to states and affected employees before releasing the employees, 5 U.S.C. § 3502(d). Absent such notice, an employee "may not be released." 5 U.S.C. § 3502(d).

227.     The actions of Defendants therefore violate the APA because they are not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

## COUNT II
## Violation of the Administrative Procedures Act
## Arbitrary and Capricious

228.    Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

229.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

230.    Defendants are agencies subject to the APA. 5 U.S.C. § 701.

231.    The terminations of probationary employees pursuant to OPM's order have been arbitrary and capricious in several respects, including:

232.    Defendants OPM and OPM Director failed to provide a reasoned explanation for their direction to agencies to carry out mass terminations of probationary employees without following RIF procedures.

233.    Defendants failed to provide a reasoned explanation for following OPM's direction and carrying out mass terminations of probationary employees.

234.    Third, to the extent Defendants provided any explanation at all for the mass terminations, the reasons given were pretextual as they purported to relate to individual employees' performance but did not identify any actual unsatisfactory performance or conduct or any reasons preceding the affected employees' appointments that justified their terminations. Rather than Defendants' stated reasons, Defendants' true reason for terminating the probationary employees was to reduce the size of the federal workforce.

235.    The arbitrariness of Defendants' actions and the indiscriminate nature of the terminations is underscored by the fact that Defendants have had to reverse the firings of individuals fulfilling

certain critical functions, such as protecting nuclear weapons and addressing a significant public health threat.

## COUNT III
### Non-Statutory Review of *Ultra Vires* Action

236. Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

237. Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

238. Defendants mass terminations of probationary employees were RIFs. These RIFs were unlawful because Defendants conducted them without following required RIF procedures, *see* 5 U.S.C. § 3502; 5 C.F.R. Part 351, including providing 60 days' notice to states and affected employees before releasing the employees, 5 U.S.C. § 3502(d). Absent such notice, an employee "may not be released." 5 U.S.C. § 3502(d).

239. Defendants' actions terminating probationary employees *en masse* therefore exceeded their lawful authority and were *ultra vires*.

240. Plaintiffs will suffer irreparable injury if Defendants' actions are not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

241. The public interest favors issuance of a judicial declaration that Defendants' terminations of federal probationary employees are unlawful and issuance of an injunction requiring Defendants to reinstate the affected employees and to follow RIF procedures for any further RIFs. Defendants' actions have resulted in the unlawful termination of tens of thousands of probationary federal employees, including large numbers of military veterans, causing a sudden surge of unemployment without providing Plaintiff States with notice or an opportunity to prepare.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

242.    Declare unlawful and set aside Defendants' terminations of probationary employees without making specific, individualized determinations regarding the employees' performance or conduct and without adhering to RIF requirements as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A);

243.    Declare unlawful and set aside Defendants' terminations of probationary employees without making specific, individualized determinations regarding the employees' performance or conduct and without adhering to RIF requirements as *ultra vires* and exceeding their lawful authority;

244.    Issue immediate temporary relief restraining Defendants from terminating any probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance and reinstating probationary employees who were terminated on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individualized determinations of the inadequacy of the employee's conduct or performance;

245.    Order Defendants to file a status report with the Court within 48 hours of entry of a temporary restraining order, and at regular intervals thereafter, identifying all probationary employees terminated on or after January 20, 2025 (including the following information for each employee: agency, name, position title, grade, termination date, whether the probationary employee has been reinstated, and the date of any reinstatement), and reporting all steps that Defendants have taken to comply with the Court's temporary restraining order;

246. Enter preliminary and permanent injunctive relief enjoining any further terminations that do not follow the RIF requirements or requirements for separating probationary employees for performance and enjoining Defendants from separating any employees pursuant to a RIF prior to the reinstatement of the probationary employees described above;

247. Award to Plaintiffs their costs of litigation including, but not limited to, reasonable attorneys' fees, under 28 U.S.C. § 2412, and any other applicable law; and

248. Order such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**ANTHONY G. BROWN**
*Attorney General*
*State of Maryland*

*/s/ James D. Handley*
James D. Handley, Bar No. 20299
Virginia A. Williamson**
Assistant Attorneys General

200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
jhandley@oag.state.md.us
Phone: (410) 576-6993
Fax: (410) 576-6955

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

*/s/ Liz Kramer*
Liz Kramer*
Solicitor General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
liz.kramer@ag.state.mn.us

**BRIAN SCHWALB**
*Attorney General*
*District of Columbia*

Emma Simson
Senior Counsel to the Attorney General

*/s/ Ryan Wilson*
Ryan Wilson**
Senior Counsel

Hannah Cole-Chu, Bar No. 20747

**KRISTIN K. MAYES**
*Attorney General*
*State of Arizona*

*/s/ Hayleigh S. Crawford*
Hayleigh S. Crawford*
Deputy Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

Anne Deng*
Pamela Disney**
Tessa Gellerson, Bar No. 21271
Charles Sinks, Bar No. 21185
Cara Spencer, Bar No. 20171
Assistant Attorneys General

Office of the Attorney General for
the District of Columbia
400 6th Street N.W., 10th Floor
Washington, D.C. 20001
(202) 230-2342
Ryan.Wilson@dc.gov

**ROB BONTA**
*Attorney General*
*State of California*

*/s/ Satoshi Yanai*
Satoshi Yanai*
Senior Assistant Attorney
General

300 S. Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6400
satoshi.yanai@doj.ca.gov

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation

Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

*/s/ Michael Skold*
Michael Skold*
Solicitor General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5020
michael.skold@ct.gov

**ANNE E. LOPEZ**
*Attorney General*
*State of Hawai'i*

*/s/ Kaliko'onālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

*/s/ Gretchen Helfrich*
Gretchen Helfrich, ARDC
#6300004*
Deputy Chief
Special Litigation Bureau
Office of the Illinois Attorney
General
115 South LaSalle Street, 35th
Floor
Chicago, IL 60603
Tel. (312) 814-3000
Gretchen.helfrich@ilag.gov

**ANDREA JOY CAMPBELL**
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Katherine Dirks*
Katherine Dirks*
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov

**DANA NESSEL**
*Attorney General*
*State of Michigan*

*/s/ Bryan Davis, Jr.*
Bryan Davis, Jr. (P84206)*
Debbie Taylor (P59382)*
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, MI 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200

**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy*
Deputy Solicitor General
25 Market Street
Trenton, NJ 08625
Phone: (862) 350-5800
Shankar.Duraiswamy@njoag.gov

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Anjana Samant*
Anjana Samant*
Deputy Counsel for Impact
Litigation
New Mexico Department of
Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508

**LETITIA JAMES**
*Attorney General*
*State of New York*

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

(505) 490-4060
asamant@nmdoj.gov

**DAN RAYFIELD**
*Attorney General*
*State of Oregon*

By: */s Deanna J. Chang*
Deanna J. Chang**
Senior Assistant Attorney
General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

**CHARITY R. CLARK**
*Attorney General*
*State of Vermont*

*/s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

**PHIL WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
Deputy Solicitor General
Office of the Colorado Attorney
General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Natalya A. Buckler*
Natalya A. Buckler (RI Bar No. 8415)*
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2022
nbuckler@riag.ri.gov

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*Brian P. Keenan*
BRIAN P. KEENAN*
Assistant Attorney General
State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

**AARON D. FORD**
*Attorney General of Nevada*

By: /s/ Heidi Parry Stern
   Heidi Parry Stern (Bar. No. 8873)*
   Solicitor General
   Office of the Nevada Attorney General
   555 E. Washington Ave., Ste. 3900
   Las Vegas, NV 89101
   HStern@ag.nv.gov

*Pro hac vice application forthcoming*
**Application for admission pending*