**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARYLAND, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | * | Case No. 1:25-cv-00748-JKB |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................4

    A.    Legal Framework. ...........................................................................4

          a.    Probationary employees............................................4

          b.    Reductions in force. ..................................................5

          c.    States' rapid response assistance to displaced workers. ...........................7

    B.    Factual Background. ........................................................................8

          a.    Defendants are conducting mass terminations of probationary employees without providing notice to the states. .......................8

          b.    States are grappling with a sudden uptick in unemployed residents and an unplanned spike in demand for public services. .......................12

STANDARD OF REVIEW.................................................................................14

ARGUMENT .......................................................................................................14

I.    PLAINTIFF STATES HAVE STANDING. ...............................................14

II.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS. ..........15

    A.    Defendants have violated the Administrative Procedure Act. ..............15

          a.    Defendants' actions are reviewable final agency actions. .........15

          b.    Defendants' failure to provide notice to States is contrary to law. .......................17

          c.    Defendants' actions are arbitrary and capricious.......................19

    B.    Defendants' actions are *ultra vires*. ...............................................22

III.    PLAINTIFF STATES ARE SUFFERING IRREPARABLE INJURIES..............23

    A.    Irreparable injuries to rapid response efforts. ..................................24

    B.    Irreparable injuries to unemployment benefits administration. .............25

    C.    Irreparable injuries to health benefits agencies....................................27

D.      Irreparable injuries to state programs that depend on federal workers.
.......................................................................................................................27

E.      Irreparable injuries to state tax base.....................................................28

IV.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST HEAVILY FAVOR A
TEMPORARY RESTRAINING ORDER. ...............................................................29

CONCLUSION.....................................................................................................30

# TABLE OF AUTHORITIES

*Cases*

*Am. Fed'n of Gov't Emps. v. Off. of Pers. Mgmt.*
Civ. No. 3:25-cv-1780 (N.D. Cal. Feb. 26, 2025) ...................... 8, 9, 10, 11, 12, 16, 18, 21, 23

*Am. Fed'n of Tchrs. v. Bessent,*
Civ. No. DLB-25-0430, 2025 WL 582063 (D. Md. Feb. 24, 2025) ...................................... 29

*Ass'n of Cmty. Cancer Ctrs. v. Azar,*
509 F. Supp. 3d 482 (D. Md. 2020) ...................................................................................... 23

*Bedford Cnty. Memorial Hosp. v. HHS,*
769 F.2d 1017 (4th Cir. 1985) ............................................................................................ 20

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................................ 15

*Burdue v. FAA,*
774 F.3d 1076 (6th Cir. 2014) ............................................................................................ 16

*Bus. Roundtable v. SEC,*
647 F.3d 1144 (D.C. Cir. 2011) .......................................................................................... 21

*C.G.B. v. Wolf,*
464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................................... 29

*Chamber of Com. of U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ............................................................................................ 22

*Chamblee v. Espy,*
100 F.3d 15 (4th Cir. 1996) ................................................................................................ 15

*Cook Cnty. v. Wolf,*
962 F.3d 208 (7th Cir. 2020) .............................................................................................. 25

*DeOtte v. State,*
20 F.4th 1055 (5th Cir. 2021) ............................................................................................. 26

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ...................................................................................................... 20, 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ................................................................................................ 19

*Fed. Defenders of N.Y., Inc. v. Fed. Bureau of Prisons*,
    954 F.3d 118 (2d Cir. 2020) ............................................................................... 17

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ............................................................................ 23

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
    313 F.3d 852 (4th Cir. 2002) ............................................................................. 15

*Heelen v. Dep't of Com.*,
    154 F.3d 1306 (Fed. Cir. 1998) .......................................................................... 19

*Heritage Found. v. U.S. Dep't of State*,
    No. 24-cv-2862, 2024 WL 4607501 (D.D.C. Oct. 29, 2024) .............................. 25

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................................... 23

*James v. Von Zemenszky*,
    284 F.3d 1310 (Fed. Cir. 2002) ............................................................................ 5

*Keating v. FERC*,
    569 F.3d 427 (D.C. Cir. 2009) ........................................................................... 20

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ............................................................................. 30

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 29

*McGuffin v. SSA*,
    942 F.3d 1099 (Fed. Cir. 2019) ............................................................................ 4

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................................... 21

*Missouri Serv. Comm'n v. FERC*,
    337 F.3d 1066 (D.C. Cir. 2003) ......................................................................... 21

*Morris v. McCaddin*,
    553 F.2d 866 (4th Cir. 1977) ............................................................................. 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 20

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
    915 F.3d 197 (4th Cir. 2019) ................................................... 14, 23, 30

*Nat'l Ass'n of Postal Supervisors v. UPS*,
    26 F.4th 960 (D.C. Cir. 2022) ................................................................ 22

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
    595 U.S. 109 (2022) ............................................................................... 22

*New York v. Yellen*,
    15 F.4th 569 (2d Cir. 2021) ................................................................... 14

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................... 14

*North Dakota v. EPA*,
    127 F. Supp. 3d 1047 (D.N.D. 2015) ..................................................... 29

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ....................................................... 29

*Profiles, Inc. v. Bank of Am.*,
    453 F.Supp.3d 742 (D. Md. 2020) .......................................................... 14

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ..................................................... 23, 29, 30

*Roe v. Shanahan*,
    359 F. Supp. 3d 382 (E.D. Va. 2019) ..................................................... 29

*Sai v. Trans. Sec. Admin.*,
    54 F. Supp. 3d 5 (D.D.C. 2014) ............................................................. 24

*Schall v. U.S. Postal Serv.*,
    73 F.3d 341 (Fed. Cir. 1996) ................................................................... 5

*Senior Execs. Ass'n v. United States*,
    891 F. Supp. 2d 745 (D. Md. 2012) ....................................................... 23

*Shaw v. United States*,
    622 F.2d 520 (Ct. Cl. 1980) ..................................................................... 4

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ..................................................................... 22

*Taubman Realty Grp. Ltd. v. Mineta*,
    320 F.3d 475 (4th Cir. 2003) ..................................................................... 14

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................... 14

*Washington v. Trump*,
    441 F. Supp. 3d 1101 (W.D. Wash. 2020) .................................................. 29

*Washington v. Trump*,
    No. 25-cv-127, 2025 WL 415165 (W.D. Wash. Feb. 6, 2025) .................... 26

*Wash. Post v. Dep't of Homeland Sec.*,
    459 F. Supp. 2d 61 (D.D.C. 2006) ............................................................. 24

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................................... 15

*Winnebago Tribe of Nebraska v. Babbitt*,
    915 F. Supp. 157 (D.S.D. 1996) ................................................................. 16

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ................................................................................... 14

### Statutes and Regulations

5 U.S.C. § 551 ............................................................................................... 15

5 U.S.C. § 702 ............................................................................................... 15

5 U.S.C. § 704 ............................................................................................... 15

5 U.S.C. § 706 ................................................................................... 16, 17, 20

5 U.S.C. § 3502 ................................................................... 3, 6, 7, 17, 19, 22

5 U.S.C. § 3595 ............................................................................................... 5

5 U.S.C. § 4303 ............................................................................................. 22

5 U.S.C. § 7101 ............................................................................................... 4

5 U.S.C. § 7513 ................................................................................................................. 22

5 U.S.C. § 8502 ................................................................................................................. 25

29 U.S.C. § 2801 ................................................................................................................. 7

29 U.S.C. § 2864 ................................................................................................................. 7

29 U.S.C. § 3174 ................................................................................................................. 7

29 U.S.C. § 3361 ................................................................................................................. 7

42 U.S.C. § 215 ................................................................................................................. 27

42 U.S.C. § 501 ................................................................................................................. 25

42 U.S.C. § 502 ................................................................................................................. 25

42 U.S.C. § 503 ................................................................................................................. 25

Md. Code Ann., Lab. & Empl. § 11-303 ........................................................................... 7

Md. Code Ann., Lab. & Empl. § 11-304 ........................................................................... 7

N.J.S.A. 34:21-5 ................................................................................................................. 7

5 C.F.R. § 351.201 .......................................................................................................... 5, 17

5 C.F.R. § 351.202 .......................................................................................................... 6, 17

5 C.F.R. § 351.402 ............................................................................................................. 5

5 C.F.R. § 351.404 ............................................................................................................. 6

5 C.F.R. § 351.501 .......................................................................................................... 6, 17

5 C.F.R. § 351.502 .......................................................................................................... 6, 17

5 C.F.R. § 351.503 .......................................................................................................... 6, 17

5 C.F.R. § 351.504 .......................................................................................................... 6, 17

5 C.F.R. § 315.801 ........................................................................................................... 21

5 C.F.R. § 351.803 ...................................................................................... 3, 6, 7, 17, 19

5 C.F.R. § 315.804 ................................................................................. 4, 5

5 C.F.R. § 315.805 ................................................................................. 4

5 C.F.R. § 315.806 ................................................................................. 5

20 C.F.R. § 682.302 ............................................................................... 8

### Other Authorities

Amber Anderson, *DC launches unemployment website for federal workers amid job status chaos*, WUSA9 (Feb. 25, 2025), tinyurl.com/4ec8cfsx ........................................... 13

Andrea Hsu, *Judge says Trump's mass firing of federal employees is illegal and should be stopped*, NPR (Feb. 27, 2025), tinyurl.com/myw4bjdh .................................. 10

Chris Megerian et al., *Trump administration begins sweeping layoffs with probationary workers, warns of larger cuts to come*, AP (Feb. 13, 2025), tinyurl.com/mtzwfc6j ............. 9

Jill Colvin et al., *Anger, chaos and confusion take hold as federal workers face mass layoffs*, AP (Feb. 14, 2025) tinyurl.com/4dma39z7 .......................................... 21

Meg Kinnard, *A comprehensive look at DOGE's firings and layoffs so far*, AP (Feb. 21, 2025), tinyurl.com/kz4wryed ........................................................... 21

Memo. from Charles Ezell, Acting Dir., OPM, to Heads of Executive Dep'ts & Agencies (Mar. 4, 2025), tinyurl.com/yf6vmhpy ................................................... 12

Memo. from Russel T. Vought, Dir., Off. of Mgmt., & Budget & Charles Ezell, Acting Dir., OPM, to Heads of Executive Dep'ts & Agencies (Feb. 26, 2025), tinyurl.com/mr2bum3d ................................................................. 11

*Summary of Reduction in Force Under OPM's Regulations*, OPM.gov, tinyurl.com/9pz287wv ................................................................. 5

U.S. Off. of Pers. Mgmt., *Workforce Reshaping Operations Handbook* (2017) ........................ 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND, *et al.*,                    *

      Plaintiffs,                    *

  v.                                      *

UNITED STATES DEPARTMENT OF    *    Case No. 1:25-cv-00748-JKB
AGRIGULTURE, *et al.*,

      Defendants.                    *

                      *

*    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff States are suffering significant and irreparable harm caused by the unannounced, unlawful, mass termination of federal employees who work or reside in our jurisdictions. These mass firings were executed illegally, without proper process or the statutorily required notice to Plaintiff States. States are now left to pick up the pieces of the shattered federal workforce—addressing numerous unemployment compensation requests and helping our residents seek new jobs as each new wave of terminations crests. This Court should halt the unlawful firings now.

Since taking office on January 20, President Trump has made clear his desire to "dramatically reduce the size of the federal workforce." In keeping with that directive, the Office of Personnel Management ("OPM") directed agencies to terminate the bulk of the roughly 220,000 probationary employees serving in the federal government, i.e., those who have generally been in their positions for less than two years. To execute these marching orders, OPM provided agencies with stock language that cites the employees' performance as the reason for their terminations.

The Defendant agencies have followed OPM's directives, using boilerplate language to unlawfully fire probationary employees by the hundreds or thousands—all without any advance notice or warning to Plaintiff States. Defendants have not made official statistics available, but public reporting indicates that they have already terminated roughly 24,000 probationary employees in just over three weeks, and that more terminations are expected any day.

These unannounced mass layoffs have created growing chaos and confusion. Thousands of affected individuals have been fired and must now make pressing decisions about healthcare, unemployment benefits, and reemployment. For help, they are turning to Plaintiff States, who are responsible under both federal and state law for supporting their unemployed residents. But states are struggling to fulfill these obligations effectively without the forewarning required by federal law. States need notice to prepare for and mitigate the administrative burdens associated with a sharp uptick in federal unemployment claims; to plan and budget for the deployment of job transition and social services; and to facilitate connections between impacted workers, potential new employers, and partner organizations.

By firing tens of thousands of civil servants *en masse* without notice and under false pretenses, Defendants have impeded the ability of Plaintiff States to perform this essential work. And those harms are ongoing. The effective dates of employees' terminations are occurring on a rolling basis, and public reporting indicates that more terminations are imminent. States, however, generally have no idea how many of their residents have been or will be fired, or when such terminations occur, until employees begin requesting state benefits. And, because of the haphazard way these firings occurred, adjudicating employees' eligibility for unemployment benefits will require an outsized expenditure of resources. Beyond that, states are suffering from other injuries, including decreased income and sales tax revenues due to the unlawful mass firings.

None of this is legal. Civil servants—including probationary employees—may generally be fired only after a finding of unsatisfactory performance or misconduct, or else as part of a reduction in force ("RIF"). While the template termination language provided by OPM generically cites performance, that is clearly not the basis for these terminations. Instead, Defendant agencies are engaged in unlawful RIFs to shrink the size of the federal workforce. But to conduct a RIF, federal law requires 60 days' advance notice to affected employees and—importantly for Plaintiff States—requires 60 days' advance notice to states and local governments. *See* 5 U.S.C. § 3502(d)(3)(A) (requiring notice to states when 50 or more employees will be released from within a "competitive area"); 5 C.F.R. § 351.803(b) (same). These notice requirements are designed to mitigate the harms of large-scale federal firings—to give federal employees an opportunity to seek new jobs, which in turn reduces the strain on state social services, *and* to give states an adequate opportunity to address the inevitable fallout. Defendants' actions have extinguished these vital safeguards.

To prevent further irreparable harm, this Court should grant immediate relief (1) restraining Defendants from terminating any probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance, (2) reinstating probationary employees who were terminated on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individual determinations of conduct or performance, and (3) ordering Defendants to file a status report with the Court within 48 hours of entry of a temporary restraining order, and at regular intervals thereafter, identifying under seal all probationary employees terminated on or after January 20, 2025 (including the following information for each employee: agency, name, position title, grade, termination date, whether the probationary employee has been reinstated, and the date of any

reinstatement), and reporting all steps Defendants have taken to comply with the Court's order.

## BACKGROUND

**A.    Legal Framework.**

**a.  Probationary employees.**

Under civil service laws, new employees and certain employees who have changed offices or recently received a promotion are subject to probationary or trial periods. *See* 5 U.S.C. § 7101 *et seq.* For employees in the "competitive" service, the "probationary period" is one year, *id.* § 7511(a)(1)(A)(ii); for employees in the "excepted" service, there is a similar "waiting period" of two years, *id.* § 7511(a)(1)(C)(ii).[1] Defendants' mass terminations have affected both competitive and excepted service employees, and for ease of reference, this brief refers to both groups as "probationary" employees. A federal agency may generally terminate a probationary employee only: (1) for cause or (2) as part of a reduction in force.

Under OPM regulations, a federal agency may lawfully terminate a probationary employee for "unsatisfactory performance or conduct" if their "work performance or conduct . . . fails to demonstrate [their] fitness or [their] qualifications for continued employment." 5 C.F.R. § 315.804(a). To invoke this provision, however, an employer "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (internal quotation marks omitted); *Shaw v. United States*, 622 F.2d 520 (Ct. Cl. 1980) (similar).[2] And the agency must notify the terminated employee in writing "as to why he is being separated and the effective date of the action," including "the

---

[1] Competitive service employees are hired through an open, competitive hiring process and excepted service employees are appointed through a non-competitive hiring process.

[2] Probationary employees may also be terminated "for reasons based…on conditions arising before [their] appointment." 5 C.F.R. § 315.805.

agency's conclusions as to the inadequacies of his performance or conduct." 5 C.F.R. § 315.804(a); *id.* § 316.304. Probationary employees terminated for inadequate performance or conduct have limited appeal rights. *See, e.g.*, 5 C.F.R. § 315.806.

### b.    Reductions in force.

*Reduction-in-force procedures.* A RIF "is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). "A RIF is not an adverse action against a particular employee, but is directed solely at a position within an agency." *Id.*; *Schall v. U.S. Postal Serv.*, 73 F.3d 341, 344 (Fed. Cir. 1996); *see generally* 5 C.F.R. Part 351 (regulations governing RIFs). "A personnel action *must* be effected under RIF procedures" in certain circumstances, including when the "action to be taken" is a "[s]eparation" or "[f]urlough for more than 30 continuous days" and the "[r]easons for the action" are a "[r]eorganization," "[l]ack of work," or "[s]hortage of funds." U.S. Off. of Pers. Mgmt., *Workforce Reshaping Operations Handbook*, 25-26 (2017) [hereinafter "OPM Handbook"] (emphasis added), tinyurl.com/2p9meucx; *see* 5 C.F.R. § 351.201(a)(2) (an agency "shall" follow RIF regulations when employees are separated due to "lack of work" or "reorganization"); *id.* § 351.204.

Conducting a RIF is lengthy process—it can take upwards of 12 to 18 months to plan. Ex. HH, DiMartini Decl. ¶ 19. Agencies must ensure personnel records are complete and accurately reflect retention preferences, and must establish "competitive areas" within which "employees compete for retention under the RIF regulations." OPM Handbook, *supra*, at 29; *see* 5 C.F.R. § 351.402. A competitive area may be as small as an "organization in a local commuting area that is separate from other agency organizations" and may be as large as an entire agency. *Summary of Reduction in Force Under OPM's Regulations*, OPM.gov, tinyurl.com/9pz287wv (last visited Mar. 7, 2025). Here, Defendants have not defined the particular "competitive areas" at issue for

the terminations of their probationary employees.

Once an agency establishes a competitive area, the agency must establish a retention register of employees in each competitive level of positions included in the RIFs. 5 C.F.R. §§ 351.403-351.404. It must then rank employees for retention based on their tenure group, time in service (including military service), veteran preference, length of service, and performance. *See* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.501-351.504. These RIF regulations expressly extend to probationary employees and, in fact, grant probationary employees some retention preferences. *See* 5 C.F.R. § 351.202(a), (b); *id.* § 351.501(b).

**RIF notices to Plaintiff States.** Further, under a RIF, agencies are required to provide advance notice to affected employees and, in circumstances relevant here, to states and local governments. An employee "may not be released" as part of a RIF "unless" they receive 60 days' "written notice" that provides information on reemployment and career transition assistance, and also includes the option to share the employee's "resume and other relevant employment information for employment referral" with the "State unit or entity established under title I of the Workforce Investment Act of 1998." 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(a). And when a RIF will result in the termination of "50 or more employees in a competitive area," an agency must "provide written notification of the action at the same time it issues specific notices of separation to employees" to "[t]he State or the entity designated by the State to carry out rapid response activities under title I of the Workforce Investment Act of 1998," and also to "[t]he chief elected official of local government(s) within which these separations will occur." 5 C.F.R. § 351.803(b); *see* 5 U.S.C. § 3502(d)(3)(A) (same). This notice requirement is absolute: Absent such notice, "an employee may not be released . . . due to a reduction in force." 5 U.S.C. § 3502(d)(1).

Generally, this notice must be provided 60 days before any employee is terminated. *See*

5 U.S.C. § 3502(d)(1)(B). When a RIF is caused by circumstances "not reasonably foreseeable," a shorter notice period may apply—but even then, the notice period must "cover at least 30 full days before the effective date of release." 5 C.F.R. § 351.801(b); 5 U.S.C. § 3502(e). The notice provided to States and local officials must detail: (a) the number of employees to be separated, broken down by geographic area; (b) when those separations will occur; and (c) any other information that may facilitate the delivery of state and local services to affected workers. *See* 5 U.S.C. § 3502(d)(3)(B); 5 C.F.R. § 351.803(c).

### c.  States' rapid response assistance to displaced workers.

Under the Workforce Investment Act of 1998 ("WIA"), which has been succeeded by the Workforce Innovation and Opportunity Act of 2014 ("WIOA"),[3] states must carry out "rapid response activities" to assist dislocated workers in obtaining reemployment when there is a "mass layoff" or "other event" causing a "substantial increase[] in the number of unemployed individuals." 29 U.S.C. § 2864(a)(2)(A)(i)(II) (Sec. 134(a)(2)(A)(i)(II) of WIA); § 3174(a)(2)(A)(i)(II) (Sec. 134(a)(2)(A)(i)(II) of WIOA). State law imposes similar requirements. *See, e.g.*, Md. Code Ann., Lab. & Empl. §§ 11-303, -304 ("quick response program"); N.J.S.A. 34:21-5 ("response team"). To comply with these obligations, states have "rapid response" teams, established under the auspices of the state department of labor, or its equivalent, which implement a coordinated, multiple-partner strategy to provide immediate assistance to individuals in the wake of mass layoffs. *See, e.g.*, Ex. A, MD DOL Decl. ¶ 12; Ex. H, NJ DOL Decl. ¶ 6; Ex. E, IL IDES

---

[3] The rapid response duties imposed on states under Section 134(a)(2)(A) of WIA—referenced in 5 U.S.C. § 3502(d)(3)(A)(i)—still apply under Section 134(a)(2)(A) of WIOA. *Compare* 29 U.S.C. § 2864(a)(2)(A), *with* 29 U.S.C. § 3174(a)(2)(A). WIOA expressly provides that "[e]xcept as otherwise specified, a reference in a Federal law to a provision of the Workforce Investment Act of 1998 (29 U.S.C. 2801 *et seq.*) shall be deemed to refer to the corresponding provision of [WIOA, as amended]." 29 U.S.C. § 3361(a).

Decl. ¶¶ 28, 30; Ex. D, CA EDD Decl. ¶¶ 9-10; Ex. F, MA EOLWD Decl. ¶ 7; Ex. J, NY DOL

Decl. ¶ 7; Ex. K, OR OWI Decl. ¶ 5; Ex. C, AZ DES Decl. ¶¶ 3, 7-8; Ex. KK, CO DLE Decl. ¶ 6.

  States' obligations are triggered by the "announcement or notification of a mass layoff,"

20 C.F.R. § 682.302, which is defined as "layoffs affecting 50 or more workers," *id.* § 682.305(a),

or fewer if the state's definition has a lower minimum threshold, *id.* § 682.305(b). Plaintiff States

provide rapid response services to those terminated as part of a RIF. *See, e.g.*, Ex. A, MD DOL

Decl. ¶ 14; Ex. H, NJ DOL Decl. ¶ 12; Ex. D, CA EDD Decl. ¶¶ 11-12; Ex. C, AZ DES Decl.

¶¶ 9-10; Ex. F, MA EOLWD Decl. ¶14; Ex. J, NY DOL Decl. ¶ 7; Ex. K, OR OWI Decl. ¶¶ 12-

13; Ex. KK, CO DLE Decl. ¶¶ 12-13. Required rapid response services include: "the establishment

of onsite contact with employers and employee representatives"; "the provision of information and

access to available employment and training activities"; "the provision of emergency assistance";

and "assistance to the local community in developing a coordinated response and in obtaining

access to State economic development." 29 U.S.C. § 3102(51); *see also* Ex. H, NJ DOL Decl.

¶ 10; Ex. D, CA EDD Decl. ¶ 10; Ex. F, MA EOLWD Decl. ¶¶ 11-13; Ex. J, NY DOL Decl. ¶ 6;

Ex. K, OR OWI Decl. ¶¶ 10-11. The purpose of the rapid response system is to reduce reliance on

public benefit systems such as unemployment insurance, and to prevent or minimize the impact of

mass layoffs on workers, businesses, and communities, among other goals.

**B. Factual Background.**

  **a. Defendants are conducting mass terminations of probationary employees without providing notice to the states.**

  The Trump Administration has continually sought "to dramatically reduce the size of the

federal workforce." CHCO Email, *Am. Fed'n of Gov't Emps. v. OPM*, No. 3:25-cv-1780 (N.D.

Cal. Feb. 26, 2025) [hereinafter "*AFGE v. OPM*"], ECF 37-1 at 1. On January 20, Acting OPM

Director Charles Ezell distributed a memorandum directing agency heads to "identify all

employees on probationary periods . . . and [to] send a report to OPM listing all such employees." Memo. from Charles Ezell, Acting Dir., OPM, to Heads & Acting Heads of Dep'ts & Agencies 1 (Jan. 20, 2025), tinyurl.com/y4cjp5wh. The memo further directed agency heads to "promptly determine whether those employees should be retained by the agency." *Id.*

On February 13, OPM met with agency heads and ordered the firing of probationary employees. Chris Megerian et al., *Trump administration begins sweeping layoffs with probationary workers, warns of larger cuts to come*, AP (Feb. 13, 2025), tinyurl.com/mtzwfc6j. The next day, OPM reiterated that demand. OPM Email, *AFGE v. OPM*, ECF 37-1. It ordered agencies to "separate probationary employees . . . not identified as mission critical no later than . . . Monday, 2/17," and it "attached a template [termination] letter" stating terminations were due to performance. *Id.* at 1; *see, e.g.*, Bachelder Decl., *AFGE v. OPM*, ECF 18-5 at ¶ 9; Frassetto Decl., *AFGE v. OPM*, ECF 18-9 ¶ 22 [hereinafter "Frassetto Decl."]; Evans Decl., *AFGE v. OPM*, ECF 18-8 at ¶ 26 [hereinafter "Evans Decl."]; Ex. HH, DiMartini Decl. ¶¶ 5-10.

Agencies have heeded OPM's demand. While some agencies had already begun to terminate probationary employees by the dozens prior to OPM's directive, still more agencies immediately followed OPM's directive by firing probationary employees by the hundreds and, in many instances, thousands. On February 13, the Department of Energy terminated nearly 2,000 employees, the Department of Veterans Affairs terminated over 1,000 employees, and the Department of Agriculture terminated around 3,400 employees. Compl. ¶¶ 115-16, 119. The next day, the Department of Health and Human Services fired approximately 1,300 employees. *Id.* ¶ 124. Over the next few days, the Department of Interior fired 1,000 employees, the Department of Agriculture fired 2,000 employees, and the Department of Treasury terminated over 6,000 employees. *Id.* ¶¶ 126-30. Although precise figures are hard to come by, to date, approximately

9

24,000 probationary employees have been terminated, and thousands more terminations are imminent. *Id.* ¶¶ 102-40. Every single one of these terminations has occurred without proper notice to Plaintiff States, and Defendants have not provided notice of any forthcoming layoffs.

In carrying out the terminations, the agencies have largely relied on the template termination language provided by OPM, which generally stated that the employees were being terminated because their "ability, knowledge, and skills do not fit the Agency's current needs, and [their] performance has not been adequate to justify further employment at the Agency." Ex. N, Sealed Decl. ¶ 5; Ex. HH, DiMartini Decl. ¶ 13. The precise language used varies slightly between agencies, but within agencies, the same letter was largely used for all terminated employees. Frassetto Decl. ¶ 17; Evans Decl. at ¶ 26.

Although unsatisfactory performance can be a basis for terminating a probationary employee, the mass firings were not based on individualized findings regarding the probationary employees' performance.[4] A former OPM Director has stated publicly that it is "not possible . . . for so many federal agencies to have independently and simultaneously decided to terminate large numbers of their workers," or "to have done proper assessments of all these employees." Archuleta Decl., *AFGE v. OPM*, ECF 18-4 ¶¶ 12-13; Ex. HH, DiMartini Decl. ¶¶ 15-17 ("[I]t would take weeks or months to evaluate the job performance of [thousands of] employees"). Rather, as the Chief Human Capital Officer of the Veterans Administration recently told Congress: Agencies received "direction from [OPM]" and the termination notices sent to probationary employees were "provided" to them. Andrea Hsu, *Judge says Trump's mass firing of federal employees is illegal and should be stopped*, NPR (Feb. 27, 2025), tinyurl.com/myw4bjdh. Some termination letters

---

[4] Many employees who were purportedly terminated for unsatisfactory performance had recently received stellar performance reviews. *See, e.g.*, Ex. W, Sealed Decl. ¶ 11 ("Outstanding"); Ex. X, Sealed Decl. ¶¶ 12 ("Exceeds Expectations").

noted expressly that the individual was being terminated "[p]er OPM instructions." Schwartz Decl. *AFGE v. OPM*, ECF 39-4 ¶ 10.

The leadership of at least one agency—the National Science Foundation ("NSF")—told its employees that their termination letters were "boilerplate" provided by OPM, and that they were "following orders" and "ha[d] no choice." Frassetto Decl. ¶¶ 20. NSF leadership stated that their initial decision to retain probationary employees had been overruled by OPM, which directed the agency to "remove probationers" and provided them with only two justifications for these removals: "performance or conduct." *Id.* at 26, 30; *see* Ex. HH, DiMartini Decl. ¶¶ 5-6; Ex. GG, Grant Decl. ¶ 11. The agency opted for "performance" to preserve terminated employees' ability to "apply for unemployment." Frassetto Decl. at 26, 30; Evans Decl. ¶¶ 27-28. Leadership at one agency also "discussed openly in meetings" that the agency "did not review or consider actual job performance or conduct" of any terminated probationary employee. Ex. HH, DiMartini ¶ 16; Ex. GG, Grant Decl. ¶ 19 (similar regarding terminations at another agency). OPM's directive is "a political effort to reduce headcount" but "without following the rules of a RIF." Ex. HH, DiMartini Decl. ¶¶ 15, 18; Ex. GG, Grant Decl. ¶ 21 (same). Indeed, some agencies have now confirmed, in response to unemployment claims, that terminations were not done for cause, but were instead due to a "reduction in force" or else a "permanent lack of work due to a change in Presidential Administration." Ex. A, MD DOL Decl. ¶¶ 61-62.

On February 26, OPM issued additional guidance directing agencies to submit plans for broader RIFs of federal employees by March 13. Memo. from Russel T. Vought, Dir., Off. of Mgmt, & Budget & Charles Ezell, Acting Dir., OPM, to Heads of Executive Dep'ts & Agencies (Feb. 26, 2025), tinyurl.com/mr2bum3d. This guidance directed agencies to address how they will use certain "tools," including "continuing to evaluate probationary employees" in designing

11

upcoming RIF plans. *Id.* at 2-3. On March 3, following a district court order to OPM to rescind its directive to terminate probationary employees,[5] OPM revised its earlier January 20 guidance to state: "OPM is not directing agencies to take any specific performance-based actions regarding probationary employees. Agencies have ultimate decision-making authority over, and responsibility for, such personnel actions." Memo. from Charles Ezell, Acting Dir., OPM, to Heads of Executive Dep'ts & Agencies 2 (Mar. 4, 2025), tinyurl.com/yf6vmhpy. To Plaintiff States' knowledge, however, no Defendant agency has announced that it will reinstate all unlawfully fired employees, or cease mass firings of probationary employees based on OPM's revised language.

**b. States are grappling with a sudden uptick in unemployed residents and an unplanned spike in demand for public services.**

Since around January 20, many Plaintiff States have received a surge in unemployment benefits claims filed by former federal employees. *See, e.g.*, Ex. A, MD DOL Decl. ¶ 50 (813 claims); Ex. E, IL IDES Decl. ¶ 15 (446); Ex. H, NJ DOL Decl. ¶ 14 (388); Ex. D, CA EDD Decl. ¶ 30 (1,621); Ex. J, NY DOL Decl. ¶ 4 (550); Ex. KK, CO DLE Decl. ¶ 15 (544). These are already material increases in the number of claims filed compared to the same period last year for many states. *See, e.g.*, Ex. A, MD DOL Decl. ¶¶ 50, 52 (330% increase); Ex. KK, CO DLE Decl. ¶ 15 (303%); Ex. H, NJ DOL Decl. ¶¶ 33-34 (273%); Ex. D, CA EDD Decl. ¶ 30 (149%); Ex. E, IL IDES Decl. ¶¶ 15-16 (almost the same number of claims filed in last several weeks as in all of 2024); Ex. F, MA EOLWD Decl. ¶¶ 16-17 ("significant uptick"); Ex. J, NY DOL Decl. ¶ 4 ("significant increase"). This surge is only beginning because the effective dates for some terminations have not yet passed and there will be a delay between when individuals are fired and when they likely apply for benefits. But the trend is already clear. In the last few weeks, the

---

[5] *See AFGE v. OPM*, ECF 45.

Maryland Department of Labor has received approximately 30 to 60 claims every day. Ex. A, MD DOL Decl. ¶ 18; *see also, e.g.*, Ex. KK, CO DLE Decl. ¶ 15 (20-30 claims per day).

Yet Plaintiff States' departments of labor have received no notice of these terminations. *See, e.g.*, Ex. A, MD DOL Decl. ¶ 16; Ex. H, NJ DOL Decl. ¶ 13; Ex. E, IL IDES Decl. ¶ 29; Ex. D, CA EDD Decl. ¶ 13; Ex. F, MA EOLWD Decl. ¶ 15; Ex. C, AZ DES ¶ 10; Ex. J, NY DOL Decl. ¶ 8; Ex. K, OR OWI Decl. ¶ 14; Ex. KK, CO DLE Decl. ¶ 14. As a result, Plaintiff States cannot identify workers subjected to federal mass layoffs who are entitled to rapid response services and assistance with their benefits claims without devoting significant time, resources, and expense. Plaintiff States must affirmatively contact various federal agencies, monitor public reporting, rely on word-of-mouth, and conduct mass outreach to identify impacted workers, determine if additional firings will occur, and to attempt to provide services to those employees. *See, e.g.*, Ex. A, MD DOL Decl. ¶¶ 19-22, 22-23; Ex. H, NJ DOL Decl. ¶¶ 17-18; Ex. E, IL IDES Decl. ¶ 29; Ex. D, CA EDD Decl. ¶¶ 16-17, 19; Ex. F, MA EOLWD Decl. ¶¶ 18-22; Ex. K, OR OWI Decl. ¶¶ 15-19. Some Plaintiff States also are diverting or expecting to divert staff from other pressing projects and retrain them to provide these services. *See, e.g.*, Ex. A, MD DOL Decl. ¶¶ 24-28 (diverting several individuals from working on state matters such as occupational and professional licensing oversight, financial regulation, and state-funded workforce development projects); Ex. H, NJ DOL Decl. ¶¶ 18, 20; Ex. E, IL IDES Decl. ¶¶ 31-33; Ex. F, MA EOLWD Decl. ¶¶ 24-30. Other Plaintiff States have even created websites for terminated federal employees to assist them in seeking unemployment compensation and reemployment resources. *See, e.g.*, Amber Anderson, *DC launches unemployment website for federal workers amid job status chaos*, WUSA9 (Feb. 25, 2025), tinyurl.com/4ec8cfsx; Ex. A, MD DOL Decl. ¶ 29; Ex. E, IL IDES Decl. ¶ 32. And another Plaintiff State set up a dedicated telephone line. Ex. D, CA EDD Decl. ¶ 19.

## STANDARD OF REVIEW

Temporary restraining orders are designed to preserve the status quo during the pendency of litigation. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). A TRO is warranted when the movant demonstrates that: (1) "the movant is likely to succeed on the merits," (2) "the movant will likely suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities favors preliminary relief," and (4) "injunctive relief is in the public interest." *Profiles, Inc. v. Bank of Am.*, 453 F.Supp.3d 742, 746 (D. Md. 2020) (cleaned up). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    PLAINTIFF STATES HAVE STANDING.

To establish Article III standing, a plaintiff must demonstrate injury in fact, causation, and redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Here, Plaintiff States are suffering a series of concrete and irreparable harms because of Defendants' failure to provide notice required by law, and their unlawful firings. *See supra* B.b; *infra* Part III. These harms include "a direct injury in the form of a loss of specific tax revenues," *Wyoming v. Oklahoma*, 502 U.S. 437, 438 (1992), as well as harms to the operations of state agencies and informational harms, *infra* Part III. The "chain of economic events" is "realistic" and "predictabl[y]" flows from Defendants' unlawful actions. *New York v. Yellen*, 15 F.4th 569, 577 (2d Cir. 2021) (internal quotation marks and citation omitted). Further, this Court may remedy these harms, and Plaintiff States are expressly referenced in "the particular provision(s) of law upon which [Plaintiffs] seek redress," so they fall comfortably within the zone of interest. *Taubman Realty Grp. Ltd. v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003).

II.     **PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS.**

Plaintiff States are likely to succeed in showing that Defendants have violated the APA and that their actions are ultra vires.

**A.     Defendants have violated the Administrative Procedure Act.**

This Court may review multiple final agency actions taken in violation of the law: OPM's January 20, February 13, and 14 directives to terminate probationary employees *en masse*, and Defendants' unlawful RIFs—i.e., their termination of tens of thousands of probationary employees for non-performance reasons. These acts are contrary to law and arbitrary and capricious.

**a.     Defendants' actions are reviewable final agency actions.**

Under the APA, the Court may review the lawfulness of a "final agency action." 5 U.S.C. §§ 702, 704. "Agency action" is defined expansively to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," *id.* § 551(13), which "cover[s] comprehensively every manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). An agency action is "final" when it is the "consummation of the agency's decisionmaking process" and is an action "by which rights or obligation have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted).

Here, there are two types of "final agency actions" at issue. *First*, the directives that OPM issued to agencies on January 20, February 13, and February 14 to terminate probationary employees are final agency actions. As the Fourth Circuit instructs, "a court should consider the practical effect of the agency's determination" when assessing finality. *Chamblee v. Espy*, 100 F.3d 15, 17 (4th Cir. 1996) (internal quotation marks and alterations omitted). Here, OPM's directives were "definitive" and with "immediate practical effects." *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 856 (4th Cir. 2002). In response to these directives,

agencies have terminated tens of thousands of federal employees. Thousands of additional terminations are likely imminent. The U.S. District Court for the Northern District of California recently held, based on a "mountain of evidence," that OPM "unlawfully direct[ed] the mass termination of probationary employees across a wide range of federal agencies," *AFGE v. OPM*, ECF 45 at 8-9, and that its actions were reviewable, *id.* at 9, 11-13.[6] And OPM's recent two-sentence modification to its directive, stating that OPM is not directing mass firings, does not moot this issue. The directive continues to instruct agencies to take steps to fire probationary employees, and neither OPM nor Defendant agencies have sought to undo the harm caused by this directive, namely to fully remediate the termination of probationary employees.

*Second*, Defendants' unlawful RIFs—that is, their termination of tens of thousands of employees for non-performance reasons, without notice—are final agency actions subject to this Court's review. 5 U.S.C. § 706(2). Agencies must comply with "non-discretionary" procedural mandates when a RIF is initiated. *See, e.g.*, *Winnebago Tribe of Nebraska v. Babbitt*, 915 F. Supp. 157, 165-66 (D.S.D. 1996) (APA review is available when the issue before the Court is "not the decision to issue the RIF or the procedure for implementing the RIF" but "the defendant's failure to comply with the duty to consult . . . prior to making the decision"). And few other actions are as "final" as a termination. *Burdue v. FAA*, 774 F.3d 1076, 1080 (6th Cir. 2014) (employee termination is a "final agency action"); Ex. O, Sealed Decl. ¶ 5 (citing Ex. 1 ("final decision")).

---

[6] Specifically, the court in that case ordered OPM to rescind its January 20 memo, February 14 email, and all other efforts to "direct the termination of employees" at six federal agencies. *AFGE v. OPM*, ECF No. 45 at 24. That decision reaches only OPM and its director (because they were the only named defendants) and does not require federal agencies to halt terminations or perform other mandatory duties—it therefore does not remedy Plaintiff States' injuries in this case. To crystallize the point: regardless of whether the Defendant agencies here were following OPM's directive, they conducted unlawful RIFs. The relief granted in *AFGE v. OPM* does not encompass the relief that Plaintiff States seek here, including reinstatement of terminated employees.

**b. Defendants' failure to provide notice to states is contrary to law.**

Agency actions taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that are otherwise "not in accordance with law," cannot withstand judicial review. 5 U.S.C. § 706(2)(A), (C). The rule in this Circuit is clear: "An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its actions cannot stand and courts will strike it down." *Morris v. McCaddin*, 553 F.2d 866, 870 (4th Cir. 1977) (compiling authorities); *Fed. Defenders of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (explaining that it is a "deeply rooted principle[] of administrative law, not to mention common sense, [that] government agencies are generally required to follow their own regulations") (collecting authorities).

Congress delegated to OPM the authority to promulgate regulations that agencies must follow in implementing RIFs. 5 U.S.C. § 3502(a). And, exercising this authority, OPM has issued detailed RIF procedures that expressly encompass the separation of probationary employees. *See generally* C.F.R. Part 351; *see also* 5 C.F.R. § 351.202(a), (b); *id.* § 351.501(b); *id.* § 351.502 (a), (b). Critically, an agency "shall" conduct a RIF when it separates employees, or places them on furlough for more than 30 days, "because of lack of work; shortage of funds; insufficient personnel ceiling; or reorganization." *Id.* § 351.201(a)(2). That is precisely what happened here— probationary employees have been separated because the new Administration seeks a massive reorganization of the federal government. *See supra* B.a; Ex. HH, DiMartini Decl. ¶ 16 (OPM sought to "reduce headcount"). And when an agency conducts a RIF, it must provide advance notice to states and local governments when 50 or more employees will be terminated in a competitive area. 5 U.S.C § 3502; 5 C.F.R. § 351.803.

The Defendant agencies were required to follow RIF procedures in conducting mass firings of probationary employees—including the state notice procedures. The Defendants' performance-

based reasons for terminating probationary employees are clearly pretextual and the firings are, instead, part of the new Administration's efforts to massively restructure and reduce the size of the federal workforce. *See supra* B.a. Indeed, the purportedly performance-based mass terminations were pretextual because they were conducted directly pursuant to OPM's orders, and because they were effectuated without a good faith assessment of performance or conduct.

As to OPM's orders, these firings have largely occurred at OPM's direction even though, as a federal court recently recognized, "[n]o statute—anywhere, ever—has granted OPM the authority to direct the termination of employees in other agencies." *AFGE v. OPM*, ECF 45 at 7. Yet OPM provided agencies with direction and boilerplate termination language that is untethered from any particularized assessment of performance or conduct. Agencies used that language to terminate tens of thousands of employees in a matter of days—and have admitted that they were "following orders" and "ha[d] no choice." Frassetto Decl. ¶ 20.

The mass firings are also pretextual because they were performed without any good faith assessment of performance or conduct, or often without any assessment at all. As a former Human Capital Officer for the IRS explained, "Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices," a fact that was "discussed openly in meetings." Ex. HH, DeMartini Decl. ¶ 14. And a recently terminated Deputy Director for Operations of one agency similarly explained that the termination of probationary employees in his unit was "not based on any individualized assessment of the probationary employees." Ex. GG, Grant Decl. ¶ 19. Indeed, the relevant human resources official "never read a single person's resume, never spoke with any of the terminated probationary employees, and had no personal knowledge of their individual performance." Ex. GG, Grant Decl. ¶ 19. It is therefore unsurprising that, in responding to inquiries from state labor departments about

18

unemployment benefits, agencies have in some cases admitted that separations occurred due to a "reduction in force," and due a "permanent lack of work due to a change in Presidential Administration." *See* Ex. A, MD DOL Decl. ¶¶ 61-62.

Because Defendants are broadly terminating employees to shrink the federal workforce, they are conducting a RIF, and are accordingly in violation of statutes and regulations governing the RIF process. The law requires the provision of 60 days' notice to "[t]he State or the entity designated by the State to carry out rapid response activities under title I of the Workforce Investment Act of 1998," and also to "[t]he chief elected official of local government(s) within which these separations will occur." 5 C.F.R. § 351.803(b); *see* 5 U.S.C. § 3502(d)(3)(A).[7] There is nothing discretionary about these notice requirements. Congress made its intention clear by using mandatory language: "Notice . . . *shall* be given." *Id.* § 3502(d)(3)(A) (emphasis added). And the agencies' own regulations reiterate that "the agency *must* provide written notification" to states. 5 C.F.R. § 351.803(b) (emphasis added); *cf. Heelen v. Dep't of Com.*, 154 F.3d 1306, 1309 (Fed. Cir. 1998) (noting that an agency must "demonstrat[e] . . . compliance with proper RIF procedures"). Defendants have simply ignored these statutory and regulatory commands, making their actions contrary to law.

### c. Defendants' actions are arbitrary and capricious.

The APA also prohibits agencies from engaging in arbitrary and capricious action. 5 U.S.C. § 706(2)(A). Agency action must be premised on "reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). Generally, an agency may not "rel[y] on factors that Congress did not intend for it to consider, entirely ignore[] important aspects of the

---

[7] As noted above, because Defendants have not conducted lawful RIFs, they have not yet defined the precise "competitive areas" at issue—but it is beyond dispute that tens of thousands of probationary employees have been fired to date.

problem, explain[] its decision in a manner contrary to the evidence before it, or reach[] a decision that is so implausible that it cannot be ascribed to a difference in view." *Bedford Cnty. Memorial Hosp. v. HHS*, 769 F.2d 1017, 1022 (4th Cir. 1985) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The rationale proffered by the agency also must be the *actual* reason for the agency's action. *Dep't of Com. v. New York*, 588 U.S. 752, 780, 785 (2019). It cannot be "pretextual" or "contrived." *Id.* Here, OPM's directives and the agencies' implementation of them are arbitrary or capricious for at least three reasons.

*First*, Defendants failed to consider important aspects of the problem before terminating probationary employees *en masse* and without any advance warning or notice. *State Farm Mut.*, 463 U.S. at 43. To survive arbitrary-and-capricious review, an agency must demonstrate that it "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009). That did not happen here. To begin, Defendants ignored the downstream effects of firing tens of thousands of employees without warning. That was a mistake. For one thing, the effects on states are profound. Those include, among other things, an unexpected spike in unemployment of federal workers, an increase in demand for public services, a decrease in tax revenue, and the expenditure of significant time and resources to support a growing unemployed population. *See infra* Part III. Moreover, the Defendants—and OPM in particular—did not adequately consider the impact sudden and unexpected mass terminations would have on agency programming. Without notice, states have been deprived of vital resources to protect the public health and ensure emergency preparedness because the relevant federal employees were terminated—a consequence the Defendants do not seem to have considered. *See, e.g.*, Ex. I, NJ DOH Decl. ¶ 5-12. Put another way, Defendants seem to have engaged in no cost-benefit analysis whatsoever before executing

these unlawful RIFs. That lack of balancing is unreasonable and arbitrary. *See, e.g.*, *Michigan v. EPA*, 576 U.S. 743, 759 (2015) (holding that it was "unreasonable" for the agency to treat cost as "irrelevant"); *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (concluding that the SEC acted arbitrarily where it failed to "adequately . . . assess the economic effects of a new rule").

*Second*, it is arbitrary to abruptly fire thousands of employees without notice or consideration of their individual performance and expertise, or the impact on agencies' ability to carry out their statutory duties. Probationary employees are not an undifferentiated mass. Some are experts who have spent years in government and recently been promoted; some are nearing the two-year mark in federal service; others may have been hired only weeks ago. *See* 5 C.F.R. § 315.801. Some may have higher performance ratings than their non-probationary peers. Some— even if not "mission critical"—handle essential tasks like overseeing our nuclear weapons program or preventing the spread of bird flu and other communicable diseases. *See* Meg Kinnard, *A comprehensive look at DOGE's firings and layoffs so far*, AP (Feb. 21, 2025), tinyurl.com/kz4wryed; Ex. I, NJ DOH Decl. ¶¶ 5-8. Treating all these employees alike, as OPM required, makes no sense. Ex. HH, DiMartini Decl. ¶¶ 5-7. On-the-ground experience supports that commonsense point: Defendants' actions have succeeded only in creating widespread chaos. *See* Jill Colvin et al., *Anger, chaos and confusion take hold as federal workers face mass layoffs*, AP (Feb. 14, 2025), tinyurl.com/4dma39z7.

*Third*, Defendants relied on false statements to justify terminating probationary employees *en masse* without following RIF procedures. As the U.S. District Court for the Northern District of California correctly explained, "[r]eliance on facts that an agency knows are false . . . is the essence of arbitrary and capricious decisionmaking." *AFGE v. OPM*, ECF 45 at 10 (quoting *Missouri Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003)). Defendant agencies have

claimed that probationary employees' "performance has not been adequate to justify further employment at the Agency." Ex. DD, Sealed Decl. ¶ 6 (referencing internal Exhibit A). But as discussed, that rationale is false. *See supra* B.a. Courts are "not required to exhibit a naiveté from which ordinary citizens are free"—they may recognize pretext for what it is. *Dep't of Com.*, 588 U.S. at 785 (internal quotation marks and citation omitted).

### B.    Defendants' actions are *ultra vires*.

Defendants have unlawfully terminated tens of thousands of federal employees without any statutory authority to do so. "Administrative agencies are creatures of statute" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022). When agencies exercise authority not bestowed on them by Congress, they act *ultra vires*, and their actions may be struck down by courts. *See, e.g.*, *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *vacated on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

Defendants exceeded their authority by terminating probationary employees without following long-established safeguards. *See* 5 U.S.C. § 4303(a) (detailing when terminations may be made for cause); *id.* § 3502 (detailing RIF requirements). For the same reasons that Defendants' defiance of RIF procedures is contrary to law, *supra* Part II.A.b, it is also *ultra vires*. Defendants have terminated thousands of employees *en masse* as part of an unlawful RIF without complying with their mandatory duty to provide Plaintiff States and affected employees advance notice, nor have Defendants observed the detailed retention preferences governing a RIF. *See* 5 U.S.C. § 3502(a); Ex. A, MD DOL Decl. ¶ 72; Ex. HH, DiMartini Decl. ¶ 12 (explaining that one agency was specifically directed not to carve out veterans when creating the list of probationary employees to be terminated). *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. UPS*, 26 F.4th 960, 960 (D.C. Cir. 2022) (*ultra vires* claim stated when agency failed to perform a mandatory duty of consultation).

This is *ultra vires* action, plain and simple—the Defendant agencies have "stepped so plainly beyond the bounds of [their] statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up).

The same holds true for OPM's express directions to agency heads to terminate probationary employees in violation of governing RIF statutes and regulations. As one court recently observed, "[n]o statute—anywhere, ever—has granted OPM the authority to direct the termination of employees in other agencies." *AFGE v. OPM*, ECF 45 at 7. In other words, this is not a close call. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President [and its subordinate agencies] may not decline to follow a statutory mandate or prohibition simply because of policy objections."). Plaintiffs are therefore likely to succeed on the merits of this action.

## III.    PLAINTIFF STATES ARE SUFFERING IRREPARABLE INJURIES.

Plaintiff States also satisfy the second requirement for preliminary relief: showing that "irreparable injury is likely in the absence of an injunction." *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020). Irreparable harm is injury that "cannot fully be rectified by the final judgment after trial." *Mountain Valley Pipeline*, 915 F.3d at 216.

Where, as here, a procedural violation is alleged, irreparable harm is demonstrated by pointing to "concrete interests" affected by the violation, and the irreparable injury that will likely result. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500-01 (D. Md. 2020). "[E]conomic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline*, 918 F.3d at 366. This circumstance is present here, as Defendants are federal agencies, and no applicable waiver of sovereign immunity permits a suit for damages. *Senior Execs. Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) (explaining that "monetary damages are an inadequate remedy" because they are "unavailable"

23

due to federal sovereign immunity). Further, informational injury can also "be sufficient to establish irreparable harm if the information sought is time-sensitive." *Sai v. Trans. Sec. Admin.*, 54 F. Supp. 3d 5, 10 (D.D.C. 2014) (internal quotation marks omitted); *see Wash. Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) (similar). Plaintiff States are continuing to suffer multiple irreparable injuries due to Defendants' unlawful mass terminations. These injuries are exactly what the RIF statutory scheme anticipates and is designed to guard against.

### A.    Irreparable injuries to rapid response efforts.

Defendants' failure to notify Plaintiff States of the RIFs has caused Plaintiff States to devote significant additional resources to rapid response efforts to assist terminated federal employees. These resource diversions would not have occurred and would not continue to occur— and would not be as severe—if Defendants complied with the notice requirement. For example, because states have not received advance notice of which agencies are planning to conduct mass layoffs, many have been forced to divert staff (or anticipate doing so) to contact various federal agencies, monitor public reporting, and conduct mass outreach to those they believe to be affected. *See supra* Part B.b. Further, a greater number of unemployed residents will likely require rapid response services now than would be the case had lawful RIFs been conducted because, without notice, employees have not been able to find new jobs as efficiently and states' efforts to support that search have been stymied.

Indeed, although Defendants have not supplied states with notice of any RIF, many Plaintiff States have observed a surge in new claims for unemployment benefits by recently fired federal workers. *See supra* Part B.b. Further, even with many Plaintiff States' reallocation of resources, the response to date has been chaotic, less effective, and more costly to the public than if the required notice had been furnished. *See, e.g.*, Ex. E, IL IDES Decl. ¶¶ 32-34; Ex. D, CA EDD Decl. ¶¶ 19-20. And States cannot prepare and allocate resources for any future mass

24

terminations without knowing how many employees will be terminated and when.

These burdens stem from federal agencies' failure to provide the legally required advance notice of mass layoffs, which has left state personnel scrambling to fulfill their statutory duties. Plaintiff States face irreparable injury from Defendants' failure to provide time-sensitive information in advance of the terminations—such as the number of employees to be separated, when terminations will occur, and other information critical to preparing for and providing rapid response. *See Heritage Found. v. U.S. Dep't of State*, No. CV 24-2862 (TJK), 2024 WL 4607501, at *4 (D.D.C. Oct. 29, 2024) ("irreparable harm" occurs "where the requested [information is] time-sensitive and highly probative . . . of an imminent event"). Likewise, Plaintiff States suffer ongoing irreparable injury from the increased burdens on their personnel and the need to pull staff away from state projects. *See Cook Cnty. v. Wolf*, 962 F.3d 208, 233 (7th Cir. 2020) (irreparable harm caused by need to "divert resources away from existing programs").

### B.    Irreparable injuries to unemployment benefits administration.

Moreover, because federal agencies have unlawfully conducted RIFs without any warning, Plaintiff States will suffer irreparable injuries in the administration of their unemployment benefits programs. Many states provide unemployment compensation payments to persons who become unemployed through no fault of their own. For federal workers, these payments are generally reimbursed by the federal government, who will pay Unemployment Compensation for Federal Employees pursuant to 5 U.S.C. § 8502(a). The federal government also offers grants that cover some of the overhead costs of administering unemployment benefits. *See* 42 U.S.C. §§ 501-503. However, these federal grants are frequently less than the total costs incurred by Plaintiff States to administer their unemployment benefits programs. *See, e.g.*, Ex. A, MD DOL Decl. ¶ 37. As a result, many Plaintiff States have often needed to cover the shortage with their own state funds. *See, e.g.*, Ex. A, MD DOL Decl. ¶ 38.

The ongoing and unlawful federal RIFs will likely cause a significant administrative burden and increase costs in unemployment benefit administration, for two primary reasons. *First*, the increase in federal layoffs and the corresponding increase in unemployment claims will impose administrative burdens in terms of processing each claim. Many Plaintiff States have seen material increases in unemployment claims due to the recent mass firings. *See supra* Part B.b. Each additional claim filed inherently increases states' administrative burden and expense, some of which is borne by state funds. These administrative costs would have been mitigated had Defendants provided notice of the terminations, thus alerting employees to seek alternative employment and allowing states to assist employees in that search before their termination.

*Second*, additional administrative burdens will result from state unemployment benefits investigations necessitated by federal layoffs. When an employer alleges that an employee was terminated for cause, such as deficient performance or misconduct, Plaintiff States' laws generally require their claims examiners to investigate the assertion to determine eligibility for unemployment benefits. *See, e.g.*, Ex. A, MD DOL Decl. ¶¶ 54-55, 67-72; Ex. H, NJ DOL Decl. ¶¶ 29-32; Ex. E, IL IDES Decl. ¶¶ 10-14; Ex. D, CA EDD Decl. ¶¶ 31-41; Ex. F, MA EOLWD Decl. ¶¶ 46-54; Ex. KK, CO DLE Decl. ¶¶ 27-28. This labor-intensive process involves, among other things, fact-finding interviews and written determinations. It also provides for multiple layers of appeal. Thus, state personnel will be required to conduct time-consuming and expensive administrative investigations into these and future unemployment claims. This process will impose significant burdens on state administrative staff, and likely require further outlays of state funds, constituting irreparable harm. *See, e.g.*, *DeOtte v. State*, 20 F.4th 1055, 1068 (5th Cir. 2021) (states showed cognizable harm via "financial injury" caused by "strain on [each of] its healthcare programs"); *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165, at *5 (W.D. Wash. Feb.

6, 2025) (Executive Order creating unrecoverable and "substantial administrative costs for state agencies" caused irreparable harm).

### C.    Irreparable injuries to health benefits agencies.

Plaintiff States also anticipate increased costs to the agencies that enroll new participants in Medicaid and other health-benefits programs. Without employer-funded insurance, terminated employees will need to apply for state-administered insurance programs. *See, e.g.*, Ex. X, Sealed Decl. ¶ 7; Ex. W, Sealed Decl. ¶ 7; Ex. Q, Sealed Decl. ¶ 7. Fielding questions from terminated employees, processing an unexpected influx of applications, and providing other health-benefits services will consume state resources and irreparably harm Plaintiff States. *See, e.g.*, *Maryland Workers Impacted by Recent Federal Actions*, Maryland.gov (last visited Mar. 6, 2025), tinyurl.com/bdfde3bp (providing resources for health coverage to terminated federal employees).

### D.    Irreparable injuries to state programs that depend on federal workers.

Plaintiff States also face operational harm to state programming that depended on federal workers who were unlawfully fired. *See, e.g.*, Ex. G, MA EOHHS Decl. ¶¶ 4, 6, 10; Ex. I, NJ DOH Decl. ¶ 11; Ex. L, RI DOH Decl. ¶ 18. For example, some Plaintiff States' departments of health rely on federal civil service personnel recruited through the Center for Disease Control and Prevention's ("CDC") Public Health Associate Program ("PHAP"). *See, e.g.*, Ex. I, NJ DOH Decl. ¶¶ 5, 13 (citing 42 U.S.C. § 215); Ex. L, RI DOH Decl. ¶ 7. PHAP associates support "critical public health work through emergency preparedness," and manage "time-sensitive cases." Ex. I, NJ DOH Decl. ¶¶ 5, 11; *see* Ex. L, RI DOH Decl. ¶ 8. On or around February 15, these associates' positions were abruptly terminated, and while some associates were later notified that they would be reinstated, the sudden loss of essential personnel coupled with the lack of notice caused tangible harms. Ex. I, NJ DOH Decl. ¶¶ 10, 11; Ex. L, RI DOH Decl. ¶ 18. Associates could not "ensur[e]

27

their files were complete and ready for transition" to other employees, resulting in "administrative inefficiencies, duplicative work," and critical delays in communications with individuals exposed to communicable diseases, straining the Department's workforce capacity, with lasting impacts on its work. Ex. I, NJ DOH Decl. ¶ 13. Furthermore, one associate will not be returning to their position despite reinstatement, *id.* ¶ 9, 11-12, and at least one Plaintiff State has "yet to receive confirmation" of the reinstatement of associates from CDC—this turmoil is straining at least some Plaintiff States' public health capacity. *Id.* ¶ 9, 11-12; Ex, L, RI DOH Decl. ¶ 18.

### E.    Irreparable injuries to state tax base.

Finally, the unlawful and unnoticed federal mass layoffs will continue to cause irreparable harm to Plaintiff States' tax base. *See, e.g.*, Ex. II, MD Comptroller Decl. ¶¶ 6-10. For example, the large-scale terminations of probationary federal workers will cause a significant decline in tax receipts for the District of Columbia. The District estimates that its lost income tax revenue for the first 60 days alone, the period in which it should have received advance notice of any RIFs, will cost the District at least hundreds of thousands of dollars in lost income tax revenue. *See* Ex. FF, Clower Decl. Ex. B, OCFO Feb. 2025 Revenue Estimates, at 3 (expecting loss in income tax revenue to be around hundreds of millions annually, which pro rata suggests millions of dollars lost in 60 days); *see also* Ex. FF, Clower Decl. ¶ 9, tbl. 2 (estimating between hundreds of thousands to millions of lost income tax revenue in 60 days, depending on number of jobs lost). Similarly, the District will likely suffer sustained declines in sales tax revenue. *See* Ex. FF, Clower Decl. Ex. B, OCFO Feb. 2025 Revenue Estimates, at 3 (expecting loss in sales tax revenue to be in the tens of millions annually, suggesting millions of dollars lost in 60 days); Ex. FF, Clower Decl. ¶ 9, tbl. 2 (estimating between tens of thousands to millions of lost income tax revenue in 60 days, depending on number of jobs lost).

Had the District received the notice required by law, these losses would likely have been

mitigated, including because some employees would have been able to obtain alternative employment prior to their termination. *See* Ex. FF, Clower Decl. ¶ 12, tbl. 1, 3 (District's "total tax losses" for 1,000 federal employee terminations would be $1.1 million per year with notice (Table 3) compared to $3.9 million per year without notice (Table 1)—an over three-fold increase in fiscal harm). Such significant financial injury resulting directly from Defendants' unlawful terminations constitutes irreparable injury. *See, e.g.*, *Washington v. Trump*, 441 F. Supp. 3d 1101, 1126 (W.D. Wash. 2020) ("loss of the tax revenue associated with" federal action constituted irreparable injury); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (same).

## IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST HEAVILY FAVOR A TEMPORARY RESTRAINING ORDER.

Here, the public interest favors the Plaintiff States. "[T]he Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). "There is generally no public interest in the perpetuation of unlawful agency action." *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 582063, at *14 (D. Md. Feb. 24, 2025) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). But "'there is a substantial public interest in having governmental agencies abide by the federal laws' . . . 'that govern their existence and operations.'" *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *League of Women Voters*, 838 F.3d at 12). "And there is a strong public interest in curing the effects of the government's unlawful acts." *Am. Fed'n of Tchrs.*, 2025 WL 582063, at *14 (internal quotation marks and alterations omitted). This is especially true in the employment context, as "the public 'undoubtedly has an interest in seeing its governmental institutions follow the law and treat their employees in reasonable, nonarbitrary ways.'" *Roe*, 947 F.3d 207, 230-31 (4th Cir. 2020) (quoting *Roe v. Shanahan*, 359 F. Supp. 3d 382, 421 (E.D. Va. 2019)). For the same reasons that Plaintiff States

are likely to succeed on the merits, the equities and public interest require relief.

There is a particularly strong public interest in ensuring that states are properly notified in advance about a forthcoming RIF. Mass terminations of federal employees impose a direct financial and administrative burden on states. As set forth above, Plaintiff States are suffering administrative and resource strain, and additional irreparable harms to their economic interests. *See supra* Part III. These harms will only be further exacerbated if the federal government continues to fire probationary employees by the thousands.

Lastly, the public interests favoring a TRO far outweigh any harms from temporarily enjoining Defendants from terminating probationary employees and requiring the reinstatement of probationary employees who were recently terminated. For decades, federal agencies have hired and retained probationary employees. These regular expenditures have not caused federal agencies undue injury in the years that they have been operating, as evidenced by the fact that agencies fired their probationary employees *en masse* only when ordered to do so by OPM. *See, e.g.*, Frassetto Decl. ¶ 18 (the terminations were "not a decision the agency made" but "a direction [it] received"). Temporarily enjoining Defendants would "preserve the status quo during the pendency of litigation," *Mountain Valley Pipeline*, 915 F.3d at 216 n.8, specifically, the "last uncontested status between the parties which preceded the controversy," *League of Women Voters of N.C.*, 769 F.3d at 236. And "[i]t is in the public interest to prevent the[] discharge [of federal employees] for apparently arbitrary and indefensible reasons, at least until the Court can definitively decide the merits of plaintiffs' claims." *Roe*, 947 F.3d at 231 (quoting *Shanahan*, 359 F. Supp. 3d at 421).

## CONCLUSION

For the foregoing reasons, Plaintiff States' motion should be granted, and the Court should issue the accompanying proposed temporary restraining order.

Respectfully submitted,

**ANTHONY G. BROWN**
*Attorney General*
*State of Maryland*

*/s/ James D. Handley*
James D. Handley, Bar No.
20299
Virginia A. Williamson**
Assistant Attorneys General

200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
jhandley@oag.state.md.us
Phone: (410) 576-6993
Fax: (410) 576-6955

**BRIAN SCHWALB**
*Attorney General*
*District of Columbia*

Emma Simson
Senior Counsel to the Attorney
General

*/s/ Ryan Wilson*
Ryan Wilson**
Senior Counsel

Hannah Cole-Chu, Bar No. 20747
Anne Deng*
Pamela Disney**
Tessa Gellerson, Bar No. 21271
Charles Sinks, Bar No. 21185
Cara Spencer, Bar No. 20171
Assistant Attorneys General

Office of the Attorney General for
the District of Columbia
400 6th Street N.W., 10th Floor
Washington, D.C. 20001
(202) 230-2342
Ryan.Wilson@dc.gov

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

*/s/ Liz Kramer*
Liz Kramer*
Solicitor General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
liz.kramer@ag.state.mn.us

**KRISTIN K. MAYES**
*Attorney General*
*State of Arizona*

*/s/ Hayleigh S. Crawford*
Hayleigh S. Crawford*
Deputy Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

31

**ROB BONTA**
*Attorney General*
*State of California*

*/s/ Satoshi Yanai*
Satoshi Yanai*
Senior Assistant Attorney General

300 S. Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6400
satoshi.yanai@doj.ca.gov

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation

Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

*/s/ Michael Skold*
Michael Skold*
Solicitor General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5020
michael.skold@ct.gov

**ANNE E. LOPEZ**
*Attorney General*
*State of Hawai'i*

*/s/ Kaliko'onālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

*/s/ Gretchen Helfrich*
Gretchen Helfrich, ARDC
#6300004*
Deputy Chief
Special Litigation Bureau
Office of the Illinois Attorney
General
115 South LaSalle Street, 35th Floor
Chicago, IL 60603
Tel. (312) 814-3000
Gretchen.helfrich@ilag.gov

**ANDREA JOY CAMPBELL**
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Katherine Dirks*
Katherine Dirks*
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov

**DANA NESSEL**
*Attorney General*
*State of Michigan*

*/s/ Bryan Davis, Jr.*
Bryan Davis, Jr. (P84206)*
Debbie Taylor (P59382)*
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, MI 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200

**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy*
Deputy Solicitor General
25 Market Street
Trenton, NJ 08625
Phone: (862) 350-5800
Shankar.Duraiswamy@njoag.gov

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Anjana Samant*
Anjana Samant*
Deputy Counsel for Impact
Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov

**LETITIA JAMES**
*Attorney General*
*State of New York*

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

**DAN RAYFIELD**
*Attorney General*
*State of Oregon*

By: */s Deanna J. Chang*
Deanna J. Chang**
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

**CHARITY R. CLARK**
*Attorney General*
*State of Vermont*

*/s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

**PHIL WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
Deputy Solicitor General
Office of the Colorado Attorney
General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

*\* Pro hac vice application*
*forthcoming*
*\*\*Application for admission*
*pending*

March 7, 2025

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Natalya A. Buckler*
Natalya A. Buckler (RI Bar No. 8415)*
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2022
nbuckler@riag.ri.gov

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*Brian P. Keenan*
BRIAN P. KEENAN*
Assistant Attorney General
State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

**AARON D. FORD**
*Attorney General of Nevada*

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorneys for Plaintiffs*