# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND; et al.,

      Plaintiffs,

v.

C.A. No. []

United States Department of Agriculture; et al.,

      Defendants.

## DECLARATION OF PORTIA Y. WU

I, PORTIA Y. WU, declare as follows:

1.    I am a resident of the State of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I am currently employed by the Maryland Department of Labor as the Secretary of Labor.

3.    The Maryland Department of Labor (MD Labor) is responsible for connecting Marylanders to good jobs; protecting workers, consumers, and the public; supporting Maryland businesses; and fostering economic growth and competitiveness. The Department administers a wide range of federally funded workforce and training programs, including but not limited to those authorized by the Workforce Innovation and Opportunity Act (WIOA), that are vital to Maryland's economic stability and workforce development. The Department is the designated

1

state agency for oversight and coordination of federally required Rapid Response activities in the state.

4.     As Secretary of Labor, I have access to comprehensive reports and financial records that detail the state of Maryland's labor market, including claims for unemployment benefits, and the allocation and distribution of federal funding received by the Maryland Department of Labor. Additionally, my role includes oversight of the implementation and compliance of federally funded programs within the agency, ensuring all expenditures align with federal guidelines and regulations.

5.     According to our Department's most recent analysis, there are an estimated 160,000 federal civilian jobs located in Maryland and approximately 250,000 individuals reside in Maryland who work in federal civilian service. This includes workers stationed in the District of Columbia who commute from their Maryland residence, and multiple federal agencies that are physically located in the state. The average annual earnings for federal civilian jobs in Maryland is nearly $127,000.  At least seven Maryland counties have more than 10,000 residents employed by the federal government.

6.     For example, Montgomery County is home to several large federal agencies, such as the National Institutes for Health (which has approximately 18,000 jobs located in Maryland) and the Food and Drug Administration (which has approximately 13,000 jobs located in Maryland). Baltimore County is home to the Social Security Administration (which has about 9,000 jobs located in Maryland) and the Centers for Medicare & Medicaid Services (which has nearly 4,000 jobs located in Maryland).

2

7.     Furthermore, official estimates of the federal workforce in Maryland undercount the number of potentially impacted jobs due to the heavy presence of classified positions, such as at the National Security Agency located in Anne Arundel County.

8.     Maryland is also home to a significant military presence, hosting over a dozen military installations. According to the most recent statistics from the Department of Defense, there were 29,564 active-duty military personnel and an additional 17,988 national guard/reserve personnel stationed in Maryland as of June 2024 for a total of 47,552 military personnel. Top branches of the military represented in Maryland include 9,701 active-duty Navy personnel, 8,468 active duty Air Force personnel, and 7,822 active duty Army personnel.

**Rapid Response Expenditures**

9.     The Maryland Department of Labor is the designated state agency with responsibility for oversight and coordination of statewide Rapid Response activities, required by 29 U.S.C. § 3174(a)(2)(A) undertaken to provide immediate assistance to Marylanders subject to mass layoffs. Per 20 C.F.R. § 682.302, the State Workforce Agency must deliver Rapid Response services for mass layoffs that meet the agency's definition of mass layoff, as long as the definition does not exceed a minimum threshold of 50 affected workers. In Maryland, "mass layoff" is defined as a layoff from work of 25 or more workers in a single establishment for an expected duration of 7 days or more, at the same time, and for the same reason.

10.     The Maryland Department of Labor oversees state rapid response effort, as required by both the federal Workforce Innovation and Opportunity Act 29 U.S.C. § 3174(a)(2)(A), and Maryland's Economic Stabilization Act, *see* Md. Ann. Code Labor and Employment, § 11-303-304 (referred to as "quick response program").

3

11.     Rapid Response activities are intended to reduce reliance on public benefit systems, such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

12.     Pursuant to both federal and state regulations and policies, when properly notified of a qualifying event Maryland deploys a coordinated Rapid Response "team" comprised of the Department's Dislocated Services Unit (DSU), and Division of Unemployment Insurance staff, as well as personnel from the state's 13 Local Workforce Development Areas (formal subrecipients under WIOA Title I) and the Professional Outplacement Assistance Center. Collaboratively, these partners are required to provide informational resources and reemployment services for workers, including information and support for filing Unemployment Insurance (UI) claims, information regarding health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training.

13.     In addition, the DSU is responsible for contacting affected employers to collect, verify, and distribute information regarding impact on workers so that services can be rapidly deployed. Rapid Response teams, in coordination with the DSU and other listed partners, coordinate directly with employers, workers, and relevant partner organizations to provide rapid support and referrals to the American Job Centers located in the affected jurisdictions to provide support for the affected workers. The Division of Unemployment Insurance will mobilize to streamline and expedite the processing of unemployment claims.

4

14.     Rapid Response partners also facilitate connections to partner agencies and organizations to ensure their ability to provide timely assistance to terminated workers and their families, such as home heating assistance, legal aid, and financial advice. Pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal government is required to provide written notice to Maryland, or "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF. This period may only be shortened upon written notice and in no event shall be less than 30 days. 5 U.S.C. § 3502(e)(3). This notice is to be provided at the same time the federal government issues specific notices of separation to employees.

15.     That notice must include the number of employees to be separated from the agency/agencies, and the effective date of the separations, as well as other information required by the U.S. Office of Personnel Management. The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger Rapid Response activities, since it is explicitly to be given to the state entity required to carry out rapid response activities.

16.     The Maryland Department of Labor has not received the required advance notice of a federal reduction in force from any federal agency with locations in the state. Nor, to the best of my knowledge, has any other entity in the Maryland State Government received notice of a federal reduction in force.

17.     Yet, as detailed more below, the Maryland Department of Labor has already received at least 813 claims by ex-federal employees for unemployment benefits since January 21, 2025. The Department is also aware of public announcements of significant layoffs at

5

Maryland and D.C.-located federal agencies, including the Social Security Administration and Department of Veterans Affairs.

18.     The Department of Labor has also seen a significant uptick of new Unemployment Insurance claims of ex-federal employees just in the last few weeks, with an approximate range of 30 to 60 new such claims *every day*.

19.     In light of these claims and public reporting about ongoing and forthcoming federal layoffs, in order to comply with federal and state obligations, Departmental personnel have contacted dozens of federal agencies and offices to seek information as to whether mass layoffs are being conducted currently or are being planned in the future.

20.     The Division of Workforce Development and Adult Learning, the unit within the Department that administers the Rapid Response program, along with other statewide partners at the county and municipal level, have not received any substantive response as to these agencies' plans for mass layoffs.

21.     Because the Department has received no notice of federal RIFs, despite extensive outreach, we are dedicating significantly more staff, resources, and expenditures to fulfill our statutory obligation.

22.     Indeed, because we have not received the statutorily required advance notice of which agencies are planning to conduct mass layoffs, the Department has been forced to rely on public reporting and word-of-mouth to conduct after-the-fact outreach to potentially affected workers.  Reacting after a layoff is far more resource-intensive than the advance planning and assistance process required by law.

6

23.     As referenced above, Department staff have conducted extensive *affirmative* outreach to federal agencies and offices to try and determine the location and extent of upcoming layoffs.

24.     Moreover, the Department of Labor has had to devote significant additional staff time from fiscal, communications, grant management, operational and administrative, and policy teams to conduct broad-based outreach to try and identify recently terminated employees, to attempt to provide relevant resources and services rapidly.

25.     While Rapid Response activities are generally funded through federal appropriations under WIOA Title I, the additional burden of responding and the related expenses has required the Department to divert multiple staff from important state projects.

26.     For example, several individuals in the Department's Office of the Secretary and Office of Administration have been diverted from working on state matters to handle the federal response. Such state matters that are being affected through the diversion of staff include occupational and professional licensing oversight, financial regulation, state workforce development programs, and matters related to other non-federally funded activities of the Maryland Department of Labor.

27.     In addition, other Department personnel have been diverted from state-funded workforce development projects, including the Employment Advancement Right Now ("EARN") program, which is a Maryland's premiere workforce development grant initiative serving over 5,000 constituents annually.

28.     However, such staff have been instead dedicated to reacting to the latest layoff news, trying to identify the affected federal agency and ex-employees, provide information, and

7

otherwise adjust procedures and resources to assist confused and unemployed Marylanders in a complicated and rapidly evolving environment.

29.     As just one example of these efforts, Department staff created a new website, requiring significant time and expense, *see* Maryland Workers Impacted by Recent Federal Actions, https://response.maryland.gov/federalpublicservants/. This effort was a further attempt to provide  resources and services, which could normally be targeted at specific personnel impacted in future layoff events, but must instead be provided less efficiently and at greater expense to the entire public, because our personnel remain unaware of whether and when the next federal mass layoff event will occur, and who has been impacted and is in need of support.

30.     In sum, every day that goes by, the Department is devoting significant time, resources, and expense to simply try and identify workers subject to federal mass layoffs, conduct mass outreach, and otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide us the legally required notice of mass layoffs.

**Unemployment Assistance Process**

31.     The Maryland Department of Labor also manages claims for unemployment benefits by individuals formerly employed to work in Maryland.

32.     The Unemployment Compensation Law of Maryland (Title 8 of the Maryland Code, Labor and Employment Article in its entirety), enacted in 1936, provides insurance benefits, over an extended period of time, to persons who become unemployed through no fault of their own. Md. Code Ann. Lab. & Empl. Art. §8-102(d).

33.     As a general matter, the federal Government is required to reimburse Maryland for unemployment benefits provided to former federal employees. Specifically, Maryland is

8

party to an agreement with the United States Secretary of Labor, wherein the Maryland

Department of Labor pays, as an agent of the United States, Unemployment Compensation for

Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

34.     Pursuant to 5 U.S.C. § 8502(b), Maryland is reimbursed for UCFE payments to

federal employees in the same amount, on the same terms, and subject to the same conditions

which would be payable to them under Maryland Unemployment Compensation Law.

35.     In addition, the Maryland Department of Labor administers its federal-state

cooperative unemployment insurance program, financed in large part by grants from the federal

government pursuant to the Social Security Act. 42 U.S.C. §§ 501-503.

36.     The Maryland Unemployment Insurance Compensation Program, certified by the

U.S. Secretary of Labor under 42 U.S.C. §502(a), provides for payment of insurance benefits for

up to twenty-six (26) weeks to persons who find themselves unemployed through no fault of

their own. Md Code. Ann. Lab. & Empl. §§ 8-201-223, 8-801, 8-808, 8-901-910, 1001-1009.

37.     While the federal Government provides grants for the purpose of administrating

state unemployment benefit programs, these grants are frequently less than the total

administrative costs incurred by Maryland. And that is the case now; the federal grant monies

allocated to Maryland are not sufficient to adequately cover our unemployment benefit program

administration.

38.     In these circumstances, Maryland relies on its Special Administrative Expense

Fund (SAEF) when federal funding is insufficient. *See* Md. Code Ann., Labor & Employment

§§ 8-419 to 842. This fund may be comprised of previously transferred federal funds (in limited

circumstances), as well as monies collected by the state through fines, interest, and other

penalties, and contributions by the state legislature. *Id.* § 8-421. Currently, SAEF is comprised

9

entirely of state funds. Accordingly, any increase in administrative costs of our unemployment benefits program will be covered at least in part by state funds.

39.     Pursuant to Md. Code Ann. Lab. & Empl. § 8-805(a), an individual in Maryland who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the Maryland Secretary of Labor.

40.     Claimants file claims online using the Department's system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for her separation, work experience, and other relevant information. Md. Code Regs. § 09.32.02.05.

41.     The reason for termination alleged by the claimant is then transmitted to the claimant's employer(s) for verification. The employer is then asked to furnish a report of the separation from employment containing, *inter alia*, the reason for the employee's separation and a report of wage history. Md. Code Ann. Lab. & Empl. § 8-627; *see also* Md. Code Regs. § 09.32.02.05.

42.     There are various reasons why a claimant may be ineligible for, or disqualified from, receiving benefits. As a baseline, to be eligible for unemployment benefits, the individual must be unemployed. Md. Code. Ann. Lab. & Empl. § 8-801(a). A person is considered unemployed during any week they: (1) do not perform work for which wages are payable; or (2) work less than full-time and earn wages less than their assigned weekly benefit amount. Md. Code. Ann. Lab. & Empl. § 8-801(b). However, a part-time worker is not considered unemployed if they are working all the hours they are available for. Md. Code. Ann. Lab. & Empl. § 8-801(c).

10

43.     Additionally, a claimant is ineligible if they did not earn requisite wages within the first four of the last five completed calendar quarters, or alternatively the four most recent calendar quarters, before their claim is filed. Md. Code. Ann. Lab. & Empl. §§ 8-101(b) and 8-802.

44.     Maryland law disqualifies some claimants from benefits depending on the circumstances of their separation from employment. *See* Md. Code Ann. Lab. & Empl. § 8-1001, et seq. A claimant is disqualified if they quit their job without good cause directly related to employment conditions or employer actions. Md. Code Ann. Lab. & Empl. § 8-1001(a). Other disqualifying circumstances include, *inter alia*, termination for misconduct, aggravated misconduct, and gross misconduct. *Id.*

45.     A claims examiner at the Maryland Department of Labor is charged with making an initial determination on the claim. Md. Code. Ann. Lab. & Empl. §8-806(a)(1).

46.     If a determination involves a resolution of a dispute of material fact, the claims examiner must conduct a predetermination fact-finding interview after notice is provided to the employee and her employer(s). Md. Code. Ann. Lab & Empl. § 8-806(a)(2); Md. Code Regs. 09.32.02.16E. At the fact-finding proceeding, conducted by the claims examiner, the parties can offer evidence and argument, cross-examine witnesses, and otherwise develop an administrative record. Md. Code Regs. § 09.32.02.16E.

47.     Thereafter, a written initial determination must be made stating, *inter alia*, the weekly benefit amount, maximum benefits payable to the claimant in a benefit year, and the reasons for the determination. Md. Code Ann. Lab. & Empl. § 8-806(c).

48.     If the claims examiner's review of a claim reveals no dispute of material fact, but the information reviewed indicates that claimant may be ineligible or disqualified, the claims

11

examiners must still schedule a call for an appointment for a fact-finding interview and render a written decision. Md. Code Regs. 09.32.02.16(D) and (E).

49.     A claimant or an employer may file an administrative appeal within 15 days. Lab. & Empl. § 8-806(e)(1).

## Unemployment Benefits Recent Experience and Investigatory Process

50.     The Department of Labor's latest data indicates that at least 813 former federal employees have applied for unemployment benefits since January 21, 2025.

51.     As noted above, the number of UCFE claims has increased significantly in just the last few weeks, starting on or around February 14, 2025.

52.     In fact, the amount of UCFE claims received by the Maryland Department of Labor since January 21, 2025, is significantly higher than past years. By way of example, from January 21, 2024, to March 3, 2024, we received only 189 unemployment claims containing federal wages in the claimant's base period.

53.     While not required to apply for unemployment benefits, multiple individuals have attached in their application their letter of employment termination from the federal government. Such letters indicate that these individuals were probationary employees purportedly terminated for cause.

54.     When an employer provides the initial report of separation to the Department, the employer must indicate the reason for the separation, including whether the employee was fired for cause, such as misconduct.

55.     Accordingly, if an employer states in its report of separation that an individual was terminated because performance has not been adequate to justify further employment at the

12

Agency, the Maryland Department of Labor's procedures require that the claims examiner must investigate the reason for discharge.

56.     The Maryland Department of Labor is required to verify both wages and reason for separation of employment from each federal agency by sending a request for wage and separation information.  20 C.F.R. §§ 609.6(e)(1), 609.21 through 609.25.  While private employers report wages each quarter for all employees into the Department's database, see Code Md. Regs. § 09.32.01.12, federal agencies are not required to regularly report active employee wages to the States.

57.     The same Department staff who handle regular unemployment claims also process and adjudicate UCFE claims.  Redirecting staff from regular Unemployment Insurance (UI) claims to process and adjudicate Unemployment Compensation for Federal Employees (UCFE) claims threatens to strain our resources - especially because the lack of notice denied the Department the opportunity to educate potential claimants on claims filing, certification of work search, and other matters. Lack of claimant awareness of program processes and requirements has historically led claimants to compliance errors affecting their entitlement to benefits absent extensive work by Department staff to fix issues with their claims.

58.     This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating significant backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods. By diverting resources, we compromise the efficiency and responsiveness of our claims processing system, ultimately undermining public trust and exacerbating economic hardship.

13

59.     While the Department of Labor is only beginning to process these claims, our staff has already begun the process of contacting relevant federal agencies to request information on relevant terminations, to determine if they were in fact done for cause.

60.     Thus far, we have received at least 193 reports of separation from federal agencies, concerning their recently terminated employees.

61.     Several of the reports gave as a reason for termination only that there was a "permanent lack of work due to a change in Presidential Administration."

62.     In addition, the Department received several reports from federal agencies explicitly stating that the employees were "laid off due to a reduction in force." Such reports were received from multiple federal agencies not disclosed here out of an abundance of caution to preserve privacy.

63.     And, as relevant here, certain reports asserted that the employee at issue was terminated for cause, for instance due to "unsatisfactory work performance" and similar generic performance-related bases.

64.     Similarly, other reports highlighted various potentially disqualifying circumstances. For instance, agencies indicated that claimants might not be genuinely unemployed or had voluntarily resigned from their positions.

65.     These reports were received from multiple federal agencies not disclosed here out of an abundance of caution to preserve privacy.

66.     Yet at the same time, termination letters, as well as recent statements of the President and other federal officials, indicate that the overwhelming majority of recent federal terminations were not for-cause firings, based on individualized assessments of performance, but

14

instead constitute a Government-wide effort to shrink the size of the federal workforce, an effective reduction in force.

67.     Where federal agencies assert that certain individual federal employees were terminated for cause or are otherwise ineligible or disqualified from benefits, or where there is disputed or conflicting information, our Department will be required to follow an intensive and mandatory investigative process for those unemployment claims.

68.     Department staff, due to regulatory requirements, must treat these separations as potential misconduct firings. This necessitates extensive investigations and fact-finding, leading to a considerable drain on resources and time, and adds delay to the benefit process.

69.     The procedures impose a significant strain on the Maryland Department of Labor's financial and temporal resources. Each case demanding interviews and/or a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

70.     Moreover, where federal agencies fail to provide responses to requests for separation information, the onus is on the Department to gather necessary wage and separation information. 20 C.F.R. § 609.6 (e)(2). This requires claims staff to solicit evidence from the claimants in the form of pay stubs, W-2s and affidavits and to pay benefits based on that information. In fact, recent federal guidance regarding federal unemployment during recent government shutdowns encourages states to have claimants file an affidavit, using available proof, given "limited federal HR resources" to respond to requests for separation information.

15

"Unemployment Insurance Program Letter 03-22," U.S. Department of Labor, November 2022,
https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2021/UIPL_03-22.pdf.

71.    Further, payment to large numbers of claimants without employer verification
was a direct cause of thousands of erroneous overpayments during the COVID-19 pandemic -
causing the Department to investigate, issue overpayment determinations, and litigate appeals.

72.    Additionally complicating matters, it has come to our attention that termination
notices issued by federal agencies were not issued in compliance with governing reduction in
force procedures. It is apparent that there are affected individuals, including veterans, who
should have been accorded preference under required RIF procedures but were not. To the
extent that preferences and other requirements would have precluded termination, and federal
employees successfully challenge their separations, this will cause the Department to re-
adjudicate claims, pursue overpayments, and conduct appeals.

73.    As noted above, because current federal appropriations are insufficient to fully
support our unemployment benefits program, Maryland is already relying on state SAEF monies
to cover the difference. Further administrative burdens and strain imposed by administrative
investigations will therefore likely require additional state funds.

74.    The cumulative effect of these investigations translates to substantial expenditures
on personnel, administrative overhead, and the technological infrastructure required to manage
the burgeoning caseload, ultimately depleting the department's budget and hindering its ability to
address other critical labor-related issues.

Executed on March 6, 2025, at Annapolis, Maryland.

Portia Y. Wu

16