# Exhibit J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND; et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DERPARTMENT OF AGRICULTURE; et al., <br><br> Defendants. | Case No.: 1:25-cv- |

### DECLARATION OF ROBERT ASARO-ANGELO

I, Robert Asaro-Angelo, declare as follows:

1. I am a resident of the State of New Jersey. I am over the age of 18. I am currently the Commissioner of the New Jersey State Department of Labor and Workforce Development ("NJDOL").

2. I provide this declaration regarding certain facts based on my personal knowledge and review of information provided to me by NJDOL personnel.

3. The mission of NJDOL is to protect New Jersey's workforce, strengthen its businesses, and promote the dignity of work. NJDOL oversees New Jersey's three wage-protection programs (Unemployment, Temporary Disability, and Family Leave Insurance),

1

which provide cash benefits to workers who lose their jobs through no fault of their own, or are unable to work because they are sick or injured, caring for a family member, or bonding with a new child. The NJDOL also oversees the Division of Disability Determination Services program, which helps individuals who are disabled and are unable to work apply for cash benefits through the federal Social Security Program; oversees and operates the Division of Workforce Development, which is responsible for New Jersey's workforce services, including vocational rehabilitation services, veterans' services, and more; and oversees the Division of Employer Accounts, which helps employers throughout New Jersey maintain compliance with Unemployment and Disability Insurance laws. Additionally, NJDOL enforces the New Jersey Public Employees Occupational Safety and Health Act as an Occupational Safety and Health Administration State Plan.

4. As Commissioner, I have access to comprehensive reports and financial records that detail the state of New Jersey's labor market, including claims for unemployment benefits, and the allocation and distribution of federal funding received by NJDOL. Additionally, my role includes overseeing the implementation of, and compliance with, federally funded programs within the agency, ensuring all expenditures align with federal guidelines and regulations.

5. The ongoing mass-layoff of federal workers is irreparably harming New Jersey in several ways.

**Rapid Response Team Expenditures**

6. NJDOL oversees the Rapid Response Program, a coordinated, multiple-partner strategy to provide immediate assistance to New Jerseyans subject to mass layoffs. NJDOL is the state entity responsible for conducting outreach and providing unemployment services

required by the federal Workforce Investment Act of 1998, as amended by the federal Workforce Innovation and Opportunity Act of 2014.

7. Specifically, a state rapid response program is required by both the federal Workforce Innovation and Opportunity Act 29 U.S.C. § 3174(A)(2)(i) and N.J.S.A. 34:21-5.

8. When a private employer with more than 100 employees contemplates a mass layoff, terminating 50 or more employees, the federal Worker Adjustment and Retraining Notification (WARN) Act imposes critical notice requirements. Specifically, the employer is required to notify certain groups including State dislocated worker units, at least sixty days in advance of the layoffs, so that rapid response activities can be undertaken to ameliorate the negative effects of large unemployment events. 29 U.S.C. § 2101 et seq.

9. The purpose of the Rapid Response Program is to reduce reliance on public benefit systems such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

10. When notified of a forthcoming mass layoff, the Rapid Response team will quickly provide informational resources and reemployment services for workers, including but not limited to: information and support for filing Unemployment Insurance (UI) claims, information on the impacts of layoffs on health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training. The information is either presented virtually or on site at the discretion of the employer.

11. I understand that, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal Government is similarly required to notify "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF.

12. My understanding is that the notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

13. To the best of my knowledge, neither the NJDOL nor any other entity in the New Jersey State Government have received notice of a federal reduction in force at any federal agency.

14. NJDOL's data indicates that 388 former federal employees, both probationary and non-probationary, have applied for unemployment benefits from January 21, 2025, to February 26, 2025. There was a material increase in the number of such claims beginning in mid-February.

15. During the same period in 2024, only 104 federal unemployment claims were filed with NJDOL. In the four months preceding the Executive Order, an average of 79 federal unemployment claims were filed each month.

16. Due to the lack of notice of these wide-scale federal employee firings, NJDOL will have to devote a significant amount of time to conduct broad-based outreach to try to identify recently terminated employees, and provide relevant resources and assistance in processing claims.

17. In addition, because of the lack of notice, NJDOL has been unable to plan in advance to allocate more staff, resources, and expenditures as needed to fulfill our statutory mission and address the influx of claims.

18. In sum, my office needs to devote significant time, resources, and expense to simply try to identify workers subject to federal mass layoffs and otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide us the legally required notice of mass layoffs.

### Unemployment Assistance Process

19. NJDOL also manages claims for unemployment benefits by individuals formerly employed to work in New Jersey.

20. The Unemployment Compensation Law of New Jersey provides insurance benefits, over an extended period of time, to persons who become unemployed through no fault of their own. N.J. Stat. Ann. §§ 43:21-1–24.30.

21. As a general matter, the federal Government is required to reimburse New Jersey for unemployment benefits provided to former federal employees. Specifically, the Division of Employment Security is party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a). N.J. Stat. Ann. § 43:21-5.2.

22. Pursuant to 5 U.S.C. § 8502(b), New Jersey is reimbursed for UCFE payments to federal employees in the same amount, on the same terms, and subject to the same conditions which would be payable to them under the New Jersey Unemployment Compensation Law.

5

23. Pursuant to N.J. Stat. Ann. § 43:21-6, an individual in New Jersey who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the Director of the Division of Unemployment and Temporary Disability Insurance of the Department of Labor and Workforce Development of the State of New Jersey.

24. Claimants file claims online or by phone using NJDOL's system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for her separation, work experience, and other relevant information. The claimant is then provided a notice from the Division informing them that the claim is being processed as well as their expected monetary determination, if wage information is available to the Division.

25. The employer is then contacted and asked to furnish a report of the separation from employment containing the reason for the employee's separation and, if not already available to the Division, a report of wage history. N.J. Admin. Code § 12:17-5.5; see also N.J. Admin. Code § 12:17-3.2.

26. New Jersey law disqualifies or delays some claimants from receiving benefits depending on the circumstances of their separation from employment or other factors. *See* N.J. Stat. Ann. § 43:21-5. Disqualifying or delaying circumstances include, *inter alia*, termination for misconduct, which if confirmed after investigation by NJDOL results in a six-week waiting period before receiving benefits. *Id.*, see also N.J. Admin. Code §§ 12:17-10.1–10.8.

27. After a claimant has filed a claim, the claimant may be required to participate in fact-finding and electronic adjudication to determine eligibility for benefits. N.J. Admin. Code § 12:17-4.3(g). Thereafter, a benefit determination notice will be made stating, *inter alia*, the

information used to determine monetary eligibility and if he or she is found ineligible or disqualified for benefits. N.J. Admin. Code § 12:17-4.7.

28. A claimant may file an appeal within 21 days from the mailing date of the benefit determination notice. An employer may file for appeal within 7 days of confirmed receipt of notification of an initial determination. N.J. Stat. Ann § 43:21-6(b)(1). An initial determination is final unless an appeal is filed, and such appeals may proceed through administrative and then judicial review. N.J. Admin. Code §§ 1:12-1–18.5.

### Unemployment Benefits Recent Experience and Investigatory Process

29. As noted above, there has been a significant increase in unemployment claims for former federal employees received by NJDOL since January 20, 2025 and in particular since mid-February.

30. Private sector employers are required to file quarterly wage information via WR-30 and NJ-927s with NJDOL. However, federal public sector employers are not required to provide such wage information.

31. For claims submitted by federal public sector employees, including every UCFE claim, NJDOL must reach out to the employer to determine wage information and the employer's reasons for the dismissal. The federal employer then has 10 days to respond to the request. Only when the information is received can the benefit amount calculation proceed. If the information is not received, additional outreach to the claimant is required to obtain pay stubs and other wage verifying information. As a result, NJDOL must expend more time and resources to process UCFE claims than regular UI claims.

32. Furthermore, if there is a dispute between the employer and employee as to the reason for the termination, or if any reason is provided for the separation other than an

agreement of lack of work between the employer and claimant, NJDOL's procedures require that the claims examiner investigate the reason for discharge.

33. I understand from public reporting that many probationary workers were notified that they were being terminated for performance. I therefore anticipate that at least some federal agencies will maintain the position that the terminated probationary employees were fired due to poor performance.

34. NJDOL thus expects that it will have to follow our intensive investigative process to investigate the reasons for the firings of many probationary employees. While designed to ensure fairness, the procedures impose a significant strain on NJDOL's financial and temporal resources. Each case demands a fact-finding proceeding and necessitates extensive staff hours for scheduling, conducting phone interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

35. The cumulative effect of these investigations translates to substantial expenditures on personnel, administrative overhead, and the technological infrastructure required to manage the burgeoning caseload, ultimately impacting NJDOL's budget and hindering its ability to address other critical labor-related issues.

36. The same Department staff who handle regular unemployment claims also process and adjudicate UCFE claims. Redirecting staff from handling regular Unemployment Insurance (UI) claims to process and adjudicate this sudden influx of resource-intensive UCFE claims threatens to strain our resources.

37. This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods.

38. Recent statements of the President and other federal officials have indicated that the overwhelming majority of recent federal terminations were not for-cause firings, based on individualized assessments of performance, but instead constitute a Government-wide effort to shrink the size of the federal workforce, an effective reduction in force.

39. As a result, it is likely that the overwhelming majority of recently-terminated federal employees will in fact be eligible for state unemployment benefits, because they were not terminated for cause.

40. However, statements in termination letters provided to probationary employees state such terminations are for-cause and will necessitate extensive and irreparable investigatory costs and resource expenditures by NJDOL.

### **Increased Unemployment Benefits**

41. Finally, New Jersey will also bear increased costs in the form of unemployment benefits of ex-federal employees. While the federal government is generally required to reimburse New Jersey for UCFE benefits, New Jersey must pay such benefits in the first instance, depleting the statewide trust fund that is supported by private employers in the state.

42. Moreover, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program. 42 U.S.C. § 502(a). While New Jersey has been and continues to expend additional resources necessary to address the uptick in federal unemployment claims, it is thus entirely speculative whether our Department's costs will be fully reimbursed.

Executed on March 5, 2025, at Trenton, New Jersey.

_____
Robert Asaro-Angelo, Commissioner

New Jersey Department of Labor & Workforce Development