# Exhibit I I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**STATE OF MARYLAND**, *et al.*,

    *Plaintiffs,*

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE**, *et al.,*

    *Defendants.*

## DECLARATION OF JEFFREY GRANT

I, Jeffrey Grant, declare under penalty of perjury that the following statements are true and correct:

1. My name is Jeffrey Grant. I am over the age of 18 and able to provide true and accurate testimony under oath.

2. I give this declaration based upon my personal knowledge of the facts recited.

3. I am a resident of the State of Maryland.

4. On February 28, 2025, I retired from my role as the Deputy Director for Operations in the Center for Consumer Information and Insurance Oversight (CCIIO) within the Centers for Medicare & Medicaid Services (CMS) after 41 years of federal service.

5. In my role as Deputy Director for Operations I was responsible for all external facing operations, including Healthcare.gov, and internal operations including, personnel, contracts, budgets, and facilities for CCIIO. In this role, I was responsible for supervising eight group directors and a support office, who in turn oversaw CCIIO's more than 600 employees, including

82 who were initially identified as probationary employees.[1]

6. Beginning after January 20, 2025, the CMS Chief Human Capital Officer (CHCO) asked CMS center directors to evaluate their probationary employees and determine any that should be removed from service.

7. Thereafter, a manager within the CMS Office of Human Capital (OHC) followed up to request updates on a daily basis regarding which probationary employees should be removed from service. This was unusual because in my experience OHC had never proactively inquired about whether particular probationary employees should be retained, and certainly not on a daily basis. OHC explained that their ongoing requests for information about probationary employees were at the request of the Department of Health and Human Services.

8. In accordance with the direction from the CMS CHCO, I met with group directors who reported to me and communicated to them that they should identify for removal all probationary employees with any performance issues, even those with marginal performance issues that in other circumstances would not have resulted in their termination.

9. The group of directors uniformly assured me that none of the probationary employees in CCIIO should be removed from service because their performance uniformly met and typically exceeded the expectations and needs of the agency for probationary employees. Accordingly, I did not identify to OHC any probationary employees at CCIIO who should be removed from service.

10. At or about 11:00 a.m. on February 14, 2025, the Deputy Chief Operating Officer of CMS convened an emergency meeting of CMS's Strategic Planning and Management Council, which is a coordinating body for all of the non-political center directors, deputy center directors, and

---

[1] Although 82 employees were initially identified as probationary employees, approximately 10 of these employees were not ultimately determined not to be probationary.

career civil service officials leading offices at CMS.

11. This Strategic Planning and Management Council meeting was conducted by Zoom. During the meeting, Stephanie Bovell, CHCO of CMS reported that at 1:00 pm that day, all probationary employees at CMS would begin to be terminated, effective later that afternoon, a process that would run between 1:00 and 4:00 pm that day. Ms. Bovell informed the meeting that the HHS CHCO had informed her and all other HHS Agency CHCOs of the decision to terminate all probationary employees during a call the previous evening. Ms. Bovell further explained that the HHS CHCO informed the Agency CHCOs that probationary employees would be terminated *en masse* via letters that would say that the employees' unsatisfactory performance was the reason for removal. Ms. Bovell stated that she and other HHS Agency CHCOs had told the HHS CHCO during the February 13 call that they did not believe that the proposed termination letters were a legitimate basis for the mass terminations of probationary employees because there was no basis for the reasons stated in the letter. Ms. Bovell stated during the meeting that although the terminations were going forward it was unclear at the time of the Strategic Planning and Management Council meeting whether the Agency CHCOs' feedback would result in HHS changing the reasons for termination given in the letters.

12. During a 4:00 p.m. all-managers meeting at CMS, Ms. Bovell informed CMS managers that the termination letters had not yet been distributed to probationary employees, and it was unclear when the terminations would take place.

13. On the morning of February 15, 2025, CMS distributed near-identical form termination letters to probationary employees across CMS, including 82 employees at CCIIO.[2] No CCIIO

---

[2] As explained above in note 1, CMS subsequently determined that approximately 10 of these employees were not in fact probationary employees, and it has subsequently rescinded the terminations of those non-probationary employees.

3

managers were copied on the letters that terminated the probationary employees who worked for us, including their direct line supervisors who ordinarily would be aware of any adverse personnel action taken against any direct report.

14. These termination letters purported to justify the terminations of probationary employees by saying, "Unfortunately, the Agency finds that you are not fit for continued employment because your ability, knowledge, and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the agency." The justifications written in these termination letters were false.

15. All of the probationary employees at CCIIO who received the February 15, 2025 termination letter were hired into positions that were tailored to the agency's needs. Specifically, every position approved during the last few years, including every position filled by one of the probationary employees terminated on February 15, had undergone a formal review, first by me, then by CMS's Enterprise Workforce Investment Council (EWIC), and ultimately by CMS's Chief Operating Officer (COO). My review of these positions was to ensure that they aligned with the priorities and needs of CCIIO. EWIC's review was to ensure that the positions aligned with the agency's needs. And the COO reviewed the EWIC's recommendations to ensure that the senior official in charge of our human capital strategy was aware of and agreed with our assessments.

16. Every one of the terminated probationary employees had the knowledge, skills, and abilities that CCIIO required to accomplish our work and that met the specific requirements of the positions for which we hired them. In selecting these individuals, we reviewed between one and two thousand resumes, many of which came from other fully qualified people. We chose the best from hundreds of very highly qualified candidates. I personally interviewed at least a third of these candidates. I reviewed their resumes. They were truly the best of the best. They had exceptional

knowledge, skills, and ability as measured against the work we asked them to perform.

17. The termination letters were also false because they were not in fact based on any evaluation of the individual probationary employees' performance. I am lucky to have witnessed the incredible performance of some of the probationary employees who had been with us the longest. They personally briefed me on their work. I talked about their performance with their managers. Many of these workers received the highest possible performance ratings, with these ratings having been completed within a month of their being terminated, ostensibly for inadequate performance. The HHS CHCO could have obtained data from the system to assess the CCIIO probationary employees' performance, and if he had done so, he would have seen that the employees' performance was outstanding.

18. Some of the terminated probationary employees did not have the minimum 90 days on the job that HHS's Performance Management Appraisal Program requires prior to making any formal performance assessment, and under HHS personnel rules, management may not make a performance-based termination prior to actually evaluating those employees' performance.

19. The mass terminations of probationary employees at CCIIO were not based on any individualized assessment of the probationary employees. The CMS CHCO did not review the positions for suitability, never read a single person's resume, never spoke with any of the terminated probationary employees, and had no personal knowledge of their individual performance. Having actually reviewed the knowledge, skills, and abilities of these probationary employees and having observed their performance and having been briefed on their performance evaluations, I can state with confidence that none of the probationary employees' terminations at CCIIO were justified by the reasons stated in the termination letters.

20. In addition, the terminations of probationary employees were not justified by the fact that

5

a new Administration has taken office with new priorities, nor will the terminations improve efficiency. The probationary employees at CCIIO fulfilled roles that are necessary for the center to make the very sorts of changes to our operations and regulations that would support the new Administration's priorities. These probationary employees were hired to add efficiencies to CMS enrollment processes, making it easier for consumers to obtain and retain coverage and saving administrative processing funds. They were going to work on writing and implementing the recently announced Program Integrity rule, a top Trump Administration priority that is projected to save billions in program dollars. These probationary employees were some of the lowest paid CMS employees who nevertheless had a huge financial impact. That is, they were the ultimate in government efficiency, the thing that the new Administration says is its most salient priority.

21. The only conceivable explanation for the mass terminations is that they are part of a concerted effort to reduce the overall size of the workforce at HHS, CMS, and other agencies. In other words, these terminations were a reduction in force. However, agencies are required to follow applicable statutes, regulations, and policies when conducting reductions-in-force, none of which were followed here.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 5, 2025 in Silver Spring, MD.

Jeffrey Grant