# Exhibit HH

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> [LEAD DEFENDANT NAME], ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

## <u>DECLARATION OF TRACI DIMARTINI</u>

I, Traci DiMartini, swear under penalty of perjury,

1.      My name is Traci DiMartini and I am an adult resident of Gaithersburg, Maryland.

2.      I served as a Human Capital Officer for the Internal Revenue Service ("IRS") until March 3, 2025, when the IRS put me on administrative leave.  The IRS is the largest bureau within the Department of Treasury ("Treasury").

3.      I am a career civil servant and have worked for the federal government for over 21 years, including at the Departments of Labor, Education, Interior, and Agriculture, as well as the Office of Personnel Management ("OPM"). I was sworn in as a member of the Senior Executive Service in 2016 and since that time, I have served as a Chief Human Capital Officer at the Equal Employment Opportunity Commission, Peace Corps, the General Services Administration, and the IRS, where I served as the Human Capital Officer from June 2023 to March 2025.  I have worked under both Democratic and Republican administrations.

1

4.      During my time as the Human Capital Officer for the IRS, I was the Senior Executive responsible for overseeing all Human Capital operations at the IRS.

5.      After President Trump took office on January 20, 2025, OPM issued guidance instructing agencies to terminate probationary employees. Around the first week of February, shortly following OPM's issuance of this guidance, the Chief Human Capital Officer for Treasury, Trevor Norris, instructed my office to begin terminating probationary employees at the IRS. Specifically, he instructed me to identify all probationary employees at the IRS and terminate all of them "based on performance."

6.      In all my decades of human resource management for the federal government, I had never before received a directive such as this one. Typically, the decision to terminate a probationary employee lies solely with the probationary employee's manager. Even then, the circumstances under which you can terminate a probationary employee are limited to instances where: (1) the employee is failing to meet the basic requirements of the job, or (2) the employee engages in highly inappropriate conduct while on the job.  In any scenario, the poor performance or conduct must be evaluated and documented.

7.      Further, I have never heard of mass probationary employee firings. Because the basis for any probationary employee termination is a highly individualized determination, terminating probationary employees on a large scale has never been done, to my knowledge.

8.      I attended several virtual meetings with Trevor Norris and other Human Capital Officers at Treasury agencies (which include the Office of the Comptroller of the Currency, the Bureau of Engraving and Printing, and the U.S. Mint) during which we discussed the directive to conduct mass terminations of probationary employees.  The other agency Human Capital Officers

and I asked Mr. Norris why Treasury was directing us to terminate probationary employees, and Mr. Norris informed us that it was what OPM "wants to do."

9.    We also asked whether the terminations were legal.  Mr. Norris explained that OPM was taking the position that the probationary period of employment was an "extension of the application process."  In my experience, this is never how probationary employment has been viewed and, candidly, makes no sense.

10.    Mr. Norris informed us that Charles Ezell, the Acting Director of OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters, were the individuals spearheading the termination of probationary employees at OPM.  All three are political appointees and, as I understand it, they do not have civil service staff assisting them in this process.  OPM was communicating these directives to the political appointees at Treasury, including Mr. York and Treasury Secretary Scott Bessent, who were passing the directives down to Mr. Norris and the other Human Capital Officers at Treasury agencies.

11.    To comply with OPM's directive to Treasury, my office pulled an initial list of 17,000 probationary employees.  We carved out employees from the Taxpayer Services, Taxpayer Advocate, and IT departments, all of whom are essential personnel for tax filing season, as well as some other categories of workers, resulting in a list of approximately 6,700 probationary employees located around the country.

12.    Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that OPM would not allow us to exempt military veterans from the probationary terminations.

13.    My colleagues and I asked Mr. Norris what the termination letter for affected probationary employees should consist of, and they informed me that OPM had drafted a letter,

Treasury made a few modifications, and that we were instructed to send this letter out.  My office was not permitted to make any changes to the letter.  I refused to sign these termination notices, as did Acting IRS Commissioner Doug O'Donnell, so the termination notices were sent on February 14, 2025 from a generic agency email to approximately 6,700 probationary employees at IRS, terminating their employment immediately.

14.    My office did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices.  I also know that Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices.  I know this because this fact was discussed openly in meetings.  Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.

15.    Although I did not review the personnel files of any of these employees, it is a statistical certainty in my mind that many of the nearly 6,700 probationary employees terminated by IRS had written documentation of positive performance.

16.    The OPM directive, communicated to me by Mr. York through Mr. Norris, was plainly an effort to reduce headcount and did not involve any evaluation of the job performance of probationary employees.

17.    To me, the mass firings were clearly a Reduction in Force ("RIF") without following the rules for a RIF.

18.    To ensure that a RIF is conducted lawfully, an agency spends approximately 12 to 18 months simply *preparing* for the RIF.  *See* Exhibit 1 (Reduction in Force (RIF) Fact Sheet).  An agency's Human Capital office begins by spending months verifying that personnel records are complete and free of errors.  This is to ensure, for example, that veterans' status is correctly

annotated and that employees' service date computations are correct, among other things.  The agency then typically takes months to determine the competitive area where the RIF will take place.  After these and other initial steps are taken, the agency will then try to reassign employees to other divisions or give them an opportunity to take an early retirement offer instead of separating them in a RIF. These effort are made in close consultation with the managers in these offices.  The RIF is the last step of the process, which must be done in accordance with required RIF procedures, including providing employees and their unions with notice. Notice to employees is critical because it allows them to make preparations and minimize the devastating impact of losing a job. I understand that an agency is also required to give notice to the state where an affected employee's duty station was located.

19.    On or about February 25, 2025, Acting IRS Commissioner O'Donnell retired, and Melanie Krause, previously the Chief Operating Officer of the IRS, became Acting Commissioner of the IRS.

20.    On Friday, February 28, 2025, Gavin Kliger, a member of the Department of Government Efficiency (DOGE), arrived at the IRS around 12:30, along with Sam Cronus a new, unpaid political advisor to Tom Krause, a Treasury political appointee.  Mr. Kliger demanded that Mr. Cronus be issued an IRS personal identity verification card and information technology equipment immediately.  I informed the Chief of Staff via email that that Mr. Kliger's request would not be completed that day because: (1) the necessary paperwork to onboard him was not prepared because we did not have advance notice that he was starting; (2) any new IRS employee must undergo a tax check and that can take up to 10 days to complete; and (3) Treasury is required to comply with a Temporary Restraining Order issued by the U.S. District Court for the Southern

District of New York, which limits access to Treasury systems without prior approval and written agreement executed by our General Counsel.

21.    Accordingly, I scheduled Mr. Cronus' onboarding to take place as soon as possible, which was the next business day, Monday, March 3, 2025 at 8:00 a.m. I notified my staff that we had a political appointee to process for onboarding and to be ready with the appropriate paperwork. I also notified our General Counsel's office to arrange for an ethics briefing and the Chief Privacy officer to request a briefing for Mr. Cronus on the confidentiality and information security requirements of Internal Revenue Code section 6103.

22.    On Saturday, March 1, 2025, Acting Commissioner Krause contacted me and requested that I complete a tax check on Mr. Cronus, the DOGE employee, that day.  I do not personally conduct the tax check, and the tax checks are not performed on the weekends.  I informed Ms. Krause that we could conduct it on Monday morning.  Ms. Krause stated that I was being uncooperative and that, in essence, I was expected to jump if DOGE told me to jump.  I simply responded that we were following established processes and protocols.

23.    On the morning of Monday, March 3, 2025, we had arranged for Mr. Cronus, the DOGE employee, to undergo the tax check at 8:00am, but he did not arrive at our offices until 10:45am.  That afternoon, Acting Commissioner Krause placed me on administrative leave with the intention of terminating my employment as a career Senior Executive.  Acting Commissioner Krause gave three reasons for placing me on administrative leave pending termination: (1) that I did not effectively implement the termination of probationary employees; (2) that I did not implement the deferred resignation program correctly; and (3) that I was insubordinate and uncooperative with the DOGE employees.

24.    Following my meeting with Acting Commissioner Krause, security escorted me to my office where I was asked to turn over my government ID, my government issued laptop, iPhone, iPad, and parking pass. I was then escorted to my car and left the premises by 3:00 PM.

Dated: March 6, 2025

Signed: _Traci DiMartini_
_____
Traci DiMartini

*A copy of the signature page bearing an
original signature is attached hereto.

7

24.    Following my meeting with Acting Commissioner Krause, security escorted me to my office where I was asked to turn over my government ID, my government issued laptop, iPhone, iPad, and parking pass. I was then escorted to my car and left the premises by 3:00 PM.

Dated: March 6, 2025

Signed: *Traci DiMartini*
Traci DiMartini

*A copy of the signature page bearing an original signature is attached hereto.