# Exhibit JJ

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND; et al.,

    Plaintiffs,

v.

UNITED STATE DEPARTMENT OF
AGRICULTURE; et al.,

    Defendants.

**DECLARATION OF PHILIP SPESSHARDT**

I, Philip Spesshardt, declare as follows:

1. I am a resident of the State of Colorado. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by the Colorado Department of Labor and Employment (CDLE) as the Director of the Colorado Division of Unemployment Insurance.

3. CDLE is responsible for connecting job seekers to great jobs; protecting workplaces and communities with a variety of consumer protection and safety programs; assisting workers injured on the job; ensuring fair labor practices; providing accurate economic data; and helping those who lost their jobs by providing temporary wage replacement. CDLE administers a wide range of federally funded workforce and training programs, including but not

1

limited to those authorized by the Workforce Innovation and Opportunity Act (WIOA), that are vital to Colorado's economic stability and workforce development.

4. As Director of the Colorado Division of Unemployment Insurance, I have access to records that detail the state of Colorado's labor market, including claims for unemployment benefits, and the allocation and distribution of funding received by CDLE.

5. The ongoing mass-layoff of federal workers is irreparably harming Colorado in several ways.

**Rapid Response Team Expenditures**

6. CDLE oversees Rapid Response, a coordinated, multiple-partner strategy to provide immediate assistance to Coloradans subject to mass layoffs. Rapid Response is the state entity responsible for conducting outreach and providing unemployment services required by the federal Workforce Investment Act of 1998, as amended by the federal Workforce Innovation and Opportunity Act of 2014.

7. The purpose of Rapid Response is to reduce reliance on public benefit systems such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

8. At the core of our Rapid Response team is CDLE's Dislocated Worker Unit (DSU). DSU works in close partnership with other stakeholders, such as the state's ten Local Workforce Development Areas, which provide localized assistance to both employers and employees across the state.

9. When notified of a forthcoming mass layoff, Rapid Response will quickly provide informational resources and reemployment services for workers, including but not limited to:

information and support for filing Unemployment Insurance (UI) claims, information on the impacts of layoffs on health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training.

10. In addition, Rapid Response will contact affected businesses to collect, verify, and distribute information regarding Rapid Response activities. Rapid Response will also coordinate with state staff and local workforce area staff at the American Job Centers located in the affected area to provide support for the affected workers. The Division of Unemployment Insurance will mobilize to streamline and expedite the processing of unemployment claims.

11. Rapid Response also facilitates connections to partner agencies and organizations to ensure their ability to provide assistance to terminated workers and their families, such as home heating assistance, legal aid, and financial advice.

12. I understand that, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal Government is required to notify "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF.

13. The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

14. To the best of my knowledge, neither CDLE, Rapid Response, nor any other entity in the Colorado State Government has received notice of a federal reduction in force at any federal agency.

15. Yet, as detailed more below, since January 21, 2025, CDLE has already received 544 claims from ex-federal workers who list a federal agency as their last employer. This is compared to 135 claims from ex-federal workers who list a federal agency as their last employer for the same time period one year ago. CDLE has also seen a significant uptick of new unemployment claims of ex-federal employees just in the last two weeks, with an approximate range of 20-30 new such claims *every day*. CDLE has been receiving substantially more unemployment claims of ex-federal employees than in past years.

16. Because our Rapid Response team has received no notice of federal RIFs, CDLE has been required to dedicate significantly more staff, resources, and expenditures to fulfill our statutory mission. In light of the increasing claims for unemployment benefits and the public reporting about ongoing and forthcoming federal layoffs, Rapid Response has been attempting to compensate for the lack of notice and information regarding the terminations. Rapid Response has been conducting substantial outreach across the state, including issuing revised guidance documents. CDLE has been conducting town halls and engaging with elected officials and other stakeholders to provide information and engage with individuals regarding the resources described above. We have internally had to divert staff from other critical tasks to monitor and develop reporting dashboards in response to these unprecedented federal terminations. These substantial efforts and expenditures would not have been necessary had the federal agencies properly provided the notice required by law.

**Harms Related to the Colorado Unemployment Insurance Act**

17. CDLE, through the Division of Unemployment Insurance, also manages claims for unemployment benefits by individuals formerly employed to work in Colorado.

18. The statutory framework of the Colorado Unemployment Insurance Act (the Act) is primarily governed by the Colorado Employment Security Act (CESA), which is codified at Title 8, Sections 8-70-101 through 8-82-105, C.R.S.

19. Colorado is party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees (UCFE) pursuant to 5 U.S.C. § 8502(a). Generally, the federal Government is required to reimburse Colorado for unemployment benefits provided to former federal employees, in the same amount, on the same terms, and subject to the same conditions which would be payable to them under the Act. 5 U.S.C. § 8502(b). These insurance benefits are generally payable for up to twenty-six (26) weeks. C.R.S. § 8-73-104.

20. The Act is designed to provide unemployment benefits to individuals who are unemployed through no fault of their own and to ensure the fair and efficient administration of these benefits. C.R.S. §§ 8-70-102 & 8-73-108(1)(a).

21. The Act does not define "fault" but in the context of unemployment benefits, courts have defined "fault" as "requiring a volitional act or the exercise of some control or choice by the claimant in the circumstances resulting in the separation such that the claimant can be said to be responsible for the separation." *Mesa Cnty. Pub. Libr. Dist. v. Indus. Claim Appeals Off.*, 396 P.3d 1114, 1119 (Colo. 2017) (internal quotation marks and citations omitted).

22. An individual in Colorado who wishes to collect unemployment insurance benefits must register for work and file a claim for benefits in accordance with applicable statutes and regulations. C.R.S. § 8-74-101; 7 CCR 1101-2.

23. At the time of separation, the employer must provide the employee, in writing, information regarding the availability of unemployment compensation benefits, which must

include the (1) employer's name and address; (2) employee's name and address; (3) employee's identification number or the last four numbers of the employee's social security number; (4) employee's start date, date of last day worked, year-to-date earnings, and wages for the last week the employee worked; and (5) reason the employee separated from the employer. C.R.S. § 8-74-101.

24. Upon receipt of a claim, the Division of Unemployment Insurance must notify interested parties of the claim. C.R.S. § 8-74-102(1). Interested parties are afforded an opportunity to present information pertinent to the claim. *Id.* A deputy, as assigned by the Director of the Division, will review the material and issue a decision that sets forth findings of fact, conclusions of law, and an order. *Id.*

25. Any interested party that is dissatisfied with a deputy's decision may appeal the decisions within twenty calendar days after the date of notification of the decision and will be afforded a hearing. C.R.S. § 8-74-103(1). A hearing officer will afford interested parties a reasonable opportunity for a fair hearing, and thereafter, will decide each relevant issue raised, including findings of fact, conclusions of law, and an issued an order. *Id.* § 8-74-103(3).

26. Throughout this process, the Division must consider the circumstances of a person's separation "in determining the amount of benefits he [or she] may receive," and must also take into account "that certain acts of individuals are the direct and proximate cause of their unemployment, and such acts may result in such individuals receiving a disqualification" from unemployment benefits. C.R.S. § 8-73-108(1)(a); *see Debalco Enters., Inc. v. Indus. Claim Appeals Office*, 32 P.3d 621, 623 (Colo. App. 2001) (whether a claimant is entitled to benefits depends on the reason for separation) (citing § 8-73-108(1)(a), (4), & (5)(e)).

27. The current situation involving the mass termination of probationary federal employees is causing, and will continue to cause, significant harms to Colorado associated with the processing of unemployment claims. Many federal employees received termination notices suggesting that they were fired for performance reasons, for example, because their performance has not been adequate to justify further employment at the federal agency. As a result, the Division of Unemployment Insurance is required to investigate and make findings whether these individuals are eligible for benefits when, as noted above, Colorado state law limits benefits to those who are unemployed through no fault of their own. These inquiries are often resource intensive and will require the Division to make individualized determinations in each case as to the real reasons for the termination.

28. The resources necessary to undertake these individualized investigations for former federal employees is a substantial burden on CDLE. It will cause the diversion of staffing to investigate these claims. This will likely cause delays and backlogs for other unemployment claims within the state. Colorado will be required to expend these substantial additional resources with no guarantee that it will be reimbursed for these expenses by the federal government.

Executed on March 6, 2025, at Denver, Colorado.

    /s/*
Philip Spesshardt
Director, Colorado Division of Unemployment Insurance

*A copy of the signature page bearing an original signature is attached hereto.

27.	The current situation involving the mass termination of probationary federal employees is causing, and will continue to cause, significant harms to Colorado associated with the processing of unemployment claims. Many federal employees received termination notices suggesting that they were fired for performance reasons, for example, because their performance has not been adequate to justify further employment at the federal agency. As a result, the Division of Unemployment Insurance is required to investigate and make findings whether these individuals are eligible for benefits when, as noted above, Colorado state law limits benefits to those who are unemployed through no fault of their own. These inquiries are often resource intensive and will require the Division to make individualized determinations in each case as to the real reasons for the termination.

28.	The resources necessary to undertake these individualized investigations for former federal employees is a substantial burden on CDLE. It will cause the diversion of staffing to investigate these claims. This will likely cause delays and backlogs for other unemployment claims within the state. Colorado will be required to expend these substantial additional resources with no guarantee that it will be reimbursed for these expenses by the federal government.

Executed on March 6, 2025, at Denver, Colorado.

*[signature]*

Philip Spesshardt

Director, Colorado Division of Unemployment Insurance

7