**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| STATE OF MARYLAND, et al., | * | |
| Plaintiffs, | * | |
| v. | * | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, et al., | * | Case No. 1:25-cv-748 |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**SUPPLEMENTAL BRIEFING IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

On Friday, March 7, Plaintiffs filed a motion for a temporary restraining order ("TRO Motion") explaining why they are entitled to immediate relief. Pursuant to the Court's March 7 Order inviting additional briefing from both parties, Plaintiffs submit this supplemental brief to elaborate on three issues: (1) Plaintiffs' standing; (2) the reviewability of Plaintiffs' claims; and (3) the necessity of the temporary relief Plaintiffs seek.

## ARGUMENT

**I.     PLAINTIFFS HAVE STANDING TO BRING SUIT.**

Standing requires, first, a concrete and particularized "injury in fact," namely, the "invasion of a legally protected interest. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Second, the injury alleged must be "fairly traceable to the challenged action of the defendant[.]" *Id.* (cleaned up). Third, and finally, it must be "likely" that the harm will be "redressed by a favorable decision." *Id.* Plaintiffs are suffering myriad distinct injuries that are directly traceable to Defendants' unlawful actions and that would be redressed by the relief Plaintiffs seek. Plaintiffs thus easily satisfy Article III standing requirements.

**A.     Rapid Response Injuries.**

Plaintiffs are harmed in their ability to conduct rapid response activities to support affected workers because the Federal government has ignored its statutory obligation to provide notice to the States. Both federal and state law require state personnel to carry out "rapid response activities" to assist dislocated workers in obtaining reemployment in the event of a "mass layoff." 29 U.S.C. § 2864(a)(2)(A)(i)(II); 29 U.S.C. § 3174(a)(2)(A)(i)(II); *see also* Pls.' Mot. at 7-8. In light of Defendants' failure to provide notice of ongoing mass layoffs, Plaintiffs are also diverting or are preparing to divert staff from critical state-funded matters, and are suffering administrative burdens in the need to affirmatively contact federal agencies, monitor public reporting, and conduct mass

outreach to identify impacted workers. *See* Pls.' Mot. at 13; *see also Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024) (holding that plaintiffs demonstrated injury where they were required to divert resources to respond to a legal violation); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 490 (D. Md. 2019) (holding that city demonstrated injury because it was "compelled to reallocate . . . finite resources"); *New England Anti-Vivisection Soc'y v. Goldentyer*, No. GJH-20-2004, 2021 WL 4459217, at *9 (D. Md. Sept. 29, 2021) (similar).

The strain on Plaintiffs' rapid response systems is directly traceable to Defendants' unlawful RIFs, conducted without the required advance notice. The relief sought by Plaintiffs would redress these injuries—that is, reinstating affected probationary employees and requiring Defendants to comply with proper RIF procedures, including notice procedures, would alleviate the need for Plaintiffs to scramble and devote significantly more resources to identifying and supporting affected workers.

**B.     Unemployment Benefits Administration Injuries.**

Further contributing to Plaintiffs' injuries, many Plaintiffs are experiencing administrative burdens and costs due to the recent increases in federal unemployment claims. *See, e.g.*, *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165, at *5 (W.D. Wash. Feb. 6, 2025) (Executive Order creating unrecoverable and "substantial administrative costs for state agencies" caused irreparable harm). Increased federal unemployment claims burden Plaintiffs by requiring the processing of numerous additional claims. *See, e.g.*, MD DOL Decl. ¶¶ 37-38, 73-74; *see also* Pls.' Mot. at 12; 25-27 (identifying various burdens, including time-consuming investigations as to whether many terminated employees are eligible for benefits). Indeed, Plaintiff Maryland represents that, as of March 9, 2025, it has received 935 unemployment claims from federal workers since January 21. Unfortunately, this is a substantial increase from the 813 claims

2

recorded through March 4, as reflected in Maryland's DOL Declaration. MD DOL Decl. ¶ 50, ECF No. 4-5.

Defendants' unlawful RIFs have caused the ongoing wave of federal unemployment claims and, because Defendants conducted these RIFs without notice, affected employees did not receive state services that could have quickly helped them to locate new employment, minimizing unemployment claims. Pls.' Mot. at 26. Further, because Defendants' employees were fired in a pretextual and haphazard manner, Plaintiffs are now required to investigate numerous claims for unemployment benefits to determine if employees were in fact fired for cause, or for another reason that would bar unemployment benefits. *Id*. Plaintiffs' sought relief, to reinstate affected probationary workers and to cease improper mass terminations moving forward, would help redress the burden and cost to Plaintiffs' unemployment agencies.

### C. State Programmatic Injuries.

Defendants' abrupt terminations of federal workers have also harmed state programs that depend on federal workers. *Id.* at 27. For example, some Plaintiffs' health departments rely on federal civil service personnel recruited through the Center for Disease Control and Prevention's ("CDC") Public Health Associate Program ("PHAP"). *Id.* Defendants abruptly terminated personnel pursuant to their unlawful mass layoffs, causing disruption to state health programs, including delays in communications with individuals exposed to communicable diseases. Here, too, an injunction requiring reinstatement of probationary employees and halting further unlawful and unnoticed layoffs will prevent ongoing injury to affected state programs and avoid further similar injuries moving forward.

### D. Injuries to State Finances.

Defendants' unlawful mass layoffs also continue to injure Plaintiffs' finances. As a result of the abrupt and unlawful terminations, many individuals will need to apply for and rely on state-

administered and state-funded social service programs, such as health insurance programs. Many of the terminated federal workers will also suffer a reduction in income, causing a significant decline in tax receipts. Pls. Mot. at 28-29; *see also Washington v. Trump*, 441 F. Supp. 3d 1101, 1113 (W.D. Wash. 2020) (holding that "the loss of significant tax revenue" is "sufficient to establish Article III standing"); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (explaining that "lost tax revenue" constitutes "irreparable harm").

The fired probationary employees are unemployed solely because Defendants conducted unlawful RIFs. And again, because Defendants declined to notify Plaintiffs of such terminations, Plaintiffs have been unable to mitigate these injuries by providing assistance before these federal employee residents became unemployed. Pls.' Mot. at 28-29. An injunction reinstating affected employees and requiring Defendants to comply with RIF procedures, including notice procedures, to conduct any further mass layoffs of probationary employees will redress these injuries, at least in part so that Plaintiffs can prepare for the economic fallout.

### E. Informational Injury.

Finally, Plaintiffs are being harmed via textbook informational injury, through Defendants' failure to provide information—advance notice of federal reductions in force ("RIFs")—as required by governing statutes and regulations. The Fourth Circuit recently reiterated that Article III injury is shown via the deprivation of information required to be disclosed by statute. *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 171-72 (4th Cir. 2023). Here, Defendants failed to satisfy their statutory obligation to provide 60 days' advance notice to Plaintiffs before conducting RIFs— and they have similarly provided no information as to the location and circumstances of future RIFs. *See* 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R. § 351.803(b)(1). This informational injury would be ameliorated by an order compelling Defendants to identify affected employees and enjoining them from terminating probationary employees *en masse* without abiding by proper RIF

procedures, including proper notice procedures.

## II. THIS COURT CAN REVIEW PLAINTIFFS' CLAIMS.

### A. This Court has jurisdiction to review Plaintiffs' claims under *Thunder Basin*.

In other cases related to the mass termination of probationary employees, the federal government has argued that the Federal Service Labor-Management Relations Statute ("FSL-MRS") and the Civil Service Reform Act of 1978 ("CSRA") preclude district-court jurisdiction under the *Thunder Basin* doctrine. Those claims were recently rejected by the U.S. District Court for the Northern District of California as to non-union plaintiffs, and if raised here, they should fail for similar reasons. *See* Mem. Op. & Order Amending TRO, *Am. Fed'n of Gov't Emps. v. Off. of Pers. Mgmt.*, No. 3:25-cv-1780 (N.D. Cal. Feb. 28, 2025) [hereinafter "*AFGE v. OPM*"], ECF 45 at 11-13. The FLS-MRS and CSRA commit ordinary employment disputes between employees or labor organizations to the jurisdiction of agency tribunals. But Plaintiffs are not asserting garden-variety employment claims. Instead, they challenge Defendants' failure to provide statutorily mandated notice before conducting a RIF, resulting in ongoing irreparable harms for which the FSL-MRS and the CSRA provide no administrative review and no remedy.

In *Thunder Basin Coal Co. v. Reich*, the Supreme Court established a two-step framework for determining whether Congress has divested district courts of jurisdiction over agency action. 510 U.S. 200, 207 (1994). First, the court must "ask whether Congress's intent to preclude district-court jurisdiction is 'fairly discernible in the statutory scheme.'" *Bennett v. U.S. Sec. & Exch. Comm'n*, 844 F.3d 174, 181 (4th Cir. 2016) (quoting *Thunder Basin*, 510 U.S. at 207). "This involves examining the statute's text, structure, and purpose." *Id.* (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012)). Second, the court must "ask whether plaintiffs' 'claims are of the type Congress intended to be reviewed within this statutory structure.'" *Id.* (quoting *Thunder*

5

*Basin*, 510 U.S. at 212). At this second stage, the court considers three factors: "(1) whether the statutory scheme 'foreclose[s] all meaningful judicial review'"; "(2) the extent to which the plaintiff's claims are 'wholly collateral' to the statute's review provisions"; and "(3) whether 'agency expertise could be brought to bear on the . . . questions presented.'" *Id.* (alteration in original) (quoting *Thunder Basin*, 510 U.S. at 212-13). "[M]eaningful judicial review is the most important factor in the *Thunder Basin* analysis." *Bennett*, 844 F.3d at 183 n.7.

Application of the *Thunder Basin* factors confirms that this Court has jurisdiction. With respect to *Thunder Basin* step one, the CSRA's administrative review scheme does not display a "fairly discernible" intent to limit jurisdiction over Plaintiffs' claims, *Thunder Basin*, 510 U.S. at 207, because these state claims are not "of the type Congress intended to be reviewed within th[e] statutory structure," *id.* at 212. Indeed, the CSRA's administrative scheme focuses solely on the rights of employees and labor organizations, and it channels their disputes to the Merit Systems Protection Board ("MSPB") and the Federal Labor Relations Authority ("FLRA"). *See* 5 U.S.C. §§ 7105, 7512. In contrast, states are not subject to these constraints because, by its own terms, this statutory structure governs only employees and labor organizations, and consequently addresses only those parties' avenues for review. *See id.* § 7103(a)(1)-(2) (defining, for the purposes of the FSL-MRS, a "person" to mean "an individual, labor organization, or agency," and an "employee" to mean "an individual employed in an agency" or "whose employment in an agency has ceased" because of unfair labor practices); *id.* § 7123 (outlining review for any "person aggrieved by any final order" of the FLRA); *id.* § 7703 (addressing review of MSPB orders affecting "employee[s]" or "applicant[s] for employment"). As a result, the channeling analysis ends at *Thunder Basin* step one, and Plaintiffs' claims should proceed in federal court.

6

Even if this Court were, however, to proceed to step two of *Thunder Basin*, the Court clearly has jurisdiction based on each of the three governing factors. *First*, Plaintiffs are asserting a "here-and-now injury" that cannot be redressed absent immediate judicial review. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 192 (2023). A statutory scheme fails to provide meaningful judicial review if an appeal to an Article III court is not available "in due course." *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at *5 (4th Cir. Apr. 19, 2022) (quoting *Bennett*, 844 F.3d at 186). This is precisely the situation here. States are different from employee- and union-litigants who may often "obtain review of and relief from the [defendants' actions] by litigating [their] claims through the statutory scheme" before the FLRA or MSPB. *Nat'l Ass'n of Agric. Emps. v. Trump*, 462 F. Supp. 3d 572, 583 (D. Md. 2020) (internal quotation marks omitted). States cannot engage in collective bargaining as a union can and thus cannot bring a concrete bargaining dispute before the FLRA. *See* 5 U.S.C. § 7123 (only a "person" may seek judicial review of an FLRA order). Nor are states "employee[s]" or "applicant[s] for employment" who can initiate suits before the MSPB. *Id.* § 7703. *Cf. Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015) (reviewing Texas's challenge to the Deferred Action for Childhood Arrivals program, despite a reticulated statute presenting barriers to judicial review, because Texas was not bringing a "cause or claim by or on behalf of any alien" but rather "assert[ing] [its] own right to the [Administrative Procedure Act's] procedural protections"); *Texas v. United States*, 50 F.4th 498, 521 (5th Cir. 2022) (similar).

Further, Plaintiffs seek relief that cannot be obtained in an administrative tribunal—the MSPB and FLRA can only redress individual employees' damages, such as by ordering "back pay and related benefits." 5 U.S.C. § 1214(g)(2); *see id.* §§ 7105(g)(3), 7118(a)(7)(D). But even if the terminated employees were eventually reinstated and awarded back pay, it would not undo Plaintiffs' injuries. Plaintiffs need immediate relief from the current administrative burdens and

7

economic harms imposed on them by the lack of notice and Defendants' unlawful terminations, *see* Pls.' Mot. Part III, and any reinstatement of employees that would be ordered through the slow-moving administrative process would "come too late to be meaningful" to Plaintiffs, *Axon*, 598 U.S. at 191. Said differently, without direct judicial review, Plaintiffs would be left with no review and no remedy at all to vindicate their statutory right to notice before federal agencies conduct RIFs.

*Second*, Plaintiffs' claims about lack of notice are "wholly collateral" to the CSRA's administrative review scheme. *Thunder Basin*, 510 U.S. at 212. Plaintiffs' claims "have nothing to do with" the labor-related matters that the MSPB and the FLRA "regularly adjudicate" between unions, employees, and employers. *Axon*, 598 U.S. at 193. Plaintiffs are not challenging the "type of personnel action covered by" the CSRA, *United States v. Fausto*, 484 U.S. 439, 448 (1988), because they are challenging the Defendants' failure to provide them notice of the RIFs, not a personnel decision.

*Third*, for similar reasons, the MSPB and FLRA lack the expertise to handle Plaintiffs' claims. While agencies have "expertise" to offer on "preliminary questions unique to the employment context," *Elgin*, 567 U.S. at 22, this expertise presumes individualized adjudications of typical employee disputes. Plaintiffs' claims—that Defendants are indiscriminately targeting large portions of agency workforces as part of a broader effort to gut the civil service, without any warning or consideration of state interests—are not of the kind that these agencies adjudicate. *See Axon*, 598 U.S. at 194.

    **B.**     **Plaintiffs' claims are reviewable under the Administrative Procedure Act ("APA") and as *ultra vires* because there are no other avenues for Plaintiffs to obtain the relief they seek.**

The federal government has similarly argued elsewhere that APA and *ultra vires* claims regarding probationary employees are precluded because there is an alternative avenue for relief

8

under the FSL-MRS or the CSRA. Opp'n to Mot. for TRO, *AFGE v. OPM*, ECF 33 at 18, 21. For all the reasons set forth *supra*, *see* Part II.A, neither the FSL-MRS nor the CSRA provide an avenue for relief for Plaintiffs, let alone an "adequate" avenue for relief. *See* 5 U.S.C. § 704 (APA review available when there is "no other adequate remedy"); *Bd. of Governors of the Fed. Rsrv. Sys. v. McCorp. Fin., Inc.*, 502 U.S. 32, 43-44 (1991) (similar regarding *ultra vires* causes of action).

Section 704 of the APA was "intended to avoid . . . duplication," by limiting judicial review to instances where no other "adequate remedy" exists. *Bacardi & Co. v. U.S. Patent & Trademark Off.*, 104 F.4th 527, 535 (4th Cir. 2024) (internal quotation marks omitted). But it should not be construed to "defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action." *Id.* (alteration in original) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)). Accordingly, judicial review is barred only when alternative procedures are truly "*adequate*." *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 600-01 (2016) (emphasis added); *Bowen*, 487 U.S. at 901 (rejecting the "novel" contention that a claim is "barred" when there is only "doubtful and limited relief available" elsewhere). As this Circuit has put it: the mere fact that "a similar result could be achieved by challenging a *different* 'agency action' does not demonstrate that an 'adequate remedy' in court is available for *this* distinct 'agency action.'" *Bacardi*, 104 F.4th at 535 (quoting 5 U.S.C. § 704). That is precisely the situation here—the mere fact that affected employees can challenge the particular personnel actions that led to their terminations in administrative proceedings does not mean that this Court is precluded from reviewing Plaintiffs' distinct challenges to Defendants' unlawful RIFs, including Defendants' failure to provide the notice required by law. The same holds true for Plaintiffs' *ultra vires* claims. *See Bd. of Governors*, 502 U.S. at 43-44 (*ultra vires* claims barred where there is another "meaningful and adequate opportunity for judicial review").

### III. THIS COURT SHOULD GRANT PLAINTIFFS' REQUESTED RELIEF.

#### A. Plaintiffs urgently require the requested relief, without which they will suffer irreparable harm.

This Court's intervention is urgently needed. As explained in Plaintiffs' TRO Motion, the rolling termination of massive numbers of federal employees has created chaos. Plaintiffs have struggled to mitigate the administrative and financial burdens associated with a sharp uptick in federal unemployment claims; plan and budget for the deployment of job transition and social services; and facilitate connections between impacted workers, potential employers, and partner organizations. Plaintiffs request three forms of relief, each of which is justified under the circumstances.

*First*, this Court should restrain Defendants from terminating any probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance or abiding by proper RIF procedures, including the state notice procedures. This relief is appropriate because it would limit Defendants to terminating probationary employees in accordance with governing regulations, and would bar them from conducting further RIFs under the guise of evaluating probationary employees. Further, a pause on unlawful mass firings of probationary employees is essential to preserve the status quo and stem the growing chaos and confusion that these firings have caused. *See, e.g.*, *Roe v. Dep't of Def.*, 947 F.3d 207, 217, 234 (4th Cir. 2020) (affirming injunction prohibiting the Air Force from "separating or discharging from military service" individuals "due to their HIV-positive status"). Plaintiffs need this pause on further unlawful mass firings of probationary employees to prevent further administrative burdens on their unemployment insurance systems, further impacts on their budgets, and further increased demands on their social services.

*Second*, to preserve the status quo, this Court should grant immediate relief reinstating probationary employees who were terminated on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individual determinations of conduct or performance. This relief is in lockstep with this Circuit's case law, which emphasizes that the status quo is the "last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). In other words, the "status quo" is the "status quo ante." *Holt v Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (emphasis omitted). And "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions" in order to "restore[]" "the status quo ante." *Di Base v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017) (internal quotation marks and citation omitted).

This principle has been applied across the country, including where employees seek reinstatement during the pendency of litigation, and in other analogous circumstances, to mandate affirmative actions on the part of Defendants to restore the status quo. *See, e.g.*, *Holt*, 708 F.2d at 90 (characterizing litigant's request for reinstatement of employment as "a restoration of the *status quo ante*"); *Bly v McLeod*, 605 F.2d 134, 137 (4th Cir 1979) (TRO allowing plaintiffs to vote by absentee ballot preserved the status quo); *Christopher P. v. Marcus*, 915 F.2d 794, 805 (2d Cir. 1990) (TRO readmitting plaintiff to a school that had discharged him "preserve[d] the status quo"). And, here, Plaintiffs should not be limited in their available relief because Defendants fired probationary employees without notice and in a blunderbuss fashion before legal recourse could be sought. *N. Am. Soccer League, LLC v. U.S. Soccer Fed. Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018) (Defendant may not "seek[] shelter under a current 'status quo' precipitated by their wrongdoing"). Reinstatement is necessary to restore the status quo during the pendency of this suit.

11

*Third*, the Court should also order Defendants to file a status report with the Court within 48 hours of entry of a temporary restraining order, and at regular intervals thereafter, identifying under seal all probationary employees terminated on or after January 20, 2025 (including the following information for each employee: agency, name, position title, grade, termination date, whether the probationary employee has been reinstated, and the date of any reinstatement). This information is needed to ensure Defendants' compliance and, in the event employees are not reinstated, to cure Plaintiffs' informational injuries by enabling Plaintiffs to identify individuals subject to workforce rehabilitation efforts and rapid response activities. These irreparable informational injuries—which have real consequences—worsen by the day, making this distinct form of relief appropriate.

### B. Emergency relief is needed to prevent further irreparable harms to Plaintiffs.

Finally, Defendants may argue that relief is no longer required because OPM recently revised its directive to federal agencies to terminate probationary employees *en masse* and because the MSPB has recently granted temporary relief to some U.S. Department of Agriculture employees. Not so.

***OPM's revisions do not cure Plaintiffs' ongoing harms.*** After a U.S. District Court in the Northern District of California ordered OPM to rescind its directive to terminate probationary employees, OPM made a two-sentence edit to its prior guidance. It stated that OPM was "not directing agencies" to take any particular action with regard to probationary employees and that agencies retain "authority" and "responsibility" for "personnel actions." *See* Pls.' Mot. at 21. This wordsmithing does not reflect a credible shift in OPM policy—OPM continues to assert that "evaulat[ing] probationary employees" is one "tool[]" agencies may use to achieve "workforce optimization." Memo. from Russell T. Vought, Dir., Off. Of Mgmt, & Budget & Charles Ezell,

12

Acting Dir., OPM, to Heads of Executive Dep't's & Agencies 1-3 (Feb. 26, 2025), tinyurl.com/mr2bum3d.

More importantly, OPM's edit tells this Court nothing about whether the other agency Defendants will cease mass, unannounced firings of probationary employees. It simply purports to turn the keys over to them. And by all accounts, Defendant agencies will not stop the terminations. Since the U.S. District Court for the Northern District of California issued its decision, agencies have continued mass layoffs. On or around March 3, the Department of Commerce fired 73 probationary employees. Compl. ¶ 137. That same day, the Department of Defense issued a memorandum stating that it is "taking independent steps to reduce the size of the civilian workforce," including "terminating those probationary employees whose continued employment . . . would not be in the public interest."[1] And in line with that policy, throughout the week of March 3 through March 7, the Defense Logistics Agency fired approximately 100 probationary employees, the Defense Health Agency fired dozens of probationary employees, and the Navy also terminated probationary employees.[2]

Although a handful of agencies, *e.g.*, the Center for Disease Control, have voluntarily reinstated *some* probationary employees, Plaintiffs are not aware of any Defendant agency announcing that it will reinstate *all* unlawfully fired employees and cease any future unlawful firings of probationary employees. Nor have the Plaintiffs heard of any plans by Defendants to offer them notice regarding still- or soon-to-be-terminated employees.

---

[1] Memo. For Senior Pentagon Leadership, DOD (Mar. 3, 2025), tinyurl.com/yc6bn5yb.

[2] Patricia Kime et al., *Firings Begin at the Pentagon: Veterans, Civil Servants Caught in the Crosshairs*, Military.com (Mar. 5, 2025), tinyurl.com/bdaydyft;  Lauren C. Williams & Bradley Peniston, *At least one Pentagon agency has begun firing probationary workers*, Defense One (Mar. 5, 2025), tinyurl.com/mvp3sv9e; Meghann Myers, *Pentagon is placing probationary employees on leave in advance of mass firings*, Defense One (Mar. 7, 2025), tinyurl.com/njjv84vr.

***Recent MSPB proceedings do not grant Plaintiffs the relief they seek.*** Defendants may also argue that a recent 45-day stay of unlawful terminations issued by the Merit Systems Protection Board obviates the need for emergency relief against the U.S. Department of Agriculture. Not so. That stay temporarily reinstates fired employees at that one agency so that the U.S. Office of Special Counsel may "further investigate[]" the firings. *Special Counsel ex rel. John Doe v. Dept. of Agriculture*, No. CB-1208-25-0020-U-1 at 2 (Mar. 5, 2025), tinyurl.com/espc3ap7. But that investigation was spearheaded by Special Counsel Hampton Dellinger, whom the President fired. *See Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 5, 2025) (vacating temporary restraining order and giving "effect to the removal of [Dellinger] from his position as Special Counsel"). As far as Plaintiffs are aware, Dellinger has not been replaced as head of this one-Officer agency, leaving the Office headless and essentially inoperative. So, no investigation may occur, and the stay will expire in just over a month—or potentially even sooner if the Department of Agriculture moves for reconsideration. Given this uncertainty, any relief should include the Department of Agriculture.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted, and the Court should issue the proposed temporary restraining order.

Respectfully submitted,

| | |
|---|---|
| **ANTHONY G. BROWN**<br>*Attorney General*<br>*State of Maryland* | **KEITH ELLISON**<br>*Attorney General*<br>*State of Minnesota* |

| | |
|---|---|
| <u>/s/ *James D. Handley*</u><br>James D. Handley, Bar No. 20299<br>Virginia A. Williamson<br>Bar No. 31472<br>Assistant Attorneys General<br><br>200 St. Paul Place, 20th Floor<br>Baltimore, Maryland 21202<br>Phone: 410-576-6993<br>Fax: (410) 576-6955 | <u>/s/ *Liz Kramer*</u><br>Liz Kramer*<br>Solicitor General<br><br>445 Minnesota Street, Suite 1400<br>St. Paul, Minnesota 55101-2131<br>Phone: 651-757-1059<br>Fax: 651-282-5832<br>liz.kramer@ag.state.mn.us |

| | |
|---|---|
| **BRIAN SCHWALB**<br>*Attorney General*<br>*District of Columbia* | **KRISTIN K. MAYES**<br>*Attorney General*<br>*State of Arizona* |

| | |
|---|---|
| Emma Simson<br>Senior Counsel to the Attorney General<br><br><u>/s/ *Ryan Wilson*</u><br>Ryan Wilson**<br>Senior Counsel<br><br>Hannah Cole-Chu, Bar No. 20747<br>Anne Deng*<br>Pamela Disney**<br>Tessa Gellerson, Bar No. 21271<br>Charles Sinks, Bar No. 21185<br>Cara Spencer, Bar No. 20171<br>Assistant Attorneys General<br><br>Office of the Attorney General for the District of Columbia<br>400 6th Street N.W., 10th Floor<br>Washington, D.C. 20001<br>(202) 230-2342<br>Ryan.Wilson@dc.gov | <u>/s/ *Hayleigh S. Crawford*</u><br>Hayleigh S. Crawford*<br>Deputy Solicitor General<br>2005 North Central Avenue<br>Phoenix, Arizona 85004<br>Phone: (602) 542-3333<br>Hayleigh.Crawford@azag.gov<br>ACL@azag.gov |

| | |
|---|---|
| **ROB BONTA** <br> *Attorney General* <br> *State of California* | **WILLIAM TONG** <br> *Attorney General* <br> *State of Connecticut* |
| /s/ *Satoshi Yanai* <br> Satoshi Yanai* <br> Senior Assistant Attorney General <br><br> 300 S. Spring Street, Suite 1702 <br> Los Angeles, California 90013 <br> Phone: 213-269-6400 <br> satoshi.yanai@doj.ca.gov | /s/ *Michael Skold* <br> Michael Skold* <br> Solicitor General <br> 165 Capitol Avenue <br> Hartford, CT 06106 <br> Phone: (860) 808 5020 <br> michael.skold@ct.gov |
| **KATHLEEN JENNINGS** <br> *Attorney General* <br> *State of Delaware* | **ANNE E. LOPEZ** <br> *Attorney General* <br> *State of Hawai'i* |
| By: /s/ *Vanessa L. Kassab* <br> Ian R. Liston <br> Director of Impact Litigation <br><br> Vanessa L. Kassab* <br> Deputy Attorney General <br> Delaware Department of Justice <br> 820 N. French Street <br> Wilmington, DE 19801 <br> (302) 683-8899 <br> vanessa.kassab@delaware.gov | /s/ *Kalikoʻonālani D. Fernandes* <br> David D. Day* <br> Special Assistant to the Attorney General <br> Kalikoʻonālani D. Fernandes* <br> Solicitor General <br> 425 Queen Street <br> Honolulu, HI 96813 <br> (808) 586-1360 <br> kaliko.d.fernandes@hawaii.gov |

| | |
|---|---|
| **KWAME RAOUL** <br> *Attorney General* <br> *State of Illinois* | **ANDREA JOY CAMPBELL** <br> *Attorney General* <br> *Commonwealth of Massachusetts* |

*/s/ Gretchen Helfrich*
Gretchen Helfrich, ARDC #6300004*
Deputy Chief
Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle Street, 35th Floor
Chicago, IL  60603
Tel. (312) 814-3000
Gretchen.helfrich@ilag.gov

*/s/ Katherine Dirks*
Katherine Dirks*
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov

**DANA NESSEL**
*Attorney General*
*State of Michigan*

**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*

*/s/ Bryan Davis, Jr.*
Bryan Davis, Jr. (P84206)*
Debbie Taylor (P59382)*
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, MI 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy*
Deputy Solicitor General
25 Market Street
Trenton, NJ 08625
Phone: (862) 350-5800
Shankar.Duraiswamy@njoag.gov

**RAÚL TORREZ**
Attorney General
State of New Mexico

**LETITIA JAMES**
*Attorney General*
*State of New York*

*/s/ Anjana Samant*
Anjana Samant*
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
asamant@nmdoj.gov

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

| | |
|---|---|
| **DAN RAYFIELD**<br>*Attorney General*<br>*State of Oregon*<br><br>By: */s Deanna J. Chang*<br>Deanna J. Chang**<br>Senior Assistant Attorney General<br>100 SW Market Street<br>Portland, OR 97201<br>(971) 673-1880<br>Deanna.J.Chang@doj.oregon.gov | **PETER F. NERONHA**<br>Attorney General for the State of Rhode Island<br><br>By: */s/ Natalya A. Buckler*<br>Natalya A. Buckler (RI Bar No. 8415)*<br>Assistant Attorney General<br>150 South Main Street<br>Providence, RI 02903<br>(401) 274-4400, Ext. 2022<br>nbuckler@riag.ri.gov |
| **CHARITY R. CLARK**<br>*Attorney General*<br>*State of Vermont*<br><br>*/s/ Jonathan T. Rose*<br>Jonathan T. Rose*<br>Solicitor General<br>109 State Street<br>Montpelier, VT 05609<br>(802) 828-3171<br>Jonathan.rose@vermont.gov | **JOSHUA L. KAUL**<br>Attorney General of Wisconsin<br><br>*Brian P. Keenan*<br>BRIAN P. KEENAN*<br>Assistant Attorney General<br>State Bar #1056525<br>Wisconsin Department of Justice<br>Post Office Box 7857<br>Madison, Wisconsin 53707-7857<br>(608) 266-0020<br>(608) 294-2907 (Fax)<br>keenanbp@doj.state.wi.us |
| **PHIL WEISER**<br>Attorney General of Colorado<br><br>/s/ David Moskowitz<br>David Moskowitz*<br>Deputy Solicitor General<br>Office of the Colorado Attorney General<br>1300 Broadway, #10<br>Denver, CO 80203<br>(720) 508-6000<br>David.Moskowitz@coag.gov | **AARON D. FORD**<br>*Attorney General of Nevada*<br><br>By: /s/ Heidi Parry Stern<br>Heidi Parry Stern (Bar. No. 8873)*<br>Solicitor General<br>Office of the Nevada Attorney General<br>555 E. Washington Ave., Ste. 3900<br>Las Vegas, NV 89101<br>HStern@ag.nv.gov |

\* *Pro hac vice application forthcoming*
\*\**Application for admission pending*

March 10, 2025                                                                                           *Attorneys for Plaintiff*

18