# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.,

Plaintiffs,
        v.

United States Department of Agriculture, et al.,

Defendants.

Case No. 1:25-cv-00748-JKB

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

I.    Statutory and Regulatory Background ................................................................... 2

II.   Factual Background ............................................................................................... 5

       A.    OPM's January 20 Guidance Memorandum on Probationary Periods and Revised March 4 Guidance Memorandum ............................................... 5

       B.    Executive Order 14,210 ............................................................................. 6

       C.    Agency Terminations of Certain Probationers; District Court Challenges and Stay Proceedings Before the MSPB .......................................... 7

THE STATES' CLAIMS IN THIS ACTION ................................................................... 9

STANDARD OF REVIEW ............................................................................................... 9

ARGUMENT ..................................................................................................................... 9

I.    The States Have Not Shown Likelihood of Success on the Merits Because They Cannot Establish Jurisdiction over their Claims. ............................................. 10

       A.    The States Cannot Show Standing. .......................................................... 10

       B.    Jurisdiction over the Claims Asserted by the States is Channeled Away from Federal District Courts under the CSRA and FSL-MRS. ............................ 15

       C.    The States Have Not Shown that Defendants Acted Contrary to Law. ................ 21

II.   The States Cannot Show Irreparable Harm. ....................................................... 23

III.  The Public Intereset Weighs Against Temporary Relief. .................................... 24

IV.  Any Temporary Relief Should Clarify tahat it Preserves the Executive's Discretionary Authority. ..................................................................................... 25

V.   Any Injunctive Relief Should Require the Provision of a Bond by the Plaintiff States. .................................................................................................................. 26

CONCLUSION ............................................................................................................... 26

## INTRODUCTION

This is an action by 20 States, against 41 federal agencies and agency heads, seeking to challenge allegedly widespread terminations of probationary federal employees.  The action has no hope of success, because third parties cannot interject themselves into the employment relationship between the United States and government workers, which is governed by a comprehensive statutory scheme that provides an exclusive remedial avenue to challenge adverse personnel actions.  The States cannot circumvent that channeling scheme by asserting downstream harm from those employment actions.  Nor do the States have any legitimate claims of their own.  The Court should therefore deny their motion for a temporary restraining order ("TRO").

Notably, this is not the first lawsuit to seek this relief.  A set of unions sued in federal court in the District of Columbia a few weeks ago to rescind the termination of the probationary workers.  *National Treasury Employees Union (NTEU) v. Trump*, No. 25-cv-420 (CRC),  2025 WL 561080, at *1 (Feb. 20, 2025).  The district court denied relief based on the exclusive channeling regime.  *See id.*  Then, other unions and organizational plaintiffs sued in the Northern District of California, also claiming downstream harms from the terminations.  While the court there agreed to restrain since-revised guidance on probationary removals from the Office of Personnel Management (OPM), it acknowledged that it could not and would not rescind terminations.  *See Am. Fed'n of Gov't Emps. (AFGE) v. Ezell, et al.*, No. C 25-01780 WHA (N.D. Cal).

The third time is not the charm.  Like the unions and the organizational plaintiffs, the States are strangers to the employment relationships at issue, and cannot disrupt the exclusive remedial scheme that Congress put in place to adjudicate these disputes.  Beyond that, the States fail to identify any act Defendants have taken inconsistent with law.  Nor can they carry their burden to establish irreparable harm or that the public interest favors the extraordinary relief they seek.

1

**BACKGROUND**

## I.    Statutory and Regulatory Background

Probationers are individuals whose employment with the federal government has not been finalized. *See* 5 C.F.R. § 315.804. "The purpose of the probationary period is to provide the Government with an opportunity to evaluate an individual's conduct and performance on the job to determine if an appointment to the civil service should become final." Merit Systems Protection Board, "The Probationary Period: A Critical Assessment Opportunity" i (August 2005).[1] The probationary period enables agencies "to determine an individual's potential to fulfill the needs of the specific position, the agency, and the civil service." *Id.* at ii. Probationers should "be assessed in light of the organization's strategic goals and the role of the position in the accomplishment of those goals." *Id.* at 22. "Until the probationary period has been completed, a probationer is still an applicant for an appointment, with the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual." *Id.* Termination is mandatory where this showing is not made; an "agency . . . shall terminate [a probationer's] services . . . if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a).

Employment-related disputes between federal employees and their employing agencies within the Executive Branch—including challenges to employee removals or terminations—are governed by the comprehensive, reticulated administrative-judicial review scheme set forth in the Civil Service Reform Act of 1978, 5 U.S.C. § 2101 *et seq.* That expansive scheme also includes parallel provisions governing labor relations between agencies and their employees, the Federal

---

[1] *See* https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

Service Labor-Management Relations Statute ("the Statute" or "FSL-MRS"), set forth in Title VII of the CSRA (codified at 5 U.S.C. §§ 7101-35). Taken as a whole, the scheme governs nearly all aspects of the federal employer-employee relationship, and largely covers the field when it comes to judicial rights and remedies for alleged constitutional and statutory violations arising out of that relationship. As the D.C. Circuit has put it, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (then-Judge Roberts).

Relevant here, the CSRA "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (citation omitted). If an agency takes a statutorily defined major adverse action against a covered employee—including removal, *see* 5 U.S.C. § 7512—the employee may appeal that action to the Merit Systems Protection Board ("MSPB") under the provisions of the CSRA's Chapter 75. *Id.* § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Final MSPB decisions generally are appealable to the Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This review scheme is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13. Other than limited circumstances, it does not permit covered employees to bring suit in federal district court. *Id*. at 14-15; *United States v. Fausto*, 484 U.S. 439, 447 (1988); *Fornaro*, 416 F.3d at 67.

Terminated probationers generally do not enjoy the same guaranteed right to appeal removal decisions to the MSPB, as Congress placed them outside the definition of "employee[s]" for purposes of the CSRA's Chapter 75. *See* 5 U.S.C. § 7511(a)(1). Instead, probationers remain properly considered "applicants" under the extended hiring and evaluation period the CSRA sets forth for new career employees. *See* 5 U.S.C. § 7511(a)(1)(A)-(B), (C); 5 C.F.R. § 315.801,

301.806.[2]  But that does not leave them without recourse for alleged constitutional or statutory violations by their employing agencies: the CSRA's Chapter 23, which sets forth the merit system principles underlying the entire statutory scheme and provides remedies for alleged violations of those principles, generally applies to both "applicants and employees." *See*, *e.g.*, 5 U.S.C. § 2302(a)(2)(A)(i)–(xii) (identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in any agency").

Thus, probationers whose employment has been terminated by their employing agencies may in appropriate circumstances pursue relief that may result in MSPB adjudication, with judicial review potentially available after the completion of that process.  There are at least two routes to such review.  *First*, a removed probationer may file a complaint alleging one or more statutorily defined "prohibited personnel practices" with the Office of Special Counsel, 5 U.S.C. §§ 1211-1219, *et seq.*, which is statutorily charged with investigating such complaints and which may in turn pursue administrative relief before the MSPB.[3]  *Second*, under OPM regulations, a removed probationer may appeal to the MSPB if they allege that the removal was based upon one of the reasons set forth in the regulations. *See id.* § 315.806.

---

[2] As noted *supra*, OPM regulations promulgated under the CSRA provide that agencies are to use the probationary or trial period "as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a). When an agency decides to terminate an employee covered by these regulations because his or her work performance or conduct during the probationary or trial period fails to demonstrate fitness or qualifications for continued employment, it must notify the employee and provide "the agency's conclusions as to the inadequacies of his [or her] performance or conduct." *Id.* § 315.804(a).

[3] Congress also created the Office of Special Counsel to, among other things, protect employees, applicants for employment, and former employees. 5 U.S.C. § 1212. The Special Counsel may receive and investigate complaints of prohibited personnel practices and may petition the MSPB for a stay of the personnel actions pending investigation, and based on the results of an investigation, seek corrective action from the Board. *Id.* § 1214.

## II.     Factual Background

### A. OPM's January 20 Guidance Memorandum on Probationary Periods and Revised March 4 Guidance Memorandum

President Trump campaigned on a promise to raise standards for federal government employment and improve the Civil Service workforce. On his first day in office, President Trump signed a memorandum declaring that "American citizens deserve an excellent and efficient Federal workforce that attracts the highest caliber of civil servants committed to achieving the freedom, prosperity, and democratic rule that our Constitution promotes." Reforming the Federal Hiring Process and Restoring Merit to Government Service (Jan. 20, 2025).  Consistent with the new administration's focus on federal employee performance, OPM Acting Director Charles Ezell transmitted a guidance memo to Executive Branch agencies identifying probationary periods as "an essential tool for agencies to assess employee performance." Mem. from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, titled "Guidance on Probationary Periods, Administrative Leave and Details," at 1 (Jan. 20, 2025) ("OPM Mem.").  The memo directed agencies to "identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees[.]"  Further, the OPM Memorandum directed agencies to "promptly determine whether those employees should be retained at the agency." OPM Mem. at 1.

Following a lawsuit in the U.S. District Court for the Northern District of California and the resulting entry of a limited temporary restraining order governing OPM's guidance to federal agencies regarding probationary removals, OPM issued revised guidance on March 4.  In relevant part, the revised OPM guidance clarified and emphasized that "OPM is not directing agencies to take any specific performance-based actions regarding probationers.  Agencies have ultimate

decision-making authority over, and responsibility for, such personnel actions." Revised Mem. from Charlies Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments, titled "Guidance on Probationary Periods, Administrative Leave and Details," at 2 (Revised: March 4, 2025) ("Rev. OPM Mem.").

### B. Executive Order 14,210

On February 11, 2025, President Trump signed Executive Order 14,210, which "commences a critical transformation of the Federal bureaucracy" to "restore accountability to the American public" by "eliminating waste, bloat and insularity." *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order. No. 14,210, § 1, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce E.O."). The Workforce E.O. directed the Director of the Office of Management and Budget ("OMB") to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition." *Id.* § 3. It further required that new career appointment hiring decisions shall be made "in consultation with the agency's DOGE Team Lead, consistent with applicable law," and that the agency shall not fill vacancies for career appointments that the DOGE Team Lead assesses should not be filled, "unless the Agency Head determines the positions should be filled." *Id.* § 3(b)(i)–(ii).

The Workforce E.O. directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). The Workforce E.O. also directed the Director of OPM to initiate a rulemaking by March 11, 2025 that proposes to revise 5 C.F.R. § 731.202(b) to include additional suitability criteria. *Id.* § 3(e). In addition, by March 11, 2025, agency heads must submit to the Director of OMB a report that identifies any statutes that establish the agency, or subcomponents

6

of the agency, as statutorily required entities, and discuss whether the agency or any of its subcomponents should be eliminated or consolidated. *Id.* Pursuant to the Workforce E.O., the USDS Administrator must submit a report to the President within 240 days of the date of the E.O. "regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified or terminated." *Id.* § 3(f).

### C. Agency Terminations of Certain Probationers; District Court Challenges and Stay Proceedings Before the MSPB

Certain federal agencies have terminated probationers. *See, e.g.*, Mem. Op. & Order at 3, *NTEU v. Trump*, No. 25-cv-420 (CRC), ("*NTEU v. Trump*"), ECF No. 28 (noting the termination of certain probationers working at federal agencies). Legal challenges in district court followed. In *NTEU v. Trump*, the U.S. District Court for the District of Columbia denied a motion for temporary restraining order and preliminary injunction on February 20, holding that the union plaintiffs' claims fell outside of district court jurisdiction under the FSL-MRS and the CSRA. *NTEU v. Trump*, 2025 WL 561080 (Feb. 20, 2025) at *1.

And in *American Federation of Government Employees (AFGE) v. Ezell, et al.*, No. C 25-01780 WHA (N.D. Cal), the U.S. District Court for the Northern District of California issued a narrow temporary restraining order on March 4 enjoining OPM from taking any action characterized as "ordering" federal agencies to terminate their probationers. *Id.* at 24.[4] (OPM maintains that it has never issued any such order, and litigation remains ongoing.) The court, like the court in *NTEU v. Trump*, held that the union plaintiffs' claims fell outside of its jurisdiction under the FSL-MRS and the CSRA. *Id.* at 11. It concluded, on the basis of the TRO record and

---

[4] A copy of the North District of California district court transcript in *AFGE* is attached for the Court's convenience, as it does not appear to be not available on Westlaw at this time. (Attached as Ex. 1).

briefing before it, that it could assert limited jurisdiction over certain claims brought against OPM by non-union, non-employee organizational plaintiffs. *Id.* at 21-22. As the States note, OPM has issued revised guidance, though they are mistaken that the *AFGE* court required it. *See Id.* at 24 (requiring OPM to notify NPS, BLM, VA, DOD, SBA, and NSF [sic NWS] that any efforts to direct the termination of employees "are illegal"). At the same time, the court disclaimed any power to rescind terminations taken by agencies of their own force; the court understood its role as only enjoining OPM from *directing* such terminations, and ensuring that the agencies appreciated the scope of their own decision-making authority.

On a parallel track, removed probationers have pursued relief before the Office of Special Counsel. On February 21, 2025, the Special Counsel requested a stay of the termination of six probationers. *See* Special Counsel's Initial Request for Stay or Personnel Action, *Special Counsel ex rel. Doe v. OPM*, No. CB-1208-25-17-U-1 (MSPB). On February 25, 2025, the MSPB granted that request. *See* Non-Precedential Stay Order, *Special Counsel ex rel. Doe v. OPM*, No. CB-1208-25-17-U-1 (MSPB). And as recently as March 5, 2025, on a February 28 stay request submitted by the Special Counsel on behalf of a J. Doe complainant, the MSPB Chair stayed the removal of several thousand USDA probationers, ordering that "Mr. Doe shall be placed in the position that he held prior to the probationary termination. Likewise, all other probationary employees whom the agency has terminated since February 13, 2025, pursuant to letters stating, 'The [a]gency finds, based on your performance, that you have not demonstrated that your further employment at the [a]gency would be in the public interest,' shall be placed in the positions that they held prior to the probationary terminations[.]" *See* Non-Precedential Stay Order, *Special Counsel ex rel. Doe v. Dep't of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB).

## THE STATES' CLAIMS IN THIS ACTION

The States base their motion for a TRO on claims under the Administrative Procedure Act ("APA") and a claim alleging *ultra vires* action. They seek an order providing three forms of temporary relief, all explicitly personnel-related:

- "Temporarily restraining Defendants from terminating federal probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance;"

- "Compelling Defendants to reinstate federal probationary employees fired on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individual determinations of conduct or performance;" and

- "Requiring Defendants to file a status report with the Court within 48 hours, and at regular intervals thereafter, identifying under seal all probationary employees terminated on or after January 20, 2025 . . . and describing all steps Defendants have taken to comply with the Court's Order."

States' Br. at 2.

## STANDARD OF REVIEW

"A [TRO or] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)). "A party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citation omitted).

## ARGUMENT

The States cannot make the "clear showing" of entitlement to a TRO required for that extraordinary relief. Most obviously, they cannot establish a likelihood of success on the merits

9

because they cannot show standing to sue; the claims they assert are jurisdictionally channeled away from federal district courts under the CSRA; and they have not identified any unlawful terminations regardless. Further, they have not shown irreparable harm absent temporary relief. Finally, the balance of equities and the public interest strongly favor Defendants.

I.      **The States Have Not Shown Likelihood of Success on the Merits Because They Cannot Establish Jurisdiction over their Claims.**

To establish likelihood of success on the merits of their claims, the States must show, at minimum, that they have Article III standing, and that their claims otherwise would fall within the Court's subject-matter jurisdiction. They cannot make either showing here: they lack standing, and their asserted claims would be jurisdictionally channeled away from district court review in any event under the comprehensive scheme governing federal employment disputes. They also fail to show that Defendants acted inconsistent with law.

A.      **The States Cannot Show Standing.**

To invoke the jurisdiction of this Court, the States "must show" that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). The alleged injury-in-fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not materialized, it must be "certainly impending," and "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted). In addition, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

10

The States fail to satisfy these fundamental principles. They premise their standing assertion primarily on resource-diversion and financial-harm grounds, arguing that removals of probationers will result in loss of tax revenue attributable to those employees' lost income (States' Br. at 28); diversion of resources to assist such employees and provide unemployment benefits (*id.* at 24-25) (while conceding unemployment insurance benefits "are generally reimbursed by the federal government" for federal workers, *id.* at 25); and increased enrollments in state insurance programs (*id.* at 27).[5] Such indirect injuries are insufficient to create standing to sue. In *United States v. Texas*, 599 U.S. 670, 674 (2023), states sued the federal government to challenge an immigration policy that would "impose[] costs on the States." *Id.* The States claimed the policy would force them to "supply social services such as healthcare and education" to persons it otherwise would not. *Id.* The Supreme Court held the States lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 680 n.3. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* "And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.*

The absence of a concrete injury is highlighted by the extraordinary breadth of the States' suit. Plaintiffs admit that their suit treats the "termination of tens of thousands of employees" as "final agency actions subject to this Court's review." States' Br. at 16. And they seek to prevent

---

[5] The States' claim they are "struggling" to provide unemployment insurance and other benefits for terminated probationers warrants skepticism. States' Br. at 2. The States allege that Defendants have terminated about 24,000 probationers nationwide since January 20. By comparison, more than 220,000 individuals made claims for unemployment insurance in just the week ending March 1. Dep't of Labor, https://www.dol.gov/ui/data.pdf. And the States do not explain what share of the 24,000 allegedly terminated probationers reside in their States, which account for fewer than half of the States overall.

11

alleged final agency actions that have not even happened yet in attempting to bar nearly every cabinet department and other agencies from terminating probationers in the future. Significantly, they fail to connect nearly any of these past and potential future personnel actions to any of the 20 State plaintiffs. They also offer little specificity with these thousands of purported agency actions. The States provide the most detail on terminations made by the National Science Foundation, States' Br. at 11, but that agency's terminations are not even part of this suit because the States chose to omit it as a defendant. The States' choice to sue 41 Executive Branch officials and agencies resembles *Murthy*, where two States and five individuals "sued dozens of Executive Branch officials and agencies." 603 U.S. at 54. The plaintiffs lacked standing to litigate that "sprawling suit," *id.* at 61, the Supreme Court again held, because of the absence of "any concrete link between their injuries and the defendants' conduct," *id.* at 76. Here too, "standing doctrine prevents [courts] from "exercis[ing] such general legal oversight" of the other branches of Government." *Id.*

And even if those conjectural assertions could suggest an injury-in-fact traceable to Defendants' actions, the States cannot satisfy standing's redressability prong. All of the States' claims derive from those of any removed probationers: the States' asserted injuries could only be conceivably redressed by their *reinstatement*. But reinstatement of removed probationers is a remedy overwhelmingly, if not exclusively, channeled away from federal district courts under the CSRA.[6] Because the Court lacks subject-matter jurisdiction to award the only remedy that might

---

[6] Limited exceptions to the CSRA's comprehensive scope exist. For example, Title VII claims are heard in district court, consistent with the CSRA's exception for claims under that scheme. And certain agencies are subject to different (and similarly preclusive) statutory administrative-judicial review schemes, such as that applicable to Title 38 employees of the Veterans Health Administration, part of the Department of Veterans Affairs. *See* 38 U.S.C. § 714.

redress the States' claimed harms here, the States cannot show redressability, and thus cannot establish standing.

To flesh this out further, take the States' asserted loss of tax revenue (States' Br. at 28). Any injury attributable to future lost tax revenue attributable to probationer removals (or future probationary removals) in 2025 is neither concrete nor certainly imminent at this point. But even if the States could surmount that injury-in-fact hurdle, they cannot show how a federal district court could award them any remedy that would redress such injury. The only remedy that might restore potential lost tax revenue for any of these States would be reinstatement of the removed probationers at issue, thereby restoring them (and their taxable incomes) to the States' tax bases. And under the CSRA, that remedy is unavailable under the facts asserted here.

As explained above, removals of covered federal employees must generally be appealed to the MSPB, with judicial review available exclusively in the Federal Circuit. *See Elgin*, 567 U.S. at 5, 11-13. That administrative-judicial review pathway bypasses district court entirely, even for constitutional claims (which the States have not asserted in any event). *Id*. The same rule holds true for probationers, who cannot appeal their removals to the MSPB as of right, but must instead pursue relief through the Office of Special Counsel complaint process (which may result in review by the MSPB). The bottom line is the same: any administrative-judicial review pathway bypasses district court entirely, meaning that district courts lack jurisdiction to review their claims under the CSRA. *NTEU v. Trump*, 2025 WL 561080, at *1. And lacking jurisdiction to review challenges to probationary employee removals, federal district courts likewise lack jurisdiction to issue the only remedy that might redress the States' asserted loss of tax revenue.

The district court opinion in *NTEU* is particularly instructive here. The unions alleged that a large-scale removal of probationers would reduce their membership numbers and revenues,

divert their resources, and reduce their heft at the bargaining table.  2025 WL 561080 at *6.  Assessing its jurisdiction over the unions' claims under the *Thunder Basin* doctrine, *see* Part I.B, *infra*, the court concluded that jurisdiction over those claims was channeled exclusively through the Federal Labor Relations Authority ("FLRA"), and from there to a court of appeals, under the special review scheme established by the FSL-MRS.  *Id*. at **6-7.  In particular, the court observed, "[if] the FLRA finds an unfair labor practice, for instance, it may 'require reinstatement of an employee with backpay'" under 5 U.S.C. § 7118(a)(7)(C).  *Id*. at *7.  And having determined both that the unions could pursue their claims through the FLRA, *id*., and that individual employees with appeal status could pursue similar recourse before the MSPB, *id*. at n.2, the court concluded that the jurisdictional scheme is exclusive, thus foreclosing district court review.  *Id*. at **5-8.  What that means for the States' standing assertion is this: lacking jurisdiction to even consider (much less remedy) the claims of removed employees, district courts cannot redress the States' asserted injuries-in-fact, thus depriving them of Article III standing.

Not does it matter that the States seek to assert claims under the APA: courts have uniformly held that the CSRA precludes claims under the APA.  *See Hall v. Clinton*, 235 F.3d 202, 206 (4th Cir. 2000); *Bolton v. Colvin*, 674 Fed. Appx. 282, 290–91 (4th Cir. 2017); *Mann v. Haigh*, 120 F.3d 34, 38 (4th Cir. 1997).  The comprehensive preclusion of APA review (and remedies) for those most directly affected by the employment-based actions here, federal employees themselves, is no less comprehensive for parties that are affected by those actions (if at all) in a derivative, attenuated, and downstream way.

The same outcome holds true for the States' other asserted injuries: diversion of assistance resources (States' Br. at 2, 13) and increased enrollment in state-administered insurance programs (*id*. at 27).  Here too, the existence of an injury-in-fact is speculative, attenuated, downstream, and

unproven.  But setting that aside, neither of these alleged injuries would be redressable by any relief within the Court's power to award.  To prevent or stem the diversion of state assistance resources, the Court again would have to order reinstatement of the removed probationers into their former agency jobs.  And to reduce enrollment in state-administered insurance programs back to their baseline levels, the Court would have to enter the same relief.  As explained above, that sort of remedy falls outside of district court jurisdiction under the CSRA.

Finally, the States claim they are entitled to specific, advance notice of every probationary employee that each federal agency has removed since January 20 or intends to remove.  (States' Br. at 2, 17-18).  They do not have standing to press that claim either.  As explained below, the States' claim is without merit; it rests on a misunderstanding of both the facts and the applicable statutory and regulatory provisions. But, regardless, "notice" would not redress the States' claimed injuries-in-fact, which again amount to asserted loss of tax revenue, diversion of resources, and increased enrollment in state insurance programs.  On this front, there is a basic mismatch between the States' asserted injuries and their supposed right to relief.

**B.    Jurisdiction over the Claims Asserted by the States is Channeled Away from Federal District Courts under the CSRA and FSL-MRS.**

Relatedly, the States cannot show that the claims they assert would fall within this Court's jurisdiction given how comprehensively the CSRA and FSL-MRS govern employment-related disputes between federal employees and agencies.  Even though they cast their claims in terms of direct injury, everything about their claims, and the remedies they seek, derives from the relationship between the federal government and its employees, to which they are strangers.  The States cannot step into the shoes of those employees and assert claims against federal agencies that the employees themselves cannot assert in federal district court, but must instead pursue before the FLRA or the MSPB.

And there is no question that these claims cannot be asserted in district court, by employees or anyone else.  Under the familiar test for implied statutory preclusion under *Thunder Basin v. Coal Co. v. Reich*, 510 U.S. 200 (1994), a claim will be found to fall outside the scope of a special statutory review scheme "only in limited circumstances: when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim is wholly collateral to the statutory review provisions; and (3) the claim is beyond the expertise of the agency."  *NTEU*, 2005 WL 561080 at *5 (cleaned up).  Since *Thunder Basin*, the Supreme Court and the D.C. Circuit have both held federal employment or labor challenges to be exclusively channeled away from district court review under both the CSRA and the FSL-MRS.  *See Elgin*, 567 U.S. at 13 (CSRA review is "exclusive, even for employees who bring constitutional challenges to federal statutes"); *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*").

Again, the district court's recent decision in *NTEU* is especially instructive.  The court there held that the union plaintiffs could not sue in district court to challenge these very same actions, but must instead pursue relief through the FLRA.  2005 WL 561080 at **5-8.  Further, in addressing the unions' argument that pursuing redress before the FLRA (and from there to a court of appeals) would be less efficient than doing so before a district court, the court emphasized that NTEU "provides no reason why it could not seek relief from the FLRA on behalf of a class of plaintiffs and admits that it would ask other agencies to follow an administrative judge's ruling in its favor."  *Id*. at *7.  In rejecting a challenge to OPM's "Fork in the Road" deferred resignation program last month, the federal district court similarly held that the FSL-MRS precluded jurisdiction.  *Am. Fed. of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) ("Congress intended for the FSL-MRS and [CSRA] . . .  to provide the exclusive procedures for disputes involving employees and their federal employer.").

16

The States make no mention of *NTEU* in their opening brief.[7]  Nor do they address *Thunder Basin* preclusion, or explain why their claims are not precluded by the comprehensive administrative-judicial review schemes created by Congress in the CSRA and FSL-MRS.  But any such argument would be unavailing for the same reasons already recognized by the court in *NTEU*.

Specifically, Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law' "by way of 28 U.S.C. § 1331's grant of jurisdiction." *Axon*, 598 U.S. at 185. Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.*  Where Congress has done so implicitly, courts determine whether it intended to preclude particular claims by assessing whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin*, 510 U.S. at 207, 212).

The first step under *Thunder Basin*—Congress's intent to preclude—is plainly satisfied here: Congress established a detailed statutory scheme for adjudicating federal employment and labor disputes.  The CSRA sets forth a process for covered employees to appeal removal decisions first to the MSPB, with judicial review available before the Federal Circuit following a final decision from the MSPB.  28 U.S.C. § 1295(a)(9). And probationers may similarly challenge their removals through at least two pathways: via complaint to the Office of Special Counsel or, in more limited instances, direct appeal to the MSPB.  *See* 5 U.S.C. § 2302(a)(2)(A)(i)–(xii).

---

[7] Plaintiffs discuss the Northern District of California's decision in *AFGE*.  But they do not acknowledge that the *AFGE* court rejected the union plaintiffs' claims as they were channeled exclusively through the FLRA; instead, the court rested its assertion of subject-matter jurisdiction solely on the non-union, non-employee organizational plaintiffs.  Defendants address that aspect of the district court's oral TRO ruling *infra*.

Likewise, the FSL-MRS provides for "administrative and judicial review" regarding disputes between federal-employee unions and the federal government. *AFGE*, 929 F.3d at 752. Congress decided, through the FSL-MRS, that federal labor disputes must first be administratively exhausted before the FLRA. Judicial review, if any, is available only in a court of appeals. *See id.* at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *see also* 5 U.S.C. § 7703(b) (judicial review in Federal Circuit or other court of appeals).  "Congress typically chooses . . . review in a court of appeals following the agency's own review process" when designing an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme includes. Accordingly, as the D.C. Circuit has repeatedly recognized, the FSL-MRS precludes jurisdiction in the district courts over federal union disputes. *See AFGE v. Trump*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 636 (D.C. Cir. 2013)).

Turning to the second *Thunder Basin* step—whether particular claims are of the type Congress intended to be reviewed in this scheme—the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* (internal quotation marks, citation, and alteration omitted). These "considerations" are ultimately merely guideposts to "best [] understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

18

All three *Thunder Basin* factors are satisfied here. First, the CSRA and FSL-MRS schemes provide for meaningful judicial review over the very claims asserted by the States, even if the States themselves are not the proper parties to assert them. *See AFGE*, 929 F.3d at 755. Here, as in *AFGE v. Trump*, federal unions can challenge probationary removals or RIFs through the administrative process "in the context of concrete . . . disputes." *Id.* at 757; *NTEU*, 2025 WL 561080 at *7. Similarly, if any affected party thinks that the probationary removals or RIFs conflict with any federal rule, guidance, or statute, it may assert that within the administrative scheme. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. VA*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja* ("*FLEOA*"), 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system).

Second, the asserted claims are not wholly collateral. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Much like the union plaintiffs in NTEU, the States challenge certain

19

probationary removals and ongoing (and future) RIFs. But those are all the kinds of federal personnel and labor issues that lie at the heart of the CSRA and the FSL-MRS.

Third, and for similar reasons, the MSPB and FLRA may bring respective expertise to bear on many of the questions raised. Indeed, *Elgin* directly addresses the point in the CSRA context. As the Court noted: "preliminary questions unique to the employment context" include fact questions about a "resignation" (there whether it "amounted to a constructive discharge") as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the FLRA, these "threshold questions" may "alleviate [the other] concerns." *See id.*

Again, the States have said nothing so far about *Thunder Basin*, *Elgin*, *AFGE v. Trump*, or *NTEU*, or about why they can assert claims in district court substantively identical to those held to be jurisdictionally precluded from district court review when asserted directly by federal employees themselves or the unions that represent them. But it would be an odd result if claims that cannot be raised in district court by the plaintiffs most directly affected by the challenged actions could be raised by States whose asserted injuries are entirely derivative of such plaintiffs. And to Defendants' knowledge, no court has countenanced the States' argument here.

The most the States might be able to say on this point—and all they have said—is that the district court in *AFGE v. Ezell* issued a limited TRO against OPM on the basis of similar claims asserted by non-employee organizational plaintiffs. But that does not help the States here. The States acknowledge that since *AFGE*, OPM has clarified that the agency "is not directing agencies to take any specific performance-based actions regarding probationary employees." States' Br. at 12. And the *AFGE* suit relied on an altogether different theory of relief. There, the plaintiffs sued

OPM and its agency head alone.  They did not attempt to seek APA review of tens of thousands of alleged final agency actions involving 41 federal government defendants.

### C.    The States Have Not Shown that Defendants Acted Contrary to Law.

Even if the States' suit were procedurally proper, they have established that Defendants took action inconsistent with law.  The States fundamentally misunderstand Defendants' discretion to terminate probationers.  "Congress . . . saw summary terminations as essential to an effective and efficient service, and it has repeatedly acted to preserve agencies' discretion summarily to remove probationary employees."  *U.S. Dep't of Justice v. Fed. Labor Relations Authority*, 709 F.2d 724, 730 (D.C. Cir. 1983).  And "[i]t has, throughout this time, delegated the task of defining and administering the specific probationary term to the President and other officials within the Executive Branch."  *Id.*  "[S]econd-guessing of the agency's decision . . . undermines the scheme Congress envisioned . . . ."  *Id.* at 289-90.

President Trump campaigned on a promise to improve the federal government workforce.  The recent increase in the number of terminations of probationers is consistent with his administration's pledge to raise standards for federal employment.  The States have not cited anything requiring a newly elected president to have his administration measure probationers by standards set under a previous government.  Proposals for heightened standards for probationers have long circulated among federal workforce policymakers.  During the Bush Administration, for example, the MSPB advocated for greater scrutiny of probationers.  MSPB, "The Probationary Period: A Critical Assessment Opportunity" (Aug. 2005).[8]

---

[8] https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

The States also fail to explain why an agency could not consider its needs and goals in determining whether it will make a probationer an employee. The agency must use the probationary period "to determine the fitness of the employee." 5 C.F.R. § 315.803(a). At the same time, the probationer must "demonstrate fully his or her qualifications for continued employment." Any fitness inquiry necessarily requires some consideration of the role that the probationer is seeking. An agency's needs and goals for specific roles can change during a probationary period—especially during any intervening change in leadership. To the extent Defendants considered their needs in terminating probationers, that was permissible.

The States also wrongly suggest that Defendants issued defective notices to terminated probationers. An OPM regulation obligates agencies to tell a terminated probationer "why he is being separated." 5 C.F.R. § 315.804(a). The States suggest this requires a "particularized assessment of performance or conduct." States' Br. at 18. But no statute or regulation requires that. Instead, the regulation clarifies that an agency satisfies its notice obligation by stating its termination conclusion: "The information in the notice as to why the employee is being terminated shall, at a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." 5 C.F.R. § 315.804(a). A statement that a probationer has been terminated because of his or her performance during the probationary period is sufficient.

Finally, the States cast doubt on Defendants' terminations of probationers by calling them reductions in force (RIFs). Based on that same premise, the States argue that Defendants violated requirements that agencies undertaking certain RIF proceedings must timely notify states or state entities designated to carry out rapid response activities under the Workforce Investment Act of 1998. *See* 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R. § 351.803. But the premise is mistaken; the States ignore fundamental differences between a RIF and the termination of a probationer. The actions

22

they challenge here are the latter, not the former. Separately, agencies have begun to implement the President's directive to consider and undertake RIFs, but there is no allegation in the States' briefing that any agency has failed to comply with RIF requirements in connection with those distinct actions. Importantly, RIFs and probationary terminations are different things. Agencies cannot replace employees terminated as part of a RIF; the position is eliminated. But a terminated probationer can be replaced.

The States also imply that OPM's circulation of a template for the termination of probationers converted those terminations into a RIF. Not so. If anything, that template shows that OPM did not direct Defendants to implement a RIF. Consistent with the probationer termination notice regulation, that template suggested as model language: "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." *See* TRO Mot. at 10. That rationale belies the States' mischaracterization of probationer terminations as a reduction in force.[9]

## II.    The States Cannot Show Irreparable Harm.

The States assert irreparable harm based on an increased demand for services they already provide. That does not suffice. The States have not asserted "an invasion of a legally protected interest," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that is, an injury "traditionally redressable in federal court," *United States v. Texas*, 599 U.S. 670, 676 (2023). The States do not claim that the firings of probationers cause them direct injury by, for example, requiring them to act or refrain from acting, determining their federal funding, or depriving them of a legal right. *Cf.*

---

[9] The States also seek relief that goes beyond Federal Rule of Civil Procedure 65(b)'s authority to "issue a temporary restraining order." A "restraint" is a "[p]rohibition of action; holding back." Restraint, Black's Law Dictionary (12th ed. 2024). The States' request for an order reinstating thousands of probationers to their roles is the opposite, a mandatory injunction. *See Northeast Ohio Coal. for Homeless & Serv. Emps. v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006).

*Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) ("The Secretary's plan will cut … revenues," which is "necessarily a direct injury."). Rather, they contend that the firings have the incidental effect of increasing the States' burden to provide services. States' Br. at 16-17. That is the same theory advanced and rejected in *Texas*. *Compare* States' Br. at 12 with *Texas*, 599 U.S. at 674, 680 n.3  (citing *Massachusetts v. Laird*, 400 U.S. 886 (1970); *Florida v. Mellon*, 273 U.S. 12, 16-18 (1927)).  Moreover, while the States focus on the number of probationers fired, the reality is that any firing of a federal employee will only "impose[] peripheral costs on a State." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022).  If those downstream costs are sufficient to state a cognizable injury, "what limits on state standing remain?" *Id.*

It cannot be that a federal employment action that increased—or decreased—a State's unemployment obligations and thus affected social-services spending or tax revenue could be challenged in federal court.  It would mean that Justice Douglas was correct in *Laird* and that a State can sue to enjoin military action if it would result in lost tax revenue or other indirect costs. *See* 400 U.S. at 887-91 (Douglas, J., dissenting); see also *id.* at 886 (summarily rejecting suit to enjoin Vietnam War).

In short, just as the States lack standing, they also lack cognizable irreparable harm.

### III.    The Public Interest Weighs Against Temporary Relief.

Turning to the third and fourth factors governing issuance of temporary injunctive relief, the States cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a TRO.  These final two factors merge in cases where relief is sought from the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  A TRO would be especially harmful to Defendants because probationary periods are time limited.  For probationers whose probationary periods end during a TRO, Defendants may be unable to later exercise their authority

24

to determine that the probationer is not fit for federal employment.  In addition, the States'
requested TRO would interfere with the President's ability to manage, shape, and streamline the
federal workforce to more closely reflect policy preferences and the needs of the American public.

A temporary restraining order would also impose significant and unrecoverable costs on
Defendants.  The relief sought by the States would require the federal government to pay salaries
and benefits for persons who it otherwise would not be obligated to pay.  These expenses are likely
unrecoverable from terminated probationers even if Defendants ultimately prevail in this action.
Defendants thus request that any relief be accompanied by a bond under Fed. R. Civ. P. 65(c),
which provides that "[t]he court may issue a preliminary injunction or a temporary restraining
order only if the movant gives security in an amount that the court considers proper to pay the
costs and damages sustained by any party found to have been wrongfully enjoined or restrained."
A bond is appropriate here given that any preliminary relief would potentially mandate that the
Executive spend money that may not be recouped once distributed.[10]

### IV.    Any Relief Should Preserve the Executive's Discretionary Authority.

To the extent the Court considers entering the States' proposed request for relief, any order
should be limited to mitigate (albeit not eliminate) the significant harms it would cause to the
Executive's abilities to exercise its lawful statutory authority and discretion. To that end,
Defendants respectfully request that any preliminary relief clarify that it does not prohibit the
President from reissuing a different directive and/or Executive Order or limit the defendant

---

[10] Indeed, the States seek relief that exceeds Federal Rule of Civil Procedure 65(b)'s authority to
"issue a temporary restraining order." A "restraint" is a "[p]rohibition of action; holding back."
Restraint, Black's Law Dictionary (12th ed. 2024). The States' request for an order reinstating
thousands of probationers to their roles is the opposite: a mandatory injunction.  *See Ne. Ohio
Coal. for Homeless & Serv. Emps. v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006).

agencies from taking actions pursuant to their legal authority to regulate in furtherance of this substantive policy priority.

Moreover, Defendants respectfully request that any preliminary relief be appropriately narrowly tailored to preserve the Executive's authority to exercise its Article II authority over the Executive Branch. That is the normal equitable remedy, and anything broader would constitute a significant intrusion on the separation of powers. *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 698 F.3d 171, 179 (4th Cir. 2012) (under *ultra vires* review standard, court "may not dictate how government goes about its business but [rules] only [on] whether a public entity has acted within the bounds of its authority or overstepped them" (citation omitted)).

**V.    Any Injunctive Relief Should Be Stayed Pending Appeal.**

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

**CONCLUSION**

For these reasons, this Court should deny Plaintiffs' Motion for a Temporary Restraining Order.

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

*/s/ Christopher R. Hall*
Christopher R. Hall
Assistant Director, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-4778
Email: Christopher.hall@usdoj.gov

Kelly O. Hayes
United States Attorney

*/s/ Beatrice C. Thomas*
Beatrice C. Thomas
Assistant United States Attorney
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, MD 21202
beatrice.thomas@usdoj.gov

*Attorneys for Defendants*