# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND, *et al.*,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

    Defendants.

    CIVIL NO. JKB-25-0748

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

# TABLE OF CONTENTS

I.    **SUMMARY** ........................................................................................................... 1

II.    **INTRODUCTION** ............................................................................................... 2

III.    **BACKGROUND** ................................................................................................... 2

   A.   Requirements for Terminating Probationary Employees ...................................... 2

   B.   The Government's Alleged Actions ...................................................................... 6

   C.   The States' Alleged Harms .................................................................................. 7

IV.    **REVIEWABILITY** ........................................................................................... 12

   A.   Justiciability ...................................................................................................... 12

      1.   Injury in Fact ............................................................................................. 13

      2.   Causation ................................................................................................... 19

      3.   Redressability ............................................................................................ 20

   B.   Jurisdiction ........................................................................................................ 21

      1.   Final Agency Action ................................................................................. 21

      2.   Claim Channeling ...................................................................................... 23

V.    **TEMPORARY RESTRAINING ORDER** ...................................................... 30

   A.   Likelihood of Success on the Merits .................................................................. 30

      1.   Zone of Interests ....................................................................................... 31

      2.   The Agencies Conducted RIFs .................................................................. 32

      3.   The Agencies' Actions Were Contrary to Statutory RIF Requirements ...... 39

   B.   Irreparable Harm ............................................................................................... 41

   C.   Balance of the Equities & the Public Interest ..................................................... 42

VI.    **SCOPE OF RELIEF** ........................................................................................ 44

   A.   TRO Purpose & Limitations ............................................................................... 44

   B.   Geographic Scope ............................................................................................. 47

   C.   Content of the Injunction ................................................................................... 49

   D.   Agencies Restrained .......................................................................................... 52

VII.    **SECURITY/BOND REQUIREMENT** ........................................................... 52

VIII.    **STAY PENDING APPEAL** ............................................................................. 53

IX.    **CONCLUSION** ................................................................................................. 54

## I.    SUMMARY

When the federal government terminates large numbers of its employees, including those still on probation because they were recently hired or promoted, it must follow certain rules. Some of those rules are intended to help states manage the consequences of sudden, mass layoffs. Workers who unexpectedly lose their jobs often need immediate assistance—in applying for unemployment, in searching for new jobs, and in obtaining essential social services—and Congress and the government itself recognized as much when they crafted rules meant to give states advance notice of big layoffs. Without advance notice and the opportunity to plan, organize, and reprogram necessary resources, states are harmed.

In this case, the government conducted massive layoffs, but it gave no advance notice. It claims it wasn't required to because, it says, it dismissed each one of these thousands of probationary employees for "performance" or other individualized reasons. On the record before the Court, this isn't true. There were no individualized assessments of employees. They were all just fired. Collectively. Accordingly, in the language of relevant laws, these big government layoffs were actually "Reductions in Force," or "RIFs." And, because these were "RIFs," they had to be preceded by notice to the states that would be impacted.

Lacking the notice to which they were entitled, the States weren't ready for the impact of so many unemployed people. They are still scrambling to catch up. They remain impaired in their capacities to meet their legal obligations to their citizens.

Because the federal government's recent discharge of thousands of probationary employees was not executed in compliance with rules intended to ensure that states are ready to bear the load cast upon them when mass layoffs occur, and because the Plaintiff States are not yet

1

in fact so prepared, and this because of the violations, the recent directives of various federal agencies terminating probationary employees must be stayed.

In the accompanying Temporary Restraining Order, the illegal RIFs *are* stayed for fourteen days, during which the Court will likely consider an application for a preliminary or longer-term injunction. The Temporary Restraining Order restores the status quo. Employees purportedly terminated under the RIFs are returned to the Government's employ, *i.e.*, they resume the status they enjoyed before the Government acted.

*       *       *

## II.     INTRODUCTION

Plaintiffs, which include nineteen states and the District of Columbia ("the States"), have filed suit against forty-one Defendants, which include cabinet agencies and their secretaries, and other federal agencies and their heads ("the Government"). (*See generally* ECF No. 1.) The States challenge the Government's termination of probationary federal employees. Plaintiffs have filed a Motion for Temporary Restraining Order ("TRO"). (ECF No. 4.) The parties have filed briefing and evidence in relation to the Motion. (ECF Nos. 4, 5, 19, 20, 33.) The Court held a Hearing on the Motion on March 12, 2025. The Motion will be granted, and a TRO will issue.

## III.     BACKGROUND

### A.     Requirements for Terminating Probationary Employees

In the federal civil service, most employees are considered to be under probationary status in the first year or two of their employment. *See* 5 U.S.C. §§ 3321(a), 7511(a)(1)(A)(ii), 7511(a)(1)(C)(ii); 5 C.F.R. § 315.801. A probationary employee may be terminated "because his

work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment," 5 C.F.R. § 315.804, or "for reasons based in whole or in part on conditions arising before his appointment," 5 C.F.R. § 315.805. If a probationary employee is terminated because his performance or conduct fails to demonstrate that he is fit for continued employment, the agency "shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." 5 C.F.R. § 315.804. Otherwise, a probationary employee may be terminated as part of a reduction in force ("RIF"). The parties have not identified any other method by which a probationary employee may be terminated.

With respect to a RIF, federal statutes and regulations set forth detailed procedures that federal agencies must follow. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351. The relevant regulations provide that "[e]ach agency shall follow this part when it releases a competing employee from his or her competitive level by . . . separation . . . , when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position die [*sic*] to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days." 5 C.F.R. § 351.201(a)(2).

When conducting a RIF, an agency must follow certain retention preferences, as laid out in the statute and regulations. *See* 5 U.S.C. § 3502(a) (directing the Office of Personnel Management ("OPM") to "prescribe regulations for the release of competing employees in a reduction in force which give due effect to (1) tenure of employment; (2) military preference . . . ;

3

(3) length of service; and (4) efficiency or performance ratings."); 5 C.F.R. § 351.501 (providing that "[c]ompeting employees shall be classified on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance" based upon group designations). Probationary employees are included in "group II" and may only be released after the release of "group III" employees, which includes certain temporary and term employees. 5 C.F.R. § 351.501(a), (b).

In addition, when conducting a RIF, a federal agency must:

> establish "competitive areas[1] in which employees compete for retention"; designate the "competitive areas" of which employees are to compete for retention at least 90 days before the effective date of the RIF; designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption; and rank employees for retention based on factors including their tenure group, time in service (including military service), veteran preference, length of service, and performance.

(ECF No. 1 ¶ 92 (citing 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.402–351.404, 351.504).)

Further, federal agencies are required to provide at least 60 days written notice before they may release a federal employee. If the RIF is caused by unforeseeable circumstances, "the Director of OPM, at the request of an agency head or designee, may approve a notice period of less than 60 days." 5 C.F.R. § 351.801(b). "The shortened notice period must cover at least 30 full days before the effective date of release." *Id.*

That notice must be provided to (1) the employee; (2) the employee's collective bargaining representative; and—if the RIF involves at least 50 employees within a "competitive area"—(3) the state in which the employee's duty station was located. 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803.

---

[1] "A competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location and . . . it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency. The minimum competitive area is a subdivision of the agency under separate administration within the local commuting area." 5 C.F.R. § 351.402(b).

The notice must be provided to "[t]he State or the entity designated by the State to carry out rapid response activities under Title I of the Workforce Investment Act of 1998." 5 C.F.R. § 351.803. That notice must include: "(1) The number of employees to be separated from the agency by reduction in force (broken down by geographic area or other basis specified by OPM); (2) The effective date of the separations; and (3) Any other information specified by OPM, including information needs identified from consultation between OPM and the Department of Labor to facilitate delivery of placement and related services." *Id.*

When an agency fails to provide the requisite notice to the State, the "employee may not be released, due to a reduction in force[.]" 5 U.S.C. § 3502(d)(1).

The States, in turn, are required to carry out "rapid response activities" pursuant to the Workforce Innovation and Opportunity Act of 2014.[2] *See* 20 C.F.R. § 682.302 ("Rapid response must be delivered when" there is, *inter alia*, "[a]nnouncement or notification of a mass layoff as defined in § 682.305."); *see also* 20 C.F.R. § 682.305 (defining "mass layoff" as one that "meets the State's definition of mass layoff, as long as the definition does not exceed a minimum threshold of 50 affected workers" or, "[w]here a State has not defined a minimum threshold for mass layoff meeting the requirements of paragraph (a) of this section, layoffs affecting 50 or more workers").

"Rapid response activity" is defined as the activities provided by the state in response to a mass layoff "in order to assist dislocated workers in obtaining reemployment as soon as possible, with services including" "the establishment of onsite contact with employers and employee representatives"; "the provision of information on and access to available employment and training activities"; "the provision of emergency assistance"; and "assistance to the local community in

---

[2] The Workforce Innovation and Opportunity Act of 2014 succeeded the Workforce Investment Act of 1998. *See* 29 U.S.C. § 3361(a) ("Except as otherwise specified, a reference in a Federal law to a provision of the Workforce Investment Act of 1998 (29 U.S.C. 2801 et seq.) shall be deemed to refer to the corresponding provision of [the Workforce Innovation and Opportunity Act of 2014].").

5

developing a coordinated response and in obtaining access to State economic development." 29 U.S.C. § 3102(51). These rapid-response services are designed to cushion the blow of sudden mass unemployment. *See, e.g.*, 20 C.F.R. § 682.100 (providing that the Workplace Innovation and Opportunity Act ("WIOA") designates "both required and allowable activities"); *id.* § 682.200 (identifying "[r]equired statewide . . . activities," including "rapid response activities"); *id.* § 682.300(a) (defining "rapid response" as "encompass[ing] the strategies and activities necessary to," among other things, "[d]eliver services to enable dislocated workers to transition to new employment as quickly as possible"). These federal duties stand alongside the States' own, jurisdiction-specific requirements related to mass unemployment events. *See, e.g.*, Md. Code Ann., Lab. & Empl. §§ 11–303 to –04 (setting out Maryland's "quick response program," whose duties include "monitor[ing] layoff and employment patterns and payments of unemployment compensation contributions to identify employers that are likely to experience large losses in employment or a reduction in operations"); N.J. Stat. Ann. § 34:21-5 (setting out New Jersey's "response team," whose duties include, among others, "[s]eek[ing] to facilitate cooperation between [management and employees] to most effectively utilize available public programs which may make it possible to delay or prevent the transfer or termination of operations"); (*see generally* ECF No. 4-1 at 16–17). Finally, the States also hold background obligations to provide unemployment and similar benefits. *See generally, e.g.*, Md. Code Ann., Lab. & Empl. §§ 8–101 to –1608; N.J. Stat. Ann. §§ 43:21–1 to –71.

### B. The Government's Alleged Actions

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." It set out as its purpose, "[b]y eliminating waste, bloat, and insularity, my Administration will empower

American families, workers, taxpayers, and our system of Government itself." It provides, *inter alia*, that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."

On February 11 and 12, various agencies terminated large numbers of probationary employees. (ECF No. 1 ¶¶ 107–109.)

The States allege that, on February 13, "OPM officials met with agency officials throughout the federal government and ordered agencies to lay off nearly all of the federal government's approximately 220,000 probationary employees." (*Id.* ¶ 110.) And, in a February 14 email, Plaintiffs allege that OPM explained to agencies that "[w]e have asked that you separate probationary employees that you have not identified as mission critical no later than the end of the day Monday, 2/27. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs)." (*Id.* ¶ 112.)

This was followed by several more agencies terminating large numbers of probationary employees on February 13 through March 3. (*Id.* ¶¶ 115–137.)

All told, the States allege that the Government has terminated at least 24,000 probationary employees. (*Id.* ¶ 139.) The States were not provided any notice of such terminations from the relevant agencies. (*Id.* ¶ 148.)

### C.    The States' Alleged Harms

The States allege several injuries resulting from the Government's failure to follow the RIF procedures. They situate these injuries within five distinct categories of harm: (1) harms to the States' rapid-response protocols, which both federal and state law require the States to develop, (*see* ECF No. 4-1 at 21–22, 33–34; ECF No. 19 at 2–3); (2) harms to the States' administration of

7

unemployment benefits, (*see* ECF No. 4-1 at 21–22, 34–35; ECF No. 19 at 2–3); (3) harms to State programs that rely on embedded federal workers, (*see* ECF No. 4-1 at 36–37; ECF No. 19 at 3); (4) harms to the States' finances, namely, the States' tax bases and various social-services programs, including public health insurance, (*see* ECF No. 4-1 at 23, 37–38; ECF No. 19 at 4–5); and (5) an informational harm that attends the fact of not having received the statutorily required notice, (*see* ECF No. 4-1 at 23, 24; ECF No. 19 at 5–6).

First, the States allege harms to their rapid-response efforts by virtue of having to "divert[] or . . . prepar[e] to divert staff from critical state-funded matters." (ECF No. 19 at 2.) They also allege harms in the form of "administrative burdens [flowing from] the need to affirmatively contact federal agencies, monitor public reporting, and conduct mass outreach to identify impacted workers," (*id.* at 2–3 (citations omitted)), as well as to "determine if additional firings will occur" and "attempt to provide services to those employees," (ECF No. 4-1 at 22 (collecting affidavits from State labor officials)). For example, the State of Maryland "created a new website, requiring significant time and expense," in order to provide resources to recently terminated federal employees. (ECF No. 4-5 ¶ 29.) In the States' telling, these recent costs exceed those they would have incurred with proper notice under the RIF statute. (*See, e.g.*, ECF No. 4-5 ¶¶ 21–22 (Maryland Secretary of Labor asserting that "[r]eacting after a layoff is far more resource-intensive than the advance planning and assistance process required by law," and that "[b]ecause the [State] has received no notice of federal RIFs, despite extensive outreach, [it is] dedicating significantly more staff, resources, and expenditures to fulfill [its] statutory obligation").)

Second, the States allege harms to their unemployment-benefits systems as a direct result of a surge in the number of claims brought by former federal employees. (*See* ECF No. 4-1 at 21–22; 32–38.) The States offer the following numbers, among others:

8

- Between January 21 and March 3, 2025, Maryland received claims from 813 former federal employees, up 330 percent from the 189 such claims it received during the same period the prior year. (*See* ECF No. 4-5 ¶¶ 50, 52.) In "the last few weeks," the State has received 30 to 60 new claims per day. (*Id.* ¶ 18.)
- Between February 1 and March 4, 2025, California received claims from 1,621 former federal employees, up 149 percent from the 650 such claims it received during the period the prior year. (*See* ECF No. 4-7 ¶ 30.)
- Between January 19 and March 1, 2025, Illinois received claims from 446 former federal employees, just seven fewer than the 453 such claims it received during the entire 2024 calendar year. (*See* ECF 4-8 ¶¶ 15–16.)
- Between January 21 and February 26, 2025, New Jersey received claims from 388 former federal employees, up 273 percent from the 104 such claims it received during the same period the prior year. (*See* ECF No. 4-11 ¶¶ 14–15.)
- Between January 21 and February 27, 2025, New York received claims from 550 former federal employees, a "significant increase" from prior numbers. (*See* ECF No. 4-13 ¶ 4.)
- In February 2025, Massachusetts received claims from 251 former federal employees, with a "significant uptick" in the latter weeks of that period, including 32 claims on February 24 alone. (ECF No. 4-9 ¶¶ 16–17.)

Because of these increases in claims, the States say they "are experiencing administrative burdens and costs," including costs related to the processing of numerous additional claims. (ECF No. 19 at 3 (citing ECF No. 4-5 ¶¶ 37–38, 73–74 (describing how, in Maryland, state money makes up for any federal shortfalls in unemployment-related funding)); *see also* ECF No. 4-5 ¶¶ 59, 70 (identifying Maryland's added costs not only in processing claims, but in *verifying* them, especially given scant information about the firings).) And the States fear "[t]his surge is only beginning," given that "the effective dates for some terminations have not yet passed" and "there will [also] be a delay between when individuals are fired and when they likely apply for benefits." (*See* ECF No. 4-1 at 21.)

Beyond the increased burdens on unemployment-benefits services and the ability to fulfill their rapid-response duties, the States separately "anticipate increased costs to the agencies that enroll new participants in Medicaid and other health-benefits programs." (ECF No. 4-1 at 36.) In that context, the expected harms stem from circumstances substantially similar to those described

above: a bevy of new and otherwise avoidable administrative tasks, including "[f]ielding questions from terminated employees, processing an unexpected influx of applications, and providing other health-benefits services." (*See id.*)

Third, "[s]ome Plaintiff States have also lost the benefit of services provided by federal employees embedded within state agencies, without any time to prepare." (ECF No. 1 ¶ 6.) In New Jersey and Rhode Island, for example, federal employees working in the Centers for Disease Control and Prevention ("CDC")'s Public Health Associate Program ("PHAP") are embedded in state health agencies. (*See* ECF No. 4-12 ¶ 5; ECF No. 4-15 ¶ 7.) In New Jersey, three PHAP associates, all of whom working on infectious disease tracing, were terminated. (ECF No. 4-12 ¶ 11.) CDC later reinstated the associates, but one of the three elected not to return. (*Id.*) New Jersey was "unable to prepare for the sudden loss of labor it was relying on to perform crucial public health services," and, because the associates' caseloads had to be transferred without any notice to staffers who already had full caseloads, there were "administrative inefficiencies, duplicative work, and most importantly, delayed notifications to persons exposed to syphilis, HIV, and TB, which in turn increased the risk of spreading disease in New Jersey." (*Id.* ¶ 13.) Plaintiffs provide similar evidence for Rhode Island, where two PHAP associates were terminated but then reinstated. (*See generally* ECF No. 4-15.)

Fourth, the States allege that the Government's actions "will continue to cause irreparable harm to Plaintiff States' tax base." (ECF No. 4-1 at 37.) According to the Comptroller of Maryland, for example, "[a]lthough unemployed individuals receiving unemployment benefits generally pay income tax on their benefits, the benefits paid are less than the amount the individuals earned when they were fully employed, and therefore the taxes paid are generally less than the taxes paid during their employment." (ECF No. 4-38 ¶ 5.) She further attests that

"hundreds" of Maryland federal employees have been recently terminated and applied for unemployment benefits, which will ultimately result in "significant decreases in Maryland's income tax revenues." (*Id.* ¶¶ 7–8.) Plaintiffs also rely on the analysis of Terry Clower, a public policy professor at George Mason University. (ECF No. 4-35.) Dr. Clower estimates that "the termination of 1,000 federal workers in the District [of Columbia] would, over a period of 60 days, reduce the District's income tax revenues by $320,914 and sales tax revenues by $57,942." (*Id.* ¶ 9.) If the number of terminated employees was 50,000, then the reductions in income and sales tax revenues would be approximately $16 million and just under $3 million, respectively. (*Id.*) Moreover, Dr. Clower estimates that, if fired workers are given the opportunity to find alternative employment, the tax losses to the District would be significantly lower, (*id.* ¶ 12); the States contend that this analysis shows that "[h]ad the District received the notice required by law, these losses would likely have been mitigated, including because some employees would have been able to obtain alternative employment prior to their termination." (ECF No. 4-1 at 37–38.)

Fifth, the States allege a "textbook informational injury" because of the Government's failure to provide information about RIFs as required by law. (ECF No. 19 at 5.) The States assert—and the Government does not deny—that the Government did not provide any advance notice that it was conducting RIFs, nor did it provide "information as to the location and circumstances of future RIFs" as required under federal law. (*Id.* (citing 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R. § 351.803(b)(1).)

## IV. REVIEWABILITY

The Court first examines whether it may review the actions at issue. It concludes that the States—or at least some subset of them—have standing, that there were reviewable final agency actions, and that *Thunder Basin* does not preclude review.

### A. Justiciability

Article III of the Constitution limits the judicial power of the federal courts to the resolution of "Cases" and "Controversies." U.S. Const., art. III, § 2, cl. 1. The law has long understood this language to limit the judiciary to settling "genuine, live dispute[s] between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (quoting *Carney v. Adams*, 592 U.S. 53, 58 (2020)). When a dispute does not fit that description, it is considered nonjusticiable, *see Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979), and the federal courts lack subject-matter jurisdiction to decide it. *See Hamilton v. Pallozzi*, 848 F.3d 614, 620–21 (4th Cir. 2017) (citation omitted).

An "essential and unchanging part" of the case-or-controversy limitation is the requirement of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry is often cast as asking "whether the plaintiff is the proper party to bring th[e] suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). By ensuring, among other things, that plaintiffs seek relief from only those acts that affect them in a definite and distinct way, the standing doctrine "ensures that federal courts decide only 'the rights of individuals,'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Marbury v. Madison*, 5 U.S. 137, 170 (1803)), and therefore exercise only "their proper function in a limited and separated government," *id.* (citation omitted). "Such scrutiny is necessary to filter the truly afflicted from the abstractly distressed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000).

12

To establish standing, a plaintiff must show (1) a "concrete, particularized, and actual or imminent" injury in fact; (2) that the injury "was likely caused by the defendant"; and (3) that the injury "would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560–61). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (internal quotation marks omitted) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

Here, the States have demonstrated each of the fundamental elements of standing, such that they are entitled to invoke federal jurisdiction over their claims. The Court addresses each element in turn.

### 1. Injury in Fact

The States assert five categories of injury: (1) increased administrative costs associated with the hasty rollout of rapid-response protocols, (2) increased administrative costs related to the burden the dismissals have placed on their unemployment-benefits programs, (3) the loss of the services of embedded federal employees, (4) financial harms by way of decreased tax revenue and increased public health insurance payouts, and (5) informational harms in the form of not receiving notice they had a strong interest in receiving (an argument supported by the foregoing, allegedly avoidable harms). *See supra* Section I.C.

As an initial matter, for analytical purposes, the Court views these injuries differently than the States do. As the States themselves observed at the TRO hearing, the "central injury" in this case is fundamentally informational: the States were not given statutorily required notice of the Government's RIFs. For that reason, the other four categories of harm are most naturally understood not as standalone injuries, but as harms flowing from the lack of notice. After all, had

13

notice been provided, those other injuries—at least as the States describe them—would not have materialized. Accordingly, the Court considers the States to assert just *one* injury, not five.

That does not mean, however, that the other categories of injury are irrelevant—far from it. This is because of what is required to establish an informational injury under Article III.

Informational injury has long been recognized as a valid injury in fact. *See, e.g., Laufer, LLC*, 60 F.4th at 163 (collecting cases). And while courts have, from time to time, enforced limits on the justiciability of claims arising from informational harms—often in the context of whether such harms were sufficiently "concrete," *see, e.g., TransUnion*, 594 U.S. at 441–42; *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 300 (4th Cir. 2024)—they have always been open to plaintiffs who (1) did not receive information they were legally entitled to receive and, as a result, (2) experienced "a 'real' harm with an adverse effect." *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also TransUnion*, 594 U.S. at 442 (observing that there must be "'downstream consequences' from failing to receive . . . required information" (citation omitted)).

The States' asserted informational injury satisfies these requirements. First, the plain text of the relevant statutes and regulations makes clear that the States were legally entitled to notice of an imminent RIF. *See* 5 U.S.C. § 3502(d)(3)(A); 5 C.F.R. § 351.803(b). Not only that, but the notice had to contain certain information. *See* 5 U.S.C. § 3502(d)(3)(B); 5 C.F.R. § 351.803(c). Nowhere does the Government dispute the States' interest on this score—not in its briefing, nor during the TRO hearing.

Second, the States have incurred substantial follow-on harms as a result of the Government's failure to provide the required RIF notice. Chief among these are the increased burdens associated with the States' flat-footed rollout of rapid-response and unemployment-

14

benefits programs. (*See, e.g.*, ECF No. 4-5 ¶¶ 27, 58 (describing costs and delays associated with diverting Maryland personnel); ECF No. 4-8 ¶ 24 (similar, but for Illinois).) To fulfill their legal obligation to provide these services, the States have had to divert money and human resources from existing purposes to new ones—and, because of the lack of notice, have done so less efficiently than they would otherwise have. That is enough for standing. After all, even on their own, monetary losses are "obvious" concrete harms, *see, e.g.*, *TransUnion*, 594 U.S. 413 at 425, such that they are also undeniably "real" for purposes of informational injury. The same must be true of the diversion and/or loss of various employees' services, whether this stems from internal employees being reassigned or embedded ones disappearing; the Court presumes employees are hired for and placed according to the value they provide—and, accordingly, that departure or placement into another role, even temporarily, constitutes (at least) a financial loss.

The Court reaches the same conclusion, albeit on somewhat shakier ground, with respect to the increased costs associated with a surge in payouts of unemployment claims and other various public benefits. The question for *these* harms is not, of course, whether they are "concrete"; they are, for the same reasons as the financial and labor harms inflicted upon the States' capacity to run their rapid-response and unemployment-benefits programs. The question, rather, is whether they are sufficiently "actual or imminent."

On balance, the Court believes they are. Future harm is enough for standing when "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). And here, the analysis is straightforward: mass layoffs lead to large numbers of unemployed people, and large numbers of unemployed people lead to an increase in the number of unemployment claims. At this early stage, that is enough, even in view of the fact

15

that not *every* terminated employee will file for unemployment, and that not every employee who does so will be successful. After all, the States have already shown an increase in the number of benefits claims coming from former federal employees. And the courts have repeatedly endorsed similar theories of future injury. *See, e.g.*, *Dep't of Com.*, 588 U.S. at 766–67 (approving standing theory based on "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" due to expected nonresponses to modified census); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (holding a State to have standing to challenge a federal immigration law based on the costs of issuing a greater number of driver's licenses), *aff'd by an equally divided court*, 579 U.S. 547 (2016); *State v. Biden*, 10 F.4th 538, 547 (5th Cir. 2021) (holding a State to have standing because it "incurs a cost every time it *inquires* into whether [someone] satisfies the requirements for a license" (emphasis in original)). Even so, the Court notes the infirmity inherent in all theories of future injury, particularly those that rely on the anticipated behavior of third parties. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

The only injury the States assert that does *not* readily present an "actual or imminent" downstream harm is the loss of tax revenue. The question of when a state or municipality has standing to sue on the grounds that a challenged federal action will reduce its tax revenue is a somewhat unsettled one. On the one hand, it has long been held that a State cannot establish standing by positing a chain of events flowing from the Government's actions that could eventually lead to decreased tax revenue flowing into the general treasury. *See Florida v. Mellon*, 273 U.S. 12, 17–18 (1927) (rejecting as "purely speculative, and, at most, only remote and indirect" the claim that a challenged act "will have the result of inducing potential taxpayers to withdraw

16

property from the state, thereby diminishing the subjects upon which the state power of taxation may operate"). On the other, a State may be able to establish standing when a challenged action will cause a "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). The Courts of Appeals are split as to how broadly *Wyoming* should be read, *compare Sierra Club v. Trump*, 977 F.3d 853, 870–71 (9th Cir. 2020), *judgment vacated on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 56 (2021), *with El Paso County v. Trump*, 982 F.3d 332, 339–41 (5th Cir. 2020), and it does not appear that the Fourth Circuit has opined on the matter.

Here, reasonable minds could differ as to whether the States' position places it closer to the plaintiff in *Florida* or in *Wyoming*. The States' fears of a general "significant decline in tax receipts" as a result of economic pressures engendered by the terminations is likely too diffuse of an injury to be cognizable. (ECF No. 19 at 4–5.) The States come closer to the mark, however, in presenting evidence that the State of Maryland will likely suffer significant lost income tax revenue as a result of the Government's terminations, because individuals receiving unemployment benefits pay lower income taxes than those who are fully employed. (ECF No. 4-38 (Declaration of the Comptroller of Maryland).) But whether this loss is sufficiently directly tied to the RIFs is unclear.

Weaknesses in certain theories aside, the Court is satisfied that the States have shown an injury in fact based on informational harm. The States have already incurred appreciable financial and labor costs as a direct result of not receiving notice they were owed, and they will certainly incur additional costs in the future related to the increased payout of public benefits. And the Court is unpersuaded by the Government's argument, reiterated throughout the TRO hearing, that each of these costs is "downstream" and therefore not cognizable under Article III. As the Supreme

17

Court has made clear, a "real," downstream harm is a critical *component* of an informational injury—hardly a circumstance that destroys one. *See, e.g.*, *TransUnion*, 594 U.S. at 442; *see also Dreher*, 856 F.3d at 345 (citing *Spokeo*, 578 U.S. at 340). For that reason, particularly in this expedited posture, the Court need not say definitively which theories of injury ought not survive for the duration of the litigation; at least one valid theory is enough.[3]

The Court is also unmoved by the Government's appeal to what it calls "the extraordinary breadth of the States' suit," an argument the Government appears to raise in support of its view that the States have not identified a particularized injury. (*See* ECF No. 20 at 13–14.)

To buttress this argument, the Government likens this action to *Murthy v. Missouri*, in which several plaintiff states—all of which had sought a preliminary injunction barring federal officials from pressuring social media platforms to suppress free speech—were held to lack standing. 603 U.S. 43 (2024). True, this case, like *Murthy*, is a "sprawling" suit in which "dozens of Executive Branch officials and agencies" have been sued. *Id.* at 49, 61. But while massive and unusual suits may legitimately invite closer judicial scrutiny than more run-of-the-mill ones, there is of course no *per se* rule that such actions are impermissible.

And besides, the scale of the two suits is where the similarities between this case and *Murthy* end. In *Murthy*, the crux of the standing problem was twofold: First, the plaintiffs could not establish that any harm—suppression of free speech protected by the First Amendment—was fairly traceable to the governmental defendants, rather than to the (nonparty) social media platforms who actually made the decision to restrict their speech. 603 U.S. at 62–68. Second, in

---

[3] For similar reasons, and in light of the fact that the Court would order nationwide relief even if just a single State had standing to press these claims, *see infra* Section IV.B, the Court need not determine which States, if any, do *not* have standing to go the distance in this action. For the limited purposes of this TRO, it is enough for one State to be able to invoke the jurisdiction of this Court. The Court is satisfied that at least some subset of the States—namely, Maryland—has done so.

*Murthy* the plaintiffs sought prospective relief against future alleged suppression campaigns, but there was no evidence that the government was continuing its alleged pressure campaign or was likely to do so in the future. *Id.* at 68–72. This case is completely different. First, unlike in *Murthy*, where only prospective relief was sought and it was doubtful that plaintiffs would suffer any future injuries, here the harm is happening right now, and can only be remedied by immediate injunctive relief. More fundamentally, unlike in *Murthy*, the alleged chain of causation does not depend upon the actions of third parties not before the Court. Instead, the allegations are simply that the Government failed to provide the States information to which they are statutorily entitled, and that because of this failure States have been forced to expend resources that they would not otherwise have had to expend. This distinction also goes to redressability. In *Murthy*, it was not clear how a favorable court order would redress the injuries claimed, as nothing in the order would prevent the nonparty social media platforms from continuing to suppress the plaintiffs' speech. *Id.* at 73–74 ("[T]he platforms remain free to enforce, or not to enforce, those policies—even those tainted by initial governmental coercion. The platforms are not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." (cleaned up)). Such concerns are simply not at issue here.

### 2. Causation

To start, it is plain that at least *some* of the harms the States have experienced—namely, the increase in the cost of administering certain state programs, irrespective of what those programs will be required to pay out—are direct and foreseeable results of the agencies' failures to provide RIF notices. The Government does not argue otherwise. (*See* ECF No. 20 at 12–17.) Accordingly, on that basis alone, the Court is confident there is no causation defect that would wholly defeat the States' standing.

19

As for the harms based on the expected increase in public benefits awards and future lost tax revenues, the Government argued during the TRO hearing that these harms were self-inflicted. The Court disagrees. Costs that States incur in the satisfaction of a mandatory legal duty, even one arising under state law, are not self-inflicted. *See, e.g.*, *Texas*, 809 F.3d at 155. And here, legal duties arise under *both* federal and state law. *See, e.g.*, 20 C.F.R. §§ 682.100–.300 (providing certain duties under the Workplace Innovation and Opportunity Act); Md. Code Ann., Lab. & Empl. §§ 11–303 to –04 (setting out Maryland's "quick response program" with respect to mass unemployment events); N.J. Stat. Ann. § 34:21-5 (similar, but for New Jersey).

Causation is also not defeated by certain theories' reliance on the anticipated behavior of third parties. This element is satisfied when "third parties will likely react in predictable ways to the" conduct at issue. *See Dep't of Com.*, 588 U.S. at 768. For much the same reason the States' appeal to future increased benefits payouts was "actual or imminent" for purposes of injury in fact, that harm is traceable to the Government's terminations: mass layoffs mean more unemployed people, more unemployed people means more unemployment claims. That is textbook predictability.

### 3. Redressability

Finally, the States have shown their harms to be redressable by the relief sought. To satisfy this element, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

As established above, the States' injuries were caused by the lack of RIF notice. That circumstance, standing alone, might lead one to conclude that the appropriate remedy—and, for that matter, the only one the States would have standing to seek—is *notice*, albeit overdue.

20

But this ignores the nature of the States injuries. While the *initial* harm was caused by a lack of notice, the States' informational harm includes at least some of the serious downstream harms the States assert. Thus, those downstream injuries must be considered in the redressability analysis.

The remedy the States seek is to set aside the Government's allegedly unlawful RIFs—a remedy which, in effect, would require the reinstatement of the terminated employees. (*See* ECF No. 1 ¶¶ 242–43.) The Government appears to agree. (*See, e.g.*, ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by their *reinstatement*." (emphasis in original).) So, too, does the Court. After all, the States' injuries are the result of the increasing pressure on States' rapid-response, unemployment, and other public programs. Were the terminated employees to be reinstated, that pressure would abate. That is enough for redressability.

## B.    Jurisdiction

### 1.    Final Agency Action

The Court begins by clarifying the conduct at issue in this case, at least for purposes of the pending TRO request. The States challenge two distinct federal actions: first, the OPM directives that allegedly directed other federal agencies to dismiss probationary employees *en masse*; and second, the actual, agency-level dismissals of those employees without notice. (ECF No. 4-1 at 24–25.) But the nub of this lawsuit is the lack of notice the States received with respect to the RIF provisions. (*See, e.g.*, ECF No. 19 at 3 ("The strain on Plaintiffs' rapid response systems is directly traceable to Defendants' unlawful RIFs, conducted without the required advanced notice.")). And the agency actions that are most proximate to that harm are the dismissals without notice, not the OPM directives, for one simple reason: under the RIF regulations, notice must come from the dismissing agencies, not from OPM, except as it concerns OPM's dismissals of its *own*

employees. *See* 5 C.F.R. § 351.803(b). For that reason, this Memorandum focuses on the unnoticed dismissals, though the Court makes no final determination at present as to which actions are appropriately reviewed in this litigation.

"Judicial review under the [Administrative Procedure Act ("APA")] is limited to review of 'final agency action.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (quoting 5 U.S.C. § 704). But, as explained below, the unnoticed dismissals fall squarely within that category. Accordingly, the APA poses no jurisdictional obstacle to this Court's review of the States' claims.[4]

To start, "agency action" is a capacious term, "cover[ing] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citation omitted). And while the Government refers to the acts at issue as "alleged final agency actions," (ECF No. 20 at 14, 23), it does not otherwise dispute that the dismissals are "agency actions" within the meaning of the APA's review provision. Nor could it. *See, e.g.*, *Burdue v. FAA*, 774 F.3d 1076, 1080 (6th Cir. 2014) ("[An agency employee's] termination is . . . agency action for purposes of the [APA].").

As for "finality," an action is "final" whenever two conditions are satisfied: (1) the action is the "consummation of the agency's decisionmaking process," and (2) the action is one "by which rights or obligations have been determined or from which legal consequences will flow." *NAACP*, 945 F.3d at 189 (ultimately quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The firings without notice undeniably meet this standard, as any agency's decision to dismiss an employee

---

[4] Notably, the requirement of "final agency action" applies only to the States's two APA claims, not their *ultra vires* claim. This is because the right of action for an *ultra vires* claim flows from the federal courts' equity jurisdiction, not from the APA. *See, e.g.*, *PFLAG, Inc. v. Trump*, Civ. No. BAH-25-337, 2025 WL 685124, at *9 & n.26 (D. Md. Mar. 4, 2025) (citing *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006)). That said, for purposes of the pending TRO request, the Court addresses the merits only of the States' APA claims, not their more unusual *ultra vires* claim, despite jurisdiction to consider each. *See infra* Section III.A.

effects self-evident legal consequences for both parties and plainly marks the end of the agency's decisionmaking with respect to the employee involved. *See, e.g.*, *Burdue*, 774 F.3d at 1080; *cf. Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, Civ. No. WHA-25-1780, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) ("OPM's direction to the other agencies [to dismiss probationary employees] constituted a final agency action for the purposes of the APA.").

The Court therefore has jurisdiction to review each of the States' claims, at least insofar as they concern dismissals without notice.

### 2. Claim Channeling

The Government argues that the Court has no jurisdiction to hear the States' claims because of an alternative administrative review structure set up by Congress.

In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court articulated a two-step analytical framework to assess whether Congress impliedly divested the district courts of jurisdiction to hear challenges to an agency action.

First, a reviewing court asks whether some statute, either explicitly or implicitly, channels certain claims about agency action away from the courts and into an administrative agency. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016). This inquiry "involves examining the statute's text, structure, and purpose." *Bennett*, 844 F.3d at 181 (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012)).

Second, if the reviewing court determines that a statute *does* channel certain claims away from the courts, it then considers whether the specific claims at issue fall within that category. *See Axon*, 598 U.S. at 185–86; *see also id.* at 186 ("The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question."). In essence, the court's task is "to decide if a claim is 'of the type'

Congress thought belonged within a statutory scheme." *Id.* at 188–89 (quoting *Thunder Basin*, 510 U.S. at 212). Only in "limited circumstances" is a claim *not* "of th[at] type," *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018), given that procedures "designed to permit agency expertise to be brought to bear on particular problems" ought ordinarily to be understood as exclusive. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965)).

To assess whether such "limited circumstances" are present in an individual case, courts apply the three so-called *Thunder Basin* factors: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claims, (2) whether the claims are "wholly collateral to [the] statute's review provisions," and (3) whether the claims are "outside the agency's expertise." *Axon*, 598 U.S. at 186 (alteration in original) (quoting *Thunder Basin*, 510 U.S. at 212–13). "When the answer to all three questions is yes, '[the court] presume[s] that Congress does not intend to limit jurisdiction,'" *id.* (quoting *Free Enter. Fund*, 561 U.S. at 489), though a claim may be judicially reviewable even if the factors "point in different directions," *id.*

As both the States and the Government observe, Congress has provided for the exclusive administrative review of most employment claims brought by federal employees, thus satisfying the first step of the two-step framework. Two statutory review schemes are relevant here. The first is set out in the Federal Service Labor-Management Relations Statute ("FSMLRS"), itself set out in Title VII of the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–216 (1978) (codified at 5 U.S.C. §§ 7101–35). As the District of D.C. recently explained in a similar context, the FSMLRS

> governs labor relations between the executive branch and its employees. It "grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The

[FSMLRS] further "establishes a scheme of administrative and judicial review." *Id.* Under that scheme, the Federal Labor Relations Authority ("FLRA"), a three-member agency charged with adjudicating federal labor disputes, reviews matters including "negotiability" and "unfair labor practice" disputes. *See* 5 U.S.C. § 7105(a). When reviewing unfair labor practice complaints, "the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118).

Direct review of the FLRA's decisions is available in the courts of appeals. 5 U.S.C. § 7123(a). The D.C. Circuit has repeatedly held that this scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims." *Trump*, 929 F.3d at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013)).

*Nat'l Treasury Emps. Union v. Trump*, Civ. No. CRC-25-420, 2025 WL 561080, at *4 (D.D.C. Feb. 20, 2025).

The second statutory review scheme is set out elsewhere in the CSRA, which separately "established a comprehensive system for reviewing personnel action taken against federal employees." *See Elgin*, 567 U.S. at 5 (citation omitted). Under *those* provisions,

[i]f an agency takes a final adverse action against an employee—removal, suspension for more than [fourteen] days, reduction in grade or pay, or furlough for [thirty] days or less, 5 U.S.C. § 7512—the employee may appeal to the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Probationary employees, however, generally do not enjoy a right to appeal to the MSPB. *Id.* § 7511(a)(1). Employees may appeal final MSPB decisions to the Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This statutory review scheme, too, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.

*Nat'l Treasury Emps. Union*, 2025 WL 561080, at *5.

Notwithstanding the existence of two exclusive statutory review schemes, the Court concludes that, under the three *Thunder Basin* factors, those schemes do not foreclose district-court jurisdiction over the States' claims in this case.

On the first factor, foreclosure of meaningful judicial review, it is clear the States prevail. The Government argues that "any affected party" may challenge the RIF dismissals "within the administrative scheme" Congress has provided. (ECF No. 20 at 19.) But that argument is defeated by the plain text of the statutory scheme the Government cites, which forecloses any possibility of the States bringing their claims before an administrative agency. In relevant part, the FLRA has the authority to "conduct hearings and resolve complaints of unfair labor practices," 5 U.S.C. § 7105(a)(2)(G), charges of which may be brought "by any *person*," *id.* § 7118(a)(1); *see also id.* § 7121(g)(3)–(4) (referring to the ability of "a person" to appeal to the MSPB, among other remedies). Yet the labor-management relations chapter of the CSRA defines a "person" as "an individual, labor organization, or agency"—not a State. 5 U.S.C. § 7103(a)(1). Similarly, the MSPB may hear appeals from "[a]n *employee*, or *applicant for employment*," *id.* § 7701; *see also id.* § 7513(d) (permitting appeals by "*employee*[*s*]")—again, categories that could not plausibly include States. *Cf. id.* § 7103(a)(2) (defining "employee," for purposes of the labor-management chapter, as either an individual "employed in an agency" or an individual whose employment "has ceased because of any unfair labor practice," as described elsewhere in the statute).

Beyond being unable to seek review *by* any agencies, the States are also foreclosed from seeking judicial review *of* agency decisions. While the Government is correct that the Federal Circuit has exclusive jurisdiction over challenges to the final decisions of the MSPB, (*see* ECF No. 20 at 19 (citing 28 U.S.C. § 1295(a)(9))), the MSPB's own statute shows that judicial review is available only for "*employee*[*s*] or *applicant*[*s*] *for employment* affected or aggrieved" by the MSPB's decisions, 5 U.S.C. § 7703(a)(1) (emphasis added). Likewise, although the Courts of

Appeals have exclusive jurisdiction over review of most final orders of the FLRA, such review is, again, available only for "[a]ny *person* aggrieved" by such orders. *Id.* § 7123(a).

In short, the Government supplies no authority for the proposition that a *State* would be able to seek review in any relevant setting—and, indeed, conceded during the TRO hearing that none could.[5] This shortcoming alone is arguably fatal to the Government's position, given that "meaningful judicial review is the most important factor in the *Thunder Basin* analysis." *Bennett*, 844 F.3d at 183 n.7 (collecting cases). If the Government were correct, then Congress would have created a statutory entitlement for States to be provided notice under 5 U.S.C. § 3502(d)(3)(A)(i), but provided no judicial review to vindicate that entitlement, a conclusion contrary to the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).

The second factor, claims' collaterality to the statutory review provisions, likewise favors the States. For its part, the Government argues the States seek to "interject themselves into the employment relationship between the United States and government workers." (ECF No. 20 at 3.) But that ignores that the States have suffered unique harms, peculiar to their status *as* states, irrespective of those harms' connection with the agency-employee relationship. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803; *see also supra* Sections I.A, .C. For that reason, the Government's reference to parallel proceedings before the MSPB and Office of Special Counsel ("OSC"), (*see*

---

[5] Likewise, the Government supplies no authority for the related (but equally dubious) proposition that the CSRA wholly divests the district courts of jurisdiction to offer reinstatement as a remedy, (*see, e.g.*, ECF No. 20 at 14), rather than the more limited view that the CSRA divests the courts of jurisdiction to offer that remedy to specific parties. This latter view is the better interpretation of the CSRA's preclusive scope. *See, e.g., Elgin*, 567 U.S. at 13 (explaining that the CSRA's review is exclusive as it concerns federal employees, without any indication that it is exclusive as to reinstatement); (*see also* ECF No. 20 at 14 n.6 (conceding that the district courts *do* have jurisdiction over Title VII claims, which may lead to reinstatement)). Perhaps that is why, when making hay of the fact that two other courts recognized a lack of jurisdiction to entertain certain claims for reinstatement, (*see* ECF No. 20 at 3 (first citing *Nat'l Treasury Emps. Union*, 2025 WL 561080; and then citing *Am. Fed'n of Gov't Emps.*, 2025 WL 660053)), the Government completely elides the fact that those claims were brought by fundamentally different parties—namely, employees and their unions.

ECF No. 20 at 10), is unavailing. As the Supreme Court has explained, "decid[ing] when a particular claim is 'of the type' to fall outside a statutory review scheme . . . requires considering the *nature* of the claim, not the status (pending or not) of an agency proceeding." *Axon*, 598 U.S. at 194 (emphasis added) (quoting *Thunder Basin*, 510 U.S. at 212). Indeed, *Thunder Basin* "contemplates . . . that even when a proceeding is pending, an occasional claim may get immediate review—in part because it involves something discrete." *Id.* What's more, *Axon* permitted judicial review of claims directed at ongoing proceedings involving *the very parties seeking judicial review, see id.* at 193–94—in other words, claims much closer (and therefore less collateral) to an administrative proceeding than are the States' claims in this case, particularly given that the States have no administrative remedy available to them.

The third and final factor, the agencies' expertise, is a closer call, but likely also breaks for the States. Again, there is no mechanism for the States to obtain administrative review before the MSPB, the FLRA, or the OSC. There is thus little reason to think those agencies hold special expertise over the States' claims. On the contrary, the States' claims "raise 'standard questions of administrative' . . . law, detached from 'considerations of agency policy.'" *Axon*, 598 at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). And while the MSPB, FLRA, and OSC "know[] a good deal about" unlawful dismissal of federal employees, they know "nothing special about" the central problem the *States* have asserted: a failure to provide proper notice under the RIF statute. *Cf. id.* And as the Court has by now made clear, that the States' problem *connects* with unlawful dismissals hardly means those dismissals are the subject of this suit.

The Government argues, unpersuasively, that the fact *someone* can seek review of similar claims is enough to disclaim jurisdiction over the States' action. (*See* ECF No. 20 at 21 ("[T]he CSRA and FSL-MRS schemes provide for meaningful judicial review over the very claims

28

asserted by the States, even if the States themselves are not the proper parties to assert them.").)

There are multiple problems with this theory. First, as explained above, while certain facts are common to the States' action and any administrative actions that might be brought by terminated employees, the States' interests remain substantially different from the employees', as evinced by the presence of harms that only states *qua* states can experience. Second, it is hard to swallow that the States, to redress their harms, must simply hope and wait for scores of terminated federal employees to pursue administrative relief. For one, the States are suffering precisely the sort of "here-and-now injury" that favors prompt judicial review. *See Axon*, 598 U.S. at 191 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020)). For another, it is highly doubtful that solo employees or their unions would or could adequately represent the States' peculiar interests in an administrative setting. For the States' harms to be fully redressed in that manner, it would seem to require every employee who was dismissed without notice to pursue (and win) administrative relief, either individually or collectively, such that the pressure on state unemployment programs would eventually, and in piecemeal fashion, be alleviated. The Court is not prepared to accept that theory as reality.

In sum, the CSRA does not preclude this Court's jurisdiction over the States' claims. Time and again, the courts have been firm: "Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186 (citing *Bowen*, 476 U.S. at 670); *accord Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (collecting cases, and observing that "judicial review of a final agency action . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress"); *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."). Here, remarkably, the Government argues that not only is there no judicial review for the States, there is no review of *any* kind. That

is a startling state of affairs indeed—and one that basic principles of administrative law require this Court to reject.

## V.   TEMPORARY RESTRAINING ORDER

Having determined that the Court has jurisdiction to hear this case, the Court turns to the factors necessary for issuance of a TRO.

"The standard for a temporary restraining order is the same as a preliminary injunction." *Maages Auditorium v. Prince George's County*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 F. App'x 256 (4th Cir. 2017). The party seeking a temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although Plaintiffs "need not establish a 'certainty of success,'" they must "make a clear showing that [they are] likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The Court concludes that the States have established all four factors, and that a TRO is warranted.

### A.   Likelihood of Success on the Merits

The States are very likely to succeed on the merits of (at least) their APA contrary-to-law claim. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For purposes of a contrary-to-law claim, the legal standards against which the federal government's conduct is assessed are supplied not by the APA itself, but by a separate statute—in

30

this case, the RIF statute, 5 U.S.C. § 3502. The Court concludes that the States are highly likely to show that they are within the zone of interests of the RIF statute, that the Government conducted RIFs, and that, when doing so, it wholly failed to comply with the statutory and regulatory demand that notice be provided to the States.

### 1. Zone of Interests

In general, statutory protections "extend[] only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked,'" whether or not a statute is invoked under the APA. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Nevertheless, "in the APA context, that . . . test is not 'especially demanding.'" *Id.* at 130 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). All it requires is that a plaintiff's interest be "*arguably* within the zone of interests to be protected or regulated" by the underlying statute. *Match–E–Be–Nash–She–Wish Band*, 567 U.S. at 224 (emphasis added) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 357 U.S. 150, 153 (1970)). Indeed, "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 497 U.S. 388, 399 (1987)).

Far beyond merely coming within the legal "zone of interests," the States' interests in this case strike at the very heart of the RIF provisions.

For one, the statute expressly identifies States and the notice they are due. *See* 5 U.S.C. § 3502(d)(3)(A)(i) ("Notice . . . shall be given to . . . the State or entity designated by the State to carry out rapid response activities under . . . the [Workplace Innovation and Opportunity Act ("WIOA")]."); *see also* 5 C.F.R. § 351.803(b) (similar). It also describes precisely *what* must be

31

shared with the States. *See* 5 U.S.C. § 3502(d)(3)(B) (requiring notice of "the number of employees to be separated from service" due to a RIF, "broken down by geographic area or on such other basis as may be required by" other regulations; "when those separations will occur"; and "any other matter which might facilitate the delivery of rapid response assistance or other services under . . . the [WIOA]"); *see also* 5 C.F.R. § 351.803(c) (similar). Based on the text of the statute alone, Congress clearly envisioned for the States an important role in the RIF process.

Beyond occupying a place of prominence in the RIF statutory text, the States also hold legal duties under the WIOA and its implementing regulations to offer rapid-response services to alleviate the societal stresses brought on by sudden mass unemployment. As the Court has discussed above, *see supra* Section I.A, the States are required by federal law to respond to assist workers in finding new employment. 20 C.F.R. § 682.200. The States have their own binding requirements regarding rapid-response activities. *See, e.g.*, Md. Code Ann., Lab. & Empl. §§ 11–303 to –04. And the States provide unemployment and similar benefits to their own citizens. *See generally, e.g.*, Md. Code Ann., Lab. & Empl. §§ 8–101 to –1608; N.J. Stat. Ann. §§ 43:21–1 to –71.

All of this underscores the general proposition that the States have important—indeed, mandatory—uses for RIF notice from the Government, and therefore strong interests in such notice being provided on time and in full. It would defy common sense to say these are not among those interests "arguably" protected by the RIF provisions. *See Match–E–Be–Nash–She–Wish Band*, 567 U.S. at 224.

### 2. The Agencies Conducted RIFs

Having determined that the States may bring this action under the APA, the Court turns to the substantive core of this case—whether the States are likely to succeed in showing that the

32

Government's mass terminations, without providing notice to the States, were unlawful. The Government makes essentially two arguments in support of its contention that it has not acted contrary to law. (*See* ECF No. 20 at 23–25.) First, it argues that it had the discretion to terminate the probationary employees in the manner that it did. (*See id.* at 23 ("The States fundamentally misunderstand Defendants' discretion to terminate probationers.").) Second, it argues that it did not conduct a RIF. (*See id.* at 24–25 ("[T]he States ignore fundamental differences between a RIF and the termination of a probationer. The actions they challenge here are the latter, not the former.").) These arguments are unavailing.

Agencies are, of course, permitted to terminate probationary employees. That is not what this case is about. Indeed, agencies are directed to "utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a). However, agencies are permitted to terminate probationary employees under only three circumstances: (1) due to conditions arising prior to their employment, 5 C.F.R. § 315.805; (2) due to unsatisfactory performance or conduct, 5 C.F.R. § 315.804(a); and (3) pursuant to a RIF. Neither the Court nor the parties has identified any other permissible reason to terminate a probationary employee. Indeed, the Government was invited at the TRO hearing to identify any other permissible ways to terminate probationary employees, and it could not do so.

Here, the terminated probationary employees were plainly not terminated for cause. The sheer number of employees that were terminated in a matter of days belies any argument that these terminations were due to the employees' individual unsatisfactory performance or conduct. As

33

Plaintiffs allege, the Government has terminated at least 24,000 probationary employees.[6] (ECF No. 1 ¶ 139 ("Defendants have not published official counts and locations of the employees they have terminated, but based on publicly reported numbers and firsthand accounts from affected employees, it appears that Defendants have terminated at least 24,000 probationary employees as of the date of this Complaint.").) It is simply not conceivable that the Government could have conducted individualized assessments of the relevant employees in the relevant timeframe. (*See, e.g.,* ECF No. 4-37 ¶ 14 ("Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.").)

The States also provided affidavits from individuals who worked at certain Defendant Agencies, reflecting that the termination decisions were not based upon individualized assessments of the relevant employees. (ECF No. 4-36 ¶¶ 4, 19 (former "Deputy Director for Operations in the Center for Consumer Information and Insurance Oversight (CCIIO) within the Centers for Medicare & Medicaid Services (CMS)" explaining that "[t]he mass terminations of probationary employees at CCIIO were not based on any individualized assessment of the probationary employees. The CMS [chief human resources officer] did not review the positions for suitability, never read a single person's resume, never spoke with any of the terminated probationary employees, and had no personal knowledge of their individual performance."); ECF No. 4-37 ¶ 14 (former "Human Capital Officer for the Internal Revenue Service ('IRS')" explaining that "Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I know this because this fact was discussed openly in meetings.").)

---

[6] At the TRO hearing, the Government was unable to supply the Court with the number of probationary employees who, to date, have been terminated from the relevant agencies. The Government likewise provided the Court with no evidence to suggest that the States' estimate was inaccurate.

The Government offers no contrary evidence, yet it insists that these were for-cause terminations and that the notices provided to individual employees were not defective because "[a] statement that a probationer has been terminated because of his or her performance during the probationary period is sufficient." (ECF No. 20 at 24.)

The Court does not render any conclusions regarding what precise language a termination for cause must contain; however, the law is clear that when dismissing an employee due to unsatisfactory performance, "[t]he employer . . . must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. Soc. Admin.*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (emphasis added) (citation and internal quotation marks omitted). The affidavits filed by terminated probationary employees reflect that they received boilerplate termination notices explaining that their performance was inadequate, but that they had all received either formal or informal positive feedback from their supervisors. (*E.g.*, ECF No. 33-1 (affidavit and termination letter from former U.S. Department of Transportation probationary employee); ECF No. 33-2 (affidavit and termination letter from former U.S. Department of Health and Human Services probationary employee); ECF No. 33-5 (affidavit and termination letter from former U.S. Department of the Interior probationary employee); ECF No. 33-10 (affidavit and termination letter from former Internal Revenue Service[7] probationary employee); ECF No. 33-11 (affidavit and termination letter from former Federal Emergency Management Agency[8] probationary employee); ECF No. 33-14 (affidavit and termination letter from former Consumer Financial Protection Bureau probationary employee); ECF No. 33-15 (affidavit and termination letter from former National Oceanic and Atmospheric

---

[7] Although the IRS is not named as a Defendant, it sits within the Department of the Treasury, which is named.

[8] Although the Federal Emergency Management Agency is not named as a Defendant, it sits within the Department of Homeland Security, which is named.

Administration probationary[9] employee); ECF No. 33-16 (affidavit and termination letter from former U.S. Department of Agriculture probationary employee); ECF No. 33-17 (affidavit and termination letter from former Environmental Protection Agency probationary employee); ECF No. 33-18 (affidavit and termination letter from former Small Business Administration probationary employee); ECF No. 33-19 (affidavit and termination letter from former U.S. Department of Veterans Affairs probationary employee).)

Further underscoring the Court's conclusion that these terminations were not based upon qualifications or performance is that many notices to employees did not even cursorily identify any issues with the individual's performance, but rather explained that their terminations were in the public interest or due to the priorities of the current administration, or else provided no reason at all. (*E.g.*, ECF No. 33-3 at 7 (U.S. Agency for International Development termination letter indicating that "I am terminating you on the basis that it is in the best interest of the U.S. Government"); ECF No. 33-4 at 7 (U.S. Department of Housing and Urban Development termination letter indicating that "this notice is to notify you of the decision to terminate your employment . . . in order to promote the efficiency of the federal service in accordance with the priorities of the Administration"); ECF No. 33-6 at 7 (U.S. Department of Labor termination letter indicating that "[t]he Agency finds your further employment would not be in the public interest"); ECF No. 33-7 at 8 (General Services Administration termination letter indicating "I do not consider it in the best interest of the government to retain you in the Federal service and have decided to terminate your appointment during your probationary period."); ECF No. 33-8 at 7 (U.S. Department of Education termination letter indicating that "I regrettably inform you that I am removing you from your position of [redacted] with the agency and the federal civil service

---

[9] Although the National Oceanic and Atmospheric Administration is not named as a Defendant, it sits within the U.S. Department of Commerce, which is named.

effective today, February 12, 2025."); ECF No. 33-9 at 7 (U.S. Department of the Treasury termination letter stating that "[b]ased on [OPM] guidance and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public interest"); ECF No. 33-12 at 7 (U.S. Department of Energy termination letter stating "[p]er OPM instructions, DOE finds that your further employment would not be in the public interest"); ECF No. 33-13 at 8 (Federal Deposit Insurance Corporation termination letter stating that "the FDIC finds that you have not demonstrated that your further employment at the FDIC would be in the public interest").)

In short, the record reflects that these probationary employees were not terminated for cause. *Cf. Roe v. Dep't of Defense*, 947 F.3d 207, 222 (4th Cir. 2020) (holding that the Air Force did not perform "individualized determination[s]" when the "the Air Force discharge memoranda contain identical language briefly stating that each servicemember's HIV-positive status 'renders him ineligible for deployment'"). The Government's contention to the contrary borders on the frivolous. Moreover, to the extent that the Government counsel tries to justify these terminations as for cause after the fact, such an attempt must fail, as "the *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). And, as the Government conceded at the hearing, probationary employees may only be terminated for cause (either due to qualifications and performance, or for issues arising prior to employment) or through a RIF.

The actions of the Government reflect that these terminations were RIFs. The relevant regulations provide that "[e]ach agency shall follow this part when it releases a competing employee from his or her competitive level by . . . separation . . . , when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position

[due] to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days." 5 C.F.R. § 351.201(a)(2); *see also* U.S. Off. of Pers. Mgmt., *Workforce Reshaping Operations Handbook*, 25–26 (2017) (explaining that "[a] personnel action must be effected under RIF procedures when both the action to be taken and the reason for the action are covered by the RIF regulations"; including, under "actions to be taken," an employee's separation; and including, under "reason for the action," a "lack of work," "shortage of funds," "insufficient personnel ceiling," and/or "reorganization"). The wholesale dismissal of employees due to their status as probationary employees appears to be some form of reorganization, even if the Government does not refer to it as such.

That these terminations were RIFs is evident from the sheer number of employees fired in such a short timespan. Further, the Secretary of Labor for the Maryland Department of Labor reported that, in response to queries from her office, federal agencies have reported, as reasons for the terminations, a "permanent lack of work due to a change in Presidential administration," and have also noted that the employees were "laid off due to a reduction in force." (ECF No. 4-5 ¶¶ 61–62.) On this point, the Court again observes that several employee termination notices evince that the terminations were plainly not due to any individual employee's performance, but rather reflected a reorganization within the relevant federal agencies. For instance, a termination letter issued by the Department of the Treasury states the following: "In its January 20, 2025, memorandum entitled *Guidance on Probationary Periods, Administrative Leave and Details*, OPM advised that '[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels.' Based on that guidance and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public

interest." (ECF No. 33-9 at 7 (alterations in original).) On top of that, the terminations came on the heels of an Executive Order directing agency heads to conduct RIFs.

The States have not carried their burden, however, of showing a likelihood of success on the merits with respect to three Defendant Agencies—the Department of Defense ("Defense"), the National Archives and Records Administration ("Archives"), and OPM. With respect to these three named agencies only, the States have not provided any affidavits from, for example, former employees attesting to their terminations, or to the presence of widespread terminations of probationary employees. (*See generally* ECF No. 33 (affidavits attesting to terminations at all Defendant Agencies except for Defense, Archives, and OPM).) While the Court does not rely solely on these affidavits and termination letters in reaching its above conclusion, those records provide an important link between the individual Defendant Agencies and the broader allegations about the number of employees terminated and the general statements, discussed above, that these actions constituted RIFs. So, although it is a close call, at this early stage, and given that a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22 (citation omitted), there is insufficient basis in the record for the Court to conclude that RIFs likely occurred at these three agencies. This conclusion is without prejudice to the presentation of additional evidence with respect to these three agencies.

### 3. The Agencies' Actions Were Contrary to Statutory RIF Requirements

Thus, the Court turns to whether the Government followed requisite RIF procedures. If employees are terminated as part of a RIF, there are legal requirements the agencies must follow. *See generally* 5 U.S.C. § 3502; 5 C.F.R. Part 351. And it is undisputed—and indisputable—that these requirements apply to probationary employees. *See* 5 C.F.R. § 351.501(a)–(b). One such

39

requirement is that, whenever a RIF involves at least fifty employees within a competitive area,[10] the agency must provide notice to "[t]he State or the entity designated by the State to carry out rapid response activities under [the WIOA]." 5 C.F.R. § 351.803(a). That notice must include (1) "[t]he number of employees to be separated from the agency by reduction in force (broken down by geographic area or other basis specified by OPM)"; (2) "[t]he effective date of the separations"; and (3) "[a]ny other information specified by OPM, including information needs identified from consultation between OPM and the Department of Labor to facilitate delivery of placement and related services." *Id.* § 351.803(c).

The Government did not follow the requisite notice procedures, and it does not attempt to argue that it did. Indeed, the Government's substantive arguments are aimed only at its view that it did not conduct RIFs. And the consequence of the Government's failure to follow the requisite notice procedures is clear: if an agency fails to provide notice, an employee "may not be released[] due to a reduction in force." 5 U.S.C. § 3502(d).

Because the States have shown that the Government's actions were highly likely "not in accordance with law," 5 U.S.C. § 706, they are likely to prevail on the merits of their APA claims.[11]

---

[10] Although the Court is focused on the lack of requisite notice, there is no evidence that the Government followed *any* of the requisite RIF procedures, including defining the competitive area. But "[a] competitive area may consist of all or part of an agency," 5 C.F.R. § 351.402, and given the sheer number of terminated employees, it is implausible that the fifty-person threshold necessary to trigger this requirement has not been met. (*See, e.g.*, ECF No. 4-5 ¶ 17 (declaration by the Maryland Secretary of Labor explaining that "the Maryland Department of Labor has already received at least 813 claims by ex-federal employees for unemployment benefits" and that it "is also aware of public announcement of significant layoffs at Maryland and D.C.-located federal agencies"); ECF No. 4-7 ¶ 30 (Declaration by the Director of the California Employment Development Department explaining that her office has received "1,621 claims by former federal employees for unemployment benefits since February 1, 2025"); ECF No. 4-8 ¶ 15 (Declaration by the Deputy Director, Service Delivery of the Illinois Department of Employment Security, explaining that her office has received 446 claims for unemployment insurance by former federal employees); ECF No. 4-13 ¶ 4 ("From January 21 – February 20, [the New York Department of Labor] received 178 new unemployment claims from federal employees. From February 21 – February 27, the most recently available data set, [that office] logged an additional 372 new unemployment claims from federal employees.").)

In any event, the Government cannot be permitted to skirt RIF notice requirements by simply not defining the competitive area as required, then claiming the preconditions for RIF notice have not been met.

[11] Having resolved the matter on the basis of the APA, the Court makes no findings as to the States' likelihood of success on their *ultra vires* claim.

## B.    Irreparable Harm

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Further, "the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

Although the harms the States face are largely economic, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citation omitted).  Here, the harm is irreparable because money damages are likely not available. *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief '*other than money damages*.'" (quoting 5 U.S.C. § 702) (emphasis added)); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (explaining that the unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

Further, even if damages were available, where economic damages are "difficult to ascertain," there may be irreparable harm. *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)).  The damages incurred by the States are difficult to ascertain, and an injunction is necessary to mitigate the chaos caused by the Government.

41

The States' diversion of resources as a result of the lack of notice also constitutes an irreparable harm. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (recognizing the "diversion of resources away from . . . core missions" as irreparable); *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) (explaining that "the forced diversion of resources" has been "recognized as irreparable harm in other suits" (collecting cases).)

In addition, the notice provision contemplates providing notice sixty days before a RIF. The information to be provided is therefore time sensitive, and the harm itself is temporal and immediate. This likewise weighs in favor of finding that the harm is irreparable. *Cf. Heritage Found. v. U.S. Dep't of State*, Civ. No. TJK-24-2862, 2024 WL 4607501, at *10 (D.D.C. Oct. 29, 2024).

## C.    Balance of the Equities & the Public Interest

The final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court is mindful that it may not collapse this inquiry with the first *Winter* factor. *See USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success argument").

In cases such as this, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe*, 947 F.3d at 230–31 (internal quotation marks and citation omitted). But the public interest goes beyond that. As discussed above, these mass terminations conducted without appropriate notice have placed enormous strain on the States. And the public has a great interest in the States not unnecessarily diverting resources from other functions. (*See,*

*e.g.*, ECF No. 4-5 ¶ 27 (Declaration from the Maryland Secretary of Labor that Maryland Department of Labor personnel "have been diverted from state-funded workforce development projects, including the Employment Advancement Right Now ('EARN') program, which is a . . . workforce development grant initiative serving over 5,000 constituents annually"); *id.* ¶ 26 (explaining that state matters that have been affected by the diversion of resources includes "occupational and professional licensing oversight, financial regulation, [and] state workforce development programs"); *id.* ¶ 58 (explaining that the diversion will also "impede the timely processing of regular [unemployment claims], creating significant backlogs and delays"); ECF No. 4-8 ¶ 24 (declaration from the Deputy Director, Service Delivery of the Illinois Department of Employment Security providing that "the diversion of personnel to handle [Unemployment Compensation for Federal Employees] claims will impede the timely processing of regular unemployment insurance claims, creating backlogs and delays").) It is in the public interest to provide immediate relief to the States so as to alleviate the extreme burdens placed upon them by the Government. The Court also recognizes that there exists an interest in a presidential administration carrying out its priorities, which may take the form of mass terminations. However, the Court concludes that the public's interest in governmental institutions following the law, and in reducing burdens on the States is greater. These harms to the States—and to the public—will be further exacerbated if emergency relief is not granted.

The Government argues that a TRO would "impose significant and unrecoverable costs on Defendants." (ECF No. 20 at 27.) The Court does not discount this reality. However, by the Government's own admission, reinstatement of the probationary employees is the *only relief* that will provide redress to the States. (*See* ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by [the employees'] *reinstatement*."); *id.* at 17 ("To prevent or stem

43

the diversion of state assistance resources, the Court again would have to order reinstatement of the removed probationers into their former agency jobs.").) The Court recognizes the breadth of the relief it will grant, but the Court cannot allow the Government to benefit from chaos of its own making.

For instance, in *HIAS*, 985 F.3d, the Fourth Circuit upheld the district court's entry of a preliminary injunction barring the Government from enforcing an Executive Order concerning refugee resettlement that was found to be likely violative of the federal Refugee Act, 8 U.S.C. § 1522. As the Fourth Circuit explained, "[t]he resettlement agencies face enormous burdens to comply with the Order and Notice, as well as the likelihood of affiliates closing entirely in jurisdictions that refuse consent. In contrast, under the district court's injunction, the government must continue to implement the refugee resettlement program according to the Act's well-established processes refined over several decades." *Id.* at 326. So too here, the States are faced with enormous burdens in the face of the Government's failure to provide notice, and under an order reinstating employees and enjoining the Government from further illegal action, the Government must simply act according to well-established law.

On balance, the Court finds that the public interest and the equities weigh in favor of granting a TRO.

## VI.    SCOPE OF RELIEF

### A.    TRO Purpose & Limitations

Before turning to the specific relief that will be ordered in this case, it is necessary to review fundamental principles about the nature of a TRO and the kinds of relief that are available at the TRO stage.

The purpose of a preliminary injunction is to preserve the status quo until there is a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The purpose of a TRO is to preserve the status quo until the Court is able to hold a preliminary injunction hearing. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). Each "aim[s] to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted).

The Government argues that an order reinstating fired workers would not be a proper invocation of the Court's authority to "restrain[]", but would rather be an impermissible "mandatory injunction." (ECF No. 20 at 25 n.9.) The Government is mistaken. A mandatory injunction, which is "disfavored" and issued in only the "most extraordinary circumstances," is one that changes the status quo. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). A prohibitory injunction, by contrast, is one that maintains the status quo. *League of Women Voters*, 769 F.3d at 236. Critically, the "status quo," for purposes of injunctive relief, "is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (citation and internal quotation marks omitted). As the Fourth Circuit has recognized, "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo ante." *League of Women Voters*, 769 F.3d at 236 (cleaned up) (quoting *Aggarao*, 675 F.3d at 378). As the Second Circuit has explained:

> The "status quo" in preliminary-injunction parlance is really a "status quo ante." *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the *status quo ante*"); *accord O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has recently disturbed the status quo to reverse its actions . . . restores, rather than disturbs, the status quo ante,

and is thus not an exception" to the ordinary standard for preliminary injunctions). This special "ante" formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current "status quo" precipitated by their wrongdoing.

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018).

It is in the context of the broader conceptual distinction between a prohibitory and mandatory injunction that Rule 65's use of the word "restraining" must be understood. *See Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1124 (2d Cir. 1989) (stating that a TRO, "by the very word 'restraining[,'] should issue only for the purpose of preserving the status quo and preventing irreparable harm and for just so long as is necessary to hold a hearing"). This is not a case in which the Court is asked, at the TRO stage, to order a defendant to take on new burdens or obligations that it had previously not shouldered. *Cf., e.g., Sosa v. Lantz*, 660 F. Supp. 2d 283, 290 (D. Conn. 2009) (declining to issue a TRO that would have required a state prison to move an inmate to a larger cell, on the grounds that such an order "would provide [the inmate] with affirmative relief *changing* the status quo" (emphasis in original)). Instead, the Court is asked to order the Government to preserve the situation that existed before it embarked on the likely illegal mass terminations without providing requisite notice to the States. Although such an order will inevitably require the Government to take affirmative steps to comply, it nevertheless fits comfortably within the scope of the Court's TRO authority. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2951 (3d ed. 2024) ("[A]lthough they are rare, temporary restraining orders can be framed to require affirmative action on the part of the 'restrained' party.").[12]

---

[12] Alternatively, as discussed in more detail below, the Court has statutory authority to order appropriate preliminary relief under the APA. 5 U.S.C. § 705.

**B.     Geographic Scope**

The Court must determine the appropriate scope of any injunctive relief. This task "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (citations omitted). As the Fourth Circuit has explained:

> District courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that "a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (citations and internal quotation marks omitted). A district court may issue a nationwide injunction so long as the court "mold[s] its decree to meet the exigencies of the particular case." *Id.* (quoting *Trump v. Int'l Refugee Assistance Project*, [582 U.S. 571, 580] (2017)). And a nationwide injunction may be appropriate when the government relies on a "categorical policy," and when the facts would not require different relief for others similarly situated to the plaintiffs. *Id.* at 232–33.

*HIAS*, 985 F.3d at 326 (first alteration in original).

In *HIAS*, the Fourth Circuit upheld the district court's entry of a preliminary injunction barring the Government from enforcing an Executive Order concerning refugee resettlement that was found to be likely violative of the federal Refugee Act, 8 U.S.C. § 1522. 985 F.3d at 316–18. The Court held that the district court did not abuse its discretion in enjoining the application of the executive order nationwide, rather than limiting the relief to the three plaintiff resettlement agencies. As the panel explained:

> The refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country. Enjoining the Order and Notice only as to the plaintiff resettlement agencies would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect.

*Id.* at 326–27.

Much like how the program challenged in *HIAS* "impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country," here, the challenged

dismissals without notice apply to federal workers spread throughout the United States. When, as is likely the case here, the Government's policy is violative of the law across the board, it is appropriate for injunctive relief to be nationwide in scope, rather than limited to specific plaintiffs. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he the scope of injunctive relief is dictated by the extent of the violation established . . . ."); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 178 (D.D.C. 2021) (affirming "the propriety of nationwide injunctions in APA cases where the challenged policy is found to be arbitrary and capricious or otherwise facially unlawful" (citation omitted)); *cf. Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 733 (5th Cir. 1977) ("[A] nationwide or companywide injunction is appropriate only when the facts indicate a company policy or practice in violation of the statute."). To limit the scope of the injunction only to Plaintiff States would mean that an individual federal employee's job status would depend on the fortuity of their physical location, a result that would be inequitable and "undermine . . . national consistency" in the federal workforce and application of federal civil service law. *HIAS*, 985 F.3d at 326. Moreover, any attempt to disaggregate federal government–wide employment policy on a state-by-state-level is bound to be unworkable, as it would functionally create two separate, drastically different regimes with respect to probationary employees in each affected agency. In these circumstances, a nationwide injunction—rather than one tied only to these specific States—is warranted. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025) (upholding the district court's grant of a nationwide preliminary injunction when "the facts would not require different relief for others similarly situated" (cleaned up) (quoting *HIAS*, 985 F.3d at 326–27)).

## C.    Content of the Injunction

Under the APA, to prevent irreparable injury, the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. at 16), *order dissolved*, Civ. No. PX-20-2118, 2023 WL 3547497 (D. Md. May 18, 2023). Furthermore, it is well established that the Court "may craft declaratory and injunctive relief designed to preclude a federal agency from acting in contravention of its statutory and regulatory authority," and that it "may require an agency to modify its current or future practices in order to account for past violations of its statutes or regulations." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004) (citations omitted).

The ordinary remedy for unlawful agency actions is vacatur. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law' . . . ." (quoting 5 U.S.C. § 706(2)(A))); *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (similar); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (cleaned up)). Although some courts have occasionally endorsed a practice of remanding an agency action to the agency for further consideration without vacatur, *see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), the Fourth Circuit "has never formally embraced the *Allied-Signal* remand-without-vacatur approach." *Sierra Club v. U.S. Army Corps of Eng'rs*,

49

909 F.3d 635, 655 (4th Cir. 2018). Even assuming that remand without vacatur may be appropriate in some instances, such a remedy is warranted only when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Id.* (quoting *Allied-Signal*, 988 F.2d at 150–51 (alteration in original)). Here, however, it is likely that the Government's actions were plainly contrary to law, and there is no plausible scenario in which the Government's procedures for terminating probationary employees could be adequately justified on remand to the agencies. In such instances, the likely final remedy is that the Government's actions must be vacated in their entirety. *See id.* (holding that vacatur was required when the challenged actions were "legally deficient" such that there was no realistic possibility of the actions being justified upon agency reconsideration).

Here, the Court finds that—just as vacatur would likely be the appropriate remedy at the final judgment stage under the APA, 5 U.S.C. § 706—the proper provisional remedy under Rule 65 and § 705 is a stay of the Government's efforts to terminate probationary employees *en masse* and without notice to the States. *Cf. Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[W]e conclude that the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."), *cert. granted in part*, ___ S. Ct. ___, 2025 WL 65914 (Mem.) (Jan. 10, 2025); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020) ("Nationwide preliminary injunctive relief guarantees that a rule shown likely to be proven unlawful does not become effective, providing complete relief to the plaintiffs while the rule's legality is finally adjudicated."); *see generally Gomez v. Trump*, 485 F. Supp. 3d 145, 202–04 (D.D.C. 2020) (explaining the relationship between vacatur under § 706 and enjoining a likely unlawful agency action under § 705).

50

Only an order staying the Government's likely unlawful RIF process can prevent the States from suffering irreparable injury in the form of the disruption and costs imposed by the mass terminations. Indeed, the Government admits as much. (ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by their reinstatement." (emphasis omitted).) Were the Court to withhold from granting such interim relief, it would likely be impossible adequately to remedy the States' injuries at the final judgment stage, which may be many months if not years away. Given the complexity and unprecedented nature of the terminations, it would be difficult, if not impossible, to retrospectively assign a dollar amount to the burdens incurred by the States from the Government's likely unlawful terminations—and in any event, money damages are likely categorically unavailable in a suit of this type, as discussed above, *see supra* Section III.B.

As a practical matter, a stay of the Government's terminations of probationary employees means that the Government must reinstate all affected employees working for the Defendant Agencies. Then, if the Government wishes to continue pursuing its RIF agenda, the Government must start from square one, acting in compliance with federal law. Only by following the procedures set forth in federal law can the Court ensure that the States receive the notice to which they are statutorily entitled. The Court is not blind to the practical reality that the relief being ordered today will have far-reaching impacts on the federal workforce and will require the Government to expend considerable resources in an effort to undo the RIFs that have been put into place. But, as explained above, "the scope of injunctive relief is dictated by the extent of the violation established." *Califano*, 442 U.S. at 702. When, as is likely the case here, the Government has engaged in an illegal scheme spanning broad swaths of the federal workforce, it is inevitable that the remediation of that scheme will itself be a significant task.

### D. Agencies Restrained

The final issue pertaining to the scope of the TRO is which specific Defendants are to be restrained. As discussed above, there are three agencies named as Defendants in this action—namely, Defense, OPM, and Archives—with respect to which Plaintiffs have provided insufficient evidence that RIFs have occurred.[13] It is of course axiomatic that a movant is not entitled to a TRO against a defendant when the movant has not shown that it is likely to prevail on the merits as to that defendant. Accordingly, Defense, OPM, and Archives will be excluded from the TRO. This exclusion is without prejudice to the States' right, at the preliminary injunction stage, to produce evidence showing that RIFs occurred at these agencies and to seek appropriate relief.

## VII. SECURITY/BOND REQUIREMENT

Under Federal Rule of Civil Procedure 65(c), a court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." District courts have discretion to set the required security at a nominal amount, *see Hoechst Diafoil Co.*, 174 F.3d at 421 n.3, and this approach has long been followed in public-interest litigation cases, *Alabama ex rel. Baxley v. Corps of Eng'rs of U.S. Army*, 411 F. Supp. 1261, 1275–76 (N. D. Ala. 1976) (collecting cases); *South Carolina v. United States*, 329 F. Supp. 3d 214, 238 n.35 (D.S.C. 2018) (same), *vacated on other grounds*, 912 F.3d 720 (4th Cir. 2019); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, Civ. No. ABA-25-0333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025); *see also* Wright & Miller, *supra*, § 2954.

---

[13] A related issue is the contention urged by counsel for the Government at the TRO hearing—namely, that certain affidavits refer to agencies that are not Defendants in this action. In particular, the Government cited to affidavits from an employee from the Federal Emergency Management Agency ("FEMA") and the National Oceanic and Atmospheric Administration ("NOAA"). (*See* ECF No. 5-11, 5-15 (affidavits attesting to terminations of probationary employees at FEMA and NOAA, respectively).) But FEMA and NOAA are housed within the Departments of Homeland Security and Commerce, respectively, which *are* expressly named as Defendants. (*See* ECF No. 1 at 3–4.)

Here, the Court concludes that a nominal bond is appropriate. Although the risk of harm to the Government is not remote, the potential cost of an improvidently granted TRO on the federal government is too complex to calculate in this expedited proceeding. And even if a dollar amount could be put on the Government's actions, it would be prohibitive to require plaintiffs to bear up front the total cost of the alleged governmental wrongdoing. Accordingly, the Court will require each Plaintiff State to pay a bond of $100.

## VIII. STAY PENDING APPEAL

The Government requests that any order issuing injunctive relief be stayed pending appeal. (ECF No. 20 at 28.) In deciding whether to issue a stay pending appeal, the Court considers:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (citation omitted). These factors "substantial[ly] overlap" with the *Winter* factors. *Id.*

It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites. *See, e.g.*, *PFLAG, Inc. v. Trump*, Civ. No. 25-337-BAH, 2025 WL 685124, at *32 (D. Md. Mar. 4, 2025) (granting a request for a preliminary injunction, then denying a request for a stay pending appeal "[f]or all the [same] reasons"). Here, the stay applicant (*i.e.,* the Government) has *not* made a strong showing of likelihood of success on the merits; indeed, the Court concluded that the Government will likely *lose* on the merits. Accordingly, for the reasons stated above in the discussion of the *Winter* factors, the Government's request for a stay pending appeal will be denied.

## IX. CONCLUSION

For the reasons stated herein, a TRO will issue.

Dated this __13__ day of March, 2025.

BY THE COURT:

_James K. Bredar_

James K. Bredar
United States District Judge