## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND, *et al.*,          *

       Plaintiffs,          *

    v.          *

UNITED STATES DEPARTMENT OF          *          Case No. 1:25-cv-00748
AGRICULTURE, *et al.*,

       Defendants.          *

                                    *

                                    *

                                    *

*   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM IN SUPPORT OF PLAINTIFFS STATES'
## MOTION FOR A SECTION 705 STAY AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

BACKGROUND .................................................................................................................3

I.      Defendants' Unlawful Mass Terminations of Probationary Employees. ..........................3

        A.      Defendants' mass terminations of probationary employees are illegal RIFs
                conducted without notice to affected states. ........................................................3

        B.      Defendants' failure to provide notice has hindered Plaintiff States' ability
                to respond to the sudden surge in unemployment and demand for public
                services..................................................................................................................7

II.     Plaintiff States' Lawsuit and This Court's TRO..................................................................8

ARGUMENT .....................................................................................................................9

I.      THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION.................................................9

        A.      Plaintiff States are Likely to Prevail on the Merits of Their Claims. ..................10

        B.      This Court Has Jurisdiction Over Plaintiff States' Claims. .................................13

        C.      Plaintiff States Are Suffering Irreparable Injuries. .............................................16

        D.      The Balance Of Equities And The Public Interest Heavily Favor A
                Preliminary Injunction. ........................................................................................17

II.     THE PRELIMINARY INJUNCTION SHOULD BIND ALL DEFENDANTS. ...................................18

III.    THE PRELIMINARY INJUNCTION SHOULD ENCOMPASS THE FULL SCOPE OF THE
        UNLAWFUL RIFS, AS THE TRO DID. ...................................................................................18

CONCLUSION..................................................................................................................20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STATE OF MARYLAND, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| UNITED STATES DEPARTMENT OF AGRIGULTURE, *et al.*, | * | Case No. 1:25-cv-748-JKB |
| | * | |
| Defendants. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A SECTION 705 STAY AND PRELIMINARY INJUNCTION

President Trump directed Defendants, federal agencies and agency heads, to "dramatically reduce the size of the federal workforce." In their haste, Defendants terminated tens of thousands of probationary employees without warning or observance of statutorily required procedures. Put bluntly, Defendants moved fast, and they broke the law. *See* TRO Hrg. Tr., ECF 48 at 41:4-41:7.

Specifically, the Office of Personnel Management ("OPM") directed agencies to conduct mass terminations of probationary employees, *i.e.*, those who have generally been in their positions for less than two years. OPM provided agencies with stock language that cited the employees' performance as the reason for their terminations. Following these directives, Defendants used these boilerplate notices to unlawfully fire nearly 25,000 probationary employees, with many agencies terminating hundreds or thousands of employees virtually simultaneously, without individualized assessments, and all without providing any advance notice or warning to Plaintiff States as federal law requires.

Accordingly, Defendants have been engaged in unlawful reductions in force ("RIFs") aimed at reducing the size of the federal workforce. These RIFs violated federal law, which agencies must provide 60 days' advance notice of the RIF to affected employees and—importantly for Plaintiff States—60 days' advance notice to states and local governments. *See* 5 U.S.C. § 3502(d)(3)(A) (requiring notice to states when 50 or more employees will be released from within a "competitive area"); 5 C.F.R. § 351.803(b) (same).

Recognizing the injuries states would suffer from a lack of notice prior to mass layoffs, Congress required that where an agency fails to provide notice to affected states in advance of a RIF, "an employee may not be released." 5 U.S.C. § 3502(d)(1). States need notice to prepare for and mitigate the administrative burdens associated with a sharp uptick in federal unemployment claims; to plan and budget for the deployment of job transition and social services; and to facilitate connections between impacted workers, potential new employers, and partner organizations. By firing tens of thousands of civil servants *en masse* without notice and under false pretenses, Defendants caused Plaintiff States an informational injury that has impeded their ability to perform this essential work and caused other harms.

Plaintiff States brought suit to end these lawless mass terminations of federal probationary employees, and the Court entered a temporary restraining order ("TRO") rescinding previous unlawful terminations and enjoining future ones. To prevent further irreparable harm, Plaintiff States now move this Court to enter a stay under Administrative Procedures Act (APA) § 705 and a preliminary injunction that binds all Defendants named in the Complaint. That relief is warranted for the reasons described below and in Plaintiffs' TRO briefs, which Plaintiffs adopt and incorporate by reference. Accordingly, the Court's order should: (1) bar Defendants from terminating any probationary employees without making specific, individualized determinations

regarding the inadequacy of the employee's conduct or performance, (2) reinstate probationary employees who were terminated on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individual determinations of conduct or performance, and (3) order Defendants to file status reports and information with the Court documenting the actions they have taken to comply with this Court's orders.

## BACKGROUND

**I.    Defendants' Unlawful Mass Terminations of Probationary Employees.**

**A.    Defendants' mass terminations of probationary employees are illegal RIFs conducted without notice to affected states.**

The Trump Administration seeks "to dramatically reduce the size of the federal workforce." OPM Email, Ex. A. On January 20, Acting OPM Director Charles Ezell distributed a memorandum directing agency heads to "identify all employees on probationary periods . . . and [to] send a report to OPM listing all such employees." Memo. from Charles Ezell, Acting Dir., OPM, to Heads & Acting Heads of Dep'ts & Agencies 1 (Jan. 20, 2025), tinyurl.com/y4cjp5wh. The memo further directed agency heads to "promptly determine whether those employees should be retained by the agency."[1] *Id; see also* ECF 52-1 at 3 ¶ 5.

On February 13, OPM met with agency heads and ordered the mass termination of probationary employees. Chris Megerian et al., *Trump administration begins sweeping layoffs with probationary workers, warns of larger cuts to come*, AP (Feb. 13, 2025), tinyurl.com/mtzwfc6j. The next day, OPM reiterated that demand. OPM Email, Ex. A. It ordered agencies to "separate probationary employees . . . not identified as mission critical no later than . . . Monday, 2/17," and

---

[1]    Plaintiff States incorporate by reference the factual background set forth in greater detail in support of their motion for a temporary restraining order. *See* ECF 4-1; ECF 19.

it "attached a template [termination] letter" falsely stating terminations were due to performance. *Id.* at 1; *see, e.g.*, Bachelder Decl., Ex. B at ¶ 9; Frassetto Decl., Ex. C ¶ 22; Evans Decl., Ex. D at ¶ 26; DiMartini Decl., ECF 4-37 ¶¶ 5-10.

Agencies have heeded OPM's demand. As Defendants acknowledge in their March 17, 2025 status report, since January 20, 2025, they have terminated at least 25,580 probationary employees. Ex. E,[2] Summary Chart (summarizing total probationary employee terminations at each of the 18 Defendants covered by the TRO). Notably, this total does not include probationary employee terminations at Defendants National Archives and Records Administration ("NARA"), OPM, or the Department of Defense ("DoD"), and Defendants continue to seek to terminate additional probationary employees.

Defendants now admit that their mass terminations of probationary employees were not related to individualized assessments of those employees' performance or qualifications. *See*, *e.g.*, ECF 52-1 at 14 (313 probationary employee terminations at Defendant Department of Homeland Security "excludes probationary employees who were terminated in individualized actions based on their performance"); *id.* at 18 n.1 (distinguishing 775 probationary employees affected by mass terminations at Defendant Department of Transportation from two probationary employees who were "terminated based on individualized performance-based determinations"); *id.* at 44 (explaining that out of the 156 probationary employees terminated by Defendant Federal Deposit Insurance Corporation, only five "would have otherwise been terminated for individualized reasons based on performance/conduct").

Defendants' new admissions confirm evidence provided by Plaintiff States, including the statement by a former Director of OPM that it is "not possible . . . for so many federal agencies to

---

[2]    Exhibits A-Q are attached to this Memorandum.

have independently and simultaneously decided to terminate large numbers of their workers" or "to have done proper assessments of all these employees." *See* Ex. F, Archuleta Decl. ¶¶ 12-13; DiMartini Decl., ECF 4-37 ¶¶ 15-17 ("[I]t would take weeks or months to evaluate the job performance of [thousands of] employees"). Indeed, at one agency, leadership "discussed openly in meetings" that the agency "did not review or consider actual job performance or conduct" of any terminated probationary employee. DiMartini Decl., ECF 4-37 ¶ 16; *see also* Grant Decl., ECF 4-36 ¶ 19 (similar as to another agency),

Many termination letters expressly noted that the individual was being terminated "[p]er OPM instructions." Schwarz Decl., Ex. G ¶ 10; *see also* Ex. H (SF-50 forms issued to terminated probationary employees by several Defendants describing the terminations as related to administration priorities rather than individual performance); MD DOL Decl., ECF 4-5 ¶¶ 61-62 (some agencies confirming that terminations were not for cause but instead due to a "reduction in force" or a "permanent lack of work due to change in Presidential Administration"). And *all* of Defendants' human resources officials acknowledge in nearly identical language that their mass terminations of probationary employees occurred following the direction from OPM.[3] *See, e.g.*, ECF 52-1 at 3 ¶ 5 (noting OPM memo directing agencies to identify probationary employees and determine whether they should be retained); *id.* at 6 ¶ 5 (same); *id.* at 10 ¶ 5 (same); *id.* at 14 ¶ 5

---

[3]     Notably, only the Department of Interior (DOI) even claims to have "reviewed all probationary and trial period appointees' performance" prior to terminating them *en masse*. ECF 52-1 at 28, ¶ 5. However, not even the agency's declaration asserts that the over 1,700 employees mass-fired from DOI were terminated *because* of deficient performance. Further, the weight of the evidence suggests that Interior's process was largely indistinguishable from other agencies. *See* Ex. H (SF-50 explaining that Interior probationary employee was terminated "PER OPM 1/20/25"); *see also* Grant Decl., ¶¶ 6-19 (explaining that another agency terminated probationary employees *en masse* despite the determinations by supervisors that the employees were well qualified, performing well, and should not be removed from service); ECF 33-5 (redacted declaration of terminated DOI employee, including termination letter, stating that they "do not meet the Department's current needs," despite receiving a positive performance evaluation).

(same); *id*. at 18 ¶ 5 (same). Indeed, some Defendants' correspondence with terminated employees appeared to acknowledge that their terminations had been RIFs, while other agencies acknowledged this fact in response to unemployment benefit claims. *See* Ex. I (email from Defendant GSA to terminated employee explaining "For any further correspondence, please direct your inquiries to rif@gsa.gov"); MD DOL Decl. ECF 4-5 ¶¶ 61-62, (noting that several responses from federal agencies stated that employees were "laid off due to a reduction in force").

The three Defendants that were not covered by the TRO—OPM, NARA, and DoD—have followed this same pattern. They too terminated probationary employees following the boilerplate language from OPM that generally stated that employees were being terminated because their "ability, knowledge, and skills do not fit the Agency's current needs, and [their] performance has not been adequate to justify further employment at the Agency." *See* Redacted OPM Decl., Ex. J. ¶ 5 ("[Y]ou have not demonstrated that your further employment at the Agency would be in the public interest."); Redacted NARA Decl., Ex. K ¶ 5 ("[I]n accordance with the direction to agencies to reduce budgets, implement a hiring freeze, reorganize and reprioritize our work and prepare for a reduction in force, we have come to the conclusion that we cannot continue with the current staffing levels."); Redacted DoD Decl., Ex. L ¶ 6 ("[Y]ou have not demonstrated that your further employment with [the Agency] would be in the public interest"). The probationary employees who received these letters had strong performance evaluations and received uniformly positive feedback on their performance from their supervisors. Redacted OPM Decl., Ex. J. ¶ 8 (declarant rated "at or above Fully Successful" in performance review), Redacted NARA Decl., Ex. K ¶ 4 (declarant's performance was excellent and NARA was not terminating him based on performance, according to his supervisors), Redacted DoD Decl., Ex. L ¶¶ 9-11 (declarant "consistently demonstrated initiative, a strong work ethic, and a commitment to excellence which

would benefit [the Agency]," and "consistently demonstrated fully successful performance" according to supervisors). Further, in a March 3 memorandum, DoD announced a plan to "reduce the size of the civilian workforce," and explained that the "first step" in this planned workforce reduction would be "terminating those probationary employees whose continued employment at the Department would not be in the public interest." Ex. M at 1. The memo made clear that firing probationary employees was part of Defendant DoD's RIF plan, and the agency did not intend to give anyone, including Plaintiff States, statutorily required notice. *Id.*

> ### B.     Defendants' failure to provide notice has hindered Plaintiff States' ability to respond to the sudden surge in unemployment and demand for public services.

Many Plaintiff States have recently seen material increases in the number of unemployment claims by federal employees compared to the same period last year. *See, e.g.*, MD DOL Decl., ECF 4-5 ¶¶ 18, 50, 52 (30-60 claims per day, 330% increase); NJ DOL Decl. ECF 4-12 ¶¶ 33-34 (273%); CA EDD Decl. ECF 4-8 ¶ 30 (149%); IL IDES Decl. ECF 4-9 ¶¶ 15-16 (almost the same number of claims filed in the last several weeks as in all of 2024).

Because Plaintiff States' departments of labor have received no notice of Defendants' mass terminations of probationary employees, Plaintiff States must devote significant resources and expense to affirmatively contact various federal agencies, monitor public reporting, and conduct mass outreach to identify impacted workers. *See, e.g.*, MD DOL Decl., ECF 4-5 ¶¶ 16, 19-23; NJ DOL Decl., ECF 4-12 ¶¶ 17-18; MI MUIA Decl., Ex. N ¶¶ 8, 23; NM DWS Decl., Ex. O ¶¶ 17-25. Some Plaintiff States are also diverting staff from pressing projects to retrain them to provide rapid response services. *See, e.g.*, MD DOL Decl., ECF 4-5 ¶¶ 24-28; MI MUIA Decl., Ex. N ¶¶ 26-27. Others have created new websites or set up dedicated phone lines to find and assist terminated employees. *See, e.g.*, MD DOL Decl., ECF 4-5 ¶ 29;, IL IDES Decl. ECF 4-9 ¶ 32; CA EDD Decl. ECF 4-8 ¶ 19; NM DWS Decl., Ex. O ¶¶ 17-25; *see also* Amber Anderson, DC launches

unemployment website for federal workers amid job status chaos, WUSA9 (Feb. 25, 2025), tinyurl.com/4ec8cfsx. And some Plaintiff States have also lost the benefit of services provided by federal employees embedded within state agencies, without any time to prepare. *See* NJ DOH Decl., ECF 4-12 ¶ 5 (explaining the harms to New Jersey caused by the sudden termination of embedded probationary workers from the Public Health Associate Program); RI DOH Decl, ECF No. 4-15 ¶ 7 (similar for Rhode Island).

## II.    Plaintiff States' Lawsuit and This Court's TRO.

On March 6, 2025, Plaintiff States filed suit in this Court challenging Defendants' mass terminations of probationary employees without following RIF procedures, including providing required notice of the RIFs to Plaintiff States. The next day, Plaintiff States filed a motion for a TRO requesting that the Court (1) restrain Defendants from terminating probationary employees without making individualized determinations based on conduct or performance; (2) reinstate probationary employees terminated on or after January 20, 2025, as part of terminations that did not comply with RIF procedures and were not based on individual determinations; and (3) order the Defendants to file a status report within 48 hours of entry of a TRO, and at regular intervals thereafter, identifying under seal all probationary employees terminated on or after January 20, 2025, and report all steps taken to comply with a TRO. ECF 4-1.

On March 13, the Court granted the Plaintiff States' motion with respect to all but three defendants and denied the Defendants' request for a stay pending appeal.[4] Defendants filed a status report on March 17, 2025, on their steps to rescind the terminations of affected probationary

---

[4]    The Court excluded OPM, NARA, and DoD because States had not yet provided declarations attesting to the terminations. The Court noted that its conclusion was without prejudice to the presentation of additional evidence in later proceedings. ECF 43 at 39. As explained below, Plaintiff States have now produced such evidence, and respectfully submit that any further orders should apply to all Defendants.

employees. ECF 52. The Court ordered Defendants to submit an updated status report on or before March 24, 2025. ECF 72.

## ARGUMENT

### I.    The Court Should Stay Agency Action Pending Judicial Review and Grant a Preliminary Injunction.

The Court has already concluded that Plaintiff States satisfy the preliminary injunction factors. As this Court explained, "[t]he standard for a temporary restraining order is the same as a preliminary injunction." ECF 43 at 32 (quoting *Maages Auditorium v. Prince George's County,* 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd,* 681 F. App'x 256 (4th Cir. 2017)). And "[t]he factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *D.C. v. USDA*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).

Both forms of preliminary relief require that a party "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." ECF 43 at 32 (quoting *Winter v. Nat. Res. Def Council, Inc.,* 555 U.S. 7, 20 (2008)). A court may rely on findings it made in granting a TRO and evidence in the TRO record when considering a subsequent motion for a preliminary injunction. *Arrendadora de Equipo y Maquinaria Especializada S.A. de C.V. v. Meukoua*, No. CV TDC-24-1203, 2024 WL 4011985, at *1 (D. Md. Aug. 2, 2024). As the Court explained in detail in its opinion granting the TRO in this matter, Plaintiffs have met their burden of "establish[ing] all four factors." ECF 43 at 32.[5] Defendants have produced no arguments

---

[5]    The Court may rely on the TRO record in granting a Preliminary Injunction. Accordingly, Plaintiff States incorporate by reference the briefing and evidence submitted in support of their motion for a temporary restraining order. *See* ECF 4-1 through ECF 4-39, ECF 51 through 5-19,

or evidence that disturbs this conclusion, and additional evidence gathered since the Parties briefed the TRO only strengthens the arguments of Plaintiff States. Plaintiff States are therefore entitled to preliminary relief during the pendency of the litigation, both pursuant to a preliminary injunction, under the Court's equitable powers, and a stay of the challenged agency actions, under § 705 of the APA.

### A. Plaintiff States are Likely to Prevail on the Merits of Their Claims.

As the Court correctly found in granting the TRO, Defendants chose to terminate probationary employees through a RIF, 5 U.S.C. 3502, but ignored the statutory and regulatory requirements governing RIFs. ECF 43 at 2-3. Instead, they issued boilerplate letters claiming falsely that probationary employees were being terminated *en masse* due to performance.

That justification was plainly pretext. To terminate a probationary employee for unsatisfactory performance, a federal agency "must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin*, 942 F.3d at 1102 (emphasis added) (cleaned up). Here, Defense counsel's bald assertion that Defendants' terminations were based on any actual assessment of the affected employees' performance is belied by the overwhelming weight of the evidence. TRO Hrg. Tr., ECF 48 at 38:1-21.

Critically, Defendants' terminations were not performance based at all. Instead, they were coordinated efforts to dismiss large numbers of employees near-simultaneously to reduce and restructure the workforce—in other words, they were a RIF. To begin with, OPM's directive was to terminate, not evaluate, probationary employees. Frassetto Decl., Ex. C. ¶ 20. Further, declarations of agency officials explained that individual assessments were not the basis for the

---

ECF 19, ECF 33-1 through 33-19. To be clear, Plaintiff States adopt all of the arguments made in that prior briefing. The mere fact that an argument is not reiterated here does not indicate an intention to abandon it.

mass terminations, DiMartini Decl., ECF 4-37 ¶ 16, and declarations of affected probationary employees demonstrate many had received exemplary evaluations shortly before their termination, *see, e.g.*, ECF 33-1, 33-2, 33-5, 33-10, 33-11, 33-14, 33-16, 33-17, 33-18, 33-19. In addition, several Defendants admitted to the Maryland Department of Labor that many employees were terminated due to a "reduction in force," MD DOL Decl., ECF 4-5 ¶¶ 61-62, and terminated probationary employees' SF-50 Forms described the reasons for their terminations such as "SEPARATED BY ORDER OF OFFICE OF PERSONNEL MANAGEMENT." Ex. H. Probationary employees fired from the General Services Administration were even instructed to direct questions regarding their separation to RIF@gsa.gov. Ex. I.

Furthermore, as discussed above, the 18 declarations Defendants submitted in support of their March 17 status report likewise confirm that Defendants' mass terminations of probationary employees were not based on individualized determinations of performance or conduct. *See*, *e.g.*, ECF 52-1 at 14 (explaining that the 313 probationary employee terminations reported by Defendant DHS "excludes probationary employees who were terminated in individualized actions based on their performance"); ECF 52-1 at 18 n.1 (similar for Defendant DOT); ECF 52-1 at 44 (similar for Defendant FDIC).

Just as the "record [at the TRO stage] reflect[ed] that these probationary employees were not terminated for cause," newly gathered declarations from terminated probationary employees who worked in DoD, NARA, and OPM underscore this conclusion. ECF 43 at 39; Redacted OPM Decl., Ex. J ¶ 8; Redacted NARA Decl., Ex. K ¶ 4; Redacted DoD Decl., Ex. L ¶¶ 9-11. Indeed, these declarations show that many affected employees had received positive performance feedback and none of them was terminated because the agencies were "honestly [] dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. Soc.*

*Sec. Admin.*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (emphasis added) (citation and internal quotation marks omitted); *see* ECF 43 at 37.

Even absent this evidence, the Court could see through Defendants' attempts to obscure the facts. "The sheer number of employees that were terminated in a matter of days belies any argument that these terminations were due to the employees' individual unsatisfactory performance or conduct." ECF 43 at 33. As the Court rightly observed, Defendants' argument that agencies fired nearly 25,000 probationary employees based on individualized findings of performance issues "borders on the frivolous." ECF 43 at 39. These mass terminations, conducted without any individualized assessment of job performance, and executed instead to reduce the size of entire agencies and offices, were plainly large-scale RIFs.

Defendants do not dispute that they are required to provide advance notice to states before separating employees as part of a RIF, nor can they. RIFs require advance notice to "[t]he State or entity designated by the State to carry out rapid response activities." 5 U.S.C. § 3502(d)(3)(A); 5 C.F.R. § 351.803(b). To mitigate the burden on state resources, Congress sought to aid states in proactively assisting soon-to-be terminated residents. Indeed, the Defendants have conceded as much. TRO Hrg. Tr., ECF 48 at 23-24 (Government Counsel: "I'm not disputing that the purpose [of the statute] is to allow states to participate in assisting individuals in their states with relocating employees, helping them find some sort of a new role."). And Defendants do not dispute that they failed to comply with these clear requirements.

As the Court correctly concluded, the Defendants' failure to provide the Plaintiff States notice was contrary to statutory requirements in violation of the APA. ECF 43 at 30. Because Defendants' legal violations are clear and obvious, they have no likelihood of success on the merits. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025)

(finding no likelihood of success on the merits because "circuit precedent foreclose[d] the government's position").

Finding it only necessary to identify one claim on which the Plaintiffs are likely to succeed, the Court declined to analyze the likelihood of success of Plaintiffs States' arbitrary and capricious APA claim and *ultra vires* claim. But the same findings that led the Court to conclude that Defendants acted contrary to law by failing to abide by the RIF statute's notice requirements require the same outcome as to Plaintiff States' other claims, as Plaintiff States explained in detail in support of their motion for the TRO and incorporate here. *See* ECF 4-1, 28-32.

Accordingly, Plaintiff States are likely to succeed on the merits, and the Court should grant their motion for a preliminary injunction.

### B.    This Court Has Jurisdiction Over Plaintiff States' Claims.

In granting the TRO, this Court rightly found that it has jurisdiction over Plaintiff States' claims. ECF 43 at 23.

*First*, Plaintiff States have standing to bring these claims. To establish standing, a plaintiff must show (1) a "concrete, particularized, and actual or imminent" injury in fact; (2) that the injury "was likely caused by the defendant"; and (3) that the injury "would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560-61). As the Court found, Plaintiff States "have demonstrated each of the fundamental elements of standing, such that they are entitled to invoke federal jurisdiction over their claims." ECF 43 at 15.

As Plaintiff States explained in detail in their memorandum supporting the TRO, ECF 4-1 at 14-15, and supplemental brief, ECF 19 at 2-5, Plaintiff states have standing. Plaintiff States' central injury is an informational injury that has caused other specific harms, including costs from the hasty rollout of rapid-response protocols, burdens associated with processing a surge in

13

unemployment claims including time-consuming investigations into benefit eligibility, disruptions to state programs depending on federal workers, and financial harms from decreased tax revenue[6] and increased reliance on state social service programs.[7] ECF 43 at 7-11; *see also* Pls.' Supp. Br., ECF 19 at 1-4 (detailing injuries to Plaintiff States). Further, there is no doubt that the Plaintiff States' injuries fall squarely within the "zones of interests" protected by the RIF statute, *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 (1991), because states are expressly referenced in "the particular provision[] of law upon which [they] seek redress," *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003); *see* 5 U.S.C § 3502(d)(3)(A) (requiring an agency to notify affected states of a RIF).

<u>Second</u>, the Federal Service Labor-Management Relations Statute ("FSL-MRS") and the Civil Service Reform Act of 1978 ("CSRA") do not preclude federal court jurisdiction. *See* Pls' Supp. Br., ECF 19 at 5-8. Under *Thunder Basin v. Reich*, courts follow a two-step framework in determining whether Congress has divested jurisdiction over agency action. *See* 510 U.S. 200, 207

---

[6]     In particular, the harms to state income tax revenues are actual, imminent, and directly tied to Defendants' unlawful RIFs. Prior to their termination, each Defendant withheld state income taxes from the probationary employees' pay and paid those funds to Plaintiff States. *See*, e.g., ECF 33-1, ¶ 9 (explaining that Defendant DOT withheld and paid income taxes to the state each pay period); ECF 33-2, ¶ 10 (same for HHS); 33-3, ¶ 12 (same for USAID); Redacted USFS Decl., Ex. P, ¶ 10 (same for USDA). Defendants' failure to follow RIF procedures therefore necessarily caused a direct harm to Plaintiff States because Defendants immediately ceased paying these withheld income taxes to Plaintiff States upon the termination of probationary employees instead of continuing to pay these income taxes during the 60 day notice period. Thus, these harms are actual and imminent. Moreover, these harms are directly tied to Defendants' failure to follow the statutorily required notice procedures. *See* 5 U.S.C. § 3502(d)(3)(B). Had Plaintiff States received the RIF notices required by statute, Plaintiff States would have been better prepared to assist affected employees seeking alternative employment, which would have mitigated the harms to Plaintiff States' income tax receipts. *See* ECF 4-35, ¶ 12; *see also* Redacted NOAA Decl., Ex. P ¶¶ 5, 8 (explaining that with notice a Maryland taxpayer probationary employee "would have started looking for a new position immediately").

[7]     Plaintiff States incorporate by reference the standing arguments included in their TRO motion and supplemental brief. ECF 4-1 at 14-15; ECF 19 at 2-5.

(1994). First, a court must "ask whether Congress's intent to preclude district-court jurisdiction is fairly discernible in the statutory scheme." *Bennett v. U.S. Sec. & Exch. Comm'n*, 844 F.3d 174, 181 (4th Cir. 2016) (cleaned up). Second, it should ask "whether plaintiffs' claims are of the type Congress intended to be reviewed within this statutory structure." *Id.* (cleaned up). At this second step, a court should consider three factors: "(1) whether the statutory scheme forecloses all meaningful judicial review"; "(2) the extent to which the plaintiff's claims are wholly collateral to the statute's review provisions"; and "(3) whether agency expertise could be brought to bear on the . . . questions presented." *Id.* (cleaned up). The first factor is the most important. *Id.* at 183 n.7.

As this Court concluded in granting the TRO, ECF 43 at 25-30, application of the *Thunder Basin* test confirms that the Court has jurisdiction to adjudicate Plaintiff States' claims. At step one, the "text, structure, and purpose" of the CSRA does not display a "fairly discernible" intent to limit jurisdiction over the States' claims. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012). The CSRA's agency tribunals—the Merit Systems Protection Board ("MSPB") and the Federal Labor Relations Authority ("FLRA")—are available only to employees, labor organizations, and agencies, 5 U.S.C. § 7103(a)(1)-(2); *id.* § 7123; *id.* § 7703, and not the Plaintiff States. Yet Plaintiff States have clear statutory rights to notice. 5 U.S.C. § 3502(d). Congress thus could not have intended to preclude their claims. Otherwise, Plaintiff States would be in the odd position of possessing a right without a remedy. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 66-67 (1992). The preclusion analysis accordingly ends at *Thunder Basin* step one with judicial review being available. *See, e.g.*, *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (examining "whether Congress foreclosed review to the *class* to which the plaintiff belongs" (emphasis added) (cleaned up)).

Even if this Court were to proceed to step two, the Court clearly has jurisdiction for all the reasons this Court explained when it granted the TRO. ECF 43 at 27-30. To find otherwise would leave Plaintiff States without review and without a remedy because they cannot litigate in the MSPB or FLRA. Further, the Plaintiff States' claims about lack of statutorily required notice are "wholly collateral" to the CSRA's administrative review scheme, *Thunder Basin*, 510 U.S. at 212, because state notice has "nothing to do with" the labor-related matters that the MSPB and the FLRA "regularly adjudicate" between unions, employees, and employers. *Axon*, 598 U.S. at 193. Finally, the MSPB and FLRA specialize in individualized adjudications of prototypical employee disputes and lack the expertise to handle the Plaintiff States' claims (*i.e.*, that Defendants are failing to provide advance notice to states, prior to terminating a swath of the federal workforce in an attempt to downsize the federal civil service).

Accordingly, the Court has jurisdiction over Plaintiff States' claims, and it should grant the requested preliminary injunction.

### C. Plaintiff States Are Suffering Irreparable Injuries.

Each day that federal probationary workers are left unemployed means rising and likely unrecoverable administrative costs for Plaintiff States. As the Court found, Plaintiff States suffered an informational injury and "have incurred substantial follow-on harms as a result of the [Agencies'] failure to provide the required RIF notice." ECF 43 at 14. These harms include costs associated with diverting personnel for statutorily required rapid response activities, managing a surge of unemployment claims and performing administrative investigations, losing federal personnel embedded in state offices, and the diversion of various employees' services. *Id.* at 15; *see also* ECF No. 4-1 at 24-29 (describing in detail the injuries suffered by Plaintiff states, and citing declarations in support).

16

The Court separately identified as "somewhat unsettled" the question of whether reductions in state tax revenues constituted a sufficient injury. ECF No. 43 at 17. Plaintiff States respectfully submit that the evidence provided, such as the declarations from Maryland and the District of Columbia, support the proposition that sudden federal layoffs will lead directly to lower tax revenues, such as through income taxes and sales taxes. *See supra*, at 3 & n.6*; see also* ECF No. 4-1 at 28 (providing estimates of revenue lost). Courts have recognized that a state's loss of specific tax revenue constitutes an injury under Article III. *See, e.g.*, *New York v. Yellen*, 15 F.4th 569, 577 (2d Cir. 2021) (states' allegation that a law would lead to specific losses in tax revenue sufficed to support standing). Plaintiff States have made such a showing here.

In any event, this Court recognized Plaintiff States' remaining harms are "temporal and immediate," ECF 43 at 44, and are integral to Plaintiff States' ability to meet their legal obligations to provide rapid response services and to otherwise discharge their responsibilities to their residents, *id.* at 15. That alone suffices to demonstrate standing.

### D.    The Balance Of Equities And The Public Interest Heavily Favor A Preliminary Injunction.

The balance of equities and the public interest continue to "weigh in favor of granting" relief. ECF 43 at 46. The public "undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020). (internal quotation marks and citation omitted). And "these mass terminations conducted without appropriate notice have placed enormous strain on the States." ECF 43 at 44. The public, in turn, "has a great interest in States not unnecessarily diverting resources from other functions." *Id*. There is no public interest in unlawful government action, and the government does not suffer harm from restraint of an unlawful practice. *Sanchez v. McAleenan*, No. CV GLR-19-1728, 2024 WL 1256264, at *14 (D. Md. Mar. 25, 2024) (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Nor should

the Plaintiff States shoulder the administrative burden of locating, supporting, and offering unemployment benefits to thousands of illegally terminated employees while the Defendants continue their "ready, fire, aim" campaign to reduce the federal workforce. Thus, it is plainly in the public interest to rescind previous unlawful terminations and prevent further illegal RIFs. *See Roe*, 947 F.3d at 371.

## II.    The Preliminary Injunction Should Bind All Defendants.

In its decision granting the TRO, the Court found that Plaintiff States established likelihood of success on the merits as to nearly all Defendants, including because of declarations and termination notices from terminated probationary employees at each agency. *See* ECF 43 at 32-39. While the Court found that Plaintiff States had not met their burden as to Defendants DoD, NARA, and OPM, it made that determination "without prejudice to the presentation of additional evidence with respect to these three agencies." ECF 43 at 39. Plaintiff States submit such evidence in support of this motion, and the Court should enter a preliminary injunction in this matter that binds all Defendants. *See* Ex. J (declaration and termination notice for OPM employee); Ex. K (declaration and termination notice for NARA employee); Ex. L (declaration and termination notice for DoD employee).

Accordingly, the Court should grant Plaintiff States' motion and enter a preliminary injunction that binds all Defendants.

## III.   The Preliminary Injunction Should Encompass the Full Scope of the Unlawful RIFs, as the TRO Did.

This Court should ensure that any order fully covers the agency actions at issue that disrupted the status quo ante, just as it did at the TRO stage. Accordingly, this Court should either stay the unlawful RIFs in full under 5 U.S.C § 705 or issue a preliminary injunction fully pausing and rescinding those RIFs through its equitable powers rather than crafting a piecemeal state-by-

state remedy. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020), *order dissolved sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18, 2023) ("The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay."). Doing so would preserve the status quo absent Defendants' unlawful agency action. *See Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) ("[S]taying an agency action under Section 705 (even after the effective date) restores the same status quo *ex ante*.").

        As this Court found, "[u]nder the APA, to prevent irreparable injury, the Court 'may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.'" ECF 43 at 51 (quoting 5 U.S.C. § 705). Put another way, because § 705 "speaks in terms of the 'agency action,'" it "must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020) (internal quotations omitted). Here, to prevent the irreparable injury described above, it is necessary to stay in full the agency actions that Plaintiff States challenge: Defendants' mass terminations of probationary employees, which were unlawful RIFs conducted without notice to Plaintiff States. Accordingly, the Court should stay actions of all Defendants that constitute an unlawful RIF and preserve the status quo ante. As explained, this would encompass reinstating the employees who were unlawfully terminated.

        In any event, this Court may also rely on its equitable powers to preliminarily enjoin in full the challenged agency actions. As this Court correctly recognized, uniform injunctions are appropriate where necessary "to provide complete relief to the plaintiffs." *CASA, Inc.*, 2025 WL 654902, at *1; *Roe v. Dep't of Def.*, 947 F.3d 207, 232 (4th Cir. 2020). In particular, a "piecemeal

approach is not appropriate" where it would undermine plaintiffs' relief by "caus[ing] confusion." *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 504 (D. Md. 2020). Here, this Court reasonably concluded that state-by-state relief would be "unworkable" because it "would functionally create two separate, drastically different regimes with respect to probationary employees in each affected agency." ECF 43 at 48. For this reason as well, a preliminary injunction of Defendants' actions should cover the full scope of the unlawful RIFs.

## CONCLUSION

Plaintiff States request relief to halt Defendants' reckless attempts to unlawfully dismantle the federal workforce. Defendants admit that their mass terminations of probationary employees were not based on performance and were conducted without advance notice to the Plaintiff States, in violation of the federal laws and regulations governing RIFs. Accordingly, Plaintiff States' motion should be granted, and the Court should issue the accompanying proposed stay and preliminary injunction order.[8]

---

[8]    Plaintiff States note that they intend to move the Court to extend the TRO entered in this matter for an additional 14 days or until such time as the Court rules on the present motion.

March 20, 2025

Respectfully submitted,

**ANTHONY G. BROWN**
*Attorney General*
*State of Maryland*

*/s/ Virginia A. Williamson*
James D. Handley, Bar No. 20299
Virginia A. Williamson, Bar. No. 31472
Assistant Attorneys General

200 St. Paul Place
Baltimore, MD 21202
Phone: 410-576-6584
vwilliamson@oag.state.md.us

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

*/s/ Liz Kramer*
Liz Kramer†
Solicitor General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
liz.kramer@ag.state.mn.us

**BRIAN SCHWALB**
*Attorney General*
*District of Columbia*

Emma Simson
Senior Counsel to the Attorney General

*/s/ Ryan Wilson*
Ryan Wilson**
Senior Counsel

Hannah Cole-Chu, Bar No. 20747
Anne Deng*
Pamela Disney**
Tessa Gellerson, Bar No. 21271
Charles Sinks, Bar No. 21185
Cara Spencer, Bar No. 20171
Assistant Attorneys General

Office of the Attorney General for
the District of Columbia
400 6th Street N.W., 10th Floor
Washington, D.C. 20001
(202) 230-2342
Ryan.Wilson@dc.gov

**KRISTIN K. MAYES**
*Attorney General*
*State of Arizona*

*/s/ Hayleigh S. Crawford*
Hayleigh S. Crawford†
Deputy Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

**ROB BONTA**
*Attorney General*
*State of California*

*/s/ Satoshi Yanai*
Satoshi Yanai†
Senior Assistant Attorney General

Demian Camacho†
Miranda Maison†
300 S. Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6400
satoshi.yanai@doj.ca.gov

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation

Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

*/s/ Gretchen Helfrich*
Gretchen Helfrich†
Deputy Chief
Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle Street, 35th Floor
Chicago, IL 60603
Tel. (312) 814-3000
Gretchen.helfrich@ilag.gov

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

*/s/ Michael Skold*
Michael Skold†
Solicitor General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5020
michael.skold@ct.gov

**ANNE E. LOPEZ**
*Attorney General*
*State of Hawaiʻi*

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day†
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes†
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**ANDREA JOY CAMPBELL**
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Katherine Dirks*
Katherine Dirks†
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov

**DANA NESSEL**
*Attorney General*
*State of Michigan*

*/s/ Bryan Davis, Jr.*
Bryan Davis, Jr.†
Debbie Taylor†
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, MI 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200


**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Anjana Samant*
Anjana Samant*
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
asamant@nmdoj.gov


**DAN RAYFIELD**
*Attorney General*
*State of Oregon*

By: */s Deanna J. Chang*
Deanna J. Chang**
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov


**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*

*/s/ Nathaniel Ilan Levy*
Nathaniel Ilan Levy, Bar No. 21840
Deputy Solicitor General
25 Market Street
Trenton, NJ 08625
Phone: (862) 350-5800
nathaniel.levy@njoag.gov


**LETITIA JAMES**
*Attorney General*
*State of New York*

By: */s/ Rabia Muqaddam*
Rabia Muqaddam†
Special Counsel for Federal Initiatives
New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov


**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Natalya A. Buckler*
Natalya A. Buckler (RI Bar No. 8415)*
Sarah W. Rice, Bar No. 29113
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2022
nbuckler@riag.ri.gov

23

**CHARITY R. CLARK**
*Attorney General*
*State of Vermont*

*/s/ Jonathan T. Rose*
Jonathan T. Rose†
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov


**PHIL WEISER**
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz†
Deputy Solicitor General
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov


*\* Pro hac vice application forthcoming*
*\*\*Application for admission pending*
† *Admitted pro hac vice*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Brian P. Keenan*
Brian P. Keenan\*
Assistant Attorney General
State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us


**AARON D. FORD**
*Attorney General of Nevada*

*/s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)\*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov