**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| STATE OF MARYLAND, et al.,<br><br>Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEP'T OF<br>AGRICULTURE et al.,<br><br>Defendants. | Case No. 1:25-cv-00748-JKB |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION**
**FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

I.    Statutory and Regulatory Background.......................................................................... 2

II.   Factual Background ...................................................................................................... 5

III.  Procedural Background................................................................................................. 5

THE PLAINTIFF STATES' CLAIMS IN THIS ACTION ....................................................... 8

LEGAL STANDARD............................................................................................................... 9

ARGUMENT ........................................................................................................................... 9

I.    Plaintiffs Fail to Make the "Clear Showing" Necessary for a Preliminary
      Injunction. ................................................................................................................... 9

      A.    Plaintiff States Have Not Shown a Likelihood of Success on the Merits.............. 9

            1.    Plaintiffs Cannot Show Standing ............................................................... 9

            2.    The CSRA Provides The Exclusive Remedies For All Claims
                  Concerning The Termination Of Federal Employees............................... 13

            3.    Plaintiffs Fail to Make a Showing that Defendants' Actions
                  Triggered the Statutory RIF Notice Requirements. ................................. 15

                  (a)    The Court Wrongly Concluded the OPM Performance
                         Regulations Required Individualized Assessment for Any
                         Probationary Employees Prior to Termination ............................ 16

                  (b)    Even if probationary employees could be terminated only
                         for individual performance problems, that does not mean
                         that terminations without sufficient cause are RIF subject to
                         notice requirements...................................................................... 20

      B.    Plaintiff States Are Unable to Show They Likely Will Suffer Irreparable
            Harm in the Absence of Preliminary Relief.......................................................... 21

      C.    The Public Interest Weighs Against a Preliminary Injunction ............................ 22

II.   Any Remedy Should Not Include Reinstatement and Should Be Limited to the
      Plaintiff States that Demonstrate Standing ................................................................ 23

A.    Plaintiffs Fail to Show that the Court has Equitable Power of
Reinstatement.......................................................................................... 23

B.    Any Preliminary Injunction or APA Stay Should Operate Only in the
Plaintiff States That Demonstrate Standing and Irreparable Harm—Not
Nationwide. ............................................................................................. 24

III.    Any Injunctive Relief Should Require the Provision of a Reasonable Bond by the
Plaintiff States. ....................................................................................... 26

CONCLUSION ................................................................................................ 27

# INTRODUCTION

Nineteen states and the District of Columbia ("Plaintiff States") claim they have been harmed by purported violations by twenty-one federal agencies of a statutory *notice requirement,* allegedly triggered when those agencies terminated large numbers of probationary employees. They claim that in doing so, the agencies actually engaged in unannounced statutory reductions in force ("RIFs"), which triggered this notice requirement.  Plaintiffs, now relying upon the temporary restraining order ("TRO") issued by the Court on March 13, 2025, seek an extraordinary nationwide preliminary injunction and an equally extraordinary stay under Section 705 of the Administrative Procedure Act ("APA") (i) reinstating all terminated probationers, (ii) barring prospective probationer terminations absent individualized performance determinations, and (iii) requiring ongoing status compliance reports by the federal agencies.  But they cannot carry the high burden necessary to obtain any of that relief.

Beyond critical deficiencies in standing, Plaintiff States fail to establish a likelihood of success on the merits, because they simply cannot show that Defendants' actions triggered the statutory RIF Notice requirements.  And the injunction they seek, in any event, would result in a profound mismatch between the informational injury they assert (failure to receive pre-termination notice) and the sweeping remedy they seek (reinstatement of thousands of terminated employees nationwide).  The States also have no place in what is, at base, a dispute between several federal agencies and their terminated probationers.

The Motion should be denied.  However, if the Court enters a preliminary injunction, it should at most be limited to Plaintiff States (that demonstrate standing and irreparable harm). Judge Rushing's concurrence in a March 21 Fourth Circuit order in this case questioned the inappropriate nationwide scope of the injunctive relief Plaintiffs seek.  Her concern was justified:

Thirty States have not claimed any injury of this type in any court, and one State has decided to litigate its claims in a different judicial district. The Court should respect those 31 States' choices and tailor any relief to the parties to this action.

## BACKGROUND

### I.    Statutory and Regulatory Background

Plaintiff States' case centers around 5 U.S.C. § 3502. That statute provides that when conducting a RIF—which is a distinct "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions*," James v. Von Zemenszky*, 284 F. 3d 1310, 1314 (Fed. Cir. 2002), the government must follow certain notice procedures. One such procedure requires providing 60 days' written notice to the employee. 5 U.S.C. § 3502(d)(1)(A). And if the RIF would affect a "significant number of employees" in a jurisdiction, notice must also be provided to "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998." *Id*. § 3502(d)(1)(B)[1], (d)(3)(A)(i). Under OPM's implementing regulations, "[w]hen 50 or more employees in a competitive area receive separation notices under this part, the agency must provide written notification of the action, . . . . to … (1) the State …. [t]o carry out rapid response activities under … the Workforce Investment Act of 1988." 5 CFR § 351.803(b)(1).

Probationers are individuals whose employment with the federal government has not been finalized. *See* 5 C.F.R. § 315.804. By statute, "The President may … provide … for a period of probation" for federal employees "before an appointment in the competitive service becomes

---

[1] Specifically, § 3502(d)(1)(B) provides: "[A]n employee may not be released, due to a reduction in force, unless (B) if the reduction in force would *involve the separation of a significant number of employees*, the [notice] requirements of [Section 3502(d)(3)] are met at least 60 days before any employee is so released." (emphasis added).

final." 5 U.S.C. § 3321(a)(1); *see id.* § 7511(a)(1).  Employees in the excepted service are subject to a trial period of two years. 5 U.S.C. § 7511(a)(1)(C)(ii).  Exercising its statutory authority, OPM has issued rules defining the probationary term for the competitive service and specifying that agencies "shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. §§ 315.801, 315.802, 315.803(a).

Employment-related disputes between federal employees and their employing agencies within the Executive Branch—including challenges to employee removals or terminations—are governed by the comprehensive, reticulated administrative-judicial review scheme set forth in the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, codified at 5 U.S.C. § 2101 *et seq.* (the "CSRA").  That expansive scheme also includes parallel provisions governing labor relations between agencies and their employees, the Federal Service Labor-Management Relations Statute (the "FSLMRS"), set forth in Title VII of the CSRA (codified at 5 U.S.C. §§ 7101-7135). Taken as a whole, the scheme governs nearly all aspects of the federal employer-employee relationship, and largely covers the field when it comes to judicial rights and remedies for alleged constitutional and statutory violations arising out of that relationship.  As the D.C. Circuit has put it, "what you get under the CSRA is what you get."  *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.).

Relevant here, the CSRA "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (citation omitted). If an agency takes a statutorily defined major adverse action against a covered employee—including removal, *see* 5 U.S.C. § 7512—the employee may appeal that action to the

3

Merit Systems Protection Board ("MSPB") under the provisions of the CSRA's Chapter 75. *Id.* §7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Final MSPB decisions generally are appealable to the Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This review scheme is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13. Other than limited circumstances not relevant here, the CSRA does not permit covered employees to bring suit in federal district court. *Id*. at 14-15; *United States v. Fausto*, 484 U.S. 439, 447 (1988); *Fornaro*, 416 F.3d at 67.

In contrast to tenured employees, terminated probationers generally do not enjoy the same guaranteed right to appeal removal decisions to the MSPB, as Congress excluded them from the definition of "employee[s]" for purposes of the CSRA's Chapter 75. *See* 5 U.S.C. § 7511(a)(1). Instead, probationers are still considered "applicants" under the extended hiring and evaluation period of the CSRA. And the CSRA, which sets forth the merit system principles underlying the entire statutory scheme and provides remedies for alleged violations of those principles, generally applies to both "applicants and employees." *See*, *e.g.*, 5 U.S.C. § 2302(a)(2)(A)(i)–(xii) (identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in any agency").

In appropriate circumstances, terminated probationers may pursue relief resulting in MSPB adjudication, with judicial review thereafter. There are two main routes to such review. *First*, a removed probationer may file a complaint alleging one or more statutorily defined "prohibited personnel practices" with the Office of Special Counsel, 5 U.S.C. §§ 1211- 1219, *et seq.*, which is statutorily charged with investigating such complaints and which may in turn pursue administrative relief before the MSPB. *Second*, under Office of Personnel Management (OPM)

4

regulations, a removed probationer may appeal to the MSPB if he alleges that his removal was based upon one of the reasons set forth in the regulations. *See* 5 C.F.R. § 315.806(b)-(d) (listing reasons such as discrimination on partisan political reasons, marital status, improper procedures, and discrimination on protected status).

## II.    Factual Background

On January 20, 2025, OPM transmitted a guidance memo to Executive Branch agencies emphasizing that probationary periods constitute "an essential tool for agencies to assess employee performance." Memorandum from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, Guidance on Probationary Periods, Administrative Leave and Details, at 1 (Jan. 20, 2025). The memo directed agencies to "identify all employees on probationary periods" and "promptly determine whether those employees should be retained at the agency." *Id*. On March 4, OPM issued revised guidance emphasizing that agencies "have ultimate decision-making authority over, and responsibility for, such personnel actions." Memorandum from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments, Guidance on Probationary Periods, Administrative Leave and Details, at 2 (rev. Mar. 4, 2025), https://perma.cc/E8P5-74WZ.

Invoking their legal authorities to manage their workforces, certain federal agencies have terminated certain probationary employees. In its TRO opinion ("Op.") (Dkt. No. 43), the Court found that "at least 24,000 probationary employees" have been terminated. *See* Op. 7. Plaintiff States allege that they "were not provided any notice of such terminations." *Id.*

## III.    Procedural Background

Plaintiff States sued on March 6, 2025, and moved for a TRO the following day. *See* Dkt. Nos. 1 (Compl.) and 4 (Mot. For TRO). Their requested TRO would "restrain[] Defendants from

terminating federal probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance" and "[c]ompel[] Defendants to reinstate federal probationary employees fired on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individual determinations of conduct or performance." Dkt. No. 4, at 2.

On March 13, following briefing and a hearing, the Court substantially granted Plaintiffs' motion. It concluded that Plaintiff States had shown standing. Op. 14-15, 19-21. It rejected Defendants' argument that claims concerning termination of federal employment may only be pursued under the CSRA and the FSLMRS. The Court recognized that the statutory scheme "forecloses any possibility of the States bringing their claims before an administrative agency" because only unions, employees, and applicants for employment have rights under those statutes. *Id.* 26. But the Court used this as a basis to counterintuitively conclude that States could collaterally attack the federal hiring decisions through other channels. And on the merits, the Court found that the government's termination of probationary employees constituted a RIF because the "terminated probationary employees were plainly not terminated for cause." *Id*. 33; *see also, e.g.*, *id.* at 38 ("The wholesale dismissal of employees due to their status as probationary employees appears to be some form of reorganization, even if the Government does not refer to it as such."). The Court then held that the government had failed to comply with the requirements governing RIFs, including advance notice to states. *See id*. at 37-38.

While acknowledging that any harms faced by the states were "largely economic," the Court nevertheless said such harms were irreparable "because money damages are likely not available" from the federal government. *Id*. 41. So too did a "diversion of resources" resulting from the lack of notice also constitute an irreparable harm. *Id.* at 42. For the last two factors, which

merge when the government is a defendant, the Court found that the balance of the equities and the public interest favored the states. *Id.* at 42-44.

The TRO is extraordinarily broad: the Court ordered that Restrained Defendants must reinstate "all Affected Probationary Employees throughout the United States FORTHWITH, and in any event before March 17, 2025, at 1:00 p.m. EDT." Dkt. No. 44, at ¶ 3. It further issued an injunction directing that Restrained Defendants shall not "conduct any future … [RIFs]—whether formally labeled as such or not—except in compliance with" statutory and regulatory requirements. *Id.* at ¶ 4. Ordering this relief nationwide—including in the 30 states that did not join any suit like this and in the one that chose to litigate elsewhere—the Court reasoned that because the "Government's policy is violative of the law across the board, it is appropriate for injunctive relief to be nationwide in scope." Op. 48. Because it "would order nationwide relief even if just a single State had standing," the Court declined to determine which states other than Maryland had standing. *See id.* at 18 n.3.

On March 17, 2025, Defendants appealed the TRO to the Fourth Circuit and moved for a stay pending appeal and an immediate administrative stay. Following briefing, the Fourth Circuit denied that motion on March 21, noting this Court's stated intention to hold a hearing on March 26 and to promptly grant or deny preliminary injunctive relief thereafter. *See* Doc. 20, No. 25-1248, at 3-4 (4th Cir. Mar. 21, 2025).

Judge Rushing concurred in the motion panel's ruling, writing separately "to echo the growing concerns over district courts issuing nationwide injunctions to order redress for those who have not sought it." *Id*. Her concurrence expressed substantial concern as to the TRO:

> The district court here required numerous federal agencies to reinstate fired probationary workers across all 50 States. It ordered relief because Plaintiffs—which are 19 States and the District of Columbia—asserted an injury stemming from the federal government's failure to notify the States of its intent to fire probationary

employees within their territory. But the district court extended its injunction to cover non-plaintiff States because (1) "the Government's policy is violative of the law across the board," and (2) it "would be inequitable" for a federal employee's status to turn on "the fortuity of their physical location." *State of Maryland v. USDA*, 1:25-cv-748, slip op. at 48 (D. Md. Mar. 13, 2025).

Neither reason holds water. As the district court noted, federal law requires an agency to notify a State of a reduction in force (RIF) when 50 or more employees in a "competitive area"—a unit definable by the agency but which must be linked to geography—receive separation notices. 5 C.F.R. §§ 351.803(b), 351.405; *see* 5 U.S.C. § 3502(d)(3). Plaintiffs identify no allegations or evidence before the district court showing that 50 or more employees were terminated in competitive areas in *non-plaintiff States*—that is, the 31 States that opted not to join this lawsuit. Accordingly, the court had no basis to conclude that the government violated federal law by failing to notify *those* States about any RIFs, and consequently no basis to conclude that the government's actions were illegal "across the board."

Further, the district court lost sight of who the Plaintiffs are and what injury they claim when it concluded a nationwide injunction was warranted. The States seek redress for their *own* purported injuries flowing from the lack of notice, not for an injury to their citizens. Accordingly, the question is not whether it is inequitable for a federal employee's reinstatement to turn on his State of residence, but rather whether it is inequitable to redress notice-based injuries only for those States that actually claim to be injured by the lack of notice. Of course not.

*Id.* at 4-5.

Following the Fourth Circuit's ruling, this Court issued an Order noting Judge Rushing's concurrence and directing the parties to brief the proper scope of any injunctive relief. *See* Doc. 97 ("If the Court grants a preliminary injunction, should it be national in scope, or should it operate in only the Plaintiff States?")

## THE PLAINTIFF STATES' CLAIMS IN THIS ACTION

Plaintiff States base their preliminary injunction motion on claims under the APA and a claim alleging *ultra vires* action. Seeking three forms of preliminary relief, all personnel-related and nationwide in scope, they request an order:

- "Bar[ring] Defendants from terminating federal probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance;"

- "Reinstat[ing] federal probationary employees fired on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individual determinations of conduct or performance;" and

- "[Requiring Defendants] to file status reports with the Court documenting the actions they have taken to comply with the Court's Order"—including "set[ting] forth the number of Affected Probationary Employees reinstated at each Defendant agency, broken down by subagency, department, and/or other subdivision, to the greatest degree of granularity practicable."

Br. at 2-3; Pls.' Proposed Order at Dkt. 78-2.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the [moving party] is entitled to such relief." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citation omitted). A party seeking a preliminary injunction must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008).

## ARGUMENT

## I.    Plaintiffs Fail to Make the "Clear Showing" Necessary for a Preliminary Injunction.

Plaintiff States cannot make the requisite "clear showing" that they are entitled to the extraordinary relief of a preliminary injunction.

### A.    Plaintiff States Have Not Shown a Likelihood of Success on the Merits

#### 1.    Plaintiffs Cannot Show Standing

"A plaintiff unlikely to have standing is *ipso facto* unlikely to succeed" and as such is not entitled to pretrial injunctive relief." *Elec. Priv. Info. Ctr.  v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017); *Speech First, Inc. v. Fenves*, 979 F.3d

319, 329 (5th Cir. 2020) ("preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue"); *R. K. v. Lee*, 53 F.4th 995, 998 (6th Cir. 2022); *Delmarva Fisheries Ass'n, Inc. v. Atl. States Marine Fisheries Comm'n*, 127 F.4th 509, 515 (4th Cir. 2025) (explaining that it is appropriate to affirm the denial of a preliminary injunction if a plaintiff fails to "establish[] a substantial likelihood of standing" at the preliminary injunction stage).  To establish standing, and invoke the Court's jurisdiction, the States "must show" that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

Plaintiff States claim injury from Defendants' probationary terminations because (a) the States did not receive notice in advance, and (b) the terminations require the States to provide additional services, while also causing a loss of tax revenues.  *See* Br. 13 & 14 n.6 (arguing that their "central injury is an information injury," which in turn caused other various downstream harms such as a loss of state income tax revenues.)  This standing argument is flawed in two ways.

First, an "informational injury" on its own does not create Article III standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021). So simply pointing to the failure to provide the allegedly required statutory-based notice is insufficient for injury.  Instead, the asserted informational injury must cause "real" harms that "are of the type that have traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (citation omitted).  Plaintiffs and the Court identify purported "downstream" harms to state resources, but those cannot suffice, as explained below.  *See, e.g.*, Op. 14-15 (citing "increased" unemployment claims and need to "divert money and human resources" to provide services and benefit programs).

Second, Plaintiffs' "downstream" theory of injury is not viable, in light of *United States v. Texas*, 599 U.S. 670, 674 (2023). There, the Supreme Court rejected a theory of state standing materially similar to that advanced here. The gist of theory in *Texas* was that States could sue based on "downstream" costs imposed and resources expended in response to a federal government action. *Id*. (citing the obligation to "supply social services such as healthcare and education" to additional persons). The Supreme Court rejected this theory. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id*. at 680 n.3. And a theory of standing based on those indirect effects is "more attenuated" and less likely to succeed. *Id*.; *accord, e.g., Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury"). The States here claim similar injuries. *See, e.g.*, Dkt. No. 1, ¶¶ 171, 179; threatened increased enrollment in social services such as Medicaid, *e.g.*, *id.* ¶¶ 205-206; and caused the states to expend funds to establish informational resources for their citizens, *e.g.*, *id.* ¶¶ 168, 202, 205.

Even assuming that Plaintiffs' claimed-"statutory right of notice" alone could give rise to an "informational injury" that suffices as an injury-in-fact, they cannot establish redressability for that injury. Specifically, a plaintiff seeking injunctive relief on a theory of informational injury must assert that a judicial order would lead him to obtain information he lacks—"[a]s when an agency denies requests for information under the Freedom of Information Act." *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989); *see also, e.g., Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). Here, at least as to terminations that have already occurred, the states do not allege that any information is presently being withheld from them. Any informational injury no longer exists and could not possibly be grounds for the district court's sweeping reinstatement

order.  Thus, a favorable decision will not remedy the "informational injury" here.  A basic mismatch exists between the informational injury the states assert (failure to receive pre-termination notice) and the sweeping remedy requested here (reinstatement of thousands of terminated employees). That relief does nothing to remedy the states' asserted informational injury because it does not provide them the information that they alleged was not provided.

In its TRO Opinion, the Court relied upon *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 171 (4th Cir. 2023), to observe that "[i]nformational injury has long been recognized as a valid injury in fact."  Op. 14.  But *Laufer* was brought by a disabled plaintiff who alleged that a hotel website failed to comply with a regulation requiring it to "[i]dentify and describe accessible features in the hotels and guest rooms."  *Laufer,* 60 F.4th at 159 (alteration in original) (quotation marks omitted).  She alleged that she "suffered an informational injury" because she had been deprived of "information required to make meaningful choices for travel." *Id*. at 160 (quotation marks omitted).  She accordingly sought "declaratory and injunctive relief," *id*. at 158—in particular, an order requiring the hotel "to revise its websites to comply" with the regulation. Amended Complaint at 9, *Laufer v. Naranda Hotels LLC,* No. 1:20-cv- 02136-CCB (D. Md. Aug. 17, 2020), ECF No. 4.  The court accepted that Laufer had "alleged an informational injury that gives her Article III standing to sue," *Laufer*, 60 F.4th at 166, and given the obvious connection between the asserted injury (missing information) and the requested relief (an order to provide it), the Court observed that the defendant had not even contested redressability in district court, *id*. at 167.  Here, Plaintiff States' "informational injury" is entirely different.  They are not seeking a judicial order compelling the provision of information;  they make no argument showing how reinstatements would redress the "informational injury" that they assert.  *See* Br. 16-17.

**2.   The CSRA Provides The Exclusive Remedies For All Claims Concerning The Termination Of Federal Employees**

Even if the States had Article III standing, Plaintiffs still fail to show that they are likely to prevail on the merits, because the Court lacks jurisdiction to adjudicate the challenges to the employment decisions of federal agencies.  Instead, as explained above, Congress "established a comprehensive system" that provides the "exclusive means" for reviewing such matters. *Elgin*, 567 U.S. 5, 8 (quotation marks omitted). Plaintiffs claim that the CSRA and FSLMRS do not preclude federal court jurisdiction.  Br. at 14.  This is incorrect.

The CSRA, together with the FSLMRS, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims."  *Ame. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2023) (alterations, citation, and quotations marks omitted).  Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, albeit limited to the claims and remedies provided by Congress.  *See Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019).

In its TRO decision, the Court never disputed that if this lawsuit were brought by the real parties in interest—terminated probationary employees—it could proceed only through the scheme enacted by Congress.  *See, e.g.*, Op. 24 ("Congress has provided for the exclusive administrative review of most employment claims brought by federal employees …."); *see also, e.g.*, *Fornaro*, 416 F.3d at 67 ("[W]hat you get under the CSRA is what you get.").  Yet the court concluded that those statutory limitations are irrelevant because Congress failed to include states among the parties who may bring claims under that scheme.  *See* Op. 26, 30.  That has it backwards.  "[T]he

CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009).

Supreme Court precedent makes clear that when a comprehensive scheme permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims. In *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), the Supreme Court considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Accordingly, the Court explained, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

The principles described in *Block* apply with full force to the CSRA. *See Fausto*, 484 U.S. at 448 (1988) (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"). Just as Congress "intentionally foreclosed judicial review to employees who … are subjected to disciplinary actions which are modest in nature," *Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it intentionally foreclosed judicial review by parties other than those it specifically

authorized to seek relief.  Any other result would encourage litigants to "bypass the statutory and administrative remedies in order to seek direct judicial relief and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established."  *Id.* at 913 (citation omitted).

In short, Congress did not leave a gaping hole in the CSRA by disallowing states from challenging federal employees' terminations on their behalf, simply because there were large numbers terminated at or around the same time.  Indeed, such an interpretation would be utterly at odds with Congress's intent in enacting the CSRA, which was to replace a "patchwork system with an integrated scheme of administrative and judicial review."  *Fausto*, 484 U.S. at 445.  Rather, Congress limited review of federal employment actions to actions by affected employees themselves, in specified administrative and judicial fora.

Plaintiffs emphasize that Congress could not have intended to preclude the States' claims, because that would place the Plaintiff States "in the odd position of possessing a right without remedy."  Br. at 15, 16.  But again, there is nothing "odd" about that, where, by design, Congress intended to permit review of federal employment actions to administrative or judicial actions by affected employees themselves, in a different forum.

### 3. Plaintiffs Fail to Make a Showing that Defendants' Actions Triggered the Statutory RIF Notice Requirements.

The thrust of Plaintiff States' motion is that Defendants' probationary terminations amounted to an unannounced statutory RIF, which triggered Notice requirements—and that the proffered reason for those terminations was pretextual.  Br. 10-13.  But a statutory RIF does not occur whenever the government terminates a large number of employees.  Statutory RIFs authorize an agency to eliminate positions and release employees through a defined process when "required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the

exercise of reemployment rights or restoration rights; or reclassification of an employee's position d[u]e to erosion of duties." 5 C.F.R. § 351.201(a)(2).  The regulation applies only "when the agency determines that a reduction in force is necessary."  *Id.* § 351.204.  Plaintiffs incorrectly assert that "Defendants do not dispute that they failed to comply with the [advance notice requirements, set forth in 5 U.S.C. § 3502(d)(3)(A); and 5 CFR § 351.803(b)]."  *See* Br. 12.  Plaintiffs have not shown that Defendants made the findings required for the RIF statute to apply.  Defendants thus had no compliance obligations under the RIF statute.

The Court supported its conclusion that the RIF statute applied with the suggestion that Defendants made improper terminations of probationers.  The Court focused on the numbers involved, suggesting that "[t]he wholesale dismissal of employees due to their status as probationary employees appears to be some form of reorganization."  Op. 38.

However, it is not correct that probationary employees can be terminated only for individual performance issues.  The OPM regulations do not purport to be exclusive, but even if they were, the language in those regulations, including "qualifications" and "fitness" (as explained below), necessarily encompasses agency priorities and resources.  However, even if probationary employees could be terminated only for individual performance problems, terminating them without cause would not make the termination a statutory RIF subject to notice requirements—it would simply give the probationary employees an argument to take through channeling.

### (a) The Court Wrongly Concluded the OPM Performance Regulations Required Individualized Assessment for Any Probationary Employees Prior to Termination

The Court erred when it concluded, essentially, that outside of a RIF, probationary employees can be terminated only for individual performance issues.  The Court stated that "agencies are permitted to terminate probationary employees under only three circumstances: (1)

due to conditions arising prior to their employment, 5 C.F.R. § 315.805; (2) due to unsatisfactory performance or conduct, 5 C.F.R. § 315.804(a); and (3) pursuant to a RIF." Op. 33. The Court's conclusion is mistaken for at least three reasons.

First, OPM's regulations, 5 C.F.R. §§ 315.803(a), 315.804, and 315.805, do not purport to be exclusive. Plaintiffs, who carry the burden here, fail to point to any source suggesting that OPM intended that these regulations purport to be the exclusive manner of terminating probationary employees. The court mistakenly interpreted these OPM regulations (5 C.F.R. §§ 315.803(a), 315.804, and 315.805) to limit agencies' authority to terminate probationary employees for individual performance issues only (outside of a RIF).

OPM regulations governing probationary employees do not limit agencies' authority to remove probationary employees for non-performance-based reasons. The Court's overreading of the import of these regulations further underscores the weakness of Plaintiffs' merits arguments. While the OPM regulations authorize removals of probationary employees for performance-based reasons, they do not purport to limit agencies' authority to remove probationary employees for other reasons, including the reasons identified by the agencies here. *See, e.g.*, Br. 6 (quoting letters which stated that "in accordance with the direction to agencies to reduce budgets, implement a hiring freeze, reorganize and reprioritize our work and prepare for a reduction in force, we have come to the conclusion that we cannot continue with the current staffing levels."); *id.* ("[Y]ou have not demonstrated that your further employment with [the Agency] would be in the public interest"). Nothing in the OPM regulations says that agencies cannot conduct assessments of an employee's utility to the agency in light of resource constraints and agency priorities.

Thus, an agency's authority to terminate probationary employees is not limited to the express authorities set forth in § 315.803(a) and § 315.804. To the contrary, although OPM's

regulations provide these bases to terminate competitive service probationary employees,[2] they do not purport to describe the only authority for doing so.  *See Yu v. Dep't of Army*, 28 Fed. App'x 968, 971 (Fed. Cir. 2002) (nonprecedential) ("However, the agency need not show unsatisfactory performance in order to discontinue employment during a probationary period; the only grounds for appeal are those set in 5 C.F.R. § 315.806(b)-(c) and § 1201.3(a)(8).").

Second, even if the regulation was exclusive, OPM's regulation § 315.803(a) provides independent authority, separate from the RIF regulations, for agencies to terminate competitive service probationary employees if the agency decides that paying their salary is unwarranted given the agency's current priorities.  Section 315.803 ("Agency action during probation period (general)") provides in subpart (a), "The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."  As for competitive service probationary employees, the phrases "fitness of the employee" and "his or her qualifications for continued employment" in section 315.803(a) encompass an analysis of whether the individual's abilities warrant continued employment in light of current agency priorities.

Indeed, "qualification" is defined as "A quality, ability, or accomplishment that makes a person *suitable for a particular position or task*."  *The American Heritage Dictionary of the English Language, New College Edition* (5th ed. 2022)[3] (emphasis added).  Likewise, "fitness" is

---

[2]  OPM regulations expressly authorize the termination of probationary employees. See 5 C.F.R. §§ 315.803(a); 315.804(a).  But by their terms, these provisions apply to probationary employees of the competitive service; they do not apply to excepted service probationary employees. *See De Santis v. MSPB*, 826 F.3d 1369, 1372 (Fed. Cir. 2016) (explaining that 5 C.F.R. §§ 315.805 and 315.806(c) "grant to a terminated probationary employee, but only one in the competitive service, certain procedural rights and a right of appeal to the Board where the employee makes a non-frivolous allegation that the termination rested wholly or partly on conditions arising before appointment.").  Thus, any reliance upon these regulations to address probationary excepted service employees is misplaced.

[3]  Available at: https://ahdictionary.com/word/search.html?

defined as "suitability or appropriateness." *Id*. Accordingly, the person's fitness and/or qualifications must be considered in light of the specific tasks agencies need performed. These regulations provide independent authority, separate from the RIF regulations, for agencies to terminate competitive service probationary employees if the agency decides that paying their salary is unwarranted given the agency's current priorities.

Third, agencies have broad discretion to remove probationary employees. In order to establish that agencies violated the law by removing them, probationary employees must point to some statute or regulation that agencies violated by removing them. Plaintiffs cannot do so. To the contrary, the governing authorities emphasize agencies' discretion to terminate probationary employees. In the CSRA, Congress enacted a carefully crafted comprehensive scheme governing all aspects of the federal employer-employee relationship. Even as it created an elaborate system allowing certain employees to challenge some personnel actions, Congress chose not to extend those rights to probationary employees. *See United States v. Connolly*, 716 F.2d 882, 886 (Fed. Cir. 1983). As the legislative history of the CSRA demonstrates, Congress recognized that "[t]he probationary or trial period ... is an extension of the examining process to determine an employee's ability to actually perform the duties of the position," and "[i]t is inappropriate to restrict an agency's authority to separate an employee who does not perform acceptably during this period." *Id.* (citing S.Rep. No. 969, 95th Cong., 2d Sess. 45 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 2723, 2767.) Thus, the CSRA preserved agencies' broad authority to terminate probationary employees, and Plaintiffs must identify some statutory constraint to prevail—which they have not done.

In this light, given that Congress chose to instead treat probationary employment as an "extension of the examining process," *id*. (citation omitted), it would be doubly inappropriate to

read in implied judicial avenues for challenging terminations, and to allow the inclusion of States as parties who can challenger termination of probationary employment. *Cf. Fausto*, 484 U.S. at 447 (Congress's silence on category of employees "displays a clear congressional intent to deny the excluded employees the protections of Chapter 75—including judicial review—for personnel action covered by that chapter.").[4]

In sum, Plaintiff States, as movants for the injunction, fail to carry their burden of making a "clear showing" that this analysis is incorrect. In fact, their moving papers do not even reference OPM's regulations, §§ 315.803, 315.804, or 315.805.

> **(b) Even if probationary employees could be terminated only for individual performance problems, that does not mean that terminations without sufficient cause are RIF subject to notice requirements.**

Even if hypothetically probationary employees could be terminated only for individual performance issues (as the Court essentially concluded), and defendants had terminated certain probationary employees without sufficient cause, that does not make the termination a RIF subject to notice requirements. Rather, in that case, the termination without sufficient cause would be a claim that only those affected employees may pursue—and in certain cases are pursuing—through channeling, *i.e.,* through the procedures created by the CSRA. *See* Dkt. No. 20, at 8 (describing how some probationers have pursued relief before the Office of Special Counsel and the MSPB). Again, that in itself would not mean the government inadvertently has conducted unlawful RIFs that should have involved a notice requirement.

---

[4] The Court cited *McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019), for the proposition that the employer "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *See* Op. 35. But the protections required by the court there relate to an entirely different statute, which Plaintiffs do not invoke in this matter. Specifically, *McGuffin* concerned an employee who was terminated during his one-year probationary period in part because of his veteran status, which the court held violated the Uniformed Services Employment and Reemployment Rights Act (USERRA). 38 U.S.C. §§ 4301-35. Plaintiffs have not brought a claim under USERRA here, so that analysis does not bear on this case.

For these reasons, Plaintiffs cannot make a "clear showing" that Defendants' actions triggered the statutory RIF notice requirements, and therefore (in addition to the other reasons explained above) cannot establish that they are likely to succeed on the merits.

**B.  Plaintiff States Are Unable to Show They Likely Will Suffer Irreparable Harm in the Absence of Preliminary Relief.**

To show irreparable injury, a plaintiff must make a "clear showing" that it will suffer harm that is "'neither remote nor speculative, but actual and imminent.'" *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (internal citation omitted). In addition, harm is irreparable only when it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal citation omitted).   "Mere injuries, however insubstantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough."  *Roe v. Department of Defense*, 947 F.3d 207, 228 (4th Cir. 2020) (internal citations omitted).

Plaintiffs do not make a "clear showing" here.  They argue that "each day that federal probationary workers are left unemployed means rising and likely unrecoverable administrative costs for Plaintiff States," (Br. 16), but cite to no authority establishing that as irreparable harm. (*New York v. Yellen*, 15 F.4th 569, 577 (2d Cir. 2021) at Br. 17 concerns standing.)  Moreover, that harm is not fairly traceable to the *informational injury* alleged; it is instead tied to the terminations themselves, which plaintiffs are barred from challenging in this litigation due to the channeling statutes.  While the TRO Opinion reasoned that the unavailability of money damages for APA claims counsels in favor of finding irreparable harm (Op. 41), this overlooks the peripheral and incidental nature of these costs.  At base, the reality of any firing of a federal employee will only "impose[] peripheral costs on a State.  *Arizona*, 40 F.4th at 386.  This is

21

especially true where the allegedly lost "notice" time, upon which these costs and lost tax revenues hinge, is 60 days.  Moreover, the Court's analysis would mean everyone who loses money from a federal action and lacks a damages claim against the government, (which would be the majority of claimants due to the small number of sovereign immunity waivers), would be entitled to emergency relief.  This is not the law.  See *Texas*, 599 U.S. at 674.

### C.  The Public Interest Weighs Against a Preliminary Injunction

Plaintiff States also cannot show that the balances of equities and public interest (which merge in cases against the United States) favor them.  Plaintiffs argue that it "is plainly in the public interest to rescind previously unlawful terminations and prevent further illegal RIFs."  (Br. 17-19).  But this presupposes that the terminations of the probationary employees were unlawful, or that the terminations were RIFs.  Plaintiffs erroneously assert that "Defendants' admit that their mass terminations of probationary employees were …. [i]n violation of the federal laws and regulations governing RIFs." (Br. 20).

The proposed relief also disserves both the federal government and the taxpayers to require Defendants to continue employing individuals whose services Defendants determined they no longer require. The government will not be able to recover that money if it later prevails at judgment.  Indeed, "[i]n deciding whether to grant a preliminary injunction, the court must also consider any irreparable harm that the defendant might suffer from the injunction—harm that would not be either cured by the defendant's ultimately prevailing in the trial on the merits or fully compensated by the injunction bond. . . ."  *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).  (internal quotation marks omitted).

Moreover, this lawsuit improperly injects States into the federal employer-employee relationship, for the reasons explained above. Implementing the order to date also has been an extraordinarily burdensome for the affected agencies.

## II.    Any Remedy Should Not Include Reinstatement and Should Be Limited to the Plaintiff States that Demonstrate Standing

### A.    Plaintiffs Fail to Show that the Court has Equitable Power of Reinstatement.

Plaintiffs cannot advance their argument by gesturing vaguely to courts' "equitable powers." Br. 10, 18-19. Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement is not a remedy that was traditionally available at equity. *See Sampson v. Muray*, 415 U.S. 61, 84 (1974). And while Congress departed from that equitable tradition in the CSRA, 5 U.S.C. §§ 1204(a)(2), 7701(g), 7703(b)(1), as discussed above, Plaintiffs cannot proceed under that statute. While Plaintiffs invoke the remedies available under the APA, that only authorizes a court to grant injunctive relief subject to traditional equitable limitations. 5 U.S.C. § 702(1).

Reinstatement exceeds a court's traditional equitable authority, and so requires specific statutory authorization. No statute—and certainly not the APA that forms the basis of this suit—authorizes reinstatement to redress downstream harm to the potential beneficiaries of the services generated by a particular employer-employee relationship. Even where reinstatement of a government employee is authorized, this Court has recognized that it requires a heightened showing in light of the Executive's traditional "latitude in the dispatch of its own internal affairs," *Sampson*, 415 U.S. at 83 (citation and internal quotation marks omitted), a showing that Plaintiffs have not come close to satisfying. Thus, the mass remedy sought here far exceeds the scope of the

23

Court's equitable powers, especially in light of the alleged legal violation of the 60-day notice requirement.

**B. Any Preliminary Injunction or APA Stay Should Operate Only in the Plaintiff States That Demonstrate Standing and Irreparable Harm—Not Nationwide.**

Any preliminary injunction should operate only in the Plaintiff States that demonstrate standing and irreparable harm, not nationwide. As this Court observed, Judge Rushing's concurrence emphasized the "growing concerns over district courts issuing nationwide injunctions to order redress for those who not sought it." (Doc. 20, No. 25-1248, at 3-4 (4th Cir. Mar. 21, 2025)). Here, specifically, the alleged legal violation turns on a notice requirement that is both agency- and geography-specific. Plaintiff States alleged they were injured when they didn't receive the allegedly required notice when defendant agencies terminated probationary employees within their territory. But as Judge Rushing's concurrence emphasized, as for "the 31 States that opted not to join this lawsuit," there was no allegation or evidence "showing that there had been terminations of probationary employee so as to potentially trigger the notice requirement." *See id.* at 5. Her concurrence therefore soundly concluded that the injunction should—at most—"redress noticed-based injuries only for those States that actually claimed to be injured by the lack of notice." *See id.* And as explained below, the view expressed in Judge Rushing's concurrence comports with Supreme Court and Fourth Circuit authority.

The Supreme Court has directed that "judicial power exists only to redress or other protect against injury to the *complaining party.*" *See Warth v. Seldin*, 422 U.S. 490 (1975) (emphasis added). And the Fourth Circuit, in a published but subsequently vacated opinion, expressed in an extensive analysis (spanning several pages) various criticisms of nationwide injunctions, and concluded those injunctions are "are plainly inconsistent with this conception of the judicial role and the proper scope of the federal courts' remedial power." *CASA de Maryland, Inc. v. Trump*,

971 F.3d 220, 256-263 (4th Cir. 2020), *vacated by, reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020); *appeal dismissed sub nom., Casa de Md. v. Biden*, 2021 U.S. App. LEXIS 7177 (4th Cir. Mar. 11, 2021).

In those cases where the Fourth Circuit has affirmed a district court's nationwide injunction, the government relied upon a "categorical policy, which effectively operated as a ban"—and that is not the case here. *See In Roe*, 947 F.3d at 232; *see also HIAS v. Trump*, 985 F.3d 309, 326 (4th Cir. 2020) ("A district court may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case.") (quotation omitted); *Cf. Casa, Inc. v Trump*, 2025 U.S. App. LEXIS 4856 (4th Cir. Feb. 28, 2025 (Niemeyer, J., dissenting) ("As a matter of order and equity, it is simply presumptuous and jurisdictionally messy for one district court to issue an injunction that covers the jurisdiction of other district courts and courts of appeals, which are considering the same issues.") (noting that "the Supreme Court has demonstrated grave concern generally over district courts' issuing national injunctions," citing *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 218 L. Ed. 2d 400 (2024) (mem.)).[5]

Finally, respectfully, Plaintiff States should be estopped from asserting new arguments in favor of a nationwide injunction. Plaintiffs' motion failed to articulate satisfactory grounds for the sought-nationwide injunction, and those arguments are forfeited now. The Court should not allow Plaintiffs to rehabilitate their preliminary injunction motion with a supplemental brief based on a Fourth Circuit concurring opinion.

---

[5] Plaintiffs cite *District of Columbia v. United States Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020), which states, "the APA's § 705 must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs." *See* Br. p. 19. This just follows from the court's view (not at issue here) that "the APA's instruction that unlawful agency actions be 'set aside' is ordinarily read as an instruction to vacate, wherever applicable, unlawful agency rules." *Id.*

Nor does Plaintiffs' request for a stay under 5 U.S.C § 705 authorize the Court to provide nationwide relief.  Section 705 (like other APA provisions) "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson*, 415 U.S. at 68 n.15. The text of § 705 says that a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." 5 U.S.C. § 705. In other words, (at a minimum) a court has discretion—the use of "may" does not require entry of any relief at all, and the "or" offers a court a choice between action to postpone the effective date or action to preserve status or rights. The text of § 705 thus puts traditional preliminary injunctions on at least equal footing with stays, making clear that stays, no less than preliminary injunctions, are a matter for the equitable discretion of the court. There is no basis to interpret § 705 to jettison the normal equitable rules. Section 705 explicitly incorporates traditional equitable principles by authorizing temporary relief only "to the extent necessary to prevent irreparable injury" and "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. That is paradigmatic equitable relief. The House Report that accompanied the APA thus explained that the relief authorized by § 705 "is equitable" and "would normally, if not always, be limited to the parties complaining." H.R. Rep. No. 791980, at 43 (1946). Grave Article III problems would arise if § 705 were interpreted to require or routinely permit district courts to extend relief to nonparties. The Supreme Court has emphasized that "plaintiffs must demonstrate standing . . . for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (quotation marks omitted).

III.   **Any Injunctive Relief Should Require the Provision of a Reasonable Bond by the Plaintiff States.**

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request the requirement of a reasonable bond, per Fed. R. Civ. P. 65(c) in light of the financial damages and other costs that injunction will cost Defendants.  As the Fourth Circuit has directed, "In fixing

the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).  The Fourth Circuit continued: "The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party."  *Id*. Specifically:

> The judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.

Id. (*quoting* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954, at 292 (2d ed. 1995)).  The Court previously ordered a $100 bond which bears no relation to the costs imposed on Defendants as a result of the TRO.  As explained above, the proposed Preliminary Injunction seeks to require Defendants to continue employing—and paying—thousands of individuals whose services Defendants determined they no longer require.  Apart from the bond posted under Rule 65(c), the government will not be able to recover that money if it later prevails at judgment. Defendants strongly believe that they will prevail on the merits in this case because, among other reasons explained above, RIF notice requirements were not triggered.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion for a Section 705 Stay and Preliminary Injunction.

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Director

CHRISTOPHER HALL
Assistant Director

*/s/ Steven M. Chasin*
Steven M. Chasin
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0747
Email: Steven.M.Chasin2@usdoj.gov

KELLY O. HAYES
United States Attorney

*/s/ Beatrice C. Thomas*
Beatrice C. Thomas
Assistant United States Attorney
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, MD 21202
Email: beatrice.thomas@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 24st day of March 2025, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel.

*/s/ Steven M. Chasin*
Steven M. Chasin
Trial Attorney
