## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STATE OF MARYLAND**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **CIVIL NO. JKB-25-0748** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM</u>

## TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................................... 1

II.     BACKGROUND ...................................................................................................... 2

 A.  Factual Background ................................................................................................ 2

 B.  Procedural History ................................................................................................. 5

III.    REVIEWABILITY .................................................................................................. 7

 A.  Justiciability ........................................................................................................... 8

   1.  Injury in Fact .................................................................................................... 9

   2.  Traceability...................................................................................................... 25

   3.  Redressability .................................................................................................. 26

 B.  Jurisdiction ............................................................................................................ 29

   1.  Final Agency Action ....................................................................................... 29

   2.  Claim Channeling............................................................................................. 31

IV.    PRELIMINARY INJUNCTION ANALYSIS ....................................................... 37

 A.  Likelihood of Success on the Merits..................................................................... 37

   1.  Zone of Interests.............................................................................................. 37

   2.  Termination of Probationary Employees ........................................................ 38

   3.  The Defendant Agencies Conducted RIFs...................................................... 42

   4.  The States Were Not Provided Requisite Notice ............................................ 52

 B.  Irreparable Harm ................................................................................................... 62

 C.  Balance of the Equities & the Public Interest ....................................................... 65

V.     SCOPE OF RELIEF................................................................................................ 66

 A.  Overview of Injunctive Relief .............................................................................. 67

 B.  Geographic Scope ................................................................................................. 68

 C.  Content of Injunction & Nature of Relief ............................................................. 74

VI.    SECURITY/BOND REQUIREMENT..................................................................... 80

VII.   CONCLUSION ........................................................................................................ 82

## I.    INTRODUCTION

The government can terminate probationary employees *en masse* (*i.e.*, dismiss them via a reduction in force, or "RIF"), but when it does so it must follow certain laws and regulations. Recently, government agencies executed a series of mass terminations, but when they did so, on the record before the Court, they failed to follow mandatory RIF procedures.

State governments are some of the intended beneficiaries of the mandates the federal government failed to follow, and because the states (and the District of Columbia) that brought this action were and likely continue to be irreparably harmed by the federal government's failures, a preliminary injunction must enter to restore the status quo, and to prevent further harm to the plaintiffs while this case is pending. Specifically, the federal government must restore the employment of those whose sudden terminations so burdened the plaintiffs (or, it must maintain the same to the extent it has already restored employees pursuant to the TRO), and it must refrain from further unlawful mass terminations, or RIFs, that would impact the plaintiffs, while this case is pending.

Not every state joined this lawsuit—thirty-one did not. It is sometimes appropriate—even necessary—for courts to issue nationwide injunctions stopping unlawful actions of the Government. But those instances are rare, and this case is not one of them. National injunctions are warranted only when it is not possible to craft narrower relief that will fully and appropriately remedy the harms unlawfully imposed on parties to the particular lawsuit, or when more narrow relief would be otherwise unworkable, grossly inequitable, or strongly contrary to the public interest. The Court's injunction is not national in scope because it is possible to substantially stop the harms inflicted on the states that did sue without extending judicial authority over those that didn't. Further, while some inequity is inevitable without a national injunction, there is a powerful

1

countervailing public interest in the Court respecting the likely carefully considered judgments of the thirty-one non-party states *not* to join this lawsuit, tipping the balance in favor of more limited relief. Perhaps a broader injunction would be in order if this action were on behalf of the thousands of employees who were laid off, the circumstances of each likely being similar if not identical to those of the others, and there being little doubt that the harms visited on some were representative of those experienced by all, or almost all. But this is not that case. Only states have sued here, and only to vindicate their interests as states. They are not proxies for the workers. Presumably well informed, each state is entitled to decide for itself whether it will seek relief in the present circumstances; it would be inappropriate for the Court to fashion relief having the consequence that decisions properly reserved to the non-party states are effectively, and *unnecessarily*, overruled by this Court.

All this said, at this preliminary stage, the Court finds that the recent actions of the defendant government agencies (and the officials leading them), now including the Office of Personnel Management and the Department of Defense as to its probationary civilian employees, probably broke the laws that regulate *en masse* terminations of government employees, and this to the continuing and irreparable harm of the Plaintiff States. The appropriate remedy now, until final judgment is entered, is entry of a preliminary injunction restoring the employment of those federal probationary workers whose sudden layoffs without requisite notice likely have harmed, are harming, and will continue to harm the Plaintiff States if not immediately stopped.

## II.   BACKGROUND

### A.   Factual Background

Plaintiffs, which include nineteen states and the District of Columbia ("the States"), filed suit against forty-one Defendants, which include cabinet agencies and their secretaries as well as

2

other federal agencies and their heads (collectively, "the Government"). (*See generally* ECF No. 1.) The States challenge the Government's termination of probationary federal employees as being contrary to law and arbitrary and capricious under the Administrative Procedure Act ("APA") and as being *ultra vires*.[1]  (*See generally id.*)

The Court previously described the facts that led to the filing of this suit in detail in its Memorandum accompanying the Temporary Restraining Order ("TRO") issued on March 13, 2025. (TRO Mem., TRO Mem. at 4–13), *reproduced as Maryland v. USDA*, Civ. No. JKB-25-748, 2025 WL 800216 (D. Md. Mar. 13, 2025).[2]  The Court described the requirements for terminating probationary employees, along with the actions allegedly taken by the Government, and the harms allegedly suffered by the States. (*Id.*)  The Court incorporates by reference that background, and will provide only a brief synopsis of the facts and legal background here. Furthermore, additional factual details will be provided as relevant to the Court's discussion of standing and the States' likelihood of success on the merits.

Most employees in the federal civil service are considered to be in a probationary status for the first year or two of their employment. *See* 5 U.S.C. §§ 3321(a), 7511(a)(1)(A)(ii), 7511(a)(1)(C)(ii); 5 C.F.R. § 315.801. Regulations provide for certain ways in which probationary employees may be terminated. As is particularly relevant here, one such way is as part of a RIF. 5 U.S.C. § 3502; 5 C.F.R. §§ 351.201–.902. The statute and regulations prescribe detailed procedures that federal agencies must follow when conducting a RIF—agencies must, among other

---

[1] Because the Court can resolve the question of preliminary injunctive relief on the basis of the Plaintiff States' APA contrary-to-law claim alone, as at the TRO stage, it will not consider the other two claims at this time.

[2] Subsequent references to the Court's TRO Memorandum will cite to the document on the Court's electronic docket. Furthermore, citations to that Memorandum, and to other items on the docket, cite to the ECF pagination, rather than to the document's original pagination.

requirements: identify "competitive areas" in which employees potentially subject to a RIF may compete for retention; rank employees based on various criteria such as veteran status and length of service; and—critically important here—provide advance notice to "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998," now titled the Workplace Innovation and Opportunity Act ("WIOA"), 29 U.S.C. § 3174(a)(2)(A).  5 U.S.C. § 3502; *see also* 5 C.F.R. §§ 351.402–04, .504. The WIOA, in turn, requires states to provide various immediate emergency services to employees affected by mass layoffs or disasters.  *See* 29 U.S.C. § 3174(a); 20 C.F.R. §§ 682.302, .305.  Notice of a RIF must be provided to the State sixty days in advance of any terminations, or—if the Office of Personnel Management ("OPM") determines that unforeseeable circumstances require more rapid terminations—at least thirty days in advance.  5 U.S.C. §§ 3502(d)(1), 3502(e)(1)–(3); 5 C.F.R. § 351.801.  The statute provides that, if advance notice is not given, "an employee may not be released, due to a reduction in force."  5 U.S.C. § 3502(d)(1).

The States allege that, in response to directives from OPM and executive orders issued in the early weeks of the current Administration, the Government began terminating large numbers of probationary employees, pursuant at least in part to a directive from OPM ordering agencies to terminate non–"mission critical" probationers by February 27, 2025.  (ECF No. 1 ¶¶ 102–112.) They allege that at least 24,000 probationary employees were terminated as part of these mass layoffs (*id.* ¶ 139); this allegation is consistent with status reports submitted by the Government, (ECF Nos. 52, 103).  The States also allege—and the Government does not contest—that they were not provided any advance notice of such terminations.  (*Id.* ¶ 148.)

As catalogued in detail below in the Court's discussion of standing, *see infra* Section III.A, the Government's mass layoffs predictably led to an influx of newly jobless employees turning to

the States for unemployment benefits and other social services.   Because the States had not received any advance notice of the layoffs, as contemplated by the RIF statute and accompanying regulations, they were caught flat-footed and have had to scramble to respond.   The States have incurred or expect to imminently incur costs resulting from, *inter alia*, processing and investigating unemployment benefit applications, diverting resources from other state programs, and loss of revenue from taxes on the wages of probationary employees. *See id.*

**B.      Procedural History**

On March 7, 2025, the States filed a Motion for Temporary Restraining Order.  (ECF No. 4.)  The Court held a Hearing on the Motion on March 12, 2025.  (ECF No. 28.)  The Court granted the Motion and issued a TRO the following day, March 13, 2025.  (TRO Mem.; TRO, ECF No. 44.)  Unless otherwise noted, the Court continues to ratify the conclusions and findings made in the TRO Memorandum, and incorporates that Memorandum by reference into this opinion.

In brief, the Court concluded that the States—or at least some subset of them—had standing, that the challenged dismissals without notice were final agency actions, and that *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), did not preclude the Court's review of the States' claims.  (TRO Mem. at 14–32.)  The Court next examined the factors for evaluating injunctive relief set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), and concluded that the States were very likely to succeed on the merits of their APA contrary-to-law claim, because most of the Defendant Agencies[3] conducted RIFs, but did not comply with the requisite notice requirements to the States.  (*Id.* at 32–42.)  The Court concluded that the other *Winter* factors—irreparability of the harm, balance of the equities, and public interest—also tipped in

_____

[3] The Court concluded that the States did not provide sufficient evidence that three Defendant Agencies engaged in RIFs, considering the high bar to TRO relief.  (TRO Mem. at 41.)

favor of the States. (*Id.* at 43–46.) Finally, the Court examined the appropriate scope of relief, and concluded that a nationwide TRO maintaining the status quo was appropriate. (*Id.* at 46–54.)

The TRO stayed all purported terminations of Affected Probationary Employees by Restrained Defendants,[4] ordered the reinstatement of all Affected Probationary Employees by Restrained Defendants, and enjoined Restrained Defendants from conducting any future RIFs except in compliance with the relevant notice requirements and other applicable laws and regulations. (TRO ¶¶ 2–4.) The Court also directed the filing of a status report by Restrained Defendants documenting actions taken to comply with the TRO. (*Id.* ¶ 5.)

The Government filed the requisite Status Report on March 17, 2025. (ECF No. 52.) The Government provided declarations from the Restrained Defendants documenting their compliance with the TRO. (*Id.*) The Court issued a further Order, explaining that "[t]he Status Report reflects that the Restrained Defendants have made meaningful progress toward compliance with the TRO" and directing the filing of a second Status Report. (ECF No. 72.)

On March 20, 2025, the States filed the pending Motion for a Section 705[5] Stay and Preliminary Injunction (the "Preliminary Injunction Motion"). (ECF No. 78.) Shortly thereafter, the States also filed a Motion to Extend Temporary Restraining Order. (ECF No. 85.) The parties proposed a briefing schedule (ECF No. 84), which the Court adopted. (ECF No. 97.) The Court also directed the parties to brief the proper scope of any injunctive relief. (*Id.*) The parties filed the briefing. (ECF Nos. 101–02.)

---

[4] In this section of this Memorandum, terms have the same meaning as provided in the TRO. (*See* TRO ¶ 10.)

[5] "Section 705" refers to 5 U.S.C. § 705, the provision of the APA that governs relief pending judicial review.

The Court held a Hearing on the Preliminary Injunction Motion on March 26, 2025. (*See* ECF No. 112; ECF No. 119 (Hearing Transcript).) At the Hearing, as supplemented by an Order docketed later that day, the Court sought additional briefing from the parties on the scope of any injunctive relief. (*See* ECF No. 114.) The parties filed the requested briefing the following day. (ECF Nos. 116–17.)

Further, the Court granted the States' Motion to Extend Temporary Restraining Order, and extended the TRO by five days, to 8:00 p.m. on April 1, 2025. (ECF No. 115.)

The Court also notes that the Government filed a Notice of Appeal on March 14, 2025, and then appealed entry of the TRO. (ECF No. 46.) The appeal has been docketed with the United States Court of Appeals for the Fourth Circuit at Docket Number 25-1248. The Government sought an administrative stay or stay pending the resolution of the appeal. The Court of Appeals denied this request, "[g]iven the district court's stated intention to hold a hearing on March 26, 2025, and to promptly grant or deny preliminary injunctive relief thereafter." (ECF No. 93.)

## III.    REVIEWABILITY

The Court previously held that some subset of the States had standing to seek a TRO, that the dismissals without notice to the States were reviewable final agency actions, and that, under the *Thunder Basin* doctrine, district-court jurisdiction over the States' lawsuit was not foreclosed by Congress's choice to channel certain related claims into an administrative review scheme. (*See* TRO Mem. at 14–32.)

The Court sees no reason to depart from those conclusions. What follows is a summary of the Court's prior analyses of justiciability and jurisdiction, along with the Court's responses to new arguments advanced by the parties on those topics.

7

A.    **Justiciability**[6]

In its decision granting the States' request for a TRO, the Court held that at least one State, Maryland, had clearly established standing to invoke federal jurisdiction over its claims. (*See* TRO Mem. at 14–23 & n.3.)

As explained in the TRO Memorandum, the requirement of standing is an "essential and unchanging part" of the Constitution's case-or-controversy limitation on the jurisdiction of the federal courts. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It demands that a plaintiff show (1) an injury in fact, meaning a harm that is "concrete, particularized, and actual or imminent"; (2) traceability, meaning that the injury "was likely caused by the defendant"; and (3) redressability, meaning that the injury "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). Without standing, "there is no case or controversy for the federal court to resolve." *Id.* (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

Importantly, "[s]tanding is not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Rather, a plaintiff must establish standing for each claim it presses and for each form of relief it seeks. *Id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

The Court continues to conclude that there is no justiciability defect that would divest it of jurisdiction over this action. And, unlike in its decision on the States' request for a TRO, the Court now finds that *all* Plaintiff States—not just Maryland—have alleged facts sufficient for the Court to draw a likely inference of standing to pursue preliminary injunctive relief. At the preliminary

---

[6] Aside from standing, the Government has not argued that the Court lacks jurisdiction by virtue of a defect in the justiciability of the States' claims. (*See* ECF No. 20 at 12–23; ECF No. 101 at 12–15.) Because the Court continues to perceive no such defect, this section addresses standing only.

injunction stage, that is enough. *See Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

The Court considers each element of standing in turn.

1.    Injury in Fact

To be constitutionally cognizable, all putative injuries in fact must satisfy three basic requirements. First, they must be "concrete"—that is, "real, and not abstract." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). Second, they must be "particularized," "affect[ing] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). And third, they must be "actual or imminent," such that they have already occurred or else are "certainly impending." *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013).

In its Memorandum addressing the States' request for a TRO, the Court observed that the States' theory of injury boiled down to one of informational harm. (*See* TRO Mem. at 15–21.) Under that theory, each State did not receive information to which it was legally entitled and each State experienced harm as a result of that deprivation. (*See id.* at 15–16.)

The Court continues to view the States' asserted injuries as fundamentally informational. And it continues to stand by its earlier conclusion that each State has, to the degree of evidence required at the preliminary-injunction stage, shown its informational injury to be a constitutionally cognizable injury in fact.

In support of this determination, the Court will first review the harms the Plaintiff States have alleged or described by record evidence and address why it finds each Plaintiff State to have shown a likelihood of suffering at least one such harm. The Court will then explain how most of

9

the harms—including those each State has shown a likelihood of experiencing—satisfy the three requirements for an injury in fact: concreteness, particularity, and actualness or imminence.

          *i.*        *Injuries Alleged or Described by Record Evidence*

The Court starts with certain of the States' most relevant allegations, namely, those that concern *all* Plaintiff States. In the Complaint, the States allege federal employees reside and/or work in each of the Plaintiff States, (ECF No. 1 ¶ 74), and that no Plaintiff State received notice of any past or upcoming RIF, (*id.* ¶¶ 5–6, 74, 101, 139, 156, 160–61, 167). They allege that each Plaintiff State "must now deal with a sudden surge in unemployment[] without the advance notice" required. (*Id.* ¶ 101.) They allege that each Plaintiff State, in accordance with federal law, operates a rapid-response team "that provide[s] immediate services and resources to workers subject to mass layoffs," (*id.* ¶ 5); that each Plaintiff State has an unemployment-assistance program, (*id.* ¶ 171); and that each Plaintiff State "ha[s] seen or anticipate[s] seeing an uptick in [unemployment-insurance] claims in the areas in which the probationary employee layoffs occurred"—a circumstance that "has burdened and will continue to burden state agencies charged with administering" those benefits, (*id.* ¶ 204). The States also allege that the unnoticed firings will burden the administration of other social-service programs, including "health care and food assistance." (*Id.* ¶ 205.) They allege that each Plaintiff State will lose out on "significant" income-tax revenue, given that Defendant Agencies "will no longer be withholding and paying income taxes to Plaintiff States on behalf of the terminated probationary employees." (*Id.* ¶ 215.) And they allege that the Plaintiff States will be deprived of state sales-tax revenues as a result of large numbers of newly out-of-work people less willing to spend money in the marketplace. (*See id.* ¶ 219.)

Next, the Court turns to the record.  As an initial matter, the record evidence explicitly confirms twelve States' allegations of not having received notice of any actual or impending RIFs. (*See* ECF No. 4-6 ¶ 10 (Arizona); ECF No. 4-7 ¶ 13 (California); ECF No. 4-39 ¶ 14 (Colorado); ECF No. 4-8 ¶ 29 (Illinois); ECF No. 4-5 ¶ 16 (Maryland); ECF No. 4-9 ¶ 15 (Massachusetts); ECF No. 78-17 ¶ 6 (Michigan); ECF No. 4-11 ¶ 13 (New Jersey); ECF No. 78-18 ¶ 17 (New Mexico); ECF No. 4-13 ¶ 8 (New York); ECF No. 4-14 ¶ 14 (Oregon); ECF No. 4-15 ¶ 20 (Rhode Island).)

The record also shows ten States explicitly identifying an increase—often a sharp one—in unemployment benefits applications coming from former federal workers.  (*See* ECF No. 4-6 ¶ 6 (Arizona); ECF No. 4-7 ¶¶ 14–15, 30 (California); ECF No. 4-39 ¶ 15 (Colorado); ECF No. 4-8 ¶¶ 15–16 (Illinois); ECF No. 4-5 ¶¶ 17–18, 50–52 (Maryland); ECF No. 4-9 ¶¶ 16–17, 41–45 (Massachusetts); ECF No. 78-17 ¶¶ 8, 22 (Michigan); ECF No. 4-11 ¶¶ 14–15, 29 (New Jersey); ECF No. 78-18 ¶¶ 18, 37 (New Mexico); ECF No. 4-13 ¶ 4 (New York).)

Because of that uptick, nine of those ten States confirm or project increases in the cost of processing and investigating an influx of unemployment-assistance claims, in no small part because state unemployment agencies are typically obligated under state law to determine whether individuals were actually terminated for cause in order to assess their eligibility for benefits.  (*See* ECF No. 4-7 ¶¶ 33–38, 41 (California); ECF No. 4-39 ¶¶ 27–28 (Colorado); ECF No. 4-8 ¶¶ 17–27 (Illinois); ECF No. 4-5 ¶¶ 57–59, 67–70, 72–74 (Maryland); ECF No. 4-9 ¶¶ 47–54 (Massachusetts); ECF No. 78-17 ¶¶ 6, 8, 23–27, 29–30, 33 (Michigan); ECF No. 4-11 ¶¶ 16–18, 34–40 (New Jersey); ECF No. 78-18 ¶¶ 45–48 (New Mexico); ECF No. 4-13 ¶ 5 (New York).) Five of these ten States confirm or project that more benefits will eventually need to be paid out to those claimants.  (*See* ECF No. 4-7 ¶¶ 40, 42–43 (California); ECF No. 4-8 ¶ 26 (Illinois); ECF

11

No. 78-17 ¶¶ 32, 34–35 (Michigan); ECF No. 4-11 ¶¶ 41–42 (New Jersey); ECF No. 78-18 ¶¶ 49–51 (New Mexico).)  Individual declarations likewise suggest that at least five States have incurred or will incur costs vis-à-vis unemployment-benefits payouts, (*see* ECF Nos. 33-13 ¶ 7, 33-14 ¶ 6 (California); ECF Nos. 33-15 ¶ 6, 33-16 ¶ 6 (Delaware); ECF Nos. 33-2 ¶ 8, 78-15 ¶ 12, 78-20 ¶ 7 (Maryland); ECF No. 78-13 ¶ 7 (Minnesota); ECF Nos. 33-3 ¶ 7, 33-4 ¶ 7, 33-5 ¶ 7, 33-6 ¶ 7, 33-7 ¶ 7, 33-8 ¶ 7, 33-10 ¶ 6, 33-11 ¶ 7, 33-12 ¶ 7, 78-14 ¶ 8, 78-19 ¶ 6 (Washington, D.C.)), and/or suggest that at least four will experience the same with respect to payouts less directly related to employment, such as those made under health-benefits or food-assistance programs.  (*See* ECF No. 78-20 ¶ 7 (Maryland); ECF No. 78-13 ¶ 7 (Minnesota); ECF No. 33-17 ¶ 9 (Rhode Island); ECF Nos. 33-4 ¶ 7, 33-6 ¶ 7, 33-8 ¶ 7, 33-12 ¶ 7 (Washington, D.C.).)

The record evidence also shows nine States confirming or projecting costs from having to ramp up and operate their rapid-response programs with no advance notice or critical information. These costs include raw financial, time, and labor costs, such as those incurred in standing up websites and telephone hotlines, as well as costs associated with diverting money and employees away from their intended purpose and toward monitoring and outreach efforts.  (*See* ECF No. 4-7 ¶¶ 16–20 (California); ECF No. 4-39 ¶ 16 (Colorado); ECF No. 4-8 ¶¶ 28–34 (Illinois); ECF No. 4-5 ¶¶ 19–30 (Maryland); ECF No. 4-9 ¶¶ 18–30 (Massachusetts); ECF No. 4-11 ¶¶ 16–18 (New Jersey); ECF No. 78-18 ¶¶ 19–25 (New Mexico); ECF No. 4-13 ¶ 5 (New York); ECF No. 4-14 ¶¶ 15–19 (Oregon).)

Two States expressly predict that unnoticed terminations will lead to significant losses of tax revenue and harms to their labor markets, (*see* ECF No. 4-38 ¶¶ 5–10 (Maryland); ECF No. 4-35 ¶¶ 13–15 (Washington, D.C.)), and declarants connected with five States (including one non-Plaintiff State) expect not to be able to support those States' economies or tax bases in the same

way as before their terminations, (*see* ECF Nos. 33-2 ¶¶ 9–10, 33-6 ¶¶ 8–9, 33-8 ¶¶ 8–10, 78-14 ¶ 9, 78-15 ¶ 13, 78-20 ¶ 7 (Maryland); ECF No. 33-17 ¶¶ 10–11 (Massachusetts); *id.* ¶ 10 (Rhode Island); ECF No. 33-11 ¶ 8 (Virginia); ECF Nos. 33-3 ¶¶ 8–9, 12; 33-4 ¶¶ 8–9; 33-5 ¶¶ 8–9; 33-7 ¶¶ 8–9; 33-8 ¶ 8; 33-9 ¶¶ 9–10; 33-10 ¶¶ 7–8; 33-11 ¶ 8; 33-12 ¶¶ 8–9; 78-19 ¶ 7 (Washington, D.C.)).

Three States expressly anticipate costs due to a loss of the services of federal employees, whether those are employees embedded in or working in close partnership with state agencies, (*see* ECF No. 4-10 ¶¶ 5–6 (Massachusetts); ECF No. 4-12 ¶¶ 6–14 (New Jersey); ECF No. 4-15 ¶¶ 7–20 (Rhode Island)), or else working solely for the federal government but serving critical functions—such as approving state managed-healthcare programs—on which the States depend, (*see* ECF No. 4-10 ¶¶ 7–10 (Massachusetts)). And various individual declarants confirm that, as an immediate consequence of their termination, Defendant Agencies ceased withholding and paying withheld income taxes to at least five Plaintiff States. (*See* ECF Nos. 33-13 ¶ 9, 33-14 ¶ 8 (California); ECF Nos. 33-15 ¶ 8, 33-16 ¶ 8 (Delaware); ECF Nos. 33-1 ¶ 9, 33-2 ¶ 10, 33-6 ¶ 9, 33-8 ¶ 10, 78-14 ¶ 10, 78-15 ¶ 14, 78-20 ¶ 8 (Maryland); ECF No. 33-17 ¶ 11 (Massachusetts); ECF Nos. 33-3 ¶ 12, 33-4 ¶ 9, 33-5 ¶ 9, 33-7 ¶ 9, 33-9 ¶ 10, 33-10 ¶ 8, 33-12 ¶ 9, 78-19 ¶ 10 (Washington, D.C.).)

On top of all that, the record contains declarations from laid-off probationary employees who work and/or reside in a total of nine different States, seven of which are plaintiffs in this action. (*See* ECF No. 33-13 (California resident with "closest geographic headquarters" in Texas); ECF No. 33-14 (California resident with California duty station); ECF No. 33-15 (Delaware resident with Maryland duty station); ECF No. 33-16 (Delaware resident with Delaware duty station); ECF Nos. 33-1, 33-6, 33-8, 78-14 (Maryland residents with Washington, D.C., duty

13

stations); ECF Nos. 33-2, 78-15, 78-20 (Maryland residents with Maryland duty stations); ECF

No. 33-17 (Rhode Island resident with Massachusetts duty station); ECF No. 33-18, 33-19, 78-13

(Minnesota residents with Minnesota duty stations); ECF No. 33-3, 34-4, 33-5, 33-7, 33-9, 33-10,

33-12, 78-19 (Washington, D.C., residents with Washington, D.C., duty stations); ECF No. 33-11

(Virginia resident with Washington, D.C., duty station).)

Finally, the Court observes that the record contains no evidence beyond the pleadings

specifically relevant to five Plaintiff States: Connecticut, Hawai'i, Nevada, Vermont, and

Wisconsin.

While the amount and type of record evidence varies as to each Plaintiff State, taken as a

whole, that evidence, together with the well-pleaded allegations, reveals a strong likelihood of

standing for every plaintiff.

As the Court has already observed, it is axiomatic that "each element [of standing] must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof,

*i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."

*Lujan*, 504 U.S. at 561.  At this early stage, the Court would ordinarily look solely to the allegations

to discern whether the States had set out enough factual matter to permit a plausible inference of

standing. *See, e.g.*, *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009).  Of course, the Plaintiff States here seek a preliminary injunction, requiring

an early showing of their likelihood of success on the merits, *Winter*, 555 U.S. at 20, which itself

must be supported by at least some record evidence (*i.e.*, by more than just unverified pleadings),

*see* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 & n.13

(3d ed. 2024) (collecting cases).  And as the Government rightly notes, "[a] plaintiff unlikely to

14

have standing is *ipso facto* unlikely to succeed" in its cause. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017).

The States have met their burden. They have amply identified a system-wide course of conduct designed to terminate federal probationary employees *en masse*. While this design was realized in some instances and merely forecasted in others, on balance, it would be naïve and contrary to the record for the Court to conclude that five Plaintiff States, because of a lack of record evidence specifically about *them*, have not suffered and will not soon suffer at least one injury sufficient for standing. After all, tens of thousands of probationary employees work for the federal government throughout the country. (*See, e.g.*, ECF No. 78-8 at 2 (counting, based on the Government's first status report, (ECF No. 52), 24,805 such employees).) The Government has made no secret of its plan to divest itself of many of them, (*see, e.g.*, ECF No. 1 ¶¶ 103 & n.1, 111–13; ECF No. 78-4 at 2–3; ECF No. 78-16 at 2), and has in many cases already taken steps to do so, (*see generally* ECF Nos. 52-1, 52-2, 103-1 (declarations confirming the firing and post-TRO restoration of terminated probationary employees)).

On top of that, most Plaintiff States *have* demonstrated, through record evidence, several highly predictable harms resulting from past and future unnoticed RIFs—harms including the loss of money, time, and other resources spent on fast-tracking rapid-response efforts and preparing unemployment-assistance programs to handle an influx of claims. Based on that evidence as well as the allegations of the Complaint—all of which may inform the Court's decision on whether to issue a preliminary injunction, *see, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 350 & n.1 (1976); *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016), *vacated on other grounds*, 580 U.S. 1168 (2017); Wright & Miller, *supra*, § 2949 & n.13—there is simply no reason to think the other five States are not similarly situated and have not been and will not be affected

15

in the same ways. *See Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993) ("At the preliminary injunction stage, it is, after all, the district court's duty—and its prerogative—to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." (internal quotation marks and citation omitted)). This Court will not conjure up implausible scenarios to imagine such a reason, anyway—especially not in a posture defined by "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Finally, the Court observes that the States' evidence regarding their asserted injuries is entirely uncontroverted; the Government has supplied no countervailing evidence, nor does it dispute the veracity or accuracy of the many declarations the States have provided in support of their requests for preliminary relief.

Having found it likely that each Plaintiff State has experienced or will soon experience the injuries asserted, the Court turns now to why those injuries are legally sufficient injuries in fact. It considers each prong in turn.

> ii.    *Concreteness*

To the extent informational injuries have faltered during courts' injury-in-fact analyses, they have typically done so on the concreteness prong. And indeed, that appears to be the only prong on which the Government attacks the States' asserted harms in this case. (*See* ECF No. 20 at 12–17; ECF No. 101 at 12–15.)

Unlike the particularity and actualness-or-imminence prongs, which ask how and whether an injury has been felt, *see infra* Sections III.A.1.iii–iv, the requirement of concreteness goes to the very *nature* of an alleged harm. It asks, in effect, whether an alleged injury is properly considered an injury at all. *See TransUnion*, 594 U.S. at 424–25. This demands a harm above and

16

beyond the bare violation of a legal right. *Id.* at 425–26. Such an above-and-beyond harm need not be tangible, of course; intangible harms, like an invasion of privacy or the indignity of discriminatory treatment, have long been recognized as concrete. *See, e.g., id.* at 425–26 (collecting cases). But the Supreme Court has been clear that any such harm must bear "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts," *id.* at 424 (quoting *Spokeo*, 578 U.S. at 341), though it need not be "an exact duplicate," *id.* at 433.

To satisfy concreteness, a valid informational injury "requires that a [plaintiff] lack access to information to which [it] is legally entitled *and* that the denial of that information create[] a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (emphasis in original); *accord TransUnion*, 594 U.S. at 441–42 (requiring plaintiffs to show "downstream consequences" from "failing to receive . . . required information" (citation omitted)). Where follow-on effects of an information deprivation exist, courts have consistently validated informational harms as sufficient to establish injury in fact. *See, e.g., FEC v. Akins*, 524 U.S. 11, 21 (1998) (follow-on effect of not being able to use information that "would help [plaintiffs] (and others to whom they would communicate it) . . ."); *Pub. Citizen v. DOJ*, 491 U.S. 440, 449–51 (1989) (similar); *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984) (consequential dignitary harm of receiving false information due to discrimination); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374–75 (1982) (same); *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 297 (4th Cir. 2024) (consequential dignitary harm of having defamatory information published to a third party). But where "[a]n 'asserted informational injury . . . causes *no* adverse effects,'" courts have held that it cannot pass Article III muster. *TransUnion*, 594 U.S. at 442 (emphasis added)

(citation omitted); *see also RentGrow*, 116 F.4th at 295–96, 300 (holding no concrete injury to exist absent evidence that a third party had in fact read defamatory material about plaintiff).

Here, nearly all the harms asserted by the Plaintiff States are concrete enough to constitute cognizable informational injuries.

First, as the Court has explained—and will explain in further detail below, *see infra* Section IV.A.4—"the plain text of the relevant statutes and regulations makes clear that the States were legally entitled to notice of an imminent RIF." (TRO Mem. at 16 (citing 5 U.S.C. § 3502(d)(3)(A); 5 C.F.R. § 351.803(b)).)  To date, the Government has not disputed that a lawful RIF requires notice to the States whenever the fifty-person competitive-area threshold is met; rather, the Government has maintained only that its actions did not actually amount to RIFs. (*See* ECF No. 20 at 24–25; ECF No. 101 at 5, 18–19, 23.)

Second, the States satisfactorily allege or show a variety of consequential harms flowing from the Defendant Agencies' failure to give the legally required RIF notice. These consequential harms include, most notably, the monetary costs and losses of services associated with the flat-footed, inefficient rollout of States' rapid-response and unemployment-assistance programs—*i.e.*, harms incurred in an effort to shore up capacity to deliver adequate and timely assistance to the suddenly unemployed, which harms the States say would have been avoided had the Defendant Agencies provided the notice mandated by federal law. (*See* TRO Mem. at 16–17.) Like the Court observed previously, monetary losses are "obvious" concrete harms, as are losses that inexorably *lead* to monetary losses, such as the diversion of resources away from their intended purpose or the loss of the services of an embedded federal employee. (TRO Mem. at 17 (citing *TransUnion*, 594 U.S. 413 at 425).)  These consequential harms are much more "real" than those held insufficient in the past. *See, e.g.*, *TransUnion*, 594 U.S. at 434 ("The mere presence of an

18

inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm.");
*RentGrow*, 116 F.4th at 300 ("[Plaintiff] has failed to demonstrate that the misleading [information] was read and understood, or otherwise considered, by any third party . . . ."). They are also more "real" than even those harms previously held to be enough. *See, e.g.*, *Akins*, 524 U.S. at 21 ("There is no reason to doubt [plaintiffs'] claim that the information would help them (and others to whom they would communicate it) . . . ."); *Pub. Citizen v. DOJ*, 491 U.S. 440, 449–50 (1989) ("Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records. There is no reason for a different rule here." (citations omitted)).

As described above, the States have also alleged or evidenced consequential harms in the forms of (1) costs tied to larger payouts of unemployment, health insurance, and other public benefits and (2) economic downturns and eventual decreases in tax revenue brought about by higher numbers of unemployed federal workers. The Court determined earlier that, because the States had already shown two valid theories of concrete injury in fact—those based on already realized financial and labor-related costs—it need not decide the viability of the States' other theories, which are inherently more predictive and uncertain, even if not fatally so. (*See* TRO Mem. at 19–20.)

The States have since clarified that at least some state income tax revenues have *already* been lost because of the unnoticed terminations—specifically, by virtue of certain Defendant Agencies having ceased withholding and paying state income taxes to several Plaintiff States. (*See* ECF No. 78-1 at 16 n.6); *see also supra* Section III.A.1.i. The Court is satisfied that this specific form of tax-revenue injury is real enough to support the concreteness of the States' asserted

19

informational injury in fact. Otherwise, to the extent the States continue to rely on their earlier arguments about *down-the-road* lost tax revenues and increased benefits payouts, the Court reaffirms what it said before: given the presence of more obviously valid theories of consequential harm, the Court need not now decide whether the States' more speculative harms suffice to make their informational injuries concrete.[7] (*See* TRO Mem. at 17–20.)

    None of the Government's counterarguments on concreteness are persuasive. First, it argues that "simply pointing to the failure to provide the allegedly required statutory-based notice is insufficient for injury." (ECF No. 101 at 13; *see also id.* at 14 ("Even assuming that Plaintiffs' claimed[]'statutory right of notice' alone could give rise to an 'informational injury' that suffices as an injury-in-fact . . . .").) Although the States may have commenced this litigation propounding

---

[7] The Court previously described the issue of the certainty of the States' consequential harms as one of actualness or imminence, not concreteness. (*See* TRO Mem. at 17.) But the Fourth Circuit has suggested that, despite any nexus with temporality, the certainty of downstream harms is an issue that goes to concreteness, not to actualness or imminence. *See RentGrow*, 116 F.4th at 299. The Court therefore departs from its prior TRO analysis only to the extent that the prior analysis described the issue as a potential actualness-or-imminence problem.

    The Court also notes that the law is unclear as to exactly how much risk a downstream harm must pose before it can be said to make a putative informational injury concrete. It is obvious, of course, that the frontline informational injury must be actual or imminent. *See, e.g.*, *Lujan*, 504 U.S. at 560. But it is not so obvious that the downstream harms must *themselves* be actual or imminent, or whether some lesser level of certainty (and if so, what) might suffice. Language from some higher courts suggests the bar might be lower for nested downstream harms. *See, e.g.*, *Spokeo*, 578 U.S. at 342 ("[N]ot all [alleged informational injuries] cause harm *or present any material risk of harm*." (emphasis added)); *RentGrow*, 116 F.4th at 298 ("We don't doubt that inferences based in customary experience and common sense can be utilized to allege and even prove [an essential downstream harm]."); *see also id.* at 299 (observing that "a substantial and imminent risk of future harm may satisfy the concreteness requirement" without indicating whether a lesser showing would be enough). And depending on how low the bar is, the States' increased-benefits-payouts and eventual-decreased-tax-revenue theories of consequential harm may ultimately be enough to support an informational injury. (*See* TRO Mem. at 17–20 (noting the "shakier ground" on which those theories stand while also stating the increased-benefits-payouts theory likely passes muster, even if the eventual-decreased-tax-revenue theory does not).)

    Regardless, having found each State's informational injury to rest comfortably on downstream harms that have already occurred or almost certainly will occur—including but not limited to the short-term expenditures and resource diversions made to accommodate past or impending unnoticed RIFs—the Court sees no need to decide at this time whether a lesser level of certainty is enough.

such a theory (in addition to several other theories of injury), (*see, e.g.*, ECF No. 4-1 at 23, 33; ECF No. 19 at 5–6), as has been made clear in both the Court's TRO Memorandum and the Plaintiff States' subsequent briefing, the States no longer make that argument, (*see* ECF No. 78-1 at 15–16), and the Court would be unwilling to accept it in any event, (*see* TRO Mem. at 15–16); *see also Dreher*, 856 F.3d at 345.

Second, the Government repeatedly argues that the States' "'downstream' theory of injury is not viable" under the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023). But its faith in that case is misplaced. For one, a "downstream" injury—that is, a *resulting* harm— is the crucial second element of a viable informational injury. *See TransUnion*, 594 U.S. at 442; *Dreher*, 856 F.3d at 345. So, to the extent the Government again appears to argue that the fact of a harm being "downstream" is *fatal* to its viability, (*see* ECF No. 101 at 14), the Court again rejects the argument. (*See* TRO Mem. at 20 ("[A] 'real,' downstream harm is a critical *component* of an informational injury—hardly a circumstance that destroys one." (citations omitted)).)

Even more importantly, *Texas* simply does not stand for the proposition the Government ascribes to it. For one, while the Government appears to use *Texas* to attack the *concreteness* of the States' asserted informational injuries, (*see* ECF No. 101 at 14 ("The gist of [the] theory in *Texas* was that States could [not] sue based on 'downstream' costs imposed and resources expended in response to a federal government action.")), *Texas* is better understood as a case about redressability and/or the propriety of relief that impinges on core Executive Branch functions.[8]

---

[8] The Court notes dueling conceptions among the justices about how properly to characterize the holding in *Texas*. The majority justified its decision by pointing to the plaintiffs' lack of a "judicially cognizable" injury, *see* 599 U.S. at 676–77, given the judiciary's ordinary sensitivity to interfering with the Executive Branch's enforcement discretion as well as a lack of "meaningful standards for assessing the propriety of enforcement choices," *see id.* at 679–80. But the majority also rested its determination on the holding of *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), which is a leading redressability case. *See* 410 U.S. at 618– 19; *see also, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106–07 (1998). And three justices, each concurring in the judgment, separately diagnosed the problem as one of redressability. *See* 599 U.S.

*See* 599 U.S. at 678 ("[T]his Court's precedents and longstanding historical practice establish that the States' suit here is not the kind redressable by a federal court."). Specifically, it was about whether two plaintiff states had standing to ask "the Federal Judiciary to order the Department [of Homeland Security] to alter its arrest policy so that the Department arrests more noncitizens," *id.* at 676 (emphasis omitted), on the ground that without such relief, the states would have to, among other things, "continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government," *id.* at 674. The Supreme Court held that the states did not have standing, citing the well-established principle that "a party 'lacks a judicially cognizable interest in the prosecution . . . of another.'" *Id.* at 677 (alteration in original) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Among the central problems was that the states' alleged injuries "ar[ose] from the government's allegedly unlawful regulation (or lack of regulation) *of someone else*," *see id.* at 678 (emphasis added) (quoting *Lujan*, 504 U.S. at 562), making them far less likely to be redressed by a favorable judicial order, *see id.* at 678 & n.2.

This case is different. Although the Government may wish to describe—and, in fact, has described—the States' harms as "aris[ing] from the . . . regulation (or lack of regulation) of someone else," *see Texas*, 599 U.S. at 678, the Court reiterates that this is not a lawsuit about the legality of the Government's actions from the viewpoint of probationary employees. Rather, it is a suit about the legality of the Government's actions from the viewpoint of the *Plaintiff States*,

---

at 686–93 (Gorsuch, J., concurring). In any event, unlike what the Government suggests, (*see* ECF No. 101 at 14), *Texas* is not a case about concreteness, not least because the word "concrete" appears just once in the majority opinion—ironically, in a paragraph that first notes a situation in which the two states might have been able to show standing, and then lists two of the leading cases on informational injury. *See* 599 U.S. at 681–82 (citing, *inter alia*, *TransUnion*, 594 U.S. at 424–27, and *Akins*, 524 U.S. at 20).

with all—and only—the unique injuries that viewpoint entails. And unlike in *Texas*, the States' asserted injuries *are* redressable by the relief they seek. *See infra* Section III.A.3.

Even if the language the Government cites applied to the informational injury at issue here, the Government's *Texas* argument still fails to persuade. The Government leans heavily on footnote 3 of that opinion, arguing that a theory of standing based on "indirect effects on state revenues or state spending" is "more attenuated" and therefore "less likely to succeed." (*See* ECF No. 101 at 14 (quoting *Texas*, 599 U.S. at 680 n.3).) There are two problems with this contention. First, on its own terms, *Texas* does not foreclose standing based on "indirect effects"; rather, it says that States "sometimes" *do* have such standing, and that when injuries rest "*only* [on] . . . indirect effects, [they] *can* become more attenuated." 599 U.S. at 680 n.3 (emphasis added). Second, and relatedly, the Government's contention ignores multiple *direct* effects the States cite as injuries—in particular, the here-and-now expenditures and resource diversions made to ramp up state rapid-response and unemployment-assistance programs, the immediate loss of the services of federal employees, and the short-term hits to tax revenue based on state income tax not withheld from now-former federal workers (and therefore not paid to any Plaintiff States). *See supra* Section III.A.1.i.

### iii. *Particularity*

A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). Particularity ensures that an injury is personal, not diffuse or "undifferentiated"—in other words, that the plaintiff has felt an injury above and beyond any experienced by the population at large. *See, e.g.*, *United States v. Richardson*, 418 U.S. 166, 176–77 (1974); *Schlesinger v. Reservists Cmte. to Stop the War*, 418 U.S. 208, 220–21 (1974).

23

The States easily satisfy this requirement. Their injuries are not injuries felt by the entire population, like those stemming from the misuse of tax dollars. *See, e.g.*, *Richardson*, 418 U.S. at 177. Rather, the States have experienced injuries unique to their status as states, as evinced by the varied but identifiable consequences to state human and financial resources as a result of the unnoticed RIFs. *See supra* Section III.A.1.i. The Government does not argue otherwise. (*See* ECF No. 101 at 12–15.)

### iv.    *Actualness or Imminence*

The actualness or imminence requirement ensures that a harm has been or will soon be realized. *See, e.g.*, *Lujan*, 504 U.S. at 563–64. An actual injury is, of course, one that has already been experienced. By contrast, an imminent injury is one that is "certainly impending"; a mere possibility of future injury is not enough. *Clapper*, 568 U.S. at 409 (citations omitted).

The States have established both actual and imminent injuries. The record evidence clearly shows the Plaintiff States have already been harmed by the unnoticed RIFs. Indeed, there is absolutely no question as to fifteen of those States, about which there is record evidence that speaks *directly* to the injuries they have incurred.[9] Given the Government's stated intentions and the breakneck, unwarned nature of its already completed firings (but for the entry of this Court's TRO), it is a virtual certainty that all Plaintiff States will soon incur similar injuries again (or for

---

[9] For example, nine States—California, Colorado, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New Mexico, and New York—have averred costs incurred in beefing up their unemployment-assistance programs to handle an influx of claims. *Supra* Section III.A.1.i. Nine States (Oregon, plus all of the previous except Michigan) have averred costs incurred in launching state rapid-response programs on inadequate information. *Id.* Five States—California, Delaware, Maryland, Massachusetts, and Washington, D.C.—have felt an immediate loss of tax revenue due to a stoppage in federal income-tax withholding and payment to those jurisdictions. *Id.* And five States—California, Washington, D.C., Maryland, Minnesota, and Rhode Island—have shown, either through their own declarations or the declarations of former federal probationary employees, an increase in unemployment or other public benefits claims. *Id.* That establishes, at a minimum, the presence of probationary employees, who, in all likelihood, exist in sufficient numbers for each State to need to launch or prepare to launch its rapid-response effort.

the first time, in the unlikely event that, contrary to the allegations of the pleadings as well as the obvious inferences to be drawn from the record, some Plaintiff States escaped unscathed from the first round of unnoticed RIFs).

At bottom, there is no reason to think the Government will wholly abandon the course of conduct that has already injured many Plaintiff States, and it would be myopic, given the breadth of the Government's actions, to conclude that not every Plaintiff State would be affected soon. Again, whether to issue a preliminary injunction entails an exercise of discretion and judgment— and, indeed, of the Court's common sense. *See Lackey*, 145 S. Ct. at 667. In view of that, the Court need not simply ignore the chaos and uncertainty that has resulted from the Government's conduct. That unpredictability, paired with the strong record evidence of varied, fully realized harms as to most States, convinces the Court that, even in the (unlikely) event that not every Plaintiff State has yet felt an "actual" injury under Article III, each Plaintiff State has nevertheless shown an "imminent" injury sufficient to invoke federal jurisdiction.

2.    Traceability

As the Court explained previously, "it is plain that at least *some* of the harms the States have experienced—namely, the increase in the cost of administering state programs, irrespective of what those programs will be required to pay out—are direct and foreseeable results of the [Defendant Agencies'] failures to provide RIF notices" to the Plaintiff States. (TRO Mem. at 21 (emphasis in original).) Now, as then, "[t]he Government does not argue otherwise." (*Id.*)

Because each Plaintiff State has established by record evidence that it has been or almost certainly will be harmed (at least) vis-à-vis administrative burdens on state rapid-response and/or unemployment-assistance programs, *see supra* Section III.A.1, the Court reaffirms its conclusion that each State has met Article III's causation requirement. It again does not consider whether this

25

is also true with respect to the States' more down-the-road theories of harm, *i.e.*, those based on anticipated long-term lost tax revenues and/or economic downturns. Finally, it incorporates by reference its prior discussion of why the States' harms are not self-inflicted or inappropriately reliant on the anticipated behavior of third parties. (*See* TRO Mem. at 22.)

        3.   Redressability

To satisfy redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). That does not mean plaintiffs or courts have *carte blanche* to seek or craft any remedy they desire. "The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis*, 518 U.S. at 357.

Here, the injury in fact is an informational one. But contrary to what the Government argues, (*see* ECF No. 101 at 4, 14–15), the ultimate harm consists of more than just an absence of information. In other words, what *begins* as a lack of information consists, in the end, of both a lack of information *and* the resulting harms. On this point, the Government's argument is self-defeating: it cannot say, for purposes of injury in fact, that the States need to but fail to invoke consequences other than the initial absence of information, (*see id.* at 13–14), yet then suggest, for purposes of redressability, that the Court should simply ignore any consequences *other* than the initial absence of information, (*see id.* at 4, 14–15). The States' demonstrated downstream harms, detailed extensively above, *see supra* Sections III.A.1.i–ii, are of course a proper part of the redressability analysis. *See Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide *complete relief* to the plaintiffs." (emphasis added) (citation omitted)).

Once the downstream harms are considered, it becomes clear that the Plaintiff States' desired remedy—in relevant part, an injunction that bars future unnoticed RIFs of probationary employees and a stay restoring any unlawfully terminated employees to their positions, (*see* ECF No. 78 at 1–2)—is both sufficient and necessary to redress the overarching informational injury. The downstream harms stem from the increased pressure on state programs. *See supra* Section III.A.1.i. *Ipso facto*, an adequate remedy is one that relieves that pressure. *See Lewis*, 518 U.S. at 357. Indeed, although it has since changed its tune, the Government expressly conceded as much at the TRO stage. (*See* ECF No. 20 at 14 (arguing that "the States' asserted injuries could only be conceivably redressed by [probationary employees'] reinstatement" (emphasis omitted)).) The Government's current suggestion that the mere provision of notice would do the trick, (*see* ECF No. 101 at 4), toggles between naïve and disingenuous. Just consider the current state of affairs: obviously, the Plaintiff States are *now* aware of the unnoticed RIFs, but that has hardly relieved the injuries of which they complain. The purpose of the notice provision is to give the States *time*, not just information. After all, the statute does not merely entitle the States to notice; it entitles them to notice sixty days (or, in extraordinary circumstances, thirty days) of notice *in advance* so that they can make adequate preparations. 5 U.S.C. § 3502(d)–(e). Merely giving notice at this juncture would be insufficient. There must be adequate notice followed by forbearance—no more terminations until all legally mandated procedures, including passage of the requisite period of time, have been satisfied.

Although the Court has already largely dispensed with the Government's argument from *United States v. Texas*, *see supra* Section III.A.1.ii, because it arguably raises redressability issues, it warrants a second mention here. Simply, the nexus between the injuries and the remedies sought in this case is much tighter than the connection in *Texas*, which involved redress for the results of

27

"the Executive Branch's alleged failure to make more arrests or bring more prosecutions." 599 U.S. at 681. In other words, the two plaintiff states in *Texas* hoped that a court order telling the Executive Branch to beef up its enforcement would lead to trickle-down ameliorative effects on the states' fiscs. *See id.* at 676–79. Under the redressability rule announced in *Linda R.S.*, that was not enough. *See* 410 U.S. at 618 ("The prospect that prosecution will, at least in the future, result in payment . . . can, at best, be termed only speculative."). While that level of speculation may describe a small subset of the States' asserted injuries in this action—namely, the long-term losses of tax revenue about which the Court expressed skepticism in the TRO Memorandum, (*see* TRO Mem. at 17–19)—it certainly does not describe the mine run of their injuries, which would doubtless be redressed by an order restoring the state of affairs to one in which the States were not trying to catch up to accommodate the Government's breakneck firings.

Finally, the Government seeks to distinguish the case of *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2023), a decision it argues the Court improperly "relied upon" in its TRO Memorandum. (ECF No. 101 at 15.) This is a puzzling argument. For one, the Court cited *Laufer* for just two propositions: first, that Article III requires a "genuine, live dispute between adverse parties," (TRO Mem. at 14 (ultimately quoting *Carney v. Adams*, 592 U.S. 53, 58 (2020)), and second, that other courts have repeatedly recognized informational injury as a valid injury in fact, as signaled by a "collecting cases" parenthetical, (*see id.* at 16). In other words, the Court cited *Laufer* not for its own conclusions but for things that *other* cases said. On top of that, the Government appears to suggest the Court used *Laufer* to explain how the States' harms were redressable. (*See* ECF No. 101 at 15.) But this is just the *Texas* problem in reverse: instead of *Laufer* being about redressability, which even the Government concedes it was not, (*id.* at 15 (explaining that the Fourth Circuit in *Laufer* "observed that the defendant had not even contested

28

redressability in district court")), *Laufer* is primarily about concreteness. *See, e.g.*, 60 F.4th at 168–71 (discussing *TransUnion*, 594 U.S.). And as discussed above, concreteness is no issue for the States. *See supra* Section III.A.1.ii.

For the reasons stated above and in the TRO Memorandum, (TRO Mem. at 14–23), the Court again concludes that the Plaintiff States have demonstrated—with the degree of proof appropriate for the preliminary injunction stage—that they have standing to pursue this relief in this Court.

### B.   Jurisdiction

In its decision granting the States' request for a TRO, the Court held that the challenged actions were final agency actions within the meaning of the APA, and thus within the Court's jurisdiction to review, (*see* TRO Mem. at 23–25), and that Congress's decision to divert certain employee- and union-related actions into a comprehensive administrative review scheme did not divest this Court of its federal-question jurisdiction over the *States'* claims, (*see id.* at 25–32).

The Court continues to conclude that there is no jurisdictional defect that would divest it of its power to adjudicate this action. It addresses both topics in turn below.

### 1.   Final Agency Action

The APA limits judicial review to final agency action. 5 U.S.C. § 704. And because the APA's judicial-review provision effects a partial waiver of the federal government's sovereign immunity, and because sovereign immunity is jurisdictional in nature, "finality under the APA is a jurisdictional requirement." *Jake's Fireworks Inc. v. U.S. Cons. Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (cleaned up).

The Court continues to conclude that the actions at issue here—past or anticipated mass firings of probationary employees without statutorily required notice—are final agency actions.[10] It incorporates by reference its analysis from the TRO Memorandum. (*See* TRO Mem. at 23–25.) As the Court explained therein, the firing (with or without notice to affected States) of a probationary employee is both "agency action" and "final" within the meaning of the APA. (*Id.* at 24 (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001); *Burdue v. FAA*, 774 F.3d 1076, 1080 (6th Cir. 2014).) The Court thus has jurisdiction to review the States' APA claims, at least insofar as they concern the unnoticed terminations.

At the TRO stage, the Government did not dispute this conclusion. (*See generally* ECF No. 20.) And it barely does so now, having made only a vague reference during the preliminary injunction hearing to its position that the States could not specifically identify from which *future* final agency actions they sought relief. This, of course, is unpersuasive. The Government has, without notice, conducted mass firings of federal probationary employees. The States fear it will do so again. Because the whole point of this lawsuit is to determine the legal consequences, if any, of the Government's choice to act *without notice*, the Court could hardly expect the States to point to specific future unwarned terminations of which they hope to be notified. Obviously, the future actions the States seek to enjoin are those that match the final agency actions from which the States seek immediate relief.

---

[10] In its TRO Memorandum, the Court concluded that the "nub of this lawsuit is the lack of notice the States received" with respect to actual or imminent mass terminations. (TRO Mem. at 23.) And because that notice must issue from any individual Defendant Agency that conducts terminations within the meaning of the RIF laws, (*see id.* at 23–24 (citing 5 C.F.R. § 351.803(b)), the relevant actions for purposes of the TRO decision were the unnoticed firings themselves, not any upstream directive from OPM that may or may not have directed those firings. (*See id.*) Because this rationale applies with equal force at the preliminary injunction stage, the Court again focuses solely on the unnoticed firings by each Defendant Agency (including OPM) of its own employees, rather than any directive from OPM. (*See id.*)

2.    Claim Channeling

In its TRO Memorandum, the Court held that, pursuant to the analytical scheme set out in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), there was no reason to believe Congress had divested the district courts of jurisdiction over the States' claims in this case. (*See generally* TRO Mem. at 25–32.)  The Court incorporates its prior analysis by reference.  What follows is a summary of that analysis as well as the Court's analysis of the parties' newest arguments.

*Thunder Basin* sets out a two-step framework to assess whether Congress divested the district courts of jurisdiction to hear challenges to federal agency action. *See* 510 U.S. at 207–13; *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185–86 (2023).  At the first step, a court considers whether a statutory scheme—as evinced by its "text, structure, and purpose"—reveals an intent to divert some agency-action claims away from the district courts' federal-question jurisdiction (under 28 U.S.C. § 1331) and into administrative review by an agency. *See Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016); *Axon*, 598 U.S. at 185.  If so, the court moves to the second step, which asks "whether the statutory review scheme, though exclusive where it applies, reaches the claim[s] in question." *See Axon*, 598 U.S. at 186.  This requires courts to apply the three so-called *Thunder Basin* factors: (1) whether precluding district-court jurisdiction would "foreclose all meaningful judicial review" of the claims, (2) whether the claims are "wholly collateral to [the] statute's review provisions," and (3) whether the claims are directed to issues "outside the agency's expertise." (TRO Mem. at 26 (quoting *Axon*, 598 U.S. at 186 (alteration in original)).)  "When the answer to all three questions is yes, the court presumes that Congress does not intend to limit jurisdiction, though a claim may be judicially reviewable even if the factors point in different directions." (*Id.* (cleaned up) (quoting *Axon*, 598 U.S. at 186).)

31

At the TRO stage, the Court concluded that the answer at step one was "yes," the federal statutory scheme *did* evince a congressional intent to carve some agency-action claims out of the Court's typical federal-question jurisdiction. (*See* TRO Mem. at 26–27 (quoting *Nat'l Treasury Emps. Union v. Trump*, Civ. No. CRC-25-420, 2025 WL 561080, at *4–5 (D.D.C. Feb. 20, 2025)).) The relevant scheme is that set out in the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–216 (1978) (codified at 5 U.S.C. §§ 7101–35), which provides for the original and exclusive administrative review of certain labor- and employment-related claims brought by federal employees and/or their unions. (*See id.*)

At step two, however, the Court concluded that the answer was "no," the CSRA scheme did *not* reach the States' claims in this case.[11]   (TRO Mem. at 27–32.)   On the first and "most important" factor, whether there is meaningful judicial review, *see Bennett*, 844 F.3d at 183 n.7 (collecting cases), the Court determined that the States' claims could not be reviewed "in any relevant setting"—not in an administrative agency as an original matter, much less on appeal to a federal appellate court. (*See* TRO Mem. at 28–29.)   On the second factor, collaterality to the statute's review provisions, the Court likewise held in favor of the States, concluding that the

---

[11] The States insist that they win on step one, *i.e.*, that the Court need not even proceed to step two because "the CSRA does not display a 'fairly discernible' intent to limit jurisdiction over the States' claims." (ECF No. 78-1 at 17 (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012)); *see also* ECF No. 19 at 7.) This misapprehends *Thunder Basin*. The identities of claimants and the nature of their claims are discussed at step two, not step one. *See Axon*, 598 U.S. at 185–86 ("After finding that Congress's creation of a 'comprehensive review process' . . . oust[s] [the] district courts of jurisdiction, the Court ask[s] another question: whether the *particular claims* brought [a]re 'of the type Congress intended to be reviewed within this statutory structure.'" (emphasis added) (quoting *Thunder Basin*, 510 U.S. at 208, 212)). Step one asks only whether a scheme purports to be exclusive over certain claims, thus divesting the district courts of some of their usual jurisdiction under 28 U.S.C. § 1331, while step two explores what, exactly, those certain claims are. *See id.*; *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, Civ. No. WHA-25-1780, 2025 WL 900057, at *1 (N.D. Cal. Mar. 24, 2025). *But see Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (Kavanaugh, J.) (suggesting, based on a pre–*Thunder Basin* decision, that "whether Congress 'foreclosed review to the class to which the [plaintiff] belong[s]'" is a step-one question). To adopt the States' approach would be to ask the same questions at both stages of the analysis.

States' harms were sufficiently distinct from the employee- and union-focused harms Congress intended to channel away from the district courts. (*See id.* at 29–30.) And on the third factor, the question of agency expertise, the States once again prevailed (albeit on a "closer call"), as there was little reason to think that agencies like the Merit Systems Protection Board, the Federal Labor Relations Authority, and the Office of Special Counsel—entities ordinarily tasked with reviewing bread-and-butter employment disputes and issues of "employer-agency policy choices," *see Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, Civ. No. WHA-25-1780, 2025 WL 900057, at *2 (N.D. Cal. Mar. 24, 2025)—held any special expertise about the notice owed to states before conducting a RIF. (*See* TRO Mem. at 30.)

Finally, the Court rejected the Government's remaining counterargument—that because the fired employees could themselves seek administrative redress, there was no need or option to retain jurisdiction over the States' claims—as relying, once again, on the faulty premise that the States were simply trying to vindicate the interests of the terminated workers (as opposed to their own and separate harms as "states *qua* states"). (*See* TRO Mem. at 30–31.) The Court then expressed its skepticism that terminated employees would or even could adequately represent the States' unique interests, let alone at a scale that would actually remedy the States' asserted injuries. (*See id.* at 31.) In short, the Government supplied no compelling reasons for the Court to hold that the States' claims were of the "rare[]" type Congress has "allow[ed] . . . to escape effective judicial review." (*See id.* (quoting *Axon*, 598 U.S. at 186).)

The Government's new arguments offer no reason to reach a different result. In essence, the Government continues to argue that the fired employees are "the real parties in interest," (ECF No. 101 at 16), and that, even if they were not, the unavailability of redress for the *States'* harms is not a problem because it simply reflects Congress's choice to limit redress to employees and

their unions, (*see id.* at 16–18). But, in the Government's words, "[t]hat has it backwards." (*See id.* at 16.) The CSRA is about where employees and unions must go to press claims relevant to them, and them alone. *See, e.g., Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.) ("[S]o far as review of [individual benefits] determinations under the CSRA is concerned, what you get under the CSRA is what you get."). The CSRA is not about where *States* may go to press wholly distinct claims based on wholly distinct injuries.

For that reason, the Government's citations to various cases for the proposition that the CSRA offers a limited review scheme—a statement with which the Court agrees—ring hollow. Each cited case involved a suit brought by employees or unions over employee or union problems. (*See* ECF No. 101 at 16–17 (first citing *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) (employees suing over their dismissal for failure to register for the Selective Service, *id.* at 6–7); then citing *Am. Fed'n of Gov't Emps v. Sec'y of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013) (unions and one employee suing over military uniform requirements, *id.* at 635); then citing *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) (unions suing over changes to federal labor-management relations scheme, *id.* at 752–53); then citing *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) (Roberts, J.) (employees suing over disability benefits, *id.* at 67); then citing *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495 (D.C. Cir. 2009) (employees suing over being denied promotions)); then citing *United States v. Fausto*, 484 U.S. 439 (1988) (employee suing over individual disciplinary action); and then citing *Pinar v. Dole*, 747 F.2d 899 (4th Cir. 1984) (same)).) And none of those cases suggests the CSRA is exclusive (much less *preclusive*, as the Government argues here) as to parties other than (1) unions or employees (2) bringing garden-variety labor or employment claims. *See Elgin*, 567 U.S. at 5 ("Under the [CSRA], certain federal employees may obtain administrative and judicial review of specified adverse employment

34

actions."); *Sec'y of the Air Force*, 716 F.3d at 636 (explaining that the CSRA offers "particular forums and procedures for particular kinds of claims" as well as the "exclusive avenue for suit to a plaintiff whose claims fall within its scope" (citations and internal quotation marks omitted)); *Trump*, 929 F.3d at 755 (explaining that the CSRA "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" (citations omitted)); *Fornaro*, 416 F.3d at 66–69 (similar); *Grosdidier*, 560 F.3d at 497 ("The CSRA protects covered federal employees . . . and it supplies a variety of causes of action and remedies to employees when their rights under the statute are violated. . . . Federal employees may not circumvent the Act's requirements and limitations by resorting to the catchall APA to challenge agency employment actions."); *Fausto*, 484 U.S. at 445 (explaining that the CSRA was "designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration"); *Pinar*, 747 F.2d at 907–08 (similar).

Curiously, in its brief opposing the issuance of a preliminary injunction, the Government wholly abandons *Thunder Basin* (on which it relied heavily at the TRO stage, (*see* ECF No. 20 at 17–23)) and opts instead to rely on a different case, *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984). But in the claim-channeling line of authority, *Block* does not represent some independent analytical framework separate and apart from *Thunder Basin*, but rather is a precursor decision to *Thunder Basin*, as *Thunder Basin* itself suggests. *See* 510 U.S. at 207, 216 (citing *Block*). Even more tellingly, in *Axon*, the last major word on the topic of administrative exclusivity, a unanimous Supreme Court did not mention *Block* at all. *See* 598 U.S. *passim*.

Notwithstanding what appears to an effort by the Government to avoid *Thunder Basin*, *Block* is distinguishable. The Government is correct that, in *Block*, a statute that authorized dairy

35

handlers and producers to seek review of certain "market orders" neglected to create a similar provision for dairy consumers, which led the Supreme Court to conclude that Congress intended "to limit the classes entitled to participate in the development of market orders." *See Block*, 467 U.S. at 346–47. But unlike the statute at issue in *Block*, the RIF requirements do not contemplate a "cooperative venture" in which Congress "intended for [a particular] class to be relied upon to challenge agency disregard of the law" and "ensure that the statutory objectives would be realized." *See id.* There is no reason to think Congress expected federal employees to police the Government's compliance with its duty to provide notice to affected states (despite any role the employees may have regarding notice they *themselves* are owed, *see* 5 U.S.C. § 3502(d)(1)(A); 5 C.F.R. § 351.801(a)), much less do so with the same vigor and precision as a state would, given the relative disunity of the two groups' interests.

Moreover, insofar as *Block* relied on the fact that handlers and producers were expressly permitted to participate while consumers were not, its holding was based on the friction that would result from allowing one group to raise "precisely the same" claims in federal court that another group "must raise administratively." *See Block*, 467 U.S. at 348. Here, the potential claims of any employees are fundamentally different than those brought by the States, and there is no such friction. And "while certain facts are common to the States' action and any administrative actions that might be brought by terminated employees, the States' interests remain substantially different from the employees', as evinced by the presence of harms that only states *qua* states can experience." (TRO Mem. at 31.)

Finally, even though the States are not mentioned in the CSRA, unlike the plaintiffs in *Block*, they *are* explicitly mentioned in the laws that supply the relevant standard of conduct for the Government (*i.e.*, RIF statutes and regulations). *See* 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R.

36

§ 351.803(b)(1). Accordingly, the States have interests in and protections under those laws. *See infra* Section IV.A.1.

In the end, the Government's claim-channeling arguments rely crucially on the idea that there is an identity of interests between the States and the fired employees. But that is not so. And while the Government has amply argued that the CSRA is an exclusive review scheme, it has shown this only in the specific context of claims brought by employees or their unions over employee or union matters. The Court thus reaffirms its jurisdiction over the States' claims.

## IV.    PRELIMINARY INJUNCTION ANALYSIS

Having determined that nothing changes the Court's prior conclusion that it has jurisdiction to hear this case, the Court turns to the factors necessary for issuance of a preliminary injunction.

The party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

The Court concludes that the States have established all four factors, and that a preliminary injunction is warranted.

### A.    Likelihood of Success on the Merits

The States continue to show they are very likely to succeed on the merits of their APA contrary-to-law claim. The Court incorporates by reference its prior analysis on this issue, (*see* TRO Mem. at 32–42), and provides additional analysis below.

#### 1.    Zone of Interests

As the Court stated in its TRO Memorandum,

37

> [u]nder the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For purposes of a contrary-to-law claim, the legal standards against which the federal government's conduct is assessed are supplied not by the APA itself, but by a separate statute—in this case, the RIF statute, 5 U.S.C. § 3502.

(TRO Mem. at 32–33.) It also explained that a plaintiff suing under a statutory right of action must show that its interests are "arguably within the zone of interests to be protected or regulated" by the statute. (*Id.* at 33 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (emphasis omitted).) The Court concluded that the Plaintiff States easily make this showing, as their "interests in this case strike at the very heart of the RIF provisions." (*Id.*)

The Government does not object to the Court's analysis of this issue now, and the Court sees no reason to revisit its prior conclusions. Accordingly, the Court continues to hold that the Plaintiff States are within the zone of interests of the RIF statute, for the reasons stated in the TRO Memorandum. (*See* TRO Mem. at 33–34.)

### 2.   Termination of Probationary Employees

In its Opposition to the Preliminary Injunction Motion, the Government argues for the first time that the three methods previously outlined by the Court are *not* the only ways to terminate probationary employees. The Court finds the Government's arguments on this score unavailing.

As the Court previously explained, there are three circumstances under which probationary employees may be terminated. A probationary employee may be individually terminated either "because his work performance or conduct during th[e probationary] period fails to demonstrate his fitness or his qualifications for continued employment," 5 C.F.R. § 315.804, or else "for reasons based in whole or in part on conditions arising before his appointment," *id.* § 315.805. Otherwise, a probationary employee may be terminated as part of a RIF. *See id.* § 315.202. The Court put

the question of alternative termination methods to the Government during the TRO Hearing, and the Government did not specifically identify any additional methods by which a probationary employee could be terminated. (*See* ECF No. 48 at 34–36 (arguing only that "[t]here may be additional provisions of Title 5 that allow for termination of employees").)

Now, the Government argues that these three methods are not exhaustive, explaining that "OPM's regulations, 5 C.F.R. §§ 315.803(a), 315.804, and 315.805, do not purport to be exclusive," and that "OPM regulations governing probationary employees do not limit agencies' authority to remove probationary employees for non-performance-based reasons." (ECF No. 101 at 20.) The Government is correct that these regulations do not expressly state that they are exclusive, but where the relevant regulations provide for three very specific ways of terminating probationary employees, it makes little sense to read in a separate, general, and unlimited method of termination, which would simply subsume and render superfluous the enumerated methods.

The Government separately points to 5 C.F.R. § 315.803(a) as providing "independent authority, separate from the RIF regulations, for agencies to terminate competitive service probationary employees if the agency decides that paying their salary is unwarranted given the agency's current priorities." (ECF No. 101 at 21.) But the Government misreads the regulation. That provision, titled "Agency action during probationary period (general)," provides that "[t]he agency shall utilize the probationary period as fully as possible to determine *the fitness* of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully *his or her qualifications* for continued employment." 5 C.F.R. § 315.803(a) (emphasis added). The very next section explains *how* an agency can terminate a probationary employee in such a circumstance (*i.e.*, when an employee "fails to demonstrate his fitness or his qualifications"). *See id.* § 315.804(a) ("[W]hen an agency decides to terminate an employee

39

serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate *his fitness or his qualifications* for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." (emphasis added)).

The Government also argues generally that "agencies have broad discretion to remove probationary employees" and that "the CSRA preserved agencies' broad authority to terminate probationary employees, and [the States] must identify some statutory constraint to prevail— which they have not done." (ECF No. 101 at 22.) While it is true that agencies have discretion to terminate employees, this discretion is available only in the context of the three authorized methods for terminating probationary employees, as previously discussed.[12]

---

[12] The Government cites *Yu v. Dep't of Army*, 28 F. App'x 968 (Fed. Cir. 2002), for the proposition that "the agency need not show unsatisfactory performance in order to discontinue employment during a probationary period; the only grounds for appeal are those set in 5 C.F.R. § 315.806(b)–(c) and § 1201.3(a)(8)." (ECF No. 101 at 21 (quoting *Yu*, 28 F. App'x at 971).) That case is inapposite. It is true that probationary employees' ability to appeal for-cause termination decisions is tightly constrained. Indeed, 5 C.F.R. § 315.806 provides that a probationary employee may appeal for-cause terminations (*i.e.*, terminations conducted pursuant to §§ 315.804 or 315.805) only when "he or she alleges [the termination was] based upon partisan political reasons or marital status," or, if the termination was conducted pursuant to § 315.805, if the appeal is on the basis "that his termination was not effected in accordance with the procedural requirements of that section." However, this case is not about whether an individual employee may appeal a termination; this case is about whether the Government conducted RIFs not in accordance with statutory and regulatory state-notice requirements.

The Government also takes issue with the Court's citation to *McGuffin v. Soc. Sec. Admin.*, 942 F.3d 1099 (Fed. Cir. 2019), for the proposition that an employer "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." (*See* ECF No. 101 at 23 n.4.) The Government explains that the case involves the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), a statute not at issue here, and that *McGuffin* is therefore irrelevant. (*Id.*) It is true that *McGuffin* discussed USERRA. However, the Government appears to ignore the immediately preceding citation in that case to 5 C.F.R. § 315.804 as well as the context of the case to which *McGuffin* refers in that discussion. The full quote is:

An employer may terminate an individual during his probationary period if the individual "fails to demonstrate his fitness or his qualifications for continued employment . . . ." 5 C.F.R. § 315.804(a). The employer, however, "must honestly be dissatisfied with the

40

The evidence in this case flatly belies the Government's assertion that it relied upon some additional, overarching discretion to fire probationary employees in this case. This is simply a post-hoc rationalization, and "*post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). Nearly every termination letter in the record reflects that the terminations purport to be for-cause terminations pursuant to the regulations cited above. Some letters explicitly reference those regulations. For instance, a Small Business Administration letter states that, "in accordance with Title 5 of the Code of Federal Regulations § 315.804, . . . your employment . . . is being terminated." (ECF No. 33-18 at 6; *see also* ECF No. 33-1 at 6 (Department of Transportation termination letter explicitly referencing 5 C.F.R. §§ 315.803 and 804); ECF No. 33-2 at 7–8 (Department of Health and Human Services termination letter explicitly referencing 5 C.F.R. §§ 315.803, 315.804, and 315.806); ECF No. 33-6 at 7 (same for Department of Labor); ECF No. 33-8 at 7–8 (same for Department of Education); ECF No. 33-9 at 7–8 (same for Department of the Treasury); ECF No. 33-10 at 6 (same for the IRS); ECF No. 33-11 at 8 (FEMA termination letter explicitly referencing 5 C.F.R. § 315.806); ECF No. 33-12 at 7–8 (Department of Education terminated letter explicitly referencing 5 C.F.R. §§ 315.804 and

---

probationer's conduct or performance after giving him a fair trial on the job." *Shaw v. United States*, 622 F.2d 520, 544 (Ct. Cl. 1980) (quotation omitted) (discussing 5 C.F.R. § 315.804(a)).

*McGuffin*, 942 F.3d at 1102. The Court in *Shaw*, the case cited in *McGuffin*, stated—in its discussion of 5 C.F.R. § 315.804—that "[s]ubstantively, the only limitation on an agency's power to dismiss a probationary employee is that the agency must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job," 622 F.2d at 544 (citation omitted)—the same proposition for which this Court originally cited *McGuffin*.

It appears that the Government is indirectly taking the position that an agency need not be honestly dissatisfied with a probationary employee to fire them for cause. The Court will not endorse this view, which would render meaningless the requirement that the termination be based on the employee's "fitness" or "qualifications." *See* 5 C.F.R. §§ 315.803(a), .804(a).

315.806).)   Others reference them more obliquely.   (*See, e.g.*, ECF No. 33-3 at 7 (USAID termination letter explaining that, "[i]f you believe this action resulted from discrimination based on marital status or partisan political reasons, or because of conditions arising before your appointment, you may appeal this action," a clear reference to 5 C.F.R. § 315.806); ECF No. 33-5 at 8 (similar for the Department of the Interior); ECF No. 33-7 at 8 (similar for GSA)).   The Government cannot now credibly argue that the Defendant Agencies were relying on some other authority to effectuate these terminations.

### 3.    The Defendant Agencies Conducted RIFs

Even if there were some additional method by which the Defendant Agencies could terminate probationary employees,[13] the Court continues to find that they conducted RIFs, and fully incorporates and adopts its prior analysis with respect to this finding.   (*See* TRO Mem. 34–41.)   In addition to the evidence previously cited by the Court, new information entered into the record since the TRO was issued confirms and strengthens the Court's conclusion that RIFs occurred.   The Court also concludes that RIFs occurred at three additional Defendant Agencies.

As the Court previously explained in its TRO Memorandum, the relevant regulations provide that "[e]ach agency shall follow this part when it releases a competing employee from his

---

[13] The Government also argues that 5 C.F.R. §§ 315.803(a) and 315.804(a) "[b]y their terms . . . do not apply to excepted service probationary employees" and apply only to competitive service probationary employees. (ECF No. 101 at 21 n.2.) However, confusingly, the record reflects that at least one termination letter relates to an excepted service position, but references 5 C.F.R. §§ 315.803 and 315.804. (*See* ECF No. 33-9 at 7; *id.* (also referencing 5 C.F.R. § 316.304, which provides that "[t]he agency may terminate a term employee at any time during the trial period" and that "[t]he employee is entitled to the procedures set forth in § 315.804 or § 315.805 of this chapter as appropriate").)

In any event, assuming that excepted service probationary employees can be terminated for essentially any reason, this does not change the Court's analysis. Regardless of any method by which a Defendant Agency *could* terminate a probationary employee, as the Court explained in detail in its TRO Memorandum and herein, the Defendant Agencies conducted RIFs. And the RIF regulations apply to excepted service employees. *See* 5 C.F.R. § 351.202 (providing that the RIF regulations apply to "each civilian employee in . . . [t]he executive branch of the Federal Government" and only exclude from their

42

or her competitive level by . . . separation . . . when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position d[ue]e to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days." 5 C.F.R. § 351.201(a)(2); *see also* U.S. Off. of Pers. Mgmt., *Workforce Reshaping Operations Handbook*, 25–26 (2017) (explaining that "[a] personnel action must be effected under RIF procedures when both the action to be taken and the reason for the action are covered by the RIF regulations"; including, under "actions to be taken," an employee's separation, among other actions; and including, under "reason for the action," a "lack of work," "shortage of funds," "insufficient personnel ceiling," and/or "reorganization," among other reasons). A reorganization "means the planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203. Under that definition, the evidence reflects that these terminations were essentially reorganizations (even if the Government does not label them as such), which means they trigger the RIF requirements.

On some occasions, the Defendant Agencies *themselves* referred to the actions as RIFs. For instance, a termination email from GSA directed a terminated employee to "direct [their] inquiries to rif@gsa.gov." (ECF No. 78-12 at 2.) And a declaration from an employee of the American Federation of Government Employees explains that he reviewed the termination letters of a USAID employee, including one the employee had received "on February 23, 2025, which . . . explained that the RIF was being taken [pursuant to] applicable to 'civil service RIF regulations.'"

---

ambit employees "[i]n a position in the Senior Executive Service" or "[w]hose appointment is required by Congress to be confirmed by, or made with the advice and consent of, the United States Senate, except a postmaster."). The Government does not argue otherwise.

(ECF No. 78-10 ¶ 17.)  That employee then received a termination letter the next day "indicating [that] she was being immediately terminated as a probationary employee." (*Id.* ¶ 18.)

Declarations filed by the Government only bolster the Court's prior conclusion that the terminations were not based upon any individualized review, as the declarations essentially state as much.  A declaration filed by the Chief Human Capital Officer of the Department of Homeland Security explains that "DHS terminated approximately 313 probationary employees between January 20, 2025 and March 14, 2025.  This number *excludes probationary employees who were terminated in individualized actions based on their performance or conduct*, and therefore excludes individuals who do not meet the definition of 'Affected Probationary Employees' in paragraph 10(c) of the [TRO] entered in this case on March 13, 2025." (ECF No. 52-1 at 14 (emphasis added).)  A declaration filed by the Assistant Secretary for Administration for the Department of Transportation explains that it terminated 788 probationary employees; that, of those, "775 are Affected Probationary Employees" as defined in the Court's TRO; and that, "[o]f the remaining 13 terminated employees, two were terminated based on individualized performance-based determinations, eight had their terminations rescinded before issuance of the TRO, two resigned, and one accepted the Deferred Resignation Program." (*Id.* at 18 & n.1.)  And a declaration filed by the Deputy to the Acting Chairman and Chief Operating Officer of the FDIC explains that "[t]he FDIC terminated approximately 156 probationary employees out of approximately 261 eligible probationary employees between February 18 and 19, 2025.  There were five probationary employees terminated as a part of the group that would have otherwise been terminated for individualized reasons based on performance/conduct." (*Id.* at 44.)

Further evidence supports the Court's prior conclusion that "[t]he sheer number of" terminated employees "belies any argument that these terminations were due to the employees'

44

individual unsatisfactory performance or conduct," (TRO Mem. at 35), and that these instead were RIFs. In particular, the Court notes detail—supplied by the Government—regarding the precise number of probationary employees fired from the Defendant Agencies. The record now reflects that over 24,000 employees were terminated from the Defendant Agencies covered by the TRO. (*See generally* ECF Nos. 52-1, 52-2 (declarations by Defendant Agencies reflecting the number of employees terminated at each agency); ECF No. 78-8 (chart provided by the States summarizing the number of employees fired by each).) This number does not include the employees terminated at three agencies—Department of Defense ("Defense"), the National Archives and Records Administration ("Archives"), and OPM—making the actual number of terminated probationary employees even higher. On that score, a declaration from a former Director of OPM provides that,

> [i]n my experience, and under the laws and regulations that apply to federal employment with which I am familiar, any agency that wished to release an individual, including a probationary individual from employment, would conduct an individualized assessment of performance. If the news reports are correct about the volume of the terminations, it is not possible for these agencies to have done proper assessments of all of these employees. Nor is it plausible that all these employees have performance issues.

(ECF No. 78-9 ¶ 13.)

The record reflects that the terminations were effected by means of form letters terminating employees *en masse*, despite good performance by those employees. (*See, e.g.*, ECF Nos. 33-1 to 33-19; ECF Nos. 79-13 to -15 (termination letters and accompanying declarations); *see also* ECF No. 78-5 ¶ 9 (declaration of the president of American Federation of State, County and Municipal Employees Local 3976 stating that they had "seen several [USDA] employees' termination notices from our bargaining unit, and they were all identical"); ECF No. 78-10 ¶ 14 (declaration of an employee of the American Federation of Government Employees explaining that, "[i]n forty-three instances, employees sent us copies of their performance evaluations with their termination

45

letters," that "the evaluations indicated satisfactory or above-average performance," and that "most of the evaluations indicated performance at the highest level possible"); ECF No. 33-2 at 3 (declaration of terminated HHS probationary employee explaining that "I know of many other probationary employees at HHS that received th[e] same termination letter"); ECF No. 33-4 at 3 (similar for employee of the Department of Housing and Urban Development); ECF No. 33-6 at 3 (similar for employee of the Department of Labor); ECF No. 33-7 at 3 (similar for employee of GSA); ECF No. 33-8 at 3 (similar for employee of the Department of Education); ECF No. 33-9 at 3 (similar for employee of the Department of the Treasury); ECF No. 33-11 at 3 (similar for employee of FEMA); ECF No. 33-12 at 3 (similar for employee of the Department of Energy); ECF No. 33-17 at 4 (similar for employee of EPA).)

In addition, OPM issued guidance on January 20, 2025, providing that agency heads should "identify all employees on probationary periods . . . and . . . send a report to OPM listing all such employees" as well as "promptly determine whether those employees should be retained by the agency." (*See* ECF No. 78-1 at 5 (quoting Memo from Charles Ezell, Acting Director of OPM, re Guidance on Probationary Periods, Administrative Leave and Details, at 1 (Jan. 20, 2025)).) On February 14, 2025, OPM issued a memorandum indicating that it had "asked that [agencies] separate probationary employees that [they] ha[d] not identified as mission-critical no later than end of the day Monday, 2/17," and that it had "attached a template letter." (ECF No. 78-4 at 2.) The memorandum goes on to state that "OPM believes 'qualifications for continued employment' in the current context means that only the highest-performing probationers in mission-critical areas should be retained." (*Id.* at 3.)

That reference to retaining probationers only in mission-critical areas suggests that this was aimed at a reduction in probationers across the board. And the Defendant Agencies listened.

Nearly every declaration filed by the Defendant Agencies states that each relevant agency received the OPM guidance memorandum of January 20, 2025—which, again, stated that "'agencies should identify all employees on probationary periods' and 'should promptly determine whether those employees should be retained at the agency,'" (*see, e.g.*, ECF No. 52-1 at 6)—and then swiftly terminated large numbers of probationary employees (in most cases, hundreds or even thousands). (*See generally id.* (declarations from EPA, Department of Energy, Department of Commerce, Department of Homeland Security, Department of Transportation, Department of Education, Department of Housing and Urban Development, Department of the Interior, Department of Labor, CFPB, Small Business Administration, FDIC, USAID, GSA, Department of the Treasury, Department of Veterans Affairs, and HHS).)   The only declaration that does not explicitly reference the OPM guidance memorandum is one from USDA, which states only that "approximately 5,714 probationary employees were terminated from USDA beginning February 13, 2025, and concluding on or around February 17, 2025." (*See id.* at 56.)

The Government's own briefing also indicates that these terminations were RIFs.  As noted above, an agency is directed to use the RIF procedures when terminating an employee for purposes of, among other things, a reorganization. *See* 5 C.F.R. § 351.201(a)(2); *Workforce Reshaping Operations Handbook*, *supra*, at 25–26.  And, as noted above, a reorganization in the context of a RIF "means the planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203.  The Government states in its briefing that the terminations were conducted due to a lack of work and/or funds, and that the agencies have been reorganizing their workforces. (*See* ECF No. 101 at 20–21 (arguing that "[n]othing in the OPM regulations says that agencies cannot conduct assessments of an employee's utility to the agency *in light of resource constraints and agency priorities*" and that assessing an employee's "fitness" or

47

"qualifications" "encompass[es] an analysis of whether the individual's abilities warrant continued employment *in light of current agency priorities*" (emphasis added)).) The Court agrees with the Government, to a point. Of course agencies may assess employees' utility in light of agency priorities and resource constraints. But, when they eliminate positions due to lack of work, funding, or a reorganization, as was the case here, they must use the RIF procedures.[14]

The Government seems to argue that, because it did not comply with the RIF requirements in terminating large numbers of probationary employees, the terminations were not RIFs at all. (*See, e.g.*, ECF No. 101 at 18–19 ("Plaintiffs have not shown that Defendants made the findings required for the RIF statute to apply. Defendants thus had no compliance obligations under the RIF statute.").) And it argues that "[e]ven if . . . defendants had terminated certain probationary employees without sufficient cause, that does not make the termination a RIF subject to notice requirements." (*Id.* at 23.) These arguments are in the same unconvincing vein—that because the Government did not call the terminations RIFs, and because it did not take even the most preliminary steps toward complying with the RIF requirements, the terminations were not RIFs. This has it backwards. The existence of a RIF turns not on whether the Government followed all the requisite procedures, but rather on whether the Government in fact terminated employees as part of a reorganization—regardless of what label the Government attaches to the actions. To reach the opposite conclusion—to say that the Government can choose to conduct RIFs without

---

[14] The Government also argues that agencies can terminate a probationary employee "if the agency decides that paying their salary is unwarranted given the agency's current priorities." (ECF No. 101 at 21.) In support of this proposition, the Government cites only to the dictionary definitions of "qualification" and "fitness," neither of which support its lone assertion that these terms, as used in the relevant regulations, do not involve an individualized assessment of the employee's individual fit for the job. (*See id.* at 21–22.)

Further, even assuming that the Government is correct that an agency can terminate an employee based on "fitness" or "qualifications" upon an assessment that it does not find it warranted to pay the employee their salary, where multiple agencies determine that hundreds or thousands of employees should no longer be paid their salaries, that is a RIF, pure and simple.

following RIF procedures so long as it does not call its actions RIFs—would be to utterly frustrate the manifest intent of Congress that the Government conduct mass layoffs in a planned and rational manner, including (as relevant here) by providing advance notice to the affected states.[15]   The Court does not find the relevant statutory text ambiguous, and even if it did, the Court would not adopt a construction that would have the effect of vitiating the statute altogether when, as here, the text does not compel such a result. *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012) ("The presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered."); *cf. King v. Burwell*, 576 U.S. 473, 498 (2015) ("Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them. If at all possible, we must interpret the Act in a way that is consistent with the former, and avoids the latter.").

The Government has not cited authority for the proposition that, because it did not call these terminations RIFs, they were not RIFs. But as the foregoing and the Court's prior TRO analysis make clear, these were indeed RIFs—even if the Government does not refer to them as such, and even if the Government did not carry them out properly. If it walks like a duck, swims like a duck, and quacks like a duck, the Government cannot instead make it a rooster by sheer *ipse dixit*.

### i.    *Defense, Archives, and OPM Conducted RIFs*

The Court previously found that the States had not carried their burden of showing a likelihood of success on the merits with respect to three Defendant Agencies—Defense, Archives,

---

[15] Similarly meritless is the Government's suggestion that Congress, in enacting 5 U.S.C. § 3502, meant merely to provide "a reduction in force process that agencies can pick up off the rack and follow if they want to go in that direction for executing a reduction in force." (ECF No. 119 at 34:13–34:15.) But Congress is not in the habit of writing "off the rack" suggestions that parties can choose to follow "if they want to go in that direction." Congress, of course, writes *laws* that bind both the people and their government.

49

and OPM. As the Court then explained, "[w]ith respect to these three named agencies only, the States have not provided any affidavits from, for example, former employees attesting to their terminations, or to the presence of widespread terminations of probationary employees." (TRO Mem. at 41 (citation omitted).) That conclusion was without prejudice to the States' presentation of additional evidence with respect to these agencies. (*Id.*)

The Court now finds that the States have carried their burden of showing RIFs occurred at those agencies.[16] The States have provided declarations from terminated employees from each of these agencies, similar to those provided for other Defendant Agencies previously, along with additional information that bolsters the States' contention.

An OPM probationary employee explains that they were terminated on February 13, 2025, despite past positive job performance. (ECF No. 78-13 at 3–4.) That employee had received a performance review less than one week prior, on February 7, 2025, stating that they were "performing at or above the Fully Successful level . . . (and had performed at or above Fully Successful for their entire time as an employee of OPM)." (*Id.* at 4, 6.) The employee further explains that their "supervisor and leadership . . . were never informed that we were being terminated; our supervisors only found out from me and my fellow terminated colleagues directly." (*Id.* at 3.) The termination letter contains boilerplate language similar to other termination letters in the record. (*See id.* at 6–7 (explaining that, "based on your performance . . . you have not demonstrated that your further employment . . . would be in the public interest").)

An Archives probationary employee provides a declaration that explains that they received a call from their supervisor and a union representative to relay that, "an hour prior, they had

---

[16] However, as discussed later in this Memorandum, although the Court concludes that it is likely that Archives conducted a RIF, the Court lacks adequate basis in the record to conclude that the Plaintiff States were entitled to notice of RIFs at Archives.

received a call instructing them to terminate all probationary employees at [the Office of the Federal Register]." (ECF No. 78-14 at 2.) The employee explains that they were told that their "job performance was excellent and that [Archives] was not terminating me based on my job performance." (*Id.* at 3–4.) The employee also explains that they received a notice of termination, which provided that the employee was terminated because, "[i]n accordance with the direction to agencies to reduce budgets, implement a hiring freeze, reorganize and reprioritize our work and prepare for a reduction in force, we have come to the conclusion that we cannot continue with the current staffing levels." (*Id.* at 3.)

A Defense probationary employee provides an affidavit in which they aver that they received a termination letter stating that "based on your performance . . . you have not demonstrated that your further employment . . . would be in the public interest." (ECF No. 78-15 at 7–8.) However, that employee's supervisor later wrote a letter of recommendation explaining that she offered her strongest recommendation of the employee, who was "only permitted to work . . . for a few weeks before the Defense Health Agency decided to dismiss her from Federal service citing her status as a probationary employee." (*Id.* at 10.) The recommendation letter also explains that, although the termination letter stated that the employee's employment would not be in the public interest, the supervisor's experience "was precisely counter to [those] findings." (*Id.*) Another recommendation letter provides that the employee's termination was not based on her supervisors' individualized assessment, which was positive. (*See id.* at 13.)

The record includes a document from the Defense Civilian Personnel Advisory Service instructing that, "[u]sing the attached Notification of Termination During Probationary Period template, all [Defense] Components must terminate the employment of all individuals who are currently serving a probationary or trial period in [that department], subject to the exceptions listed

51

below, beginning February 28, 2025." (ECF No. 78-10 at 12.) It goes on to state that, "[f]ollowing direction from OPM . . . federal agencies have been thoroughly reviewing their rosters to identify individuals serving a probationary or trial period in mission-critical positions essential for executing agency functions and fulfilling national priorities. This review aligns with the Administration's directive to streamline the federal workforce and ensure effective resource allocation." (*Id.*)

A third document from Defense reflects that the Office of the Under Secretary of Defense issued a memorandum providing that,

> [c]onsistent with Executive Order 13217, "Commencing the Reduction of the Federal Bureaucracy," February 19, 2025; Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," February 11, 2025; and the Secretary of Defense's clear direction to streamline operations and prioritize critical missions in order to re-direct scarce and limited resources towards enhancing the lethality and war fighting capacity of the Department of Defense, the Department is taking independent steps to reduce the size of the civilian workforce . . . . The first step in doing this will be terminating those probationary employees whose continued employment at the Department would not be in the public interest. These terminations will commence on Monday, March 3, 2025.

(ECF No. 78-16 at 2.)

Based on the foregoing, the Court concludes that it is likely that OPM, Archives, and Defense[17]—in addition to the Defendant Agencies discussed in the TRO Memorandum—each conducted RIFs.

### 4.    The States Were Not Provided Requisite Notice

If employees are terminated as part of a RIF, there are legal requirements the agencies must follow. *See generally* 5 U.S.C. § 3502; 5 C.F.R. Part 351. One such requirement is that, whenever a RIF involves at least fifty employees within a competitive area, the agency must provide notice

---

[17] As the accompanying Order makes clear, the Court's ruling applies to *civilian* Defense employees.

to "[t]he State or the entity designated by the State to carry out rapid response activities under [the WIOA]." *See* 5 C.F.R. § 351.803(b)(1). The Court concludes that the States were due notice from nearly every Defendant Agency, but that those agencies failed to provide it.

i. *Notice Requirements*

5 U.S.C. § 3502(d)(1)(B) provides, *inter alia*, that "an employee may not be released, due to a reduction in force, unless[,] . . . [in the event] the reduction in force would involve the separation of a significant number of employees, the requirements of paragraph (3) are met at least 60 days before any employee is so released." Paragraph (3) provides as follows:

> Notice under paragraph (1)(B)—
>  (A) shall be given to—
>    (i) the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the [WIOA]; and
>    (ii) the chief elected official of such unit or each of such units of local government as may be appropriate; and
>  (B) shall consist of written notification as to—
>    (i) the number of employees to be separated from service due to the reduction in force (broken down by geographic area or on such other basis as may be required under paragraph (4));
>    (ii) when those separations will occur; and
>    (iii) any other matter which might facilitate the delivery of rapid response assistance or other services under [the WIOA].

5 U.S.C. § 3502(d)(3). The relevant implementing regulations provide that:

> (b) When 50 or more employees in a competitive area receive separation notices under this part, the agency must provide written notification of the action, at the same time it issues specific notices of separation to employees, to:
>   (1) The State or the entity designated by the State to carry out rapid response activities under title I of the Workforce Investment Act of 1998;
>   (2) The chief elected official of local government(s) within which these separations will occur; and
>   (3) OPM.
> (c) The notice required by paragraph (b) of this section must include:
>   (1) The number of employees to be separated from the agency by reduction in force (broken down by geographic area or other basis specified by OPM);
>   (2) The effective date of the separations; and

53

(3) Any other information specified by OPM, including information needs identified from consultation between OPM and the Department of Labor to facilitate delivery of placement and related services.

5 C.F.R. § 351.803(b)–(c).

### ii.    The Competitive Area Threshold Is Met

With respect to the term "competitive area," the relevant regulation provides that

[a] competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location and, except as provided in paragraph (e) of this section, it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency. The minimum competitive area is a subdivision of the agency under separate administration within the local commuting area.

5 C.F.R. § 351.402(b).

This language is not a model of clarity. However, it makes clear that a "competitive area" can be drawn as large as "all . . . of an agency" or that it can be drawn more narrowly. *See* 5 C.F.R. § 351.402(b). And, as the text reveals, there is a lack of congruence between the geographical boundaries of states and the contours of the competitive areas that must be defined prior to any RIF. It is virtually inevitable, moreover, that even when a competitive area is drawn with the narrowest permissible geographic scope—*i.e.*, as "a subdivision of the agency under separate administration within the local commuting area," *id.*—it will still necessarily cross state lines in certain instances.

The term "local commuting area" is not defined for the purposes of this provision, but the term is used and defined elsewhere in the Code of Federal Regulations. In one instance, the term is defined as "the geographic area that usually constitutes one area for employment purposes[,] includ[ing] any population center (or two or more neighboring ones) and the surrounding localities in which people live and can reasonably be expected to travel back and forth daily to their usual employment." 10 C.F.R. § 709.2. Another provision defines the term as a "population center (or

54

two or more neighboring ones)" along with the "surrounding areas that can reasonably be considered part of this single area for transportation purposes," and, in certain cases, as homologous with defined metropolitan areas. 15 C.F.R. § 946.2.

Without determining precisely what the meaning of "local commuting area" is in the context of 5 C.F.R. § 351.402, it is almost certain that, for example, the District of Columbia and portions of Maryland and Virginia would constitute one such area. Or, to take another example, the Chicago local commuting area would likely include parts of Illinois as well as parts of Wisconsin and Indiana. But both of these examples raise a complication—the District of Columbia and Maryland, as well as Illinois and Wisconsin, are parties to this suit, but Virginia and Indiana are not.

Beyond the issue of "local commuting areas," the "competitive area" can be much larger. Indeed, OPM guidance suggests that "[o]rganization could be defined agency-wide; geographical location could be defined as nationwide." U.S. Off. of Pers. Mgmt., *Competitive Areas in Reduction in Force (RIF)* 1 (Mar. 2025), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-competitive-areas.pdf [https://perma.cc/5GLN-L3Y4].

Given the sheer number of terminated employees, it is implausible that fewer than fifty people were terminated through a RIF at each of the Defendant Agencies, save Archives (which the Court addresses in more detail below). Most Defendant Agencies terminated hundreds or thousands of employees. (*See generally* ECF Nos. 52-1, 52-2, 78-8 (declarations from Defendant Agencies other than OPM, Defense, and Archives); ECF No. 78-13 at 3 (declaration from OPM probationary employee explaining that "I was terminated along with eight other probation[y] colleagues . . . and nearly 100 employees across OPM"); ECF No. 78-15 (declaration from Defense employee explaining that they believe, "based on news reports and conversations with former

55

colleagues, that Defense has terminated dozens of probationary employees since March 3, 2025");

*Am. Fed'n of Gov't Emps.*, Civ. No. WHA-25-1780, ECF No. 141-1 ("Department [of Defense] records indicate that since February 13, 2025, the Department separated, or notified of termination, 364 probationary employees in light of recent OPM guidance.")[18].)

However, the States have not pointed to any evidence in the record—and the Court has found none—that this threshold was met at Archives. Thus, although the Court concludes that Archives likely conducted RIFs, the Court cannot conclude at this time that the States were entitled to notice with respect to Archives employees.

Although the Government seems to argue to the contrary, the Government cannot be permitted to skirt RIF notice requirements by simply not defining the competitive area as required and then claiming the preconditions for RIF notice have not been met. In any event, without the Government having defined the competitive areas more narrowly, the Government will not be heard to complain about the Court's default assumption that those areas are agency-wide.

### iii.    *The States Were Entitled to Notice*

The Court next turns to when a state is due notice. The Court concludes that a state's entitlement to notice turns on whether fifty or more employees in a competitive area are terminated, and whether any one employee either lives or works in that state. This conclusion encompasses two, interrelated, subsidiary determinations: first, that the notice threshold is met when fifty or more workers in a competitive area (not a state) are terminated; and second, that the "State" entitled to notice when this threshold has been met, *see* 5 U.S.C. § 3502(d), covers *both* (1) the state in which an affected worker lives and (2) the state in which an affected worker resides, to the extent

---

[18] The Court may take judicial notice of this document, which was filed in another federal case. *See, e.g.*, *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records." (cleaned up)).

that the states are not the same. To reach these conclusions, some work is required, as neither the statute nor the regulations are models of legislative draftsmanship.

a.    When Is the Threshold for Notice Met?

The statutory and regulatory framework establishes that the Government's obligation to provide notice turns *not* on whether fifty or more employees *in any state* are to be terminated, but rather whether there are fifty or more such employees *in a competitive area.* The statute simply says that when a RIF involves "the separation of a significant number of employees," notice must be given to "the State" or state agency designated to carry out rapid-response activities under the WIOA, 29 U.S.C. § 3174. 5 U.S.C. § 3502(d)(1)(B), (3)(A)(1). The implementing regulations do not define "significant number," in so many words, but they do provide that the notice threshold is met "[w]hen 50 or more employees in a competitive area receive separation notices" pursuant to a RIF. 5 C.F.R. § 351.803(b).

With respect to the "rapid response activities" referenced in 5 U.S.C. § 3502(d), separate regulations provide that a state must deliver rapid-response services whenever there is a "mass layoff" in that state, where "mass layoff" is defined as the lesser of either (1) the state's definition of the term or (2) fifty people. 20 C.F.R. §§ 682.302, .305. But the regulations are not clear as to whether a "mass layoff," for WIOA purposes, refers to the loss of fifty or more jobs of state residents (even if the residents work in another state) or fifty or more jobs located in the state (even if the workers reside in another state).

Notwithstanding the reference in 5 U.S.C. § 3502(d) to the WIOA, which relates to states' rapid-response obligations, the Court concludes that states are due notice regardless of whether there would be enough layoffs in the state to qualify as a "mass layoff" event. The statute requires there to be "a significant number of employees" separated *overall* as part of the RIF, but it does

57

not require that there *also* be a "significant number of employees" separated in each state entitled to notice. 5 U.S.C. § 3502(d). Similarly, the regulations provide that "[w]hen 50 or more employees in a competitive area receive separation notices . . . the agency must provide written notification of the action . . . to . . . [t]he State or the entity designated by the State to carry out rapid response activities under [the WIOA]." 5 C.F.R. § 351.803(a). Thus, as long as fifty or more people *in a competitive area* (as opposed to any given state) are terminated, notice must be provided. There is no requirement, in either the statute or the regulations, that notice be given only to a particular state if the layoffs qualify as a "mass layoff" in that state for purposes of the WIOA. And the Court will not read in an extra requirement that is absent from the statutory text. *See 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("[O]ur problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort.").

b.    Which States Are Entitled to Notice?

Neither the RIF statute nor the accompanying regulations expressly say *which* states are due notice when fifty or more people in a competitive area are terminated. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803. However, the Court concludes that the best reading is that *any* state in which an employee in the competitive area lives or works should be given notice. This is so because, under the WIOA, a state's rapid-response activities are tied (as relevant here) to the presence of a "mass layoff . . . or other disaster, that results in mass job dislocation." 29 U.S.C § 3102(51). The WIOA and its implementing regulations do not appear to draw a distinction between a state whose *workers* suffer a mass layoff and one whose *residents* suffer a mass layoff. Some required rapid-response activities appear to fall more appropriately on the state in which the worker *works*, *see*

58

20 C.F.R. § 682.300(b)(1) (requiring a state to provide workers with information on how to file for unemployment), whereas others more naturally apply to the state where the worker *lives*, *see id.* § 682.300(b)(3) (requiring states to, *inter alia*, facilitate assistance with home heating). Thus, the WIOA appears to contemplate that both the state in which an employee lives and the state in which an employee works—to the extent they are not one and the same—would be responsible for providing certain rapid-response activities in the event of a mass layoff.

There is therefore no principled basis for the Court to prefer a reading of "the State" in 5 U.S.C. § 3502(d) that is limited to the state of an employee's duty station, as opposed to the state of the employee's residence. Nor, for that matter, is there any principled reason for the Court to prefer the opposite reading. Thus, given that the self-evident purpose of the RIF statute's notice-to-state provision is to assist states in complying with their WIOA obligations, it makes sense to understand the reference to "the State" in 5 U.S.C. § 3502(d) as referring *both* to the state in which an employee's duty station is located *and* to the employee's state of residence.

What is the upshot of all this? The Court concludes that a state is entitled to notice of a RIF if fifty or more people in a competitive area are terminated and *any* employee within that competitive area resides or works in the state. To take an example, suppose an agency headquartered in Northern Virginia was planning to undertake a RIF, and it identified a competitive area comprising a total of fifty employees, with forty-eight residing in Virginia and one each residing in the District of Columbia and Maryland. Even though only one employee in each of the District of Columbia and Maryland would be affected, all three jurisdictions would be entitled to notice pursuant to 5 U.S.C. § 3502(d) and 5 C.F.R. § 351.803(b). To take another example, if an agency followed OPM's invitation to define a "nationwide" competitive area, then so long as fifty people in that competitive area throughout the country received termination notices,

59

by the terms of the statute, *every state* with at least one employee in that competitive area would be entitled to notice. In short, when an agency separates fifty or more employees in a "competitive area"—a term which can comprise multiple states, an entire agency, and, perhaps, the entire country—the agency must provide notice to any state in which any number of those employees works or lives.

        c.   How Do the Notice Requirements Apply to This Case?

   With that in mind, the Court concludes that the Plaintiff States were due notice. As the Court explained above, the Defendant Agencies conducted RIFs, and they involved at least fifty people in a competitive area. Thus, any States in which those employees lived or worked were due notice, which it is undisputed that no Plaintiff State received.

   There is evidence in the record with respect to nearly every Plaintiff State that suggests that terminated probationary employees lived or worked in those States. (*See generally* ECF Nos. 4-5, 4-38 (declarations from the Maryland Department of Labor and Comptroller discussing terminated probationary employees in the state); ECF Nos. 33-1, 33-2, 33-6, 33-8, 33-15, 78-14, 78-15, 78-20 (declarations from terminated probationary employees residing and/or working in Maryland); ECF Nos. 33-18, 33-19, 78-13 (declarations from terminated probationary employees living and working in Minnesota); ECF Nos. 33-1, 33-3, 33-4, 33-5, 33-6, 33-7, 33-8, 33-9, 33-10, 33-11, 33-12, 78-14, 78-19 (declarations from terminated probationary employees residing and/or working in Washington, D.C.); ECF No. 4-6 (declaration from the Arizona Department of Economic Security discussing terminated probationary employees in the state); ECF No. 4-7 (declaration from the California Employment Development Department discussing terminated probationary employees in the state); ECF Nos. 33-13, 33-14 (declarations from terminated probationary employees residing and/or working in California); ECF No. 4-39 (declaration from

the Colorado Division of Unemployment Insurance discussing terminated probationary employees in the state); ECF Nos. 33-15, 33-16 (declaration from terminated probationary employees residing and/or working in Delaware); ECF No. 4-8 (declaration from the Illinois Department of Employment Security discussing terminated probationary employees in the state); ECF No. 4-9 (declaration from the Massachusetts Executive Office of Labor and Workforce Development discussing terminated probationary employees in the state); ECF No. 33-17 (declaration from terminated probationary employee with a Massachusetts duty station but living in Rhode Island); ECF No. 78-17 (declaration from the Michigan Unemployment Insurance Agency discussing terminated probationary employees in the state); ECF No. 4-11 (declaration from the New Jersey Department of Labor and Workforce Development discussing terminated probationary employees in the state); ECF No. 78-18 (declaration from the New Mexico Department of Workforce Solutions discussing terminated probationary employees in the state); ECF No. 4-13 (declaration from the New York Department of Labor discussing terminated probationary employees in the state); ECF No. 4-14 (declaration from Oregon's Higher Education Coordinating Commission discussing terminated probationary employees in the state).)

The Court extends this conclusion to those States that have not provided specific evidence that they have a terminated employee working or living in the state: Connecticut, Hawai'i, Nevada, Vermont, and Wisconsin. For the purposes of a preliminary injunction, the Court finds it likely that each Plaintiff State was entitled to notice. The Government has not defined any competitive areas, but given the number of workers fired, it is all but certain that a "significant number of employees" were terminated in what *would* have been properly defined competitive areas, and that there was at least one employee in an area that would have constituted a competitive area in each Plaintiff State, thus triggering the notice requirement. Importantly, as explained above, the

regulations do not require a finding that more than fifty people in a given state have been terminated; rather, there must merely be a showing that at least one employee in a given state is part of a competitive area in which fifty or more people were terminated.

The Court recognizes that the proof on this topic is not complete, and that reaching a final determination on the merits is complicated by the complete failure of the Government to define any competitive areas, which makes it difficult to determine exactly which States would have been owed notice if the RIFs had been conducted properly. However, the Court's findings at the preliminary injunction stage are properly based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Lackey*, 145 S. Ct. at 667 (quoting *Camenisch*, 451 U.S. at 395); *see also G.G.*, 822 F.3d at 725 (indicating that the Court may consider both "well-pleaded allegations of [a plaintiff's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction" (quoting *Elrod*, 427 U.S. at 350 n.1)). The Court's preliminary findings of "likelihood of success" must not be equated with a final finding of actual success on the merits. *Lackey*, 145 S. Ct. at 667.

## B.    Irreparable Harm

As the Court previously concluded, the States likely have suffered and will imminently suffer irreparable harm. (TRO Mem. 43–44.) The Court incorporates that analysis by reference.

The Government cites to *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020) for the proposition that "[m]ere injuries, however insubstantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." (ECF No. 101 at 24 (second alteration in original).) The Government misquotes the case ("insubstantial" instead of "substantial"), and also leaves out important context. *Roe* quoted *Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017), which reads:

> "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.,* 17 F.3d 691, 693 (4th Cir. 1994).

872 F.3d at 230.

As the Court previously explained, although the harms are largely economic in nature—in the sense that the harms involve substantial costs associated with the Government's lack of notice, *see supra* Section III.A.1—they are nevertheless irreparable. The States are unlikely to be able to recover money damages at the time of judgment to remedy their harms. Money damages are likely unavailable. *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief '*other than money damages.*'" (emphasis added) (quoting 5 U.S.C. § 702)); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (explaining that the unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

And even if damages were available, they would be incredibly difficult to ascertain given the multifaceted and complex nature of the impacts of the Government's actions on the Plaintiff States. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) ("Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." (internal quotation marks and citation omitted)), *abrogated in part on other grounds*, *Winter*, 555 U.S. 7. These impacts include, among other things, the consequences of having to divert resources and personnel to accommodate the shifting unemployment-response landscape. (*See, e.g.*, ECF No. 4-5 ¶ 27 (declaration from the Maryland

Secretary of Labor that Maryland Department of Labor personnel "have been diverted from state-funded workforce development projects, including the Employment Advancement Right Now ('EARN') program, which is a . . . workforce development grant initiative serving over 5,000 constituents annually"); *id.* ¶ 26 (explaining that state matters that have been affected by the diversion of resources include "occupational and professional licensing oversight, financial regulation, [and] state workforce development programs," among others); *id.* ¶ 58 (explaining that diversions will also "impede the timely processing of regular [unemployment claims], creating significant backlogs and delays"); ECF No. 4-8 ¶ 24 (declaration from the Deputy Director, Service Delivery of the Illinois Department of Employment Security explaining that "the diversion of personnel to handle [federal employees' unemployment-compensation] claims will impede the timely processing of regular unemployment insurance claims, creating backlogs and delays").)

Further, as the Court explained above, the harm is also irreparable because the information to be provided by the Defendant Agencies is time sensitive and the harm itself is temporal and immediate. Here, the Government argues that the harm is not irreparable because the harms the States are suffering are not "fairly traceable" to the informational injury alleged. (ECF No. 101 at 24.) The Government also argues that the harms suffered by the States are "peripheral" and "incidental" to any informational injury. (*Id.*) Not so. This is simply a rehashing of the Government's argument that the States lack standing. As discussed above with respect to the States' standing to bring their claims, the harms suffered by the States are directly traceable to the Government's failure to provide notice. *See supra* Section III.A.2. The relevant statutes and regulations impose upon the States rapid-response responsibilities, which the RIF notice provision explicitly reference. The regulatory and statutory scheme assumes that the Government will

provide the States with advance warning of layoffs so that the States can prepare in time. The States' harms are hardly peripheral; indeed, they are the main problem Congress sought to avoid.

### C.    Balance of the Equities & the Public Interest

The Court previously concluded that the balance of the equities and the public interest weighed in favor of injunctive relief. (TRO Mem. at 44–46.) It incorporates that analysis by reference here, and continues to so find.

As the Court previously explained, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe*, 947 F.3d at 230–31 (internal quotation marks and citation omitted). But the public interest goes beyond that. These unnoticed terminations have placed a huge strain on the States and have disrupted State processes. *See supra* Section III.A.1. Although it has now abandoned this argument, at the TRO stage, the Government argued that the only way the States could be made whole was by reinstatement. (*See* ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by [the employees'] reinstatement." (emphasis omitted)); *id.* at 17 ("To prevent or stem the diversion of state assistance resources, the Court again would have to order reinstatement of the removed probationers into their former agency jobs.").) The Court agreed then, and it agrees now.

In weighing the equities and assessing where the public interest lies, the Court must also consider the harms imposed by any injunctive relief on the defendant, in the event the injunction is later determined to have been mistakenly granted. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283–84 (4th Cir. 2002). The Court recognizes the existence of weighty countervailing interests on the Government's side of the ledger. There is of course a strong public interest in a vigorous and capable Executive Branch that can pursue its policy objectives, especially as those objectives relate to Executive Branch employees. Given the "widest latitude in the dispatch of its

65

own internal affairs" that the Government has traditionally been accorded, *Sampson*, 415 U.S. at 83 (citation and internal quotation marks omitted), the Court does not take lightly the prospect of ordering relief in this space. But the public interest in the Executive Branch's ability to further its policies does not extend so far as to permit the Government to flout statutes enacted by Congress and regulations duly promulgated pursuant to statutory authority. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (citation and internal quotation marks omitted)). The Court also recognizes that the Government will inevitably incur significant costs by retaining on its payroll, at least temporarily, employees that it would have otherwise terminated. (*See generally* ECF Nos. 52-1, 52-2.) But, in the absence of injunctive relief, the Government's desired quick reduction in costs will inevitably correspond to a surge in costs borne by the Plaintiff States in responding to the unnoticed mass terminations.

After weighing these considerations, the Court continues to find that the public interest and the balance of equities favor immediate relief. If there were some narrower way to prevent the harm suffered by the States, the Court would take that path. But the Government cannot engage in far-reaching illegal activity and then complain that the remedy is too burdensome. A preliminary injunction is appropriate and, indeed, necessary.

## V.    SCOPE OF RELIEF

Having determined that the States are entitled to a preliminary injunction, the Court turns to the appropriate scope of relief. As the Court previously observed, "[t]his task 'is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" (TRO Mem. at 49 (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).) Upon a review of the parties' briefs and the record, and after

66

careful consideration of the issues, the Court concludes that a § 705 stay and preliminary injunction that is in some respects broader and in some narrower than the relief ordered at the TRO stage is warranted. The preliminary injunction will be broader both temporally (in that it will extend indefinitely until final judgment unless otherwise ordered) and in the scope of agencies affected. As the Court has explained, *see supra* Section IV.A.3.i, and unlike at the TRO stage, there is now record evidence showing that it is more likely than not that the Plaintiff States were entitled to notice of RIFs occurring at Defense and OPM, although not at Archives. Accordingly, Defense and OPM will be added to the list of agencies enjoined.

In a crucial respect, however, the relief ordered today will be narrower in scope. At the TRO stage, the Court determined that nationwide relief was necessary to prevent irreparable harm and preserve the status quo until there was time for a full preliminary injunction hearing. (TRO Mem. at 49–50.) With the benefit of more time to consider the issues, a more developed record, and additional ventilation of the salient issues by the parties, the Court concludes that narrower relief is possible and appropriate in this case.

### A.    Overview of Injunctive Relief

In APA cases, the Court's authority to order injunctive relief stems from two sources. One stems from the Court's equitable authority to grant preliminary injunctions. *See Salazar v. Buono*, 559 U.S. 700, 714 (2010). The second is APA § 705, which permits courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." (TRO Mem. at 51 (quoting *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020).)

As the Court previously stated, "[t]he purpose of a preliminary injunction is to preserve the status quo until there is a trial on the merits." (TRO Mem. at 47 (quoting *Camenisch*, 451 U.S. at 395).) The Court also previously explained the nature of injunctive relief in APA cases and its application to the facts of case in the TRO Memorandum. (*Id.* at 51–53.)[19]  In short, and as more fully explained in the TRO Memorandum, "[t]he ordinary remedy for unlawful agency actions is vacatur," and, "just as vacatur would likely be the appropriate remedy at the final judgment stage, . . . the proper provisional remedy under Rule 65 and § 705 is a stay of the Government's efforts to terminate probationary employees *en masse* and without notice to the States." (*Id.* at 51–52.)  The Court determined that "[o]nly an order staying the Government's likely unlawful RIF process can prevent the States from suffering irreparable injury in the form of the disruption and costs imposed by the mass terminations." (*Id.* at 53.)

## B.    Geographic Scope

The Court is aware of the heated debate surrounding nationwide (or "universal") injunctions in recent years. *See generally District Court Reform: Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1703–15 (2024).  As have others before it, the Court "wades into this controversy reluctantly, and with caution." *Alaska v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 873, 897 n.11 (D. Kan. 2024).  Nationwide injunctions have been characterized as "legally and historically dubious," *Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J., concurring), and as "plainly inconsistent with . . . the proper scope of the federal courts' remedial power," *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 257 (4th Cir. 2020), *vacated for reh'g en banc*, 981 F.3d 311 (4th Cir. 2020) (dismissed Mar. 11, 2021).  It is contended that nationwide injunctions are

---

[19] The Court fully ratifies and incorporates its prior discussion about the distinction between prohibitory and mandatory injunctions and about the application of § 705 to the facts of this case. (TRO Mem. at 46–48, 51–53.)

inconsistent with the foundational principle that the courts are entitled to adjudicate the rights and obligations of only the litigants before them. *See Texas*, 599 U.S. at 693–94 (Gorsuch, J., concurring). Others, however, defend nationwide injunctions, arguing that they have a longer historical pedigree in the courts of equity than is commonly acknowledged, and that they are sometimes necessary as the only way effectively to check unlawful governmental power. *See, e.g.*, *City of Chicago v. Barr*, 961 F.3d 882, 912–18 (7th Cir. 2020); *see generally* Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065 (2018).

Ultimately, it is not the function of this Court to determine which side has the better of the argument. Instead, the Court's responsibility is to follow the controlling precedent of the Supreme Court and the Fourth Circuit, and—when appropriate—to exercise its equitable jurisdiction within the contours defined by that binding law. In this Circuit, the law is clear: "A district court may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (cleaned up). Such relief may be appropriate when (1) the challenged policy is a "categorical" one and (2) "the facts would not require different relief for others similarly situated to the plaintiffs." *Id.*; *see also Roe*, 947 F.3d at 232 (affirming "the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants"). That said, however, the Court will not lose sight of the bedrock principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Determining the proper geographic scope of relief in this case is complicated by the statutory and regulatory regime at issue. As discussed earlier in this Memorandum, *see supra* Section IV.A.4.ii, the competitive areas that must be defined prior to any RIF do not map neatly

69

onto state boundaries. A competitive area might (and, in many cases, inevitably will) encompass multiple states or even the entire country, and federal workers often live in one state and work in another. The RIF framework was clearly not designed to follow state boundaries. Instead, it contemplates region-wide—and in some cases nationwide—planning and coordination through, among other things, the identification of competitive areas.

Here, the Government has wholly failed to define these competitive areas. And the Court cannot do the Government's job for it. Thus, the simplest way to ensure that the Plaintiff States are alleviated from the burden of ongoing RIFs, and that they receive adequate notice of any future RIFs, would simply be to stay the Government's likely unlawful RIFs throughout the country and require the Government to fully comply with the RIF procedures nationwide for any future RIFs. A nationwide approach would also advance the values of uniformity, consistency, and rationality in the federal workforce, as opposed to the inevitable fragmentation and confusion that will accompany state-specific relief.

But these considerations, while powerful, are ultimately not persuasive when balanced against the negatives of a nationwide injunction and given the reality that more narrowly tailored relief is feasible. Ultimately, the Court concludes that a § 705 stay and preliminary injunctive relief are warranted only with respect to employees who live or work in Plaintiff States.[20]

This subnational scope of relief appropriately protects the Plaintiff States from irreparable harm. In particular, it covers and protects the Plaintiff States in three scenarios. The first and simplest scenario involves a federal probationary employee who lives in a Plaintiff State and whose duty station is also in a Plaintiff State. The second scenario involves a probationary

---

[20] The injunction will apply to *all* Plaintiff States, as, for the purposes of the preliminary injunction stage, the Court finds it more likely than not that each Plaintiff State was entitled to notice. *See supra* Section IV.A.4.

employee who works in a Plaintiff State but lives in a non-Plaintiff State—for example, an employee whose duty station is in Maryland but who resides in Virginia. (*See, e.g.*, ECF No. 33-11 (declaration of probationary employee living in Virginia but working in Washington, D.C.).) The Plaintiff States are entitled to be protected against mass layoffs of this category of workers, because, as the States explain in their second supplemental brief, federal employees are generally required to file for unemployment claims in the state of their duty station. (ECF No. 116 at 2 (citing 5 U.S.C. § 8504).) Thus, any mass layoffs of workers in this category would burden the Plaintiff States at least by inflicting costs associated with processing and paying out unemployment claims. Finally, the third scenario involves a probationary employee who works in a non-Plaintiff State but who lives in a Plaintiff State—for example, a worker whose duty station is in Virginia but who resides in Maryland. (*See, e.g.*, ECF No. 33-13 (declaration of probationary employee living in California but whose "closest geographic headquarters" was in Texas).) The Government argues that relief should not be extended to cover this situation. (ECF No. 117 at 3.) The Court concludes, however, that the Plaintiff States are also entitled to protection against mass layoffs of this category of workers, as workers generally turn to their state of residence for a variety of social services when they are terminated. (*See, e.g.*, ECF No. 116 at 2 (citing Maryland state regulations).) And, as the Court has already explained, *see supra* Section IV.A.4.iii, a state's rapid-response obligations under the WIOA appear to be triggered whenever there is a mass layoff of individuals who work or reside in that state.

The Court is not persuaded that a nationwide injunction is warranted with respect to a fourth category—individuals who both live and work in a non-Plaintiff State. The Court has endeavored to make the injunction as minimally intrusive as possible while preventing irreparable harm to the States, keeping in mind once again "that the Government has traditionally been given

71

the widest latitude in the dispatch of its own internal affairs." *Sampson*, 415 U.S. at 83 (internal quotation marks and citation omitted).  The States raise a concern that "[i]f the Court only reinstates probationary employees in the Plaintiff States, employees in the Plaintiff States will face a greater likelihood of being subject to the upcoming RIFs than they would if all probationary employees were reinstated." (ECF No. 116 at 1.)  But the States do not actually explain how this concern would materialize.  Without a stronger showing of the need for nationwide relief, the Court concludes that the more appropriate course is relief tailored to the Plaintiff States.

A nationwide injunction would of course offer benefits in terms of consistency throughout the country.  But a "general interest of national uniformity" is not enough, as "nonuniformity is a deliberate feature of our federal court system." *Georgia v. President of the United States*, 46 F.4th 1283, 1307 (11th Cir. 2022).  Even assuming that a nationwide injunction is the only way to guarantee with absolute certainty that Plaintiffs States will not suffer any irreparable harm during the pendency of this action, the Court does not just mechanically award the full scope of relief requested when a party prevails under the *Winter* factors.  The Court exercises its "discretion and judgment," *Lackey*, 145 S. Ct. at 667 (citation omitted), recognizing always that a preliminary injunction is an "extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 24.  If even the most run-of-the-mill preliminary injunction is an extraordinary remedy, a nationwide injunction is surely even more so.  When faced with such a super-extraordinary request, the Court must "pay particular regard for the public consequences" of the relief it orders.  *Id.*

Here, broadening the scope of the injunction beyond the Plaintiff States offers diminishing return in terms of preventing harm to the Plaintiffs.  In other words, an injunction tailored only to the Plaintiff States will prevent the vast majority of the harm they could suffer, while admittedly leaving them exposed to some possibility of unredressed harm.  By contrast, a nationwide

injunction would provide only a small quantum of additional redress to Plaintiff States, but would bring with it all the downsides of nationwide injunctions that legal commentators and judges both within this Circuit and on the Supreme Court have so thoroughly catalogued.

The harms that flow to the Plaintiff States from the Government's actions, as catalogued above, arise from the obligations that each State owes to its residents and people employed in that State. Simply put, a state is not harmed—at least not in a cognizable way—by unnoticed mass layoffs of people who both live and work in *another* state.[21]  In other words, Maryland has not shown how it will suffer irreparable harm if the Government terminates probationary employees working and residing in Virginia without giving notice to Virginia.  Thus, in order to preserve the status quo and prevent irreparable harm to the Plaintiff States, it is enough for the Court (1) to stay the terminations of employees in those States and (2) to enjoin the Government from conducting *en masse* terminations of employees working and/or residing in those States, except in accordance with the lawful RIF procedures.

Moreover, the scope of the Court's relief is a function of which states chose to participate in this action.  The decision of a state as to whether to sue the federal government is a quintessentially political one—one that no court should lightly render irrelevant.  In this situation, when the Court must presume that the decision of the non-Plaintiff States not to participate was a conscious one, the Court declines to go further and "grant[] supposed 'relief' to absent persons

---

[21] Of course, a state might, as a matter of economic reality, be harmed by mass layoffs of residents of a neighboring state.  For example, if many Virginia residents lose their (Virginia-based) jobs, that may translate into fewer Virginians patronizing shops and restaurants in neighboring Washington, D.C., and Maryland, which in turn could eventually lead to reduced tax revenue for those jurisdictions.  But this kind of injury is almost certainly too attenuated and generalized to be cognizable. *See Florida v. Mellon*, 273 U.S. 12, 17–18 (1927).

who had asked for no such 'relief' and might not want it." *Georgia*, 46 F.4th at 1308 (Edmondson, J., concurring).[22]

The Court pauses to make one final note on the geographic scope of relief. It may be the case that, as a practical matter, the Government determines that the most efficient method of complying with the Court's order is to change its hiring and firing policies throughout the United States, rather than trying to disentangle its RIF procedures as they affect Plaintiff States from those as they affect employees living and working in the rest of the country. But that is a decision the Government can make, not one that the Court will force upon it.

### C.     Content of Injunction & Nature of Relief

The injunction that will issue today has two basic components. One is a stay, pursuant to APA § 705, of the likely unlawful mass terminations, without notice, of probationary employees who either live or work in the Plaintiff States.[23] The second component is a preliminary injunction barring Defendants from terminating *en masse* any federal probationary employees who live or work in a Plaintiff State, except pursuant to the RIF statute and regulations. This preliminary

---

[22] The Court previously stated that anything less than nationwide relief would be "inequitable" to probationary employees, as "an individual federal employee's job status would depend on the fortuity of their physical location." (TRO Mem. at 50.) And the Fourth Circuit has suggested that a district court may, in weighing the scope of injunctive relief, appropriately consider the unfairness of less-than-national relief to nonparties. *See HIAS*, 985 F.3d at 327 (stating that enjoining a challenged policy "only as to the plaintiff resettlement agencies would cause inequitable treatment of [nonparty] refugees"). The Court continues to give due regard to this consideration. However, in this case, any potential unfairness is outweighed by the considerations militating against a nationwide injunction.

[23] As the Court previously explained, the ordinary provisional remedy in APA cases is that the unlawful agency action is stayed in its entirety, not that the action is stayed only as to the plaintiffs. This approach can be seen most clearly in bread-and-butter APA cases in which an agency regulation is stayed in its entirety. *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016); *Cook County v. Wolf*, 498 F. Supp. 3d 999, 1006–07 (N.D. Ill. 2020). In this case, the agency action at issue is not a rule or even the likely unlawful scheme as a whole, but rather each individual instance of a federal worker being terminated pursuant to a likely unlawful RIF without notice to the Plaintiff States. Each such instance will be stayed. However, because any likely unlawful firings of probationary employees who both live and work in non-Plaintiff States do not cognizably harm the Plaintiffs, they are not the subject of this Court's ruling.

injunction is necessary to prevent irreparable harm and preserve the status quo ante—"not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." (TRO Mem. at 47 (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)).)[24] Together, this relief will relieve the Plaintiff States from bearing further irreparable harms associated with the sudden influx of unemployed workers as a result of unnoticed RIFs, as documented *supra* Section III.A.1.i. With the unlawfully terminated probationary employees returned to the Government's employ, the Plaintiff States will no longer be forced to bear the administrative and financial costs of playing catch-up on their rapid-response and other obligations. This relief does not prevent future RIFs but simply requires that any RIF be done in accordance with the law, so that the Plaintiff States can prepare accordingly.

Further, the Court is unpersuaded by the Government's argument that the Court cannot order reinstatement on the grounds that this remedy was not traditionally available in equity. (*See* ECF No. 101 at 26–27.) For one thing, the Court is not ordering that the Government return affected probationary employees to their actual job duties, nor is the Court ordering the Government to reappoint people whose terms of service have lapsed. Instead, the Court is simply staying the terminations as likely "void *ab initio*." *See Wilcox v. Trump*, ___ F. Supp. 3d ___, Civ. No. 25-334 (BAH), 2025 WL 720914, at *16 (D.D.C. Mar. 6, 2025), *stayed on other grounds sub nom. Harris v. Bessent*, Nos. 25-5037, 25-5055, 25-5057, 2025 U.S. App. LEXIS 7301 (D.C. Cir. Mar. 28, 2025). Such an order, of course, necessarily results in *de facto* reinstatement to the Government's fully paid employ (whether on active duty or on leave), but this practical reality

---

[24] The Court incorporates and ratifies the discussion regarding the nature of the status quo ante in the TRO Memorandum. (TRO Mem. at 46–48.)

does not place the order outside the remit of the Court's injunctive authority. *See id.* (citing *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023)). Moreover, even assuming that the stay would be considered reinstatement in both a *de facto* and a formal sense, such a remedy against the federal government *is* permissible and consonant with historical practice. *See id.*; *McNeill v. Butz*, 480 F.2d 314, 317 (4th Cir. 1973) (holding that a former USDA employee was entitled to reinstatement); *Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294, 312 (D.C. Cir. 1987) (holding that a federal employee was "entitled to reinstatement with full back pay"); *Harris v. Bessent*, Civ. No. 25-412 (RC), 2025 WL 679303, at *10 (D.D.C. Mar. 4, 2025), *stayed on other grounds*, Nos. 25-5037, 25-5055, 25-5057, 2025 U.S. App. LEXIS 7301 (D.C. Cir. Mar. 28, 2025). As the United States District Court for the District of Columbia recently explained in detail:

> Historically, requests for reinstatement were styled as writs of mandamus or *quo warranto* before courts of law instead of requests for injunctions before courts of equity, as defendants' cited cases reflect. *See In re Sawyer*, 124 U.S. 200, 212 (1888) (noting that while a court of equity does not have "jurisdiction over the appointment and removal of public officers, . . . the courts of law, . . . either by certiorari, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*" do); *White v. Berry*, 171 U.S. 366, 377 (1898) (same). After the merger of law and equity in the federal courts over eighty years ago, however, that distinction makes no difference and does not render improper the injunctive relief plaintiff requests.
>
> Unsurprisingly, many courts have, therefore, reinstated federal employees to their positions or prevented their removals from taking effect. *See, e.g., Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) ("[P]etitioner is entitled to the reinstatement which he seeks."); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that plaintiff was "entitled to reinstatement"); *Paroczay v. Hodges*, 219 F. Supp. 89, 94 (D.D.C. 1963) (holding that, because plaintiff "was never legally separated," the court "will therefore order plaintiff's reinstatement"); [*Berry v. Reagan*, Civ. No. 83-3182, 1983 WL 538, at *6 (D.D.C. 1983)] (enjoining removal of members of the U.S. Commission on Civil Rights); *cf. Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (acknowledging that "[u]se of the court's injunctive power" may be appropriate in certain cases regarding discharge of employees). The other cases cited by defendants for the principle that reinstatement is not available as equitable relief, involve the unique situation of federal courts presiding over questions about state officers' entitlement to their positions, which is wholly inapplicable here. *See Baker v. Carr*, 369 U.S. 186, 231 (1962) (citing cases about "enjoin[ing]

76

> a state proceeding to remove a public officer"); *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 489–90 (1924) (holding that the district court did not have "jurisdiction over the appointment and removal of state officers"); *Harkrader v. Wadley*, 172 U.S. 148, 165–70 (1898) (declining to enjoin a state criminal proceeding).

*Wilcox*, 2025 WL 720914, at *16 n.22 (citations to the record omitted).[25]

*Sampson v. Murray*, 415 U.S. 61 (1974), on which the Government relies, is not to the contrary. There, a probationary employee working for GSA was terminated, purportedly because of poor on-the-job performance. *Id.* at 64. However, she contended that the real reason for her firing had to do with actions arising *before* her appointment, and that she did not receive the procedural protections to which a probationer terminated for that reason is entitled under 5 C.F.R. § 315.806(c). *Id.* at 64–65. She filed an administrative appeal, and while that appeal was pending, she also filed an action directly in federal district court. *Id.* at 66. The district court granted a preliminary injunction staying her termination, and the D.C. Circuit affirmed. *Id.* at 67. The Supreme Court reversed, but for reasons that are wholly inapposite to this case. The main problem in *Sampson*, as the Supreme Court saw it, was that the district court granted preliminary relief

---

[25] The *Wilcox* decision's statement that the question of whether reinstatement was traditionally awarded by courts of law or courts of equity "makes no difference" is perhaps questionable given the rule that injunctive relief under Federal Rule of Civil Procedure 65 is limited to relief that "was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrolo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). But, even assuming that *Wilcox* is indeed wrong on this point, and even assuming further that the stay of the terminations is equivalent to reinstatement both *de facto* and as a matter of law, the Court's authority to order reinstatement would still be unaffected. That is so because the Court's injunctive authority in this context stems not only from Rule 65 and the general grant of equitable jurisdiction to the district courts, *see id.* at 318, but also from 5 U.S.C. § 705. And the Court sees no reason to conclude that § 705 is limited to relief traditionally available at equity. After all, § 705 does not by its terms even reference the concept of equity or equitable relief, but instead authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The statute's lack of any reference to equitable relief distinguishes § 705 from other statutory remedy provisions expressly authorizing "equitable relief," which the Supreme Court has generally read to be limited to "those categories of relief that were *typically* available in equity." *Liu v. SEC*, 591 U.S. 71, 78–79 (2020) (interpreting 15 U.S.C. § 78u(d)(5) and quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (interpreting section 502(a)(3) of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3))).

77

without ever finding that the plaintiff was *actually* likely to suffer irreparable harm, apparently on the erroneous belief that the *possibility* of irreparable harm was enough. *Id.* at 88–89. The Supreme Court's view of the record led it to conclude that the plaintiff fell "far short of" the necessary irreparable harm showing, given that she could obtain backpay if she ultimately prevailed. *Id.* at 90–92.

In reaching this conclusion, the Supreme Court embarked on a lengthy disquisition about the authority of federal courts to enjoin the terminations of federal workers. *Sampson*, 415 U.S. at 68–84.[26] In that discussion, the Court noted earlier authority providing that courts of equity could not enjoin the wrongful termination of a federal employee, but then went on to observe that "[m]uch water has flowed over the dam" since then. *Id.* at 71. More recent cases, the Court observed, reveal that federal courts "do have authority to review the claim of a discharged governmental employee that the agency effectuating the discharge has not followed administrative regulations." *Id.* (citing *Service v. Dulles*, 354 U.S. 363 (1957)). Ultimately, the Court declined to "hold that Congress has wholly foreclosed the granting of preliminary injunctive relief in such cases," but instead insisted that such relief must be premised on a sufficiently strong showing of irreparable injury. *Id.* at 83–84. The most favorable reading of *Sampson* for the Government, then, is not that such relief is unavailable, but simply that such relief be limited to "extraordinary situation[s]" rather than "routine case[s]." *Harris*, 2025 WL 679303, at *10 (quoting *Sampson*,

---

[26] There were other problems in *Sampson* that further distinguish that case from this one. In *Sampson*, the plaintiff sought judicial review while the administrative appeal was pending. The Supreme Court expressed great reluctance to allow the judiciary to engage in "obviously disruptive" interference with the administrative process by allowing the federal court litigation to proceed, when it was entirely possible that that administrative process would grant the plaintiff all the relief to which she was entitled. 415 U.S. at 83. The case has thus also been read to stand for the proposition that employees must exhaust administrative remedies before seeking injunctive relief. *Gaballah v. Johnson*, 629 F.2d 1191, 1199 (7th Cir. 1980). Here, there is no pending administrative review that the States are attempting to short-circuit—and, as the Court has explained, there is no administrative review process the States *could* seek. (*See* TRO Mem. at 28–30.)

415 U.S. at 92 n.68).[27]  The case certainly does not stand for the proposition that reinstatement is categorically unavailable as a remedy.  *Id.*; *see also Marsden v. U.S. Postal Serv.*, 390 F. Supp. 329, 336–37 (D. Minn. 1974).

Finally, the Court turns to the remedies that the Government suggests *would* be appropriate in the event that the Court determines the States are entitled to relief.  These alternative remedies are nonsensical.  One suggestion appears to be that the States' injuries be remedied simply by giving them the notice to which they were originally entitled.  (*See* ECF No. 101 at 14–15.)  But the states are not entitled to "notice" in the abstract, untethered to other requirements.  Instead, they are entitled to *sixty days* of notice (or thirty days if an exception is validly invoked), which gives them time to prepare for the onslaught of terminated workers.  And that notice can be provided only *after* the Government has already determined the competitive areas, which has not happened here.  As the Court has already explained in its standing analysis, *see supra* Section III.A, simply giving the Plaintiff States notice now is not even closing the stable door after the horse has bolted.  Instead, it is warning the stable hand that the door should be closed after the horse is long gone.

The second suggestion is even further afield.  The Government contends that the States could "seek some sort of declaratory judgment about their obligations under the Workforce Investment Act."  (ECF No. 117-1 at 38; *see also* ECF No. 117 at 2 ("[A]ny remedy for the States should not go beyond a declaration with respect to States' federal-law rapid-response

---

[27] It is doubtful whether, after *Winter*, the heightened "extraordinary situation" requirement for preliminary injunctions in this context still applies. *See Roe v. Shanahan*, 359 F. Supp. 3d 382, 419 (E.D. Va. 2019), *aff'd sub nom. Roe v. Dep't of Defense*, 947 F.3d 207 (4th Cir. 2020). But assuming *arguendo* that the States must make such a showing, they have done so here. The Government apparently engaged in mass terminations without even attempting to follow a detailed statutory and regulatory scheme, and it blithely cast the burden of these actions on wholly unprepared states. This is an extraordinary and—so far as the Court is aware—unprecedented state of affairs.

obligations.").)  In essence, the Government proposes that the Court issue a declaratory judgment relieving Plaintiff States of their obligations to follow federal law.  But even if the Court issued such a judgment at the conclusion of this case, that would do nothing to redress the harms that the States are suffering right now and will likely suffer in the immediate future, as detailed *supra* Section III.A.1.  In any event, there is an even more fundamental problem with the Government's suggestion.  It is a matter of grave doubt if this would even be a permissible invocation of the Court's declaratory judgment authority.  The Declaratory Judgment Act permits a court, in appropriate circumstances, to "declare the rights and other legal relations of any interested party seeking such declaration," not to *waive* such rights and obligations.  28 U.S.C. § 2201(a).  Even in the unlikely event that the Court *could* issue such a declaratory judgment, it would not do so.  The Court is tasked with applying the law as Congress wrote it, not in rewriting the law wholesale when convenient for the Government.  The Court is aware of no authority for the startling proposition that a court may remedy a defendant's violation of a federal law by authorizing a plaintiff to violate a totally separate federal law.  In the law, two wrongs do not make a right.

## VI.    SECURITY/BOND REQUIREMENT

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  As the Court previously explained, "district courts have discretion to set the required security at a nominal amount, and this approach has long been followed in public-interest litigation cases." (TRO Mem. at 54 (cleaned up) (collecting cases).)  The Court adopted that approach at the TRO stage, setting a bond of $100 per Plaintiff State while explaining that (1) "the potential cost of an improvidently granted TRO on the federal government is too complex to calculate in this expedited

proceeding" and (2) "even if a dollar amount could be put on the Government's actions, it would be prohibitive to require [P]laintiffs to bear up front the total cost of the alleged governmental wrongdoing." (*Id.* at 55.) As the Fourth Circuit has explained,

> [i]n fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order. The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party: "[T]he judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained."

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (citing Wright & Miller § 2954 (2d ed. 1995)).

The Government cites to this passage, and protests that the bond imposed at the TRO stage "bears no relation to the costs imposed on Defendants as a result of the TRO." (ECF No. 101 at 30.) The Court acknowledges that the Government may not be able to recoup the costs it will incur in the event that the preliminary injunction is later determined to have been improvidently granted. But the Government has not provided the Court with any quantitative estimate as to the costs imposed on it by any injunction, and the Court is no position to make such a calculation on its own. Moreover, the Government does not even acknowledge—let alone attempt to distinguish— the very next sentence of *Hoechst Diafoil*, in which the Fourth Circuit stated that "[w]here the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. *In some circumstances, a nominal bond may suffice*." 174 F.3d at 421 n.3 (emphasis added). Indeed, "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement," so long as it "expressly address[es] the issue of security before allowing any waiver" and does not "disregard

81

the bond requirement altogether." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (citation omitted). Other circuit courts have reached the same conclusion. *See, e.g.*, *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (collecting cases). And, as the Court already explained, a nominal bond is common in public-interest litigation cases, as requiring plaintiffs to "bear up front the total cost of the alleged governmental wrongdoing" will often be effectively to foreclose judicial review altogether. (TRO Mem. at 54–55.)

The Court sees no basis for departing from its earlier conclusion that a nominal bond is appropriate. For these reasons, and for the reasons stated in the TRO Memorandum, (*see id.* at 54–55), the Court will continue to require the Plaintiff States to provide security in the amount of $100 each.

## VII.    CONCLUSION

For the reasons stated herein, the Motion for Section 705 Stay and Preliminary Injunction, (ECF No. 78), will be granted in part, and a Preliminary Injunction will issue. Now overtaken by a Preliminary Injunction, the previously entered TRO (which in any event would have expired at 8:00 p.m. tonight) will be vacated.

Dated this _____/_____ day of April, 2025 at _7:20  P.M.  EDT_

BY THE COURT:

_James K. Bredar_
James K. Bredar
United States District Judge